**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____

DR. FARID HAFEZ                                              )
21 Thistle Path                                                )     **CIVIL ACTION NO.**
Williamstown, MA 01267                                )     **1:24-cv-00873**
                                                                     )
Individually and On Behalf of All Others          )
Similarly Situated,                                            )
                                                                     )
                                   Plaintiff,                   )     CLASS ACTION COMPLAINT
                                                                     )
                                                                     )
                                                                     )
                          vs.                                     )     <u>**JURY TRIAL DEMANDED**</u>
                                                                     )
DR. LORENZO VIDINO                                    )
1110 23rd Street, N.W., Apt. 604                     )
Washington, D.C. 20037                                 )
                                                                     )
Individually and in his respective corporate    )
capacities,                                                      )
                                                                     )
THE GEORGE WASHINGTON UNIVERSITY     )
1918 F Street, N.W.                                          )
Washington, D.C. 20052                                 )
                                                                     )
THE PROGRAM ON EXTREMISM AT THE       )
GEORGE WASHINGTON UNIVERSITY            )
2000 Pennsylvania Avenue, N.W., #2210          )
Washington, D.C. 20052                                 )
                                                                     )
ALP SERVICES, S.A.                                       )
Rue de Montchoisy 36                                    )
CH-1207 Geneva, Switzerland                         )
                                                                     )
DILIGENCE SARL                                          )
Rue de Montchoisy 36                                    )
CH-1207 Geneva, Switzerland                         )
                                                                     )
                                                                     )
_____     )
                                                                     )

_____     )
MARIO BRERO                                  )
Route de l'Allaman                           )
1173 Fechy, Switzerland                      )
                                             )
MURIEL CAVIN                                 )
Avenue du Mail 27                            )
Geneva, Switzerland                          )
                                             )
LIONEL BADAL                                 )
Rue Eugene Welter 60                         )
2723 Howald, Luxembourg                      )
                                             )
ARIAF STUDIES AND RESEARCH LLC               )
P.O. Box 3088                                )
Abu Dhabi, United Arab Emirates              )
                                             )
                                             )
and                                          )
                                             )
                                             )
JOHN DOE NOS. 1-25                           )
                                             )
                                             )
                     Defendants.             )
                                             )
                                             )
                                             )
                                             )
                                             )
                                             )
                                             )
                                             )
                                             )
                                             )
                                             )
                                             )
                                             )
                                             )
                                             )
                                             )
                                             )
                                             )
_____     )

Plaintiff, Dr. Farid Hafez (hereinafter referred to as either "Plaintiff" or "Dr. Hafez"), by his attorney, David M. Schwartz, Esq., alleges the following based upon information and belief, and the investigation conducted by Plaintiff's counsel, which included, among other things, a review of the Defendants' public documents, announcements made by Defendants, canvassing of government records, wire and press releases published by and on behalf of the Defendants, legal documentation from the Austrian government pertaining to Operation Luxor, and information readily obtainable on the Internet.

## PRELIMINARY STATEMENT

1.      Beginning in late 2017, the United Arab Emirates ("UAE") and some of its top officials managed, directed, and bankrolled a years-long "dark" public relations campaign through the Swiss private investigative firm, Alp Services S.A. ("Alp"), which was founded, owned, and run by Mario Brero ("Mr. Brero") and Muriel Cavin ("Ms. Cavin"). The UAE and its officials, along with Alp, Mr. Brero, Ms. Cavin, and their employees, operated as an association-in-fact enterprise that leveraged a network of co-conspirators – private operatives, paid "journalists," and a professor at The George Washington University in Washington, D.C., among many others – to smear dozens of innocent victims.

2.      For years, this enterprise made false and misleading statements to the press, on Wikipedia and elsewhere online, and to the world's top financial risk compliance monitors as part of an overarching scheme to "destroy" their targets' businesses and reputations by defrauding banks, their targets' business partners, government decision makers, and the public. More than 8,000 of the enterprise's internal documents, procured by anonymous hackers in April 2021 and shared with law enforcement, show the enterprise's objectives, its longevity, and its devastating consequences.

3.      Plaintiff and those similarly situated were victimized and effectively silenced by Defendants' illicit undisclosed unregistered foreign agent activities which included branding anyone whom the UAE perceived to be pro-Islamic as terrorists or extremists with ties to groups like the Muslim Brotherhood, with Plaintiff having no means to correct the public record because of Defendants' concealment of their actions being taken at the behest of a foreign regime and their continuing false representations, and Defendants' failure to disclosure that they were acting as unregistered foreign agents and not as they held themselves out to be as disinterested academics much to Plaintiffs' great detriment.

4.      On information and belief, Alp and Dr. Lorenzo Vidino ("Dr. Vidino"), with the assistance of the other co-defendants, targeted Dr. Hafez and others similarly situated because they saw him as a means of keeping their UAE gravy train rolling and veracity was simply beside the point.

5.      With this in mind, Alp concocted and widely publicized a false narrative accusing Dr. Hafez of terrorist ties and Muslim Brotherhood associations despite the fact that Dr. Hafez had no credible associations with any radicalized Islamists or the Muslim Brotherhood. None of that mattered to Alp.

6.      The internal documents procured by anonymous hackers show that one of Alp's preferred *modus operandi* was to unlawfully obtain phone records for its targets; use those records to map out the targets' supposed associates based on phone call data; dig for any dirt (regardless of how farfetched) on any of those associates (regardless of how far removed from the targets); and concoct a false narrative imputing to the targets the uncorroborated accusations Alp uncovered or fabricated about the targets' (in some cases, very distant) associates.

7.      That is exactly what the enterprise did to Dr. Hafez. It unlawfully obtained his phone records and used those phone records to map out purported network of associates; and used

rumors – including many that had been conclusively debunked – about some of those associates to manufacture a false narrative accusing Dr. Hafez of using his scholastic posts and related associations as fronts to support the Muslim Brotherhood, even though there was no evidence that Dr. Hafez ever had any ties to the Muslim Brotherhood.

8.     The UAE was quick to approve Alp's proposal to smear Plaintiff because the false narrative that Alp manufactured about Plaintiff's alleged connections to the Muslim Brotherhood and involvement with terrorist supporters fit with the UAE's broader geopolitical agenda of discrediting its regional rival, Qatar. For years, the UAE had been locked in a shadow conflict with Qatar – a key Muslim Brotherhood ally. By smearing Dr. Hafez in this way, the UAE could *not only* silence Plaintiff, *but also* sow suspicion about Qatar and the Muslim Brotherhood's activities in the United States and Europe.

9.     The UAE's unlawful enterprise was discreet, organized, and effective. The UAE and then Crown Prince of Abu Dhabi, Mohamed bin Zayed Al Nahyan ("M.B.Z."), oversaw the enterprise's larger campaign, providing strategic guidance and direction. M.B.Z. enlisted Matar Humaid al-Neyadi ("Matar"), another UAE government official, to oversee operations at a more granular level by serving as a direct liaison with Alp. Matar, under the cover of Ariaf Studies and Research LLC ("Ariaf"), contracted with Alp and Diligence SARL ("Diligence"), another firm that was founded, owned, and run by Mario Brero and Muriel Cavin, to propose targets and conduct "discreet" operations abroad to further the UAE's objectives, while keeping the UAE's role "invisible."

10.     Matar worked hand in glove with Mr. Brero and one of Alp's senior employees, Lionel Badal, to identify targets including Dr. Hafez, and dozens of others, to hire sources, journalists, and academics to write and publish false articles about those targets. The

enterprise would then cite those false and misleading articles which appeared legitimate but were actually fabricated by Mr. Brero, Ms. Cavin, Mr. Badal, and other Alp employees, and written by journalists and academics on Alp's payroll to defraud financial institutions, business partners, and counterparties, and induce them to break ties with the enterprise's targets, ruining the targets' businesses and reputations.

11.     The hacked documents lay out in detail each step of this plan. For example, a document written by Alp in February 2018, titled "Action Plan", explained Alp's proposal to the UAE. According to this document, which on information and belief, Alp shared with the UAE via email, Alp would:

- "***Launch massive negative articles*** on dozens of key [Muslim Brotherhood] … in French, Italian, and ***most importantly, English***."

- "***[I]nform selected journalists about our targets***, their leadership role within the MB in Europe and connections with Al Qaeda."

- "***[A]ctivate our network of trusted journalists and editors***, as we successfully did with *Le Temps* and soon in *Le Point*."

- "***[C]reate negative Wikipedia pages for our targets***, including the company and its key directors, in a negative tone, in English, French, and Italian. This would be the first source of information for anyone looking at the company (e.g., journalists, politicians, law enforcement and intelligence officials, compliance officers, etc.)."

- "***[A]lert compliance databases and watchdogs, which are used by banks*** and multinationals, about … links to terrorism."

- "***[D]iscreetly notify banks*** of MB … [associates] … links to terrorism and Political Exposed Persons (PEPs), ***the objective being to block their bank accounts and business***."

- "[U]se … social media to ***boost public interest in the articles*** and viral actions."

- And "***discreetly*** lobby decision-makers.

12.     Alp concluded: "Should you give us the green light, we believe that we could seriously damage, if not destroy, the reputation and viability of key MB European groups through our confidential offensive viral communication."

13.     In Dr. Hafez's case, the enterprise hired "scholar" Dr. Vidino to provide a veneer of respectability to Alp's false claims accusing Dr. Hafez of being a Muslim Brotherhood associate and providing these false claims the illusion of academic rigor.

14.     This collective enterprise's lies were outlandish but devastating. The impact upon the Plaintiffs' credibility and careers cannot be overstated. Plaintiff and those similarly situated bring this lawsuit asserting claims for violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961–1968, and the Foreign Agents Registration Act (FARA) (under 18. U.S.C § 618). They seek to vindicate their rights and recover damages for the devastating economic harm that the enterprise's confidential, offensive, and viral communication campaign caused to their businesses and reputations, along with the direct impact the smear campaign had on Plaintiff Farid Hafez's personal life and emotional, physical, and psychological well-being.

## PARTIES AND RELEVANT NON-PARTIES

15.     Plaintiff Farid Hafez is currently the Class of 1955 Distinguished Visiting Professor of International Studies at Williams College. Since 2017, he has also been a non-resident Researcher at Georgetown University's The Bridge Initiative. Previously, he was a Senior Researcher at the University of Salzburg from 2014 to 2021. He earned his PhD from the University of Vienna, Austria. In 2017, he was a Fulbright-Botstiber Visiting Professor of Austrian-American Studies at the University of California, Berkeley's Center for Race and Gender. In 2014, he was a Visiting Scholar at the Middle East Institute at Columbia University, New York. Since 2010, Dr. Hafez has been the founding editor of the Islamophobia Studies Yearbook, and since 2015, co-editor of

the annual European Islamophobia Report. He has received the Bruno Kreisky Award for the political book of the year, for his anthology Islamophobia in Austria (co-ed. with John Bunzl, 2009), and has published more than 150 books and academic articles including 40 in peer-reviewed journals. Dr. Hafez has taught courses on race and racism, far-right politics in Europe and the United States, politics and religion, Muslim minorities, political thought, theories of democracy, and human rights. His latest English publications include The Rise of Global Islamophobia in the War on Terror. Coloniality, Race, and Islam, (co-edited with Naved Bakali, Manchester University Press, 2022) and forthcoming in March 2024, Politicizing Islam in Austria. The Far-Right Impact in the Twenty-First Century (co-authored with Reinhard Heinisch, Rutgers University Press, 2024). His main areas of study include politics and religion, far-right parties and movements, race, and racism, and decolonial studies.

16.     Dr. Vidino was a director of or with the Defendant institutions at all relevant times. Dr. Vidino was a director or employee, or agent of the Defendant institutional entities listed herein at all relevant times.

17.     Because of his positions with the various Defendant institutional entities, which provided him with an aura of disinterested academic expertise, Dr. Vidino possessed the power and authority to control the contents of said institutional Defendants' reports, press releases, and presentations to government agencies, intelligence organizations, watchdog groups, influencers of public opinion, and international academic institutions. Institutional Defendants were provided with copies of the various reports and correspondences alleged herein to be misleading or entirely false prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them but not to the public, each of these Defendants knew or should

have known that the adverse facts specified herein had not been verified. Moreover, they knew or should have known that funding was being provided by regimes with an agenda and concealed this from the public, and that the representations which were being made were then materially false and misleading. Each Defendant in this action is liable for the false statements pleaded herein, as those statements were each "group-published" information and the result of the collective actions of all Defendants.

18.     Defendant Alp Services S.A. ("Alp") is a private investigative company founded, owned, and operated by Mario Brero and Muriel Cavin. Alp is incorporated under the laws of Switzerland, and its principal place of business is located at Rue de Montchoisy 36, CH–1207 Geneva, Switzerland. On information and belief, the majority of Alp's clients were private businesses, law firms, and ultra-high net worth individuals.

19.     Defendant Mario Brero ("Mr. Brero") resides and is domiciled in Geneva, Switzerland. He is a citizen of Italy. Mr. Brero is one of the founders, owners, and operators of Alp. Mr. Brero routinely communicated and interacted with Matar and other UAE officials in connection with the smear campaign targeting Dr. Hafez and dozens of other targets. Among other things, Mr. Brero regularly proposed targets to Matar and UAE officials, devised tactics and operations to achieve the enterprise's objectives of destroying the businesses and reputations of their targets (including Dr. Hafez), communicated with Matar regarding funding, and managed and directed Alp employees and the enterprise's co-conspirators in furtherance of the enterprise's objectives.

20.     On information and belief, defendant Muriel Cavin is a citizen of, resides in, and is domiciled in Switzerland. She co-founded Alp and Diligence with Mr. Brero and is a longstanding director of Alp. Ms. Cavin helped devise and manage disinformation operations in furtherance of

the enterprise's objectives of destroying the business and reputations of their targets (including Dr. Hafez).

21.     On information and belief, Defendant Lionel Badal is a citizen of and resides in Luxembourg. Mr. Badal is a former senior Alp employee, who, like Mr. Brero and Ms. Cavin, devised and managed disinformation operations in furtherance of the enterprise's objectives of destroying the reputations of their targets (including Dr. Hafez). Mr. Badal also routinely communicated with Matar. On information and belief, he is currently an investigator at the Luxembourg Financial Authority.[1]

22.     Defendant The George Washington University, ("GWU") is a private, 501(c)(3) non-profit university chartered in 1821. During the last half-century, the University's campus was developed in a section of the old First Ward known as Foggy Bottom. Its principal address is located at 1918 F Street, NW, Washington, DC 20052, 202-994-1000.23. Between 2019 and 2023, GWU has received an estimated $12,032,657 in funds from the United Arab Emirates pursuant to certain contracts.

23.     In 2015, GWU founded The Program on Extremism at The George Washington University and placed it at 2000 Pennsylvania Avenue, NW #2210 Washington, DC 20052. On its website, GWU describes the program's Mission as:

> "…a leading research center on all forms of extremism. The Program spearheads innovative and thoughtful academic inquiry, producing empirical work and developing pragmatic policy solutions that resonate with policymakers, civic leaders, and the general public. Its partnerships with some of the world's most prominent universities, think tanks, media outlets and governmental agencies are a testament of the Program's *research quality*, *independence,* and innovative approach…"[2]

---

[1] The Luxembourg Financial Authority is officially known as "La Commission de Surveillance de Secteur Financier."
[2] Mission statement from GWU's website https://www.extremism.gwu.edu/

24.     Defendant Ariaf is a limited liability company formed under the laws of the UAE with its principal place of business in Abu Dhabi. Ariaf was the signatory to the contracts between the UAE and Diligence governing Mr. Brero, Ms. Cavin, and Alp's disinformation operations. Ariaf was a front used by the UAE, M.B.Z., Matar, and other UAE officials to conceal the identities of Alp's true clients and insure they remained "invisible."

25.     Defendant Diligence is a private investigative company founded, owned, and operated by Mr. Brero and Ms. Cavin. Diligence is incorporated under the laws of Switzerland, and its principal place of business is located at Rue de Montchoisy 36, CH–1207 Geneva, Switzerland. Diligence was a party to the contracts with Ariaf that governed Mr. Brero, Ms. Cavin, and Alp's disinformation operations. Diligence entered into a non-disclosure agreement with Ariaf for work relating to the enterprise's smear campaign.

26.     Mr. Brero and Ms. Cavin used Alp and Diligence interchangeably as instrumentalities to plan and orchestrate disinformation operations in furtherance of the enterprise's smear campaign targeting Dr. Hafez, and dozens of other targets.

27.     Dr. Vidino ("Dr. Vidino"), an American, is a citizen of, resides in, and is domiciled in Washington, D.C. Dr. Vidino is the Director of the Program on Extremism at the George Washington University. Dr. Vidino was hired by Alp as a contractor to provide leads on new targets, research, and analysis on the Muslim Brotherhood. The enterprise relied on Dr. Vidino and his academic credentials to legitimize the false and misleading statements it had published to discredit and destroy its targets. Dr. Vidino consulted with Alp about Dr. Hafez.

## RELEVANT NON-PARTIES – SOVEREIGN BAD ACTORS

28.     The United Arab Emirates is a foreign state. The UAE maintains an Embassy in the District of Columbia. It is located at 3522 International Court N.W., Suite 100, Washington, D.C. 20008.

29.     Mohamed bin Zayed Al Nahyan ("M.B.Z.") is a citizen of the UAE and the current President of the UAE and ruler of Abu Dhabi. M.B.Z. was the Crown Prince of Abu Dhabi until May 14, 2022, when he was elected President by a decision of the members of the Federal Supreme Council of the UAE. M.B.Z. had ultimate approval authority over the enterprise's disinformation operations.

30.     Matar Humaid al-Neyadi ("Matar") is a citizen of the UAE. Matar was the UAE's main intermediary with Alp, Mr. Brero, and other co-conspirators outside the UAE. Matar met with Mr. Brero numerous times in Switzerland and the UAE, and he routinely approved Alp's proposed targets and viral communication operations. He kept his "boss", M.B.Z., informed about Alp's operations, and he ensured that Alp and its operations were adequately funded. Between 2017 and 2021, Matar directed and approved millions of dollars to Alp to fund its smear campaign.

31.     Defendants John Doe Nos. 1-25 are individuals and entities who conspired with the enterprise to publish false and misleading statements about Dr. Hafez. Plaintiffs are currently unaware of the identities of John Doe Nos. 1-25, and they intend to identify John Doe Nos. 1-25 through discovery in this action. Upon information and belief, John Doe Nos. 1-25 include other unidentified UAE officials, Alp employees, journalists, and academics.

## JURISDICTION AND VENUE

32.     The claims asserted herein arise under and pursuant to the Foreign Agents Registration Act (FARA), Under 18 U.S.C. § 618, as well as Racketeer Influenced and Corrupt Organizations Act of 1970 ("RICO"), Title 18 USC §§ 1961-1968, as well as mail and wire

fraud and money laundering.

33.     This Court has jurisdiction over the subject matter of this action pursuant to the Foreign Agents Registration Act (FARA) (Under 18 U.S.C. § 618) and 28 U.S.C. § 1331 and RICO, and/or diversity of jurisdiction.

34.     Venue is proper in this Judicial District pursuant to the Foreign Agents Registration Act (FARA), (Under 18 U.S.C. § 618), as well as Racketeer Influenced and Corrupt Organizations Act of 1970 ("RICO") (Title 18 USC §§ 1961-1968) and 28 U.S.C. § 1391(b). Many of the acts and transactions alleged herein, including the preparation and dissemination via mail and wire of materially false and misleading information, occurred in substantial part in this Judicial District. Many of the participants maintain offices in Washington D.C.

35.     In connection with the acts, conduct and other wrongs alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and wire services.

36.     As mentioned, Dr. Vidino is a citizen of the United States of America and resides in Washington, D.C., where he is also domiciled. Dr. Vidino is the Director of the Program on Extremism at The George Washington University. Dr. Vidino was hired by Alp as a contractor to provide leads on new targets and research and analysis on the Muslim Brotherhood. Dr. Vidino's usage of his academic credentials was a way to legitimize the false and misleading statements it had published to discredit and destroy its targets. Dr. Vidino consulted Alp about Dr. Hafez.

## NATURE OF ACTION AND OVERVIEW

37.     This is a federal class action on behalf of persons who have been damaged by or misled by Defendants GWU and its Program on Extremism, Dr. Vidino, and others collaborating

with the Defendants. Despite their tax exempt not-for profit status, which requires that all monies be spent in the furtherance of their academic mission and not for pecuniary gain or partisan purpose,[3] and despite the GWU Program on Extremism's Mission Statement, which would seem to assure academic integrity and independence, the Program was used as a platform for its Director, Dr. Vidino, to undertake working in the service of Alp, a Switzerland based private investigator, funded by the United Arab Emirates to discredit their rivals and their critics.

38.    This only became a matter of public knowledge after a number of periodicals started to report on it. On March 27, 2023, an online article from the magazine *The New Yorker* titled "The Dirty Secrets of a Smear Campaign" recounted the tribulations of an Egyptian-American living in Italy who had been the subject of smear campaigns and false charges for years, and who suddenly received information from cyber-hackers who exposed the dirty tricks of a Swiss-based private detective agency that had conducted intelligence operations for many foreign governments including the ruler of the United Arab Emirates. The article reads:

> The UAE had paid this private intelligence firm "millions of dollars to taint perceived enemies…". "Several Heads of State…had made use of…[its'] capacity to enhance or degrade reputations …[including]… drafting damning Wikipedia entries…." One of [it's] first moves after signing the U.A.E. as a client was to seek out ***Lorenzo Vidino, the director of the Program on Extremism at the George Washington University and a consultant for several European governments….*** Georgetown University's Bridge Initiative, which studies Islamophobia… described Vidino as someone who "promotes conspiracy theories about the Muslim Brotherhood" and "is connected to numerous anti-Muslim think tanks." In 2020, the Austrian Interior Ministry cited a report by Vidino as a basis for carrying out raids on dozens of citizens

---

[3] The exempt purposes set forth in section 501(c)(3) are charitable, religious, educational, scientific, literary, testing for public safety, fostering national or international amateur sports competition, and preventing cruelty to children or animals. The term charitable is used in its generally accepted legal sense and includes relief of the poor, the distressed, or the underprivileged; advancement of religion; advancement of education or science; erecting or maintaining public buildings, monuments, or works; lessening the burdens of government; lessening neighborhood tensions; eliminating prejudice and discrimination; defending human and civil rights secured by law; and combating community deterioration and juvenile delinquency. Creating Nixonian Enemies Lists for an undisclosed foreign regime does not fit neatly into this rubric.

or organizations suspected of having links to the Muslim Brotherhood. No one targeted in the raids has been arrested, much less convicted of any wrongdoing. An Austrian appellate court ruled the raids unlawful. ***Farid Hafez, an Austrian scholar of Islamophobia who was picked up in the raids and is now a professor at Williams College*** and a fellow at Georgetown University, said that Vidino portrays nearly all of the most prominent Muslim civil-society organizations as adjuncts of the Brotherhood.

"Vidino is like a fox," Hafez said. "He says, 'They have some kind of a relationship to people who are related to the Muslim Brotherhood,' so you cannot sue him for libel, because he does not actually say you are a member of the Muslim Brotherhood!" Alp records show that, on January 12, 2018, Brero treated Vidino to a thousand-dollar dinner at the Beau Rivage Hotel in Geneva… notes for the dinner suggest that he aimed to make Vidino a proposal: "Would he be available to work as a consultant, perhaps a short unnamed memo on the MB in Europe? (Confidential of course)." Two weeks after the dinner, Vidino signed an initial contract paying him three thousand euros for "interesting leads/rumours" about the Muslim Brotherhood, along with a "list of alleged members of the first-tier organizations in European countries."

Vidino acknowledged to me that he'd worked for Alp, adding that he often undertook research for private firms. "***It's the same research I do no matter what, so it does not really matter who the final client is,***" he said. "I am a one-trick pony. I have been researching the Muslim Brotherhood in Europe for almost twenty-five years." ***Given this experience, I said, he must have realized that only the U.A.E. had the means and the motive to pay a private investigator to dig up dirt on Brotherhood-style Islamists across Europe. [Vidino said] "They were the most realistic client," he said, though "it wasn't clear cut whether it was the Emiratis, the Saudis, the Israelis, or some private entity in the States."***

Vidino delivered to Alp a series of gossipy reports about the Brotherhood's reach, and they undergirded [it's] work for the Emiratis. Vidino even appears to have promised Alp information that he'd obtain while consulting for European security services about Islamist threats. ***German authorities had invited him to Berlin "to work exactly on our topic," he told an Alp operative in a WhatsApp message in February 2020, adding, "Obviously I think that my memo would be 'juicier' after that visit'."*** The next month, ***Vidino wrote that "many of the names on the list come indeed straight from various meetings with German intel."*** (Vidino told me that he did not remember meeting the Germans around that time but considered such official interactions "field work.") After ruining Lord Energy, Brero persuaded the Emiratis to pay him to go after many more people on Vidino's roster of suspected Islamists. By November 2019, Brero had proposed to the Emiratis more than fifty potential European targets. ***At one point, he asked Vidino for "interesting elements/rumours"*** on the other side of the Atlantic. "It may be an opportunity

to show that we could be useful in this jurisdiction too," Brero suggested. According to the partial records in the hacked files, *by April 2020, Brero had paid Vidino more than thirteen thousand euros.* And an internal Alp accounting indicates that between August 21, 2017, and June 30, 2020, the U.A.E. paid Brero at least 5.7 million euros. *Nada told me that, as he combed through the dossiers on various targets, he began to feel oddly "privileged." Whereas other Alp victims remained in the dark, he had seen the machinations behind his downfall. He recalled, "I was thinking of what I had lived through and multiplying it by all these other people, imagining what every single one of them had gone through. I began to feel a kind of responsibility." The biggest Alp campaign that Vidino inspired was against Islamic Relief Worldwide, a major international charity....* .... In a report to the Emiratis, Brero wrote that he had leaked the quotes "piece by piece" to... an investigative reporter with a history of inflammatory writing about extremism... But Brero explained to the Emiratis that Vidino had served as a cutout: "We channeled our findings to the academic expert Lorenzo Vidino and to the Times to be sure to remain completely confidential." ... Vidino did not disclose that he had received the information from Alp."

Two days later on March 29th, 2023, the Middle East Monitor, in an online article dubbed The dark, Islamophobic world of a UAE 'dirty smear campaign'. A "smear campaign" alleged to be orchestrated by the United Arab Emirates and executed through a Geneva-based private intelligence firm has apparently been peddling hateful misinformation associated with anti-Muslim conspiracy theorists ...The article exposes the desperate and often criminal lengths to which the UAE, an absolutist tribal Gulf monarchy, has gone to crackdown on political opponents....

With his first pay cheque from the UAE, the journalist recruited a so-called expert known for producing anti-Muslim research as much as he is venerated by far-right Islamophobes, Lorenzo Vidino. He is the director of the Programme on Extremism at George Washington University and a consultant for several European governments. Vidino is known for dressing up bigotry towards Muslims in academic language...Alongside Vidino, Brero also recruited a mainstream journalist in the London Times newspaper for his smear campaign on behalf of the UAE...Brero persuaded the UAE to go after many more people on Vidino's roster of suspected Islamists and, by November 2019, he is said to have proposed to the Emiratis more than fifty potential European targets.[4]

39.     Then in July 2023, *Der Spiegel* [5] released an article entitled "Abu Dhabi Secrets - How

---

[4] *The Dirty Secrets of a Smear Campaign*. The New Yorker. available at:
https://www.newyorker.com/magazine/2023/04/03/the-dirty-secrets-of-a-smear-campaign
[5] *Der Spiegel* (The Mirror) is a German weekly news magazine published in Hamburg. It is one the largest such publications in Europe. It was founded in 1947 by John Seymour Chaloner, a British army officer, and Rudolf

United Arab Emirates Seeks to Leverage Its Influence in Europe ... A data leak … revealed how Abu Dhabi has sought to discredit its rival with the help of a private intelligence company in Switzerland – an effort that extends into Germany."[6]

40.     In sum, the *Der Speigel* exposé outlined how a Swiss, private detective agency whose modus operandi was spying, character assassination and smear campaigns, was employed by politicians, oligarchs, countries and in this case, the United Arab Emirates ("UAE") to silence, sideline and destroy its rivals or detractors and ultimately employed Lorenzo Vidino to do some of its dirty work.[7]

41.     Their modus operandi as per *Der Spiegel*:

> "[F]ind easy target[s], dredge up all the muck they could find and then present it graphically to both the media and politicians. ... An Italian-American scholar named Lorenzo Vidino played an important role in the campaign…. ***Vidino is the director of the Program on Extremism at George Washington University in the U.S.*** He is a recognized expert on the Muslim Brotherhood… and… he says, acted as an adviser to eight Western governments. Since 2018, he has repeatedly performed work for Alp Services…Vidino…was able to establish contacts to reputable media outlets and he had access to a network through which Alp Services could receive secret service information – a network the company could also use to funnel information back into intelligence and government channels. Vidino also apparently had contact with state agencies in Germany. In February 2020, the scholar wrote a memo on behalf of Alp Services about members of the Muslim Brotherhood in Germany. At one point, he asked an Alp Services employee how quickly the memo had to be finished, because, he said, he would be in Berlin for a few days in mid-March as a "guest of the government." If he could send his report after that visit, he said, it would be "juicier." When contacted by DER SPIEGEL, Vidino said that the trip never actually took place. But he sent a memo anyway. In it, he noted that German security officials were boosting their resources for conducting surveillance on the Muslim Brotherhood. And he also delivered a list of "interesting individuals,"… In a chat, an Alp Services employee

Augstein, a former Wehrmacht radio operator who was recognized in 2000 by the International Press Institute as one of the fifty World Press Freedom Heroes. Der Spiegel is known in German-speaking countries mostly for its investigative journalism. It has played a key role in uncovering many political scandals such as the Spiegel affair in 1962 and the Flick affair in the 1980s. According to *The Economist*, *Der Spiegel* is one of continental Europe's most influential magazines.
[6] https://www.spiegel.de/international/world/abu-dhabi-secrets-how-qatar-seeks-to-leverage-its-influence-in-europe-a-d0058776-2806-464d-9e0b-1fd3b6a07282
[7] Ibid

asked whether Vidino had more information … [t]he scholar said he did not but mentioned that … like others on the list – came from "various meetings with German intel."[8]

42.     A Member of the European Parliament has requested further information regarding the "disinformation" activities of Alp, specifically mentioning concerns regarding the role of Dr. Vidino.[9] The High Representative/Vice-President, Josep Borrell Fontelles, answered on behalf of the European Commission that "the Foreign Information Manipulation and Interference (FIMI) remains a considerable threat to European societies, and the High Representative and the Commission services, in cooperation with the Member States, are advancing an EU toolbox to address and counter FIMI and impose costs on the perpetrators."[10]

43.     Until investigative reporting exposed this skullduggery, Plaintiff had no way of knowing that Defendant Vidino's unsubstantiated and unfounded attacks aimed at him were in fact funded by the UAE, either through Alp or through GWU's benefactors. The fact that Defendants GWU, Dr. Vidino and the Alp associates were acting on behalf of foreign governments without registering under FARA and, in the case of GWU, in contravention of its 501(c)3 purposes and its stated mission, allowed Dr. Vidino to deceive others in academia and government while silencing Plaintiff to please a foreign paymaster.

44.     This action is brought pursuant to the Racketeer Influenced and Corrupt Organizations Act (RICO) as well as common law fraud and related causes of action because Defendants GWU and Dr. Vidino engaged in a well cloaked conspiracy to defraud authorities, academia, and the fourth estate while holding themselves out as independent and objective academic actors, when in fact, Dr. Vidino was a hired gun selling and repackaging unverified rumor and

---

[8] Ibid.
[9] https://www.europarl.europa.eu/doceo/document/P-9-2023-002379_EN.html
[10] https://www.europarl.europa.eu/doceo/document/P-9-2023-002379-ASW_EN.html

gossip with the veneer of academic objectivity and scholarship, and with a mind toward ruining individuals and institutions that their undisclosed illegal paymasters disapproved. Dr. Vidino admitted the most likely funders for his work product were the UAE or other foreign powers and his willful ignorance is no defense to the allegations made herein of participating in a conspiracy including evasion of FARA compliance.

45.     Dr. Vidino's willful ignorance or intentional mental reservation and evasion as to funding for this character assassination project also does not inoculate him from charges relating to the extensive work he did for UAE interests without filing under FARA. Upon information and belief, Dr. Vidino has counted on UAE as a major source of foreign income totaling in the hundreds of thousands and UAE, of late, has soured on the Muslim Brotherhood.[11] While there may be a biblical admonishment against serving two masters, Dr. Vidino was clearly agnostic on this point as he clearly served many while failing to file for FARA for any. Had he done so, his reports would have lost much of their bite and ruinous results. "It's the same research I do no matter what, so it does not really matter who the final client is." Supra *The New Yorker*, March 27, 2023. His feint to not know specifically which foreign power was funneling funds through the private Swiss intelligence firm is also dubious.[12] A French newspaper, *Mediapart*, has written about the connections between Dr. Vidino and the UAE mentioning that Dr. Vidino appears as an expert on the website of the Emirati think tank, Trends Research.[13] According to an Austrian magazine, *Profil*, Dr.Vidino also sits on the Abu Dhabi-based think tank, Hedayah, which is mainly chaired by

---

[11] Turkey has turned its back on the Islamist group, eliminating one of its last safe havens. By Anchal Vohra, a columnist at Foreign Policy.https://foreignpolicy.com/2023/08/07/muslim-brotherhood-turkey-survival/

[12] Vidino thereby committed frauds that violate RICO's mail and wire fraud provisions and his failure to disclose sources RICO's Money Laundering provisions. The same hold for Georgetown University.

[13] https://www.mediapart.fr/en/journal/france/040323/leaked-data-shows-extent-uaes-meddling-france

representatives of the ruling family.[14]

46.     The complaint  alleges  that Defendants' Class Period representations  were materially false and misleading when made for the following reasons: Plaintiff alleges that from at least June 2020 through 2023 (the "Class Period"), Defendants made a series of fraudulent or continuing and knowingly false representations concerning Plaintiff as well as other similarly situated individuals and institutions that amounted to guilt by association dressed up in innuendo and shopped and filtered through various foreign intelligence or police agencies and authorities receptive to same, thereby giving the innuendo and allegations the veneer of authority, and to complete the façade, done from a storied academic perch with a vainglorious important title of Director of GWU's Program on Extremism. What better means to promulgate the equivalent of a blood libel or a McCarthyesque guilt by association witch hunt while being paid by undisclosed foreign powers for such unscrupulous machinations.

47.     Defendants, under the veil of scholarship, accused Plaintiff and at least 50 other persons and institutions of illicit or improper ties with the Muslim Brotherhood, effectively labeling all concerned with being extremists when in fact, Plaintiff is most renowned for his scholarship, speaking out against Islamophobia, and if anything, being a voice for inclusion and political moderation.

48.     Defendants may have a complete right to their own opinions about the Muslim Brotherhood and its motives, and even who they think might, by six degrees of separation, have some association with the Brotherhood, but they do not have an unfettered right to propagate reports paid for by foreign governments directly or indirectly without registering as foreign agents under FARA, so that all concerned can recognize the inherent lack of

---

[14]https://www.profil.at/oesterreich/operation-luxor-nehammers-debakel/402385727

objectivity of such reports. Neither do they have the right to use an American not-for-profit 501(c)3 educational organization of higher learning as a platform for spreading bile and the titles and credibility bestowed upon same to give credence to such reports paid for by foreign powers, and still hold themselves out as independent when they are acting as foreign agents - not as objective scholars – and while enriching themselves monetarily in the process.

49.     Plaintiff alleges the Defendants violated tax evasion  under Title 26  of the United States Code Section 7201, "Any person who willfully attempts in any manner to evade or defeat any tax imposed by this title or the payment thereof shall, in addition to other penalties provide by law be guilty of a felony and, upon conviction shall be fined…, or imprisoned. Here, by maintaining undisclosed foreign accounts and/or failing to report foreign payments to the Internal Revenue Service, and the Secret Service, as well as failing to file as a Foreign Agent under the Foreign Agents Registration Act (FARA), Defendants violated tax evasion. Here, in pertinent part, Defendants acted at the behest of either ( 1) a foreign principal, or (2) a person whose activities are "directly or indirectly supervised, directed, controlled, financed, or subsidized in whole or in major part by a foreign principal, and who directly or through any other person (i) engages within the United States in political activities for or in the interest of such foreign principal; (ii) acts within the United States as a public relations counsel, publicity agent, information-service employee or political consultant for or in the interests of such foreign principal; (iii) within the United States solicits, collects, disburses, or dispenses contribution, loans, money, or other things of value for in the interest of such foreign principal; or (iv) within the United States represents the interests of such foreign principal before any agency or official of the government of the United States." 22 U.S.C. §611.

50.     In the course of the foregoing illicit and criminal conduct, Defendants engaged in mail fraud, wire fraud and violations of the Federal Racketeer Influenced and Corrupt Organizations Act (RICO), tax evasion, and violations of the Espionage Act.

51.     Beyond the forgoing federal violations of law, Defendants have engaged in conduct harmful to the Plaintiff that ring in prima facie tort, negligent and intentional infliction of emotional distress, civil fraud, and civil conspiracy.

## DAMAGES

52.     As a result of the Defendants' wrongful actions and false information pursuant to this collective enterprise, the Plaintiff has suffered significant emotional and psychological damages. The Plaintiff's reputation has been severely damaged because he was wrongfully labeled as a terrorist sympathizer, an ally of the Muslim Brotherhood and because of all of the false information disseminated about the Plaintiff. The Plaintiff, a scholar and professor of Islamophobia, has dedicated his career to combating discrimination and promoting understanding. However, due to the Defendants' false information, the Plaintiff's reputation has been tarnished, leading to a loss of credibility within his professional community and society at large. The Plaintiff has also experienced severe psychological distress as a direct result of the Defendants' actions. The Plaintiff has undergone significant emotional trauma, including anxiety, depression, and feelings of social isolation. The Plaintiff's mental health has been adversely affected, leading to a decline in their overall well-being and ability to carry out their professional and personal responsibilities. The Plaintiff has been a victim of a smear campaign, orchestrated by Defendants, which has further exacerbated the damage caused to their reputation and psychological well-being. False statements by the Defendants' enterprise have been circulated, resulting in further social isolation and stigmatization of the Plaintiff within their community.  The Defendants' actions have also had

tangible financial consequences for the Plaintiff. The Plaintiff's bank accounts were frozen, leaving them unable to access their funds and pay their bills. This has caused significant financial hardship for the Plaintiff, leading to additional stress and anxiety.  Furthermore, the Plaintiff has suffered professional setbacks as a result of the Defendant's actions. Speaking engagements and job opportunities have been canceled or not renewed due to the false information propagated by the Defendants. The Plaintiff's professional growth and opportunities for advancement have been severely hindered, resulting in a loss of income and career prospects. In light of the aforementioned damages, the Plaintiff seeks compensation for the emotional, psychological, reputational, and financial harm they have endured as a direct result of the Defendants' wrongful actions. These damages and the related relief sought are further delineated below.

## STATEMENT OF FACTS

53.     A blockbuster article about Dr. Vidino and the propaganda he has spewed was published in March of 2023. This article and subsequent articles in American, German, and French papers uncovered the fact that he is a paid mouthpiece of the UAE and other foreign entities. Dr. Vidino, as part of his work for the UAE, has engaged in demonization campaigns against the political rivals of the UAE and any of their perceived enemies here in the United States. To add insult to injury, under the false aegis of scholarship, he assembled the enemies list and through an intermediary, fed it back up to the UAE. For his spurious work product, Dr. Vidino was rewarded monetarily, but also with his standing with UAE based think tanks, one being closely associated with the UAE royal family.

54.     Defendant Vidino has furthermore used his role as the Director of The Program on Extremism at the GWU in the furtherance of the UAE's agenda and that of other foreign powers. Dr. Vidino, as alleged herein, is in violation of FARA rules as well as several federal crimes and

other violations of law. GWU and The Program on Extremism, because of their complicity, are also responsible for these violations. At all times, including in his testimony to Austrian authorities and in his contract with Alp, Dr. Vidino has identified himself as the Director of The Program on Extremism at GWU.

55.     GWU has similarly sought to obscure the basis of The Program on Extremism by structuring it in such a way that has shielded it from proper oversight. Unlike a typical university department or center, The Program on Extremism does not report to any broader administrative unit. Instead, it is linked directly to the Office of the Vice President on Research. Accordingly, the Memorandum of Understanding filed to establish it is not available for examination by anyone outside the Office of the Vice President on Research, even though the UAE's political machinations are now known.[15]

56.     At the center of this case is Operation Luxor, which was conducted on December 9, 2020. Operation Luxor is the largest peacetime raid ever conducted by Austrian authorities and targeted the homes of 70 Austrian Muslims. Dr. Vidino was central to Operation Luxor: his 2017 GWU Program on Extremism report, "The Muslim Brothers in Austria"[16] served as the starting point for Operation Luxor and he was the first expert retained by the State Prosecutor for this case. Dr. Vidino subsequently provided testimony in January 2020, March 2022, and December 2022 to the Austrian intelligence services, *Landesamt für Verfassungsschutz und Terrorismusbekämpfung Steiermark* ("LVT Steiermark"). None other than the current Austrian Minister of Justice, Alma Zadić, confirmed the centrality of Dr. Vidino's 2017 report to the raid,[17] and from the original list

---

[15] https://gwhatchet.com/2019/10/16/former-program-on-extremism-employee-criticizes-director-for-attempted-censorship/
[16] See https://extremism.gwu.edu/sites/g/files/zaxdzs5746/files/MB%20in%20Austria-%20Print.pdf. This "Muslim Brotherhood in Austria" report was jointly funded by GWU, POE and Austrian intelligence.
[17] 13893/AB vom 27.04.2023 zu 14351/J (XXVII. GP), p. 2. This document is available at https://www.parlament.gv.at/dokument/XXVII/AB/13893/imfname_1554718.pdf

of 20 Austrian Muslims that Dr. Vidino delivered to Austrian authorities, ten later became victims of Operation Luxor. Dr. Vidino's report was mentioned 14 times in the search warrant for Operation Luxor.

57.     Dr. Hafez was one such victim, targeted simply because he was a proponent of cautioning Austrians, Europeans, and Americans of the threat to Muslims posed by Islamophobia. The UAE, despite being a Muslim-majority country, considers the Muslim Brotherhood its enemy and has a history of tagging its enemies and rivals as extremists. Dr. Hafez, who now resides in the USA and teaches at Williams College and is a fellow at Georgetown University's Bridges Initiative, was effectively blacklisted by Dr. Vidino's and GWU's activities which were taken under the influence of the UAE, simply for being a voice for moderation and religious tolerance and for challenging Dr. Vidino's false accusations against Western Muslims.

58.     It also appears that Dr. Hafez's inclusion in Dr. Vidino's 2017 report was retaliation for a 2016 book chapter, "The MJÖ as a Projection Surface for Conspiracies,"[18] in which Dr. Hafez criticized Dr. Vidino for inaccurately and conspiratorially associating the leading Austrian Muslim Youth Organization (MJÖ) with the Muslim Brotherhood as a means of "politically delegitimizing" the former.

59.     Dr. Vidino's accusation against Dr. Hafez had an immediate effect on Dr. Hafez's reputation and professional opportunities: only a month after the publication of "the Muslim Brotherhood in Austria" in August 2017,[19] the Austrian Ministry of Interior released a press release based on Dr. Vidino's report, which emphasized that scholars of Islamophobia Studies sought to radicalize

---

[18] Farid Hafez, "The MJÖ as a Projection Surface for Conspiracies," In: Hafez, Farid/Heinisch, Reinhard/Kneucker, Raoul/Polak, Regina (eds.): *Jung, muslimisch, österreichisch. Insights into 20 Years of Muslim Youth* (Austria, Vienna: New Academic Press & Alhamra, 2016), 302-329.

[19] Vidino received Euro 90,000 for his so-called report "The Muslim Brotherhood in Austria"? See Der Standard Die Umstrittenen Razzien Gegen Angebliche Muslimbrueder Werden Thema Im OEVP

Muslims.[20] That same month, Dr. Hafez had been slated to give a lecture at an educational institution about Islamophobia but was disinvited and told that the Austrian Integration Fund, which had been involved in funding Dr. Vidino's report, had, based on the report, falsely claimed that he was a member of the Muslim Brotherhood.

60.    In his testimony to the Styrian branch of the intelligence service (LVT Steiermark), Dr. Vidino further willfully associated Dr. Hafez with terrorism. The provisions of the Austrian penal code cited in the December 2022 interview – §§ 278b, 278a, 278d, 246 StGB – relate specifically to the commission and financing of terrorism and membership in terrorist organizations (see p. 1).[21] Dr. Vidino cannot claim ignorance of the contents of this document: page 11 specifically states that an interpreter was present (in German: "*Dolmetscher erforderlich: ja*") and Dr. Vidino then signed each page of this document to confirm that it represented his words.

61.    There is no doubt that others similarly situated have been adversely affected by this campaign to destroy anyone that may have a contrary agenda to the UAE.

62.    There is now ample evidence within the public domain to substantiate that the United Arab Emirates is working to influence the narrative on Islam in the West through GWU's Program on Extremism and Dr. Vidino. The Program on Extremism at GWU, and particularly Dr. Vidino, has been linked to the UAE Minister of Foreign Affairs and the UAE Ambassador to the United States, Yousef Al Otaiba.[22] In addition, foreign news sources indicate that Dr. Vidino is now part of Hedaya, an Emirati think tank closely associated with the UAE royal family.

---

[20] See https://www.ots.at/presseaussendung/OTS_20170914_OTS0161/internationaler-extremismus-forscher-muslimbruderschaft-auch-in-oesterreich-aktiv-und-stark-vernetzt

[21] The penal code is available at: https://www.jusline.at/gesetz/stgb/paragraf/278b. 278B pertains to leadership of or membership in a terrorist organization; 278A to the establishment or participation in an organization that seeks to "commit serious criminal acts that threaten life, physical integrity, liberty or property…"; 278D to the funding of air piracy, kidnapping or extortion, or an attack on civilians; and 246 to efforts to "unlawfully undermine the independence, constitutional form of government or a constitutional institution of the Republic of Austria."

[22] https://www.middleeastmonitor.com/20171109-exclusive-uae-works-to-defeat-voices-of-islamism-in-the-west-reveal-leaked-emails/

63.     The Defendants, including GWU and Dr. Vidino, have unclean hands. Dr. Vidino has been paid untold sums directly from the UAE and/or intermediaries as well as other foreign governments. That behavior, without proper reporting, is illegal.

## ALP, GWU, AND DR. VIDINO ORGANIZE AN UNLAWFUL ENTERPRISE

64.     In 2017, the UAE was approached by Alp, a private investigative firm in Switzerland. Alp touted its ability to "destroy" targets through what it termed "offensive viral communication[s]." Alp understood the power of online misinformation and the value of online reputations. It prided itself on secrecy, and for a price, it was willing to do anything necessary to dispatch its targets, including breaking the law.

65.     Early in his career, one of Alp's founders and directors, Mr. Brero, ran a business exporting computers and semiconductor manufacturing equipment from the United States to Europe. He was indicted by federal prosecutors for violating U.S. laws prohibiting the export of sensitive American technologies to Eastern bloc countries through a system of straw buyers he set up in Western Europe. Mr. Brero resolved the charges by signing a consent decree and exiting his computer export business.

66.     Subsequently, Mr. Brero decided to start a career as an investigator and he founded Alp, along with Ms. Cavin, in Geneva in 1989. In 2007, he and Ms. Cavin incorporated a second entity, Diligence, at the same address as Alp, for the sole purpose of confusing the clients of a competing investigative firm, also called Diligence, which was launching a branch in Geneva.[4]

67.     Alp and Mr. Brero's methods were as unscrupulous as they were effective. In 2012, he was sued in French court for invasion of privacy. In those proceedings, Mr. Brero acknowledged violating Swiss law by paying phone company employees for lists of

customers' call histories. The court convicted Mr. Brero of, among other things, disseminating information acquired by illegal means.

68.     Not only did Alp and Mr. Brero unlawfully *collect* private information about their targets, but they also *spread* disinformation about their targets, a technique they referred to as "offensive viral communication campaigns."

69.     Alp first pitched the UAE in May 2017. Mr. Brero sent a letter on May 12, 2017 to give the UAE "a brief introduction to [Alp] and [their] specific skills," which included "finding negative information/red flags on individuals" and conducting "confidential offensive viral communication campaigns, notably through [Alp's] in-house team of IT and social media experts." Mr. Brero boasted that Alp's "clients…include multinational companies, law firms, governments and government agencies," "Heads of States," and "notorious ultra-high-net-worth individuals."

70.     Mr. Brero assured the UAE that Alp's team, which comprised "a core of 20 analysts, investigators, and full-time consultants with extensive multi-disciplinary backgrounds," was "extremely sensitive to the necessity for any assignment to remain confidential." All of Alp's employees and undercover consultants had "signed tight and legally binding confidentiality agreements," and Alp's "discreet offices and IT systems [were] the subject of appropriate, and regularly tested, security countermeasures."

71.     Despite Mr. Brero's bluster about Alp's sophisticated expertise, in truth, Alp's playbook was simple. Alp would run straightforward background checks on its targets and impersonate those targets to unlawfully obtain confidential information such as phone and bank records. It would use those records to diagram the targets' supposed associates and connections in elaborate link charts. Subsequently, Alp would scour the internet looking for

any "negative" information on its targets' connections, heedless of whether the "negative" information was wildly farfetched and obviously untrue or had been proven false. Alp would then hire journalists, academics, and freelance writers to publish stories and blog posts inputting the negative information Alp had uncovered about the targets' connections to the targets themselves.

72.     Alp legitimized and further disseminated the false claims it concocted about its targets by creating fake Wikipedia "controversy" sections; citing its own "reporting" as truth and using search engine optimization tactics to ensure the stories it had planted remained top results on Google, Yahoo!, Bing, and other search engines. Finally, Alp would alert banks and bank compliance monitors to the false claims Alp manufactured to get banks to stop lending to Alp's targets, isolating them financially.

73.     On August 7, 2017, Alp prepared a more detailed proposal for the UAE. The document, which had the filename "Arnica 0-first proposal-not agreed-20170807," described a "Global Action Plan" for Alp to launch "widespread offensive actions" against Qatar and its networks, including the Muslim Brotherhood, to expose and counter Qatar's efforts to "direct [a] global media and political campaign against" the UAE. "Arnica" was one of the codenames Alp used to refer to its work for the UAE.

74.     Alp reiterated that it was "[i]ntransigent on security," and told the UAE that "given the sensitivity of the topic," Alp could not "put in writing the extent of [its] services." Instead, the proposal was meant to provide an overview of Alp's capabilities. Specifically, Alp proposed making "advanced cartographies of our targets' secret influence networks in Europe and the US," conducting "investigations to obtain damaging negative material on our key

targets," and engaging in "offensive viral communication to discredit and embarrass key targets" using "dark PR" and "fake news."

75.     With respect to the offensive viral communications, Alp explained that, once it identified key targets and obtained "negative intelligence about them," it would "launch highly aggressive online negative campaigns, relaying and spreading in a viral and strategic manner the previously identified negative intelligence, which could then appear in mainstream media." Alp claimed it would use "tested advanced confidential techniques in 'dark PR'" and "aim to discredit [its] targets by discreetly, and subtlety, diffusing embarrassing and compromising intelligence" to make their targets "appear as either perverts, corrupts, hypocrites and/or terrorists" in the "eyes of the media/public/officials." Alp wrote that it "could also use creative and particularly damaging actions, which [it] would describe verbally," and cautioned the UAE not to underestimate the "power of 'dark PR.'"

76.     On information and belief, Mr. Brero emailed Alp's proposal to the UAE officials before he travelled to Abu Dhabi to meet with them in person from August 7 to August 9, 2017.

77.     Nominally, Alp's client was an Emirati enterprise called Ariaf. Yet the hacked documents make clear that the UAE's top leadership was in charge. Mr. Brero's main point of contact was Matar, but Mr. Brero also met with Matar's superior, whom Mr. Brero and Matar referred to as "His Excellency" and "the boss." On information and belief, they were referring to M.B.Z.

78.     The UAE's unlawful enterprise had a clear chain of command. On information and belief, M.B.Z., Matar, and other UAE officials provided funding, strategic guidance, and final approval. Mr. Brero, Ms. Cavin, and their top deputy, Mr. Badal, devised the plan, identified

targets, and oversaw the execution of the campaign. Mr. Brero, Ms. Cavin, Mr. Badal, M.B.Z., and Matar were deeply involved in managing the enterprise's affairs. But to make the smear campaign effective, they conspired with journalists, academics, and others to legitimize their reputation-destroying lies. These co-conspirators included Swiss journalist Sylvain Besson[23] and Washington, D.C.-based Muslim Brotherhood "expert" Dr. Vidino.

79.     Dr. Vidino, the Director of the Program on Extremism at The George Washington University in Washington, D.C., and a supposed expert on Islamism in Europe and North America, including the Muslim Brotherhood, would prove to be a valuable co-conspirator who could lend credibility to their false claims. The enterprises intended to use Dr. Vidino as an American analogue to Mr. Besson, as a credible and highly credentialed intermediary who was willing to say whatever they wanted in exchange for money.

80.     On January 3, 2018, Mr. Badal asked Dr. Vidino for a meeting. Days later, on January 12, 2018, Mr. Brero treated Dr. Vidino to a $1,000 dinner at the Beau Rivage Hotel in Geneva. According to Mr. Brero's prepared talking points, he initially planned to disguise the identity of his Emirati clients, telling Dr. Vidino that Alp had been hired by a "London-based law firm." However, Dr. Vidino later acknowledged to *The New Yorker* that he knew the UAE was the "most realistic client."

81.     On January 24, 2018, Dr. Vidino signed a contract with Alp to provide "[i]nteresting leads/rumours…regarding the subject of investigation organisations/individuals/funding in Europe" and a "[l]ist of alleged members of the first-tier organisations in European countries." Alp agreed to pay Dr. Vidino € 3,000 for his work.

82.     In early 2018, with a € 300,000 budget, the enterprise vastly expanded its

---

[23] Besson is not named in this suit but included as background to show the Defendants' tactics.

disinformation campaign. An updated Alp strategy document from January underscored the campaign's secrecy and breadth. It mentioned communicating using "encrypted channels" and engaging in "confidential actions," and proposed "strik[ing]" targets using "viral com" and "social media."

83.     On February 15, 2018, Alp published a "detailed investigative analysis" that falsely described various targets as part of the Muslim Brotherhood's support base. On information and belief, Alp shared this document internally and sent it to the UAE and its officials via email.

84.     That month, Mr. Brero visited Abu Dhabi, and afterwards, on information and belief, he sent via email a "formal letter of appreciation" to "His Excellency." He wrote, "Your comments and advice were very helpful, especially on the next steps, and we will do everything possible to match your expectations." Mr. Brero also offered thanks to "our dear friend" (i.e., Matar) for his "much valued feedback."

85.     By spring 2018, the enterprise's "offensive viral communication" plan began to have its desired effects. In addition to fabricating negative pages on Wikipedia, a U.S.-based company, and manipulating results on U.S.-based search engines like Google, Yahoo!, and Bing, the proposal emphasized publication of negative information in "English-speaking media," specifically identifying "Daily Kos in the USA (which was once described as 'the second-best blog' by Time Magazine)" as one potential outlet for negative information.

86.     In the proposal, Alp told Matar: "should you give us the green light, ***we believe that we could seriously damage, if not destroy, the reputation and viability*** of key MB European groups through our confidential offensive viral communication." (Emphasis added.)

87.     An internal Alp document written on March 1, 2018, outlined a plan for Alp to have 45 articles published about the targets it had identified at that point, about four per week, and

Wikipedia pages. It specifically called for an "[a]rticle in English" on the San Francisco-based blogging website Medium. The action plan also mentioned "[i]nform[ing] media UK + USA."

88.    On April 30, 2018, Alp drafted a document with the file name "arnica 6-lorenzo-to do list-20180430," which included having Dr. Vidino prepare an "overview of key MB individuals/organisations/companies in the USA and interesting elements/rumours…to show our capacities by obtaining new, concrete, up-to-date information in the US."

89.    The report also identified seven "new case studies" for the enterprise to target in "the next phase" of its disinformation scheme. Alp noted that "[a]s always, all our actions were made strictly confidential, and we remained invisible."

90.    In an August 6, 2018 "Summary Report – Impact Assessment," Alp also explained to the UAE how it "used social media and SEO techniques ('Search Engine Optimization') to boost visibility for our actions," and as a result, several of the articles the enterprise fabricated were "visible" on the first three pages of "Google USA."[24]

91.    Matar was Alp's main point of contact. Mr. Brero and Mr. Badal frequently communicated with Matar via telephone, WhatsApp messages, and emails. Alp's primary method of communicating with Matar and other UAE officials was through secure, encrypted Protonmail email accounts. Alp used the account, 487563@protonmail.com and Matar used the account, 547321@protonmail.com. The parties rarely referred to each other by name, instead greeting one another as "My Friend" or "Dear Friend." These were obvious security measures meant to ensure that the enterprise's unlawful activities remained concealed, and the identities of the culpable

---

[24] Vidino's Alp report, "Mapping of the Muslim Brotherhood in Germany" explicitly mentions Dr. Hafez. In pertinent part it states "Dr. Farid Hafez is an Austrian political scientist teaching at the University of Salzburg. He is known to be a close MB operator from Austria. He has published several books on Islamophobia in Europe." It is wholly inaccurate to describe Dr. Hafez as a "a close MB operator," The "MB in Austria" report was also shared with Alp Services. Vidino, in a publication called *Foreign Policy*, again falsely referred to Dr. Hafez as belonging to a group of "known Islamist actors and supporters."

parties remained confidential. On November 9th, the day of the police raid against Dr. Hafez, "487563@protonmail.com" wrote to his contact in the UAE, "As you may have seen and as we wrote on August 24th, The Austrian authorities is currently conducting a massive anti-terror counterterrorism against the MB, 'operation ramses'".[25]

92.     Mr. Brero, Ms. Cavin, Mr. Badal, and other Alp employees also repeatedly met in person with Matar, M.B.Z., and other UAE officials. On July 4, 2018, Mr. Brero had a telephone call with Matar to provide status updates. Matar told Mr. Brero that Mr. Brero's team had done an "excellent job so far" and that "everyone is appreciate[ive] of what you've done so far." Matar also informed Mr. Brero that Matar "told His Excellency" about the "action plan." Matar mentioned that he was not sure if "they" would visit Mr. Brero or ask Mr. Brero to meet them in Abu Dhabi.

93.     On July 23, 2018, Matar had another telephone call with Mr. Brero and Mr. Badal, during which Matar informed them that he "did talk to His Excellency and … he's very pleased to meet you there next week."

94.     According to Alp's internal meeting minutes, on August 9 and 10, 2018, Mr. Brero and another Alp employee met in Zurich with Matar and another UAE official. During that meeting, Matar informed the Alp representatives that he was "very pleased with the results of [Alp's] work so far." Matar and the other official said that "in terms of Alp's proposal," they "did not have the opportunity to discuss it with the 'big boss'" – presumably M.B.Z. - but "they will do so and keep Alp informed." They told Mr. Brero and the other Alp employee to "continue with new cases", trying to achieve the same impact. In a list of action items, "Matar/Ali" were to "send Alp info on Obama's six advisors linked to MB (CNN report)." Matar and the other official also indicated they would provide Alp with a "safe (Katim) phone

---

[25] https://www.profil.at/investigativ/inside-the-united-arab-emirates-spy-campaign-in-europe/402598541

to communicate together."

95.     The enterprise's campaign to "continue to critically reshape the reputation of [its] initial targets" was successful. As a result of the enterprise's efforts, various financial institutions and business partners ended their existing relationships, some of which had begun decades earlier, and others refused to start new business dealings with the targets.

**CRIMINAL CONSPIRACY EXPOSED**

96.     In April 2021, the veil of secrecy cloaking this criminal enterprise was partly exposed. Hazim Nada of Lord Energy, another victim of this conspiracy, received a message from an encrypted French phone number that he did not recognize. The sender wrote that he represented a group of hackers who had infiltrated Alp's servers. He sent Mr. Nada a copy of the message that Mr. Nada had sent to Alp's "contact us" email address as proof that the hackers were legitimate.

97.     The hackers also allowed Mr. Nada to review the internal Alp documents they had obtained, but they prevented him from downloading or saving any of the files. Mr. Nada was shocked at what he read. The documents included emails from the enterprise and its co-conspirators directing operatives to publish articles linking Mr. Nada and his company, Lord Energy, to terrorism. With these documents, Mr. Nada was finally able to appreciate the enormity of the conspiracy against him. In a way, he was right that a competitor was responsible for the smear campaign against him. But that competitor was not a rival commodity trading firm as he suspected. It was the UAE, its top officials, and its state-owned oil company.

98.     The hackers offered to sell the Alp files to Mr. Nada for $30 million in cryptocurrency. Mr. Nada responded that he was unable and unwilling to pay $30 million for the hacked files.

99.     Mr. Nada reported the hackers' communications to Swiss authorities, and a Swiss intelligence officer met with Mr. Nada and took photos of the hackers' encrypted messages. Mr.

Nada heard nothing from the Swiss authorities for months after that. Eventually, however, the authorities obtained copies of the hacked documents that they shared with Mr. Nada.

100.    The scope and scale of the enterprise's overarching conspiracy was brazened and daunting. The hacked documents revealed that Mr. Nada was far from the enterprise's only target. According to the documents, between 2017 and April 2021, the enterprise targeted more than 50 individuals and entities, using the same "viral communication" and "discreet lobbying" tactics they employed against Dr. Hafez.

101.    The enterprise continued to operate for years after it bankrupted Mr. Nada's Lord Energy in 2019. Indeed, it may still be operating today. On January 18, 2020, Alp prepared, and on information and belief, sent to the UAE, a new "strictly confidential" action plan for 2020-2025. Alp wrote, "Thank you for renewing your trust with us. We are ready to start the new five-year Action Plan," which would follow the enterprise's tried and true strategy combining "media attacks" with actions to "influence decision makers," including "politicians, compliance databases, 70 banks" and "the public." Alp proposed a budget of € 2.4 million for the first year of the new five-year plan.

102.    _In March 2023, this intrigue was finally disclosed in the European media_ followed by the U.S media, thereby making this litigation by Dr. Hafez possible by decloaking the underlying scheme.

## **SUBSTANTIVE ALLEGATIONS**

### **ADDITIONAL BACKGROUND**

103.    This is an action for Racketeer Influenced and Corrupt Organizations Act of 1970 ("RICO") (Title 18 USC §§ 1961) Re: Multiple RICO Primary Secondary, Derivative, and Conspiracy Liability Re: _Pinkerton v. United States_, 328 U.S. 640 (1964); RICO Conspiracy

to Aid and Abet; and, RICO Aiding and Abetting RICO Conspiracy Re: For Primary Contravention of RICO § 1962 (Title 18 U.S.C. §1962); for RICO Aiding and Abetting Primary Contravention of RICO §1962) (Title 18 U.S.C. § 1962); for RICO Respondent Superior/Derivative Liability Arising from Primary Contravention of RICO §1962) (Title 18 U.S.C. § 1962)); for RICO § 1962(d) Conspiracy Arising from Primary RICO§1962) Contravention (Title 18 U.S.C. §§1962(c)-(d)); for RICO §1962(d) Conspiracy Arising from Aiding and Abetting RICO §1962) Primary Contravention (Title 18 U.S.C. §§1962(c)-(d)); for RICO §1962) Aiding and Abetting RICO §1962(d) Conspiracy to Contravene RICO § 1962) (Title 18 U.S.C. §§1962 (c)-(d)); for Primary Contravention RICO §1962(b) (Title 18 U.S.C. §1962(b)); for RICO Aiding and Abetting Primary Contravention of RICO §1962(b) (Title 18 U.S.C. §1962(b)); for RICO Aiding and Abetting Primary Contravention of RICO §1962(b) (Title 18 U.S.C. §1962(b)); for RICO Respondeat Superior/Derivative Liability Arising from Primary Contravention of RICO §1962(b) (Title 18 U.S.C. §1962(b)); for RICO § 1962(d) Conspiracy Arising from Primary RICO §1962(b) Contravention (Title 18 U.S.C. §§1962(b)-(d for RICO §1962(d) Conspiracy Arising from Aiding and Abetting RICO §1962(b) Primary Contravention (Title 18 U.S.C. §§ 1962(b)-(d)); for RICO § 1962(b) Aiding and Abetting RICO §1962(d) Conspiracy to Contravene RICO §1962(b) (Title 18 U.S.C. §§1962(b)-(d)); for Primary Contravention RICO §1962(a) (Title 18 U.S.C.§ 1962(a)); For RICO Aiding and Abetting Primary Contravention of RICO § 1962(a) (Title 18 U.S.C. §1962(a)); for RICO Respondeat Superior/Derivative Liability Arising from Primary Contravention of RICO § 1962(a) (Title 18 U.S.C. § 1962(a)) for RICO §1962(d) Conspiracy Arising from Primary RICO §1962(a) Contravention (Title 18 U.S.C. §§1962(a)-(d)); for RICO §1962(d) Conspiracy Arising from Aiding and abetting RICO §1962(a) (Title 18

U.S.C. § §1962(b)-(d)); for RICO §1962(a) Aiding and Abetting RICO §1962(d) Conspiracy to Contravene RICO §1962(b) (Title 18 U.S.C. §§1962(a)-(d)); for RICO §1962(d) Conspiracy Re: Conspiracy to Conceal RICO §1962(b) Contravention (Title 18 U.S.C. § §1962(b)-(d)); for RICO §1962(d) Conspiracy Re: Conspiracy to Conceal RICO §1962(a) Contravention (Title 18 U.S.C. § §1962(a)-(d)); for RICO §1962(d) Conspiracy Re: Inter-Corporate Affiliate Conspiracy RICO §1962 Contravention (Title 18 U.S.C. §§1962(a)-(d)); for Immediate Dissolution of RICO Enterprise and Permanent Expulsion of RICO Persons from RICO Enterprise Pursuant to RICO §1964(a)-(b) (Title U.S.C. §1964(a)-)b)) of the Racketeer Influenced And Corrupt Organizations Act of 1970 ("RICO"); For Immediate Dissolution of RICO Enterprise and Permanent Expulsion of RICO Persons from RICO Enterprise Pursuant to RICO § 1964(b) (Title U.S.C. §1964(b)) of the Racketeer Influenced and Corrupt Organizations Act of 1970 ("RICO") and Rule 65 of the Federal Rules of Civil Procedure; for Immediate Dissolutions of RICO Enterprise and Permanent Expulsion of RICO Persons from RICO Persons from RICO Enterprise Pursuant to RICO 1964(a) (Title U.S.C. §1964(a)) of the Racketeer Influenced and Corrupt Organizations Act of 1970 ("RICO") and Rule 64 of the  Federal Rules of Civil Procedure; for Immediate Dissolution of RICO Enterprise and Permanent Expulsion of RICO Persons from RICO Enterprise Pursuant to RICO §1964(b) (Title U.S.C. § 1964(b)) of the Racketeer Influenced and Corrupt Organizations Act of 1970 ("RICO"); for Immediate Dissolution of RICO Enterprise and Permanent Expulsion of RICO Persons from RICO Enterprise Pursuant to RICO § 1964(b) (Title 18 U.S.C. §1964(b)) of the Racketeer Influenced and Corrupt Organizations Act of 1970 ("RICO") and Rule 65 of the  Federal Rules of Civil Procedure; For Ex Parte Issuance of Preliminary and Permanent Injunctive Relief Pursuant to FRCP 65 and RICO § 1964(a) for

Ex Parte Issuance of Preliminary and Permanent Injunctive Relief Pursuant to FRCP 64 and RICO § 1964(a); for Ex Parte Temporary Restraining Order Relief re: Enjoin Pending Litigation Pursuant to RICO § 1964(a) (Title 18 U.S.C. § 1964(a)) of the Racketeer Influenced and Corrupt Organizations Act or 1970 ("RICO") and Rule 65 of the  Federal Rules of Civil Procedure; for Ex Parte Temporary Restraining Order Relief re: Enjoin Pending Litigation Pursuant to RICO §1964(b) (Title 18 U.S.C.§1964(b)) of the Racketeer Influenced and Corrupt Organizations Act of 1970 ("RICO") and Rule 65 of the  Federal Rules of Civil Procedure; for RICO §1962(d) (Title 18 U.S.C. § 1962(d)) Conspiratorial Liability for Contravention of RICO § 1962) of the Racketeer Influenced and Corrupt Organizations Act of 1970 ("RICO") (Title 18 U.S.C. §1962) Pinkerton Doctrine (Pinkerton V. United States, 328 U.S. 640 (1946)) re: Conspiracy to Conceal; for RICO § 1962(d) (Title 18 U.S.C. §1962(d)) Conspiratorial Liability for Contravention of RICO §1962(a) of the Racketeer Influenced and Corrupt Organizations Act of 1970 ("RICO") (Title 18 U.S.C. §1962(a)) Pinkerton Doctrine (*Pinkerton v. United States*, 328 U.S 640 (1946)) re: Conspiracy to Conceal; for Aiding and Abetting RICO Conspiracy RICO Section 1962(d) (Title 18 U.S.C.§1962(d)) Conspiratorial Liability for Contravention of RICO § 1962) of the Racketeer Influenced and Corrupt Organizations Act of 1970 ("RICO") (Title 18 U.S.C. §1962)) Pinkerton Doctrine (*Pinkerton v. United States*, 328 U.S. 640 (1946)); for Aiding and Abetting RICO Conspiracy RICO Section 1962(d) (Title 18 U.S.C. §1962(d) Conspiratorial Liability for Contravention of RICO § 1962(a) of the Racketeer Influenced and Corrupt Organizations Act of 1970 ("RICO") (Title 18 U.S.C. §1962(a)) (Pinkerton V. United States, 328 U.S. 640 (1946)); for RICO Conspiracy for RICO Aiding and Abetting re: Primary RICO Section 1962) re: RICO Section 1962(d) (Title 18 U.S.C. §1962(d)) Conspiratorial Liability for

Contravention of RICO § 1962) of the Racketeer Influenced and Corrupt Organizations Act of 1970 ("RICO) (Title 18 U.S.C. §1962)) Pinkerton Doctrine (Pinkerton V. United States, 328 U.S. 640 (1946)); for RICO Conspiracy for RICO Aiding and Abetting re: Primary RICO Section 1962(b) re: RICO Section 1962(d) RICO Conspiracy RICO Section 1962(d) (Title 18 U.S.C. §1962(d)) Conspiratorial Liability; for RICO Conspiracy for RICO Aiding and Abetting re: Primary RICO Section 1962(a) re: RICO Section 1962(d) RICO Conspiracy RICO Section 1962(d) (Title 18 U.S.C. §1962(d)) Conspiratorial Liability for Contravention of RICO § 1962 (a) of the Racketeer Influenced and Corrupt Organizations Act of 1970 ("RICO") (Title 18 U.S.C. §1962(a)) Pinkerton Doctrine (Pinkerton V. United States, 328 U.S. 640 (1946)); for RICO Successorship Liability re: RICO §§ 1962 (a), 1962 (B), 1962), 1962(d), 1964(a), and 1964(b)); for  Federal Declaratory Relief Pursuant to the  Federal Declaratory Judgment Act of 1940 (Title 28 U.S.C. §§ 2201-2202); for Commission of Common Law Fraud re: Constructive Fraud and re: Promissory Fraud; for Commission of Civil Conspiracy to Commit Common Law Fraud re: Constructive Fraud and re: Promissory Fraud; for Commission of Common Law Conversion; for Commission of Civil Conspiracy to Commit Common Law Conversion; for Commission of Money Had and Received; for Unjust Enrichment; for Negligent Misrepresentation; for Entry of Appropriate Order Commanding Immediate Accounting of Monies and Properties Pursuant to (Title 18 USC §§ 1962(a) -d), 1964(a), and 1964(b)); for Disregard of Corporate Entity Re: Piercing Corporate Entity as Mere Subterfuge-Shell-Sham and Absence of Independent Legal Significance re: Alter Ego Liability as well as collection of payments and transfer of funds to Banks in the District of Columbia or elsewhere. The total amount due and owing is $5.2 million plus punitive damages and attorneys' fees.

104.    In the course of investigating the circumstances surrounding the aforementioned conspiracy, Plaintiff researched and took other investigative steps and Plaintiff has discovered instances of fraud in the inducement, conspiracy to commit fraud, tortious interference with contract, wire fraud and multiple instances of breach of Federal and States law, that taken together demonstrate a criminal conspiracy and criminal enterprise between and among the Defendants.

105.    Ultimately, Plaintiff learned that Defendants Vidino and the GWU Program on Extremism (with knowledge of the Defendants to varying degrees), had masterminded a scheme to defraud the public and take advantage of individuals like the Plaintiff casting them all as radicals and Islamic extremists in order to secure undisclosed funding from the UAE.

106.    Among the many entities drawn into Defendants' schemes on information and belief, include Austrian authorities, French authorities, and German authorities.

### RICO PERSONS [RICO TITLE 18 UNITED STATES CODE § 1961(3)]

107.    Plaintiff alleges that: GWU, The Program on Extremism at GWU,  Alp, Diligence, and Ariaf (and as corporate entities where applicable) as well as Dr. Vidino, Mr. Brero, Ms. Cavin, and Mr. Badal as individuals or in their respective capacities as officers or directors or agents of the above named corporate Defendants, (as well John Doe Nos. 1-25, which we intend to identify through discovery) as each are engaged in activities and conduct that affect federal interstate and/or foreign commerce, that each hold legal, equitable, and/or beneficial interests in property, and each is a "person," as that term is defined pursuant to Section 1961(3) of the Racketeer Influenced and Corrupt Organizations Act of 1970 ["RICO"].

108.    Plaintiff alleges that each and every RICO person that is specifically identified and named as a RICO defendant is liable as a principal pursuant to Title 18 United States Code §§

2(a)-(b) and that each and every RICO person that is a RICO defendant is liable as a co-conspirator pursuant to Title 18 United States Code § 371.

109.   Plaintiff alleges that at all times material herein, the activities, conduct, and/or omissions committed and/or engaged in by the Defendants herein give rise to this action being instituted within this federal district court inasmuch as Plaintiff is a resident of Massachusetts, and Defendants maintain principal place of business within the District of Columbia, and the events that give rise to the federal Racketeer Influenced and Corrupt Organizations Act of 1970 ["RICO"][Title 18 United States Code § §§ 1961, 1964(C)), 1965(a), (b), and (d)] action are predicated under the RICO co-conspiracy theory of venue and under the RICO co-conspiracy theory of personal jurisdiction, by and through employment of federal instrumentalities of federal interstate commerce, including the federal mails, federal wires, and traveling in connection with the commission of racketeering activity across federal interstate and/or international boundaries and/or lines.

110.   Plaintiff further alleges that the Defendants, each of whom are engaged in principal business activities within the District of Columbia, engaged in continuous, concerted, and systematic activities with Plaintiff within this federal district, resulting in injury to their respective interests in their business or property, pursuant to RICO Title 18 United States Code § 1964(C)).

111.   Plaintiff alleges that venue is proper within this judicial district pursuant to Title 28 United States Code §§ 1391(a)(2), (a)(3), and (b) inasmuch as all Defendants transact business and can be found within this district, and that a substantial part of the events or omissions giving rise to the claims occurred, or a substantial part of property that is the subject matter is situated within this district.

## AS AND FOR A FIRST CAUSE OF ACTION
## CIVIL RACKETEERING, 18 U.S.C. § 1962 (c)
### (*Against All Defendants*)

112.   Plaintiff repeats and re-alleges each of the foregoing paragraphs as set forth fully herein.

113.   At all relevant times, all Defendants constituted "persons" within the meaning of U.S.C. § 1961(3).

114.   Between at least April 2021 and March 2023, Defendants were associated, and in fact, constituted an enterprise within the meaning of 18 U.S.C. § 1964 (c), engaging in and affecting international and interstate commerce. The enterprise has a clear organization and structure. Alp, Mr. Brero, Ms. Cavin, and Mr. Badal carried out the enterprise's day-to-day operations, among other things, proposing targets, hiring sources, and commissioning false and misleading articles. Among the co-conspirators, Alp led the  misleading articles. The articles' main initiative was to be published and disseminate the enterprise's false and misleading claims.

115.   Alp agreed to and intended to conduct, and directly or indirectly participate in the conduct of the enterprise's affair through a pattern of racketeering activity in violation of 18 U.S.C. § 1962 (c), including international and interstate wire fraud violation of 18 U.S.C § 1343 and bank fraud violation of 18 U.S.C. § 1344.

116.   Alp managed and operated the enterprise's affairs with full knowledge that their activities were unlawful and with the intent to defraud. Specifically, they orchestrated a multi-year coordinated smear campaign to publish false information about Plaintiff Farid Hafez.

To carry out this fraudulent scheme, Alp worked with several academics, journalists and bloggers including Dr. Vidino, GWU, and The Program on Extremish at GWU, to disseminate

false information about Plaintiff Farid Hafez with the specific intent of fraudulently inducing the Plaintiff's business associates, employers, and academics, and others, to break ties with Dr. Hafez.

117.    In the case of Plaintiff Farid Hafez, the enterprise concocted the false narrative that Dr. Hafez was closely tied to the Muslim Brotherhood and involved in terrorist activities. Alp and Dr. Vidino and other defendants made use of interstate wires to commission and publish online disseminating false statements about Dr. Hafez.

118.    As a direct proximate result of Defendants racketeering activities in violation of 18 U.S.C. § 1962 (c), Plaintiffs have been injured in their business and property in an amount to be proven at trial. Plaintiff now seek damages under 18 U.S.C. § 1964 (c) to remedy that injury. Plaintiff's injuries are grounded in the United States.

119.    Plaintiff alleges that the nature of the controversy arising between the RICO Plaintiffs and the RICO Defendants is a controversy between parties completely diverse in federal citizenship; inasmuch as Plaintiff is a resident of the State of Massachusetts and Defendants are citizens of the District of Columbia and Italy.

120.    In addition, Plaintiff alleges that the amount in controversy exceeds $75,000.00, exclusive of costs, expenses, interests, and fees, for purposes of invoking and establishing federal diversity of citizenship subject matter jurisdiction pursuant to Title 28 United States Code §§ 1332(a)(1) which, if need be, will allow this matter to remain in the District of Columbia.

## **AS AND FOR A SECOND CAUSE OF ACTION**

## **RACKETEERING CONSPIRACY, 18 U.S.C. § 1962(d)**

### (***Against all Defendants***)

121.   Plaintiffs repeat and reallege each of the foregoing paragraphs as if set forth fully herein.

122.   18 U.S.C. § 1962 (d) makes it "unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section."

123.   As set above, Defendants, unlawfully and willfully combined, conspired, and agreed to violate 18 U.S.C. § 1962 (c). Specifically, Defendants committed acts in furtherance of the conspiracy described above, including, by publishing and directing the publication of dozens of false and misleading articles about Plaintiff Farid Hafez.

124.   Defendants intentionally conspired and agreed to participate in the conduct of the enterprise's affairs directly and indirectly through a pattern of racketeering activity. Defendants knew their acts were part of a pattern of racketeering activity and agreed to the commission of those acts to further the schemes described above. That conduct constitutes a conspiracy to violate 18 U.S.C. § 1962 (c), in violation of 18 U.S.C. 1962 (d).

125.   As a direct proximate result of the enterprise's conspiracy, the overt acts taken in furtherance of that conspiracy, and violations of 18 U.S.C § 1962 (d), Plaintiffs have been injured in their business and property in an amount to be proven at trial. Plaintiffs now seek treble damages under 18 U.S.C. § 1964 (c) to remedy that injury.

## AS AND FOR A THIRD CAUSE OF ACTION

## MULTI COMPLEX RICO ARTIFICE AND SCHEME TO DEFRAUD [TITLE 18 U.S.C. § 1964(C))] re: DESTRUCTION and INJURY TO BUSINESS AND PROPERTY INTERESTS - INTERNATIONAL MONEY LAUNDERING and OBTAINING MONIES BY AND THROUGH FALSE PRETENSE, FRAUD, THEFT, and CONVERSION

### (*Against all Defendants*)

126.    Plaintiff incorporates each and every allegation of this Complaint and re-alleges them as though they were fully set forth herein. Plaintiff alleges that the afore described factual allegations establish the commission of two or more forms of "predicate acts," "predicate offenses," and/or "racketeering activity," as defined pursuant to Title 18 United States Code § 1961(1)(B) of the federal Racketeer Influenced and Corrupt Organizations Act of 1970 ["RICO"] [Title 18 U.S.C. §§ 1961-1968], committed by Defendants. Plaintiff alleges that the commission of two or more forms of "predicate acts," "predicate offenses," and/or "racketeering activity" committed by Defendants contravened the following federal statutory provisions:

-   Federal Principal and Aider and Abettor Liability: Title 18 U.S.C.A. §2(a)-(b);

-   Federal Principal and Aider and Abettor Liability re: Aiding and Abetting a Conspiracy: Title 18 U.S.C.A. §2(a)-(b);

-   Federal Principal and Aider and Abettor Liability re: Conspiracy to Commit Aiding and Abetting: Title 18 U.S.C.A. §2(a)-(b);

-   Federal Mail Fraud: Title 18 U.S.C.A. §1341;

-   Federal Mail Fraud re: Aiding and Abetting: Title 18 U.S.C.A. §1341;

-   Federal Mail Fraud re: Conspiracy: Title 18 U.S.C.A. §1341;

- Federal Mail Fraud re: Conspiracy to Aid and Abet: Title 18 U.S.C.A. §1341;

- Federal Mail Fraud re: Aiding and Abetting a Conspiracy: Title 18 U.S.C.A. §1341;

- Federal Wire Fraud: Title 18 U.S.C.A. §1343;

- Federal Wire Fraud re: Aiding and Abetting: Title 18 U.S.C.A. §1343;

- Federal Wire Fraud re: Conspiracy: Title 18 U.S.C.A. §1343;

- Federal Wire Fraud re: Conspiracy to Aid and Abet: Title 18 U.S.C.A. §1343;

- Federal Wire Fraud re: Aiding and Abetting a Conspiracy: Title 18 U.S.C.A. §1343;

- Federal Intangible Personal Property Right Deprivation: Title 18 U.S.C.A. §1346;

- Federal Racketeering: Title 18 U.S.C.A. §1952;

- Federal Racketeering re: Aiding and Abetting: Title 18 U.S.C.A. §1952;

- Federal Racketeering re: Conspiracy: Title 18 U.S.C.A. §1952;

- Federal Racketeering re: Conspiracy to Aid and Abet: Title 18 U.S.C.A. §1952;

- Federal Racketeering re: Aiding and Abetting a Conspiracy: Title 18 U.S.C.A. §1952;

- Federal Money Laundering: Title 18 U.S.C. §1956;

- Federal Money Laundering re: Aiding and Abetting: Title 18 U.S.C. §1956;

- Federal Money Laundering re: Conspiracy to Aid and Abet: Title 18

U.S.C.A. §1956;

- Federal Money Laundering re: Aiding and Abetting a Conspiracy: Title 18 U.S.C.A. §1956;

- Federal Money Laundering re: Conspiracy: Title 18 U.S.C. §1956(h);

- Federal Money Laundering re: Aiding and Abetting a Conspiracy: Title 18 U.S.C. §1956(h);

- Federal Money Laundering re: Conspiracy to Aid and Abet: Title 18 U.S.C. §1956(h);

- Federal Criminally Derived Property: Title 18 U.S.C. §1957;

- Federal Criminally Derived Property re: Aiding and Abetting: Title 18 U.S.C. §1957;

- Federal Criminally Derived Property re: Conspiracy: Title 18 U.S.C. §1957;

- Federal Criminally Derived Property re: Aiding and Abetting a Conspiracy: Title 18 U.S.C. §1957;

- Federal Criminally Derived Property re: Conspiracy to Aid and Abet: Title 18 U.S.C. §1957;

- Federal Interstate Transportation of Property Obtained by Fraud, False Pretense, and Conversion: Title 18 U.S.C.A. §2314;

- Federal Interstate Transportation of Property Obtained by Fraud, False Pretense, and Conversion re: Aiding and Abetting: Title 18 U.S.C.A. §2314;

- Federal Interstate Transportation of Property Obtained by Fraud, False Pretense, and Conversion re: Conspiracy: Title 18 U.S.C.A. §2314;

- Federal Interstate Transportation of Property Obtained by Fraud, False

Pretense, and Conversion re: Aiding and Abetting a Conspiracy: Title 18 U.S.C.A. §2314;

- Federal Interstate Transportation of Property Obtained by Fraud, False Pretense, and Conversion re: Conspiracy to Aid and Abet: Title 18 U.S.C.A. §2314;

- Federal Interstate Receipt of Transported Property Obtained by Fraud, False Pretense, and Conversion: Title 18 U.S.C.A. §2315;

- Federal Interstate Receipt of Transported Property Obtained by Fraud, False Pretense, and Conversion re: Aiding and Abetting: Title 18 U.S.C.A. §2315;

- Federal Interstate Receipt of Transported Property Obtained by Fraud, False Pretense, and Conversion re: Conspiracy: Title 18 U.S.C.A. §2315;

- Federal Interstate Receipt of Transported Property Obtained by Fraud, False Pretense and Conversion re: Aiding and Abetting a Conspiracy: Title     18 U.S.C.A. §2315;

- Federal Interstate Receipt of Transported Property Obtained by Fraud, False Pretense and Conversion re: Conspiracy to Aid and Abet: Title 18 U.S.C.A. §2315;

127.   Plaintiff alleges that based upon the afore-referenced allegations against Defendants: operate, manage, administer, control, direct, and/or own, directly or indirectly, affiliated party multi-tiered owned and operated corporate/partnership/business successor entities, and that such successor entities are potentially liable as RICO successors in interest for injuries sustained by Plaintiff by reason of contravention of RICO Sections 1962(a)-(d), according to offer of proof at time of trial.

## AS AND FOR A FOURTH CAUSE OF ACTION
## RICO § 1961(4) ENTERPRISE ALLEGATIONS re: RICO § 1962(C)
## CLAIM FOR RELIEF [18 U.S.C. § 1961(4)]
### (*Against all Defendants*)

128.    Plaintiff incorporates each and every allegation of this Complaint and re-alleges them as though they were fully set forth herein. Plaintiff alleges that each individual Defendants, (Individually and in the capacity as directors and/or corporate officers), and Corporate Defendants (and as corporate entities where applicable), and other persons unknown to Plaintiff, were employed by and associated with others, and engaged in conduct that constitutes a RICO pattern of racketeering activity. Plaintiff further alleges that said RICO Defendants were knowledgeable and aware of the activities of the following RICO §1961(4) enterprises, and that said RICO Defendants facilitated and furthered the RICO §1962(d) conspiracies alleged herein, for the purpose and objective of damaging and/or injuring Plaintiffs' interests in their businesses and/or properties.

129.    Plaintiff alleges that each of the following configurations, for purposes of Plaintiffs' RICO §1962(C)) claims for relief, constitute a RICO "enterprise," as that term is defined pursuant to Title 18 United States Code §1961(4) of the Racketeer Influenced and Corrupt Organizations Act of 1970 ["RICO"][Title 18 U.S.C. §1961(4)] and within the strictures of *Odom v. Microsoft Corp.*, 486 F.3d 541 (9th Cir. 2007)(en banc):

130.    Defendants, Dr. Vidino, individually and in his respective corporate capacities, Mr. Brero, Ms. Cavin, Mr. Badal, and John Doe Nos. 1-25, Individually and in their capacity as Directors, and Corporate Defendants GWU, The Program on Extremism at GWU, Alp, Diligence, Ariaf (and as corporate entities where applicable), constitute a RICO enterprise, organized and maintained by and through a consensual hierarchy of partners, managers, directors, officers, supervisors, agents, deputies, and/or representatives that formulate and

implement plans to defraud or convert corporate resources for personal use up to and including defrauding or improperly disseminating false reports to influence the State Department and/or other authorities to secure improper ends including but not limited to the Defendant, Dr. Vidino, maintaining dual citizenship in the US and Italy to avoid tax liabilities and shelter ill-gotten income, and to defraud Plaintiff and others by the use of artifices and devices both domestically and internationally, including, but not restricted to, disseminating false reports to foreign authorities and foreign paymasters, employing federal mails and/or federal interstate wires, as well as and disseminating documentary materials with false and unsubstantiated claims and the bribing of foreign officials or defrauding domestic banks or misusing otherwise valid corporate instruments and entities without authority. Plaintiffs allege that RICO persons, and other persons unknown to Plaintiffs, acting in concert therewith, are employed by and associated with said RICO enterprise that is engaged in, or activities of which affect, federal interstate and/or foreign commerce, and that said RICO persons, and persons acting in concert therewith, conduct or participate, directly or indirectly, in the conduct of such RICO enterprise's affairs through a RICO pattern of racketeering activity.

131.    Plaintiff alleges that in conducting the business and affairs of the RICO enterprises, and in committing the acts, omissions, misrepresentations, and breaches referred to herein between 2020 and 2023 and continuing up through and including the initiation of these proceedings, Defendants engaged in a RICO pattern of racketeering activity in contravention of Title 18 United States Code § 1962(C) inasmuch as said Defendants were employed by, or associated with, said RICO enterprises that engaged in activities that affect federal interstate and/or foreign commerce, and conducted such RICO enterprise

affairs by and through a RICO pattern of racketeering activity.

## AS AND FOR A FIFTH CAUSE OF ACTION
## RICO §1961(5) PATTERN OF RACKETEERING ACTIVITY ALLEGATIONS [TITLE 18 U.S.C. § 1961(5)], COMMISSION OF PRIMARY CONTRAVENTION OF RICO SECTION 1962(C)[Title 18 US.C. §1962(C))], and COMMISSION OF RICO §1961(1)(B) RACKETEERING ACTIVITY [TITLE 18 U.S.C. § 1961(1)(B)]
### (*Against all Defendants*)

132.    Plaintiff incorporates each and every allegation of this Complaint and re-alleges them as though they were fully set forth herein. Plaintiff alleges that Defendants engaged in the above activities and/or conduct that constitutes the following form of "racketeering activity," as that term is defined pursuant to Title 18 United States Code §1961(1) of the Racketeer Influenced and Corrupt Organizations Act of 1970 ["RICO"]. Plaintiff alleges that the forms of "racketeering activity" include, and are not restricted to, various formulations of conspiracy to aid and abet, and aiding and abetting a conspiracy:

- Federal Principal and Aider and Abettor Liability: Title 18 U.S.C.A. §2(a)-(b);

- Federal Principal and Aider and Abettor Liability re: Aiding and Abetting a Conspiracy: Title 18 U.S.C.A. §2(a)-(b);

- Federal Principal and Aider and Abettor Liability re: Conspiracy to Commit Aiding and Abetting: Title 18 U.S.C.A. §2(a)-(b);

- Federal Mail Fraud: Title 18 U.S.C.A. §1341;

- Federal Mail Fraud re: Aiding and Abetting: Title 18 U.S.C.A. §1341;

- Federal Mail Fraud re: Conspiracy: Title 18 U.S.C.A. §1341;

- Federal Mail Fraud re: Conspiracy to Aid and Abet: Title 18 U.S.C.A. §1341;

- Federal Mail Fraud re: Aiding and Abetting a Conspiracy: Title 18 U.S.C.A. §1341;

- Federal Wire Fraud: Title 18 U.S.C.A. §1343;

- Federal Wire Fraud re: Aiding and Abetting: Title 18 U.S.C.A. §1343;

- Federal Wire Fraud re: Conspiracy: Title 18 U.S.C.A. §1343;

- Federal Wire Fraud re: Conspiracy to Aid and Abet: Title 18 U.S.C.A. §1343;

- Federal Wire Fraud re: Aiding and Abetting a Conspiracy: Title 18 U.S.C.A. §1343;

- Federal Intangible Personal Property Right Deprivation: Title 18 U.S.C.A. §1346;

- Federal Racketeering: Title 18 U.S.C.A. §1952;

- Federal Racketeering re: Aiding and Abetting: Title 18 U.S.C.A. §1952;

- Federal Racketeering re: Conspiracy: Title 18 U.S.C.A. §1952;

- Federal Racketeering re: Conspiracy to Aid and Abet: Title 18 U.S.C.A. §1952;

- Federal Racketeering re: Aiding and Abetting a Conspiracy: Title 18 U.S.C.A. §1952;

- Federal Money Laundering: Title 18 U.S.C. §1956;

- Federal Money Laundering re: Aiding and Abetting: Title 18 U.S.C. §1956;

- Federal Money Laundering re: Conspiracy to Aid and Abet: Title 18 U.S.C.A. §1956;

- Federal Money Laundering re: Aiding and Abetting a Conspiracy: Title 18

U.S.C.A. §1956;

- Federal Money Laundering re: Conspiracy: Title 18 U.S.C. §1956(h);

- Federal Money Laundering re: Aiding and Abetting a Conspiracy: Title 18 U.S.C. §1956(h);

- Federal Money Laundering re: Conspiracy to Aid and Abet: Title 18 U.S.C. §1956(h);

- Federal Criminally Derived Property: Title 18 U.S.C. §1957;

- Federal Criminally Derived Property re: Aiding and Abetting: Title 18 U.S.C. §1957;

- Federal Criminally Derived Property re: Conspiracy: Title 18 U.S.C. §1957;

- Federal Criminally Derived Property re: Aiding and Abetting a Conspiracy: Title 18 U.S.C. §1957;

- Federal Criminally Derived Property re: Conspiracy to Aid and Abet: Title 18 U.S.C. §1957;

- Federal Interstate Transportation of Property Obtained by Fraud, False Pretense, and Conversion: Title 18 U.S.C.A. §2314;

- Federal Interstate Transportation of Property Obtained by Fraud, False Pretense, and Conversion re: Aiding and Abetting: Title 18 U.S.C.A. §2314;

- Federal Interstate Transportation of Property Obtained by Fraud, False Pretense, and Conversion re: Conspiracy: Title 18 U.S.C.A. §2314;

- Federal Interstate Transportation of Property Obtained by Fraud, False Pretense, and Conversion re: Aiding and Abetting a Conspiracy: Title 18 U.S.C.A. §2314;

- Federal Interstate Transportation of Property Obtained by Fraud, False Pretense, and Conversion re: Conspiracy to Aid and Abet: Title 18 U.S.C.A. §2314;

- Federal Interstate Receipt of Transported Property Obtained by Fraud, False Pretense, and Conversion: Title 18 U.S.C.A. §2315;

- Federal Interstate Receipt of Transported Property Obtained by Fraud, False Pretense, and Conversion re: Aiding and Abetting: Title 18 U.S.C.A. §2315;

- Federal Interstate Receipt of Transported Property Obtained by Fraud, False Pretense, and Conversion re: Conspiracy: Title 18 U.S.C.A. §2315;

- Federal Interstate Receipt of Transported Property Obtained by Fraud, False Pretense and Conversion re: Aiding and Abetting a Conspiracy: Title 18 U.S.C.A. §2315;

- Federal Interstate Receipt of Transported Property Obtained by Fraud, False Pretense and Conversion re: Conspiracy to Aid and Abet: Title 18 U.S.C.A. §2315;

133. Plaintiff alleges that above activities and/or conduct engaged in by RICO Defendants constitute a "pattern of racketeering activity," as that term is defined pursuant to Title 18 United States Code §1961(5) of the Racketeer Influenced and Corrupt Organizations Act of 1970 ["RICO"]. Plaintiff further alleges that the activities and/or conduct engaged in by Defendants was both related as to the modus operandi engaged in by said Defendants of depriving Plaintiffs of Plaintiffs' interests in business and/or property. Plaintiff alleges that the RICO pattern of racketeering activity was continuous inasmuch as the activities and/or conduct engaged in by the RICO Defendants exhibited a

realistic, long-term threat of continued future injury to Plaintiffs' interest in their business and/or property.

134.    Plaintiff alleges that the fraudulent activity engaged by Defendants injured Plaintiff's business and/or property in connection with their business activities that affect federal interstate commerce, resulting in loss of Plaintiff's property interests, business opportunities, and monies.

135.    Plaintiff alleges that the afore described activities constitute conduct engaged in by Defendants to deprive Plaintiff of his interest in business and/or property, by and through commission of federal mail fraud, federal wire fraud, federal money laundering, federal interstate transportation and receipt of property obtained by fraud, false pretense, and/or conversion, and federal racketeering, and are therefore indictable as "racketeering activity," as that term is defined pursuant to Title 18 United States Code §1961(1). The course of conduct engaged in by said Defendants constitute both continuity and relatedness of the racketeering activity, thereby constituting a "pattern of racketeering activity," as that term is defined pursuant to Title 18 U.S.C. §1961(5).

136.    Plaintiff alleges that the aforementioned pattern of racketeering activity committed by said Defendants is both related and continuous inasmuch as it is designed and/or intended to cause damage and/or injury to the interest in business and/or property of Plaintiff, and Plaintiff reasonably believe and apprehend that such conduct shall and will continue prospectively with correlative long-term injury. Plaintiff alleges that similarly situated victims, including members of the general public, sustained losses by reason of the conduct alleged against Defendants, including, but not restricted to, the following persons: Defendants, Dr. Vidino, individually and in his respective corporate capacities

Mr. Brero, Ms. Cavin, Mr. Badal, and John Doe Nos. 1-25 (Individually and in the capacity

as directors), and Corporate Defendants GWU, The Program on Extremism at GWU, Alp,

Diligence, Ariaf (and as corporate entities where applicable).

137.   Plaintiff is entitled to recover compensatory damages, according to offer of proof at

time of trial, including lost lines of credit, and lost profits, at a minimum of $1,000,000.00.

Plaintiffs are also entitled to recover an award of exemplary and punitive damages where

permitted by applicable law. Plaintiff is entitled to recover attorneys' fees, expenses, fees,

surcharges, costs, and post-judgment interest.

### Recovery Pursuant to RICO - Title 18 U.S.C. §1964(C)

138.   Plaintiff is entitled to recover, pursuant to Title 18 United States Code §1964(C)),

treble damages in the amount to be determined by offer of proof at time of trial. Plaintiff is

also entitled to recover attorneys' fees and costs of this litigation, as well as damages arising

from lost profits and/or lost business opportunities attributable to the activities engaged in by

Defendants committed in furtherance of the Racketeer Influenced and Corrupt Organizations

Act of 1970 ["RICO"][Title 18 U.S.C. §1961 et.seq.].

## AS AND FOR A SIXTH CAUSE OF ACTION
## COMMON LAW FRAUD
### (*Against all Defendants*)

139.    Plaintiff incorporates each and every allegation of this Complaint and re-alleges them as though they were fully set forth herein.

140.    The relief sought herein exceeds the jurisdictional limits of all other courts, which would otherwise have jurisdiction. Moreover, the within action falls within one or more of the exceptions of CPLR § 1602.

141.    At all times mentioned herein, the Plaintiff, FARID HAFEZ is a natural person, and was a resident of the Massachusetts.

142.    At all times mentioned herein, the Defendants are individuals or companies who conduct business in the District of Columbia and defrauded Plaintiff.

143.    At all times mentioned herein, the Defendants maintained an office to conduct business in the District of Columbia including maintaining accounts therein.

144.    Corporate Defendants hold offices in the District of Columbia and throughout the US.

145.    From 2017- to through 2023 the Defendants, Dr. Vidino, The George Washington University and The Program on Extremism at The George Washington University, disseminated reports masquerading as academic, rooted in fact, and with the façade of independence and scholarly integrity when in fact undisclosed foreign actors funded such.

146.    Plaintiff has been damaged by Defendants' misrepresentations, as it would not have had to defend himself against false accusations, false detention and being blacklisted but for the misrepresentations. As a result, Plaintiff is out-of-pocket for the damages associated with Defendants' ongoing activities and therefore Plaintiff demands out-of-pocket damages plus punitive damages in the amount of $10 million. The Complaint also included a demand for

attorneys' fees and other costs on each of the causes of action.

147.    Among the misrepresentations were that Plaintiff was associated with the Muslim Brotherhood or by implication some agent of the Muslim Brotherhood rather than a voice against Islamophobia and in favor of religious tolerance.

148.    In addition to being damaged by Defendant's falsehoods, Plaintiffs have since learned that Defendants, Dr. Vidino, The George Washington University, and The Program on Extremism at The George Washington University (Individually and in the capacity as Directors), and Corporate Defendants (and as corporate entities where applicable), have defrauded Plaintiff in various ways including failing to disclose that their actions were taken at the behest of a foreign government. On information and belief, the Defendants took advantage of Plaintiff, Dr. Farid Hafez, by hiding behind the edifice of academic freedom and integrity when in fact they were engaged in skullduggery for a foreign power.

149.    On information and belief, this worked to the detriment of others similarly situated to Plaintiff as well as other authorities and may not have complied with relevant laws and regulations.

150.    That as a result of the foregoing, the Plaintiff, Dr. Farid Hafez, and others similarly situated, have suffered a serious loss of reputation and forgone opportunities as well as the lingering prospect of open-ended legal exposure for Defendants' improprieties, and in particular as to the Plaintiff herein.

151.    That, by reason of the foregoing, the Plaintiff seeks a sum of money from the Defendants that will reasonably and fairly compensate him for his injuries, including lost opportunities, investment and damages, costs disbursements and legal fees.

## AS AND FOR A SEVENTH CAUSE OF ACTION

## VIOLATION OF DISTRICT OF COLUMBIA CODE § 28–3904

## UNFAIR OR DECEPTIVE TRADE PRACTICES

### (*Against all Defendants*)

152.    Plaintiff, Dr. Farid Hafez, repeats and realleges each and every allegation contained in paragraphs "1" through "156" as if same were more fully set forth at length herein.

153.    DCC § 28-3904 declares unlawful it shall be a violation of this chapter for any person to engage in an unfair or deceptive trade practice, whether or not any consumer is in fact misled, deceived, or damaged"

154.    By engaging in the acts and practices above, Defendants have engaged in deceptive and misleading practices in violation of DCC § § 28–3904 and demanded are treble damages to the statutory cap, punitive damages, and attorney's fees, as well as an injunction against the unlawful trade practice.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

155.    Plaintiff, Dr. Farid Hafez, repeats and realleges each and every allegation contained in paragraphs "1" through "170" as if same were more fully set forth at length herein.

156.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who were damaged by Defendants promulgation of and dissemination of the UAE funded enemies list while Defendants failed to disclose such was generated on behalf of a foreign government for hire. Excluded from the Class are Defendants, the officers, and directors of the Defendants.

157.    The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiff at this time

and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Defendants or their transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

158.    Plaintiff's claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

159.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has or will retain counsel competent and experienced in class and securities litigation.

160**.**    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)  whether the federal laws or laws of the District of Columbia were violated by Defendants' acts as alleged herein;

(b)  whether statements made by Defendants to third parties during the Class Period misrepresented material facts about the business, operations and management of Defendants or Plaintiff or members of the Class; and

(c)  to what extent the members of the Class have sustained damages and the proper measure of damages.

161.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and

burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## SCIENTER ALLEGATIONS

162.   As alleged herein, Defendants acted with scienter in that Defendants knew that the documents and statements issued or disseminated in the name of the Defendant The GWU were materially false and misleading; knew that such statements or documents would be issued or disseminated to the public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal laws governing registering as a foreign agent. That would also have reason to know that payments made on behalf of foreign governments were unlawful and failure to disclose them under FARA or to the IRS was a violation of laws governing same. As set forth elsewhere herein in detail, Defendants, by virtue of their receipt of information reflecting the true facts regarding Defendants, their control over, and/or receipt and/or modification of Defendants' allegedly materially misleading misstatements and/or their associations with the Defendant Dr. Vidino or Defendant The GWU which made them privy to confidential proprietary information concerning Defendants, participated in the fraudulent scheme alleged herein.

## LOSS CAUSATION

163.   Defendants' wrongful conduct, as alleged herein, directly, and proximately caused the economic loss suffered by Plaintiff and the Class.

164.   During the Class Period, Plaintiffs were wrongly detained and/or blacklisted, fired, or subject to scorn and ridicule, including the inability to travel and were damaged thereby.

The losses incurred will be established at trial.

## AS AND FOR AN EIGHTH
## CAUSE OF ACTION
## TORTIOUS INTERFERENCE WITH EXISTING BUSINESS RELATIONS
### (*Against all Defendants*)

165.    Plaintiff incorporates each and every allegation of this Complaint and re-alleges them as though they were fully set forth herein.

166.    Plaintiff had a business relationship with The University of Salzburg's Department of Political Science and Sociology as a researcher and lecturer and invitations to other academic and publishing venues.

167.    At all times relevant herein, Defendants knew that Plaintiff had a business relationship with The University of Salzburg and other academic and publishing venues.

168.    A claim for tortious interference is warranted here as Defendants directly interfered with the business relationships between Plaintiff and Salzburg University and Plaintiff and Other academic and publishing venues.

169.    Defendants knew making false allegations as to ties with the Muslim Brotherhood would destroy Plaintiff's career in academia and constrain his ability to speak out against Islamophobia. Defendants' active conspiracy to stymie and then kill Plaintiff's ability to speak in favor of religious tolerance and to destroy Plaintiff's reputation in order to make it impossible for him to speak out against Islamophobia because of Defendants' dissemination of its false reports intended to discredit Plaintiff by casting doubt upon his commitment to democratic and western values, negatively affected all of Plaintiff's efforts both in his career and in his ability to speak truth to power causing a further spiraling effect and significant financial damage.

170.    The Defendants interfered out of malice and/or spite and/or pecuniary motives and at times to appease powerful donors and interests, thereby inflicting intentional harm on Plaintiff.

171.    The Defendants' interference amounted to extreme and unfair economic pressure or was otherwise wrongful under applicable law.

172.    Defendants' actions and statements qualify as wrongful conduct sufficient to allege a tortious interference with business relations claim.

173.    Plaintiff had business relationships with many colleges and universities not limited to The University of Salzburg.

174.    At all times relevant herein, Defendants knew or should have known that Plaintiff was routinely invited to participate in panel discussions and symposiums.

175.    As described above, Defendants directly targeted and interfered with the business relationships with The University of Salzburg and others.

176.    The Defendants interfered with these business relationships and intentionally harmed the Plaintiff.

177.    The Defendants' interference amounted to extreme and unfair economic pressure or was otherwise wrongful under applicable law.

178.    As a direct result of the Defendants' interference, Plaintiff lost existing economic relationships.

179.    As a direct and proximate result of Defendants' tortious interference, Plaintiffs sustained severe economic and non-economic damages

180.    As a result of Defendants' actions, Plaintiff has sustained damages in an amount to be determined at trial.

## **AS AND FOR A NINTH CAUSE OF ACTION**

## **TORTIOUS INTERFERENCE WITH PROSPECTIVE BUSINESS RELATIONS**

### (*Against all Defendants*)

181.    Plaintiff incorporates each and every allegation of this Complaint and re-alleges them as though they were fully set forth herein.

182.    As described above, Defendants directly interfered with the prospective business relationship between Plaintiff and The University of Salzburg.

183.    The UAE hired a Swiss intelligence firm to hire Defendants to blacklist Plaintiff and besmirch Plaintiff's reputation in order to tar the reputation of those it perceived to be aligned with the Muslim Brotherhood. Defendant's collective dissemination of its false reports intended to discredit Plaintiff by casting doubt upon about his commitment to democratic ideals and western values affected all of Plaintiff's efforts to speak out against Islamophobia causing a further spiraling effect and significant financial damage.

184.    The Defendants interfered out of malice and/or spite and/or pecuniary motives, and to appease powerful foreign interests, thereby inflicting intentional harm on Plaintiff.

185.    The Defendants' interference amounted to extreme and unfair economic pressure or was otherwise wrongful under applicable law.

186.    As a direct result of the Defendants' conduct, Plaintiff was damaged.

187.    The false statements were widely disseminated and directed toward public authorities as well as individuals and entities known to have business relationships with Plaintiff with the intent of impinging upon their contractual relations with Plaintiff.

188.    As a direct result of Defendants' actions and statements, including the false statements and insinuations, Plaintiff had to leave Austria and take up permanent residence in the United States and cannot easily travel for fear of further retribution, including denial of reentry into the U.S.

189.    Defendants' actions and statements qualify as wrongful conduct sufficient to allege a tortious interference with business relations claim.

190.    Plaintiff had business relationships with many colleges and universities not limited to The University of Salzburg and prospective relations with many others.

191.    At all times relevant herein, Defendants knew that Plaintiff was a vising professor or guest speaker at innumerable international universities and think tanks.

192.    As described above, Defendants directly targeted and interfered with the business relationships between the Plaintiff and The University of Salzburg and others.

193.    The Defendants interfered with these business relationships and intentionally harmed the Plaintiff.

194.    The Defendants' interference amounted to extreme and unfair economic pressure or was otherwise wrongful under applicable law.

195.    As a direct result of the Defendants' interference, these industry players have indicated that they are not interested in working with Plaintiff.

196.    As a direct result of Defendants' interference, Plaintiff lost prospective economic relationships.

197.    As a direct result of the Defendants' interference, Plaintiff lost prospective economic relationships in terms of speaking engagements and publishing, both of which are central to profess employment and advancement.

198.    As a direct and proximate result of Defendants' tortious interference, Plaintiff sustained severe economic and non-economic damages.

## AS AND FOR A TENTH CAUSE OF ACTION

## PRIMA FACIE TORT

### (*Against all Defendants*)

199.    Plaintiff incorporates each and every allegation of this Complaint and re-alleges them as though they were fully set forth herein.

200.    As set forth above, Defendants intentionally and gratuitously inflicted harm upon Plaintiff for the sole purpose of causing Plaintiff harm. Defendants did so for their own reasons, likely sheer personal gratification, or fun - in any case, purely out of malice.

201.    Defendants' foregoing intentional and malicious interference with Plaintiff's standing at The University of Salzberg and prospective other employers and academic partners by improper means, including subterfuge, misrepresentations, and innuendo, constitutes conduct that is the very essence of disinterested malevolence.

202.    There is no reasonable, much less lawful, excuse or justification for any of Defendants' actions.

203.    As a direct and proximate result of Defendants' malicious conduct, Plaintiff has been injured, and will continue to suffer special injury, including lost valuable time, money, opportunities, as a direct and proximate result of this conduct. Such special injury to Plaintiff includes:

    a.    The loss of funds associated with stigma placed upon Plaintiff as a result of the Austrian raid prompted by Defendants' false report and UAE enemies list including the

cost to relocate to the United States, as well as lost business opportunities including seniority at a value of no less than $1,000,000.

b.      Travel costs and costs associated with relocating Plaintiff, including new schools and sundry other costs of $75,000.

204.    In addition, because Defendants' conduct evidences such wanton indifference to their civil and legal obligations as to suggest criminal intentionality and/or recklessness, Plaintiffs are entitled to a further award of punitive damages in an amount to be determined at trial, but in no event less than ten million dollars ($10,000,000.00).

## JURY TRIAL DEMAND

Plaintiff, Dr. Farid Hafez, respectfully requests a trial by jury on all matters set forth herein.

**WHEREFORE,** Plaintiff prays for relief and judgment, as follows:

i.      Determining that this action is a proper class action, designating Plaintiff as Lead Plaintiff and certifying Plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and Plaintiff's counsel as lead counsel.

ii.     Awarding compensatory, punitive, and treble damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon.

iii.    Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

iv.     Such other and further relief as the Court may deem just and proper.

Dated: New York, New York
April 16, 2024

Respectfully Submitted,

*/s/ David M. Schwartz, Esq.*
David M. Schwartz, Esq.
AIDALA, BERTUNA & KAMINS, P.C.
546 Fifth Avenue, 6th FL.
New York, NY 10036
Tel: (212) 641-0499
dschwartz@aidalalaw.com

*Attorneys for Plaintiff Farid Hafez*