**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| FARID HAFEZ, individually and on behalf of all others similarly situated,<br><br>       *Plaintiff*,<br><br>  *v.*<br><br>LORENZO VIDINO, *et al.*,<br><br>       *Defendants*. | Case No. 1:24-cv-00873-ABJ |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT LORENZO VIDINO'S
MOTION TO DISMISS**

Matthew D. McGill (D.C. Bar #481430)
Jeffrey Liu (D.C. Bar #1672057)
M. Christian Talley (D.C. Bar #1735656)
GIBSON, DUNN & CRUTCHER LLP
1700 M Street, N.W.
Washington, D.C. 20036
T: (202) 887-3680
F: (202) 530-9662
mmcgill@gibsondunn.com
jyliu@gibsondunn.com
ctalley@gibsondunn.com

*Counsel for Lorenzo Vidino*

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ................................................................................................................ 1

STATEMENT OF THE CASE ........................................................................................... 4

LEGAL STANDARDS ....................................................................................................... 7

ARGUMENT ....................................................................................................................... 8

    I.     The First Amendment Bars Hafez's Claims. ........................................................ 8

         A.  Hafez Cannot Overcome The Free Speech Clause's Protection. ........................... 8

         B.  The Petition Clause and *Noerr-Pennington* Doctrine Independently Preclude Liability. ............................................................................................... 20

    II.    The Complaint Fails To State A RICO Claim (Counts 1-5) Against Dr. Vidino. ....... 22

         A.  Hafez Suffered No Injury To "Business Or Property." ......................................... 23

         B.  Hafez's Purported Injures Are Not "Domestic." .................................................... 26

         C.  The Complaint Fails To Plausibly Allege Any RICO Predicate Offense. ............ 29

         D.  The Complaint Fails To Plausibly Allege A "Pattern" Of Racketeering Activity. 30

         E.  The Complaint Fails To Plausibly Allege A RICO "Enterprise." ......................... 32

         F.  The Complaint Fails To Plausibly Allege That Dr. Vidino Proximately Caused Hafez's Purported Injuries. ................................................................. 33

         G.  The Complaint Fails To Plausibly Allege That Dr. Vidino Knowingly Joined A Conspiracy To Commit At Least Two Predicate Acts. .......................................... 34

    III.   Hafez's State-Law Claims (Counts 6-10) Are Untimely And Meritless. ................... 36

         A.  The State-Law Claims Are Barred By The Statute Of Limitations. ..................... 36

         B.  The Common-Law Fraud Claim (Count 6) Fails. ................................................. 38

         C.  The Unfair Trade Practices Claim (Count 7) Fails. ............................................. 39

         D.  The Tortious-Interference Claims (Counts 8 & 9) Fail. ........................................ 40

         E.  The Prima Facie Tort Claim (Count 10) Is Not Recognized In The District And Would Fail Anyway. ............................................................................................. 42

    CONCLUSION ................................................................................................................ 45

## **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Abbas v. Foreign Pol'y Grp., LLC*,
    975 F. Supp. 2d 1 (D.D.C. 2013) ....................................................................................12, 16

*Abram v. United States*,
    2023 WL 8891002 (D.D.C. Dec. 26, 2023) ................................................................................36

*Aktieselskabet AF 21. Nov. 2001 v. Fame Jeans Inc.*,
    525 F.3d 8 (D.C. Cir. 2008) ......................................................................................................38

*Albert v. Loksen*,
    239 F.3d 256 (2d Cir. 2001) ......................................................................................................44

*Ali v. Tolbert*,
    636 F.3d 622 (D.C. Cir. 2011) ..................................................................................................39

*Allen v. District of Columbia*,
    312 A.3d 207 (D.C. 2024) .........................................................................................................41

*Allied Tube & Conduit Corp. v. Indian Head, Inc.*,
    486 U.S. 492 (1988) .............................................................................................................21, 22

*Applegate v. Dobrovir, Oakes & Gebhardt*,
    628 F. Supp. 378 (D.D.C. 1985) ...............................................................................................39

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) .......................................................................................................7, 8, 30, 36

*Aston v. Johnson & Johnson*,
    248 F. Supp. 3d 43 (D.D.C. 2017) ............................................................................................25

*Austl./E. U.S.A. Shipping Conf. v. United States*,
    537 F. Supp. 807 (D.D.C. 1982) ...............................................................................................21

*Bates v. Nw. Hum. Servs., Inc.*,
    466 F. Supp. 2d 69 (D.D.C. 2006) ..............................................................................................8

*BE & K Constr. Co. v. NLRB*,
    536 U.S. 516 (2002) ..................................................................................................................21

*Bennett Enters., Inc. v. Domino's Pizza, Inc.*,
    45 F.3d 493 (D.C. Cir. 1995) ...............................................................................................40, 42

*Bernhardt v. Islamic Republic of Iran*,
    47 F.4th 856 (D.C. Cir. 2022) ......................................................................................8

*Bill Johnson's Rests., Inc. v. NLRB*,
    461 U.S. 731 (1983) ...................................................................................................21

*Biro v. Conde Nast*,
    963 F. Supp. 2d 255 (S.D.N.Y. 2013) .......................................................................17

*Blankenship v. NBCUniversal, LLC*,
    60 F.4th 744 (4th Cir. 2023) ......................................................................................20

*Boley v. Atl. Monthly Grp.*,
    950 F. Supp. 2d 249 (D.D.C. 2013) ..........................................................................19

*Bouchet v. Nat'l Urb. League, Inc.*,
    730 F.2d 799 (D.C. Cir. 1984) ..................................................................................10

*\*Boyle v. United States*,
    556 U.S. 938 (2009) ..............................................................................................32, 33

*Brink v. Cont'l Ins. Co.*,
    787 F.3d 1120 (D.C. Cir. 2015) .............................................................................8, 30

*\*Buckley v. Littell*,
    539 F.2d 882 (2d Cir. 1976) ........................................................................11, 12, 13

*Burnett v. Al Baraka Inv. & Dev. Corp.*,
    274 F. Supp. 2d 86 (D.D.C. 2003) ............................................................................26

*Carpenter v. King*,
    792 F. Supp. 2d 29 (D.D.C. 2011) ............................................................................12

*Carpet Grp. Int'l v. Oriental Rug Imps. Ass'n, Inc.*,
    256 F. Supp. 2d 249 (D.N.J. 2003) ...........................................................................22

*Chandok v. Klessig*,
    648 F. Supp. 2d 449 (N.D.N.Y. 2009) .....................................................................17

*Cheminor Drugs, Ltd. v. Ethyl Corp.*,
    168 F.3d 119 (3d Cir. 1999) ......................................................................................21

*Cheng v. Neumann*,
    51 F.4th 438 (1st Cir. 2022) ................................................................................10, 12

*Clark v. Martinez*,
    543 U.S. 371 (2005) ...................................................................................................21

*Coastal States Mktg., Inc. v. Hunt,*
694 F.2d 1358 (5th Cir. 1983) ...................................................................21

*\*Couch v. Verizon Commc'ns Inc.,*
105 F.4th 425 (D.C. Cir. 2024)................................................10, 13, 19

*Covad Commc'ns Co. v. Bell Atl. Corp.,*
407 F.3d 1220 (D.C. Cir. 2005) ....................................................................4

*\*Ctr. for Immigr. Stud. v. Cohen,*
410 F. Supp. 3d 183 (D.D.C. 2019) ......................................................9, 29

*D'Addario v. D'Addario,*
901 F.3d 80 (2d Cir. 2018)..........................................................................24

*Danielsen v. Burnside-Ott Aviation Training Ctr. Inc.,*
941 F.2d 1220 (D.C. Cir. 1991) ..................................................................34

*Daskalea v. Wash. Humane Soc'y,*
480 F. Supp. 2d 16 (D.D.C. 2007) ..............................................................39

*DeGuelle v. Camilli,*
664 F.3d 192 (7th Cir. 2011) ......................................................................35

*Deripaska v. Associated Press,*
282 F. Supp. 3d 133 (D.D.C. 2017) ............................................................16

*Desai v. Hersh,*
719 F. Supp. 670 (N.D. Ill. 1989) ..............................................................16

*DiFolco v. MSNBC Cable LLC,*
831 F. Supp. 2d 634 (S.D.N.Y. 2011)..........................................................14

*Dist. Telecomms. Dev. Corp. v. Dist. Cablevision, Inc.,*
638 F. Supp. 418 (D.D.C. 1985) ..................................................................32

*Doe I v. Israel,*
400 F. Supp. 2d 86 (D.D.C. 2005) ..............................................................35

*Doe v. Roe,*
958 F.2d 763 (7th Cir. 1992) ................................................................23, 24

*\*E. R.R. Presidents Conf. v. Noerr Motor Freight, Inc.,*
365 U.S. 127 (1961)......................................................................................20

*E. Sav. Bank, FSB v. Papageorge,*
31 F. Supp. 3d 1 (D.D.C. 2014) ......................................................21, 31, 39

*Econ. Rsch. Servs., Inc. v. Resol. Econ., LLC*,
   208 F. Supp. 3d 219 (D.D.C. 2016) ................................................................40

*Edmondson & Gallagher v. Alban Towers Tenants Ass'n*,
   48 F.3d 1260 (D.C. Cir. 1995) ......................................................................31

*Egiazaryan v. Zalmayev*,
   880 F. Supp. 2d 494 (S.D.N.Y. 2012) .......................................................12, 13

*Ellis v. Jackson*,
   319 F. Supp. 3d 23 (D.D.C. 2018) .................................................................41

*ESI, Inc. v. Coastal Power Prod. Co.*,
   995 F. Supp. 419 (S.D.N.Y. 1998) ...............................................................44

*Farah v. Esquire Mag.*,
   736 F.3d 528 (D.C. Cir. 2013) .........................................................................9

*Fay v. Humane Soc'y of U.S.*,
   2021 WL 184396 (D.D.C. Jan. 19, 2021) .......................................................34

*\*Feld Ent., Inc. v. Am. Soc'y for Prevention of Cruelty to Animals*,
   873 F. Supp. 2d 288 (D.D.C. 2012) ..........................................................21, 29

*Flynn v. Cable News Network, Inc.*,
   2024 WL 1765566 (S.D.N.Y. Apr. 24, 2024) ................................................13

*Franchini v. Bangor Publ'g Co.*,
   109 F.4th 13 (1st Cir. 2024) ...........................................................................15

*Gamboa v. Velez*,
   457 F.3d 703 (7th Cir. 2006) ..........................................................................24

*Gertz v. Robert Welch, Inc.*,
   418 U.S. 323 (1974) .......................................................................................17

*Gong v. Sarnoff*,
   2023 WL 5372473 (S.D.N.Y. Aug. 22, 2023) ...............................................36

*Greenpeace, Inc. v. Dow Chem. Co.*,
   97 A.3d 1053 (D.C. 2014) ..............................................................................36

*Hamm v. Rhone-Poulenc Rorer Pharms., Inc.*,
   187 F.3d 941 (8th Cir. 1999) ..........................................................................23

*United States ex rel. Hawkins v. Mantech Int'l Corp.*,
   2024 WL 4332117 (D.D.C. Sept. 27, 2024) .............................................26, 28

*Hecht v. Com. Clearing House, Inc.*,
  897 F.2d 21 (2d Cir. 1990) ...........................................................................24

*\*Hemi Grp., LLC v. City of New York*,
  559 U.S. 1 (2010) ...............................................................................33, 34

*Hoffman v. Wash. Post Co.*,
  433 F. Supp. 600 (D.D.C. 1977) .....................................................................16

*\*Hourani v. Mirtchev*,
  796 F.3d 1 (D.C. Cir. 2015) ....................................................................23, 29, 32

*Hourani v. PsyberSolutions LLC*,
  690 F. App'x 1 (D.C. Cir. 2017) .....................................................................19

*Hustler Mag., Inc. v. Falwell*,
  485 U.S. 46 (1988) .......................................................................................9

*Jain v. McGraw-Hill Cos.*,
  827 F. Supp. 2d 272 (S.D.N.Y. 2011) ...........................................................43, 44

*Jankovic v. Int'l Crisis Grp.*,
  72 F. Supp. 3d 284 (D.D.C. 2014) ..................................................................17

*\*Jankovic v. Int'l Crisis Grp.*,
  822 F.3d 576 (D.C. Cir. 2016) ........................................................14, 15, 18, 19

*Joseph Burstyn, Inc. v. Wilson*,
  343 U.S. 495 (1952) .....................................................................................20

*Joseph v. Xerox Corp.*,
  594 F. Supp. 330 (D.D.C. 1984) ....................................................................16

*Jovanovic v. US-Alg. Bus. Council*,
  561 F. Supp. 2d 103 (D.D.C. 2008) .............................................................36, 39

*Kahl v. Bureau of Nat'l Affs., Inc.*,
  856 F.3d 106 (D.C. Cir. 2017) ....................................................................15, 16

*Katz v. Travelers*,
  241 F. Supp. 3d 397 (E.D.N.Y. 2017) ..............................................................43

*King v. Twp. of E. Lampeter*,
  17 F. Supp. 2d 394 (E.D. Pa. 1998) ................................................................22

*Klayman v. Obama*,
  125 F. Supp. 3d 67 (D.D.C. 2015) ..................................................................25

*Levin v. McPhee*,
 119 F.3d 189 (2d Cir. 1997)........................................................................14

*Lewis v. Abramson*,
 673 F. Supp. 3d 72 (D.N.H. 2023)...............................................................12

*Lexington Ins. Co. v. Swanson*,
 240 F.R.D. 662 (W.D. Wash. 2007)..............................................................13

*Liberty Lobby, Inc. v. Rees*,
 852 F.2d 595 (D.C. Cir. 1988)......................................................................14

*Lohrenz v. Donnelly*,
 350 F.3d 1272 (D.C. Cir. 2003)....................................................................16

*Lopez v. Council on Am.-Islamic Rels. Action Network, Inc.*,
 657 F. Supp. 2d 104 (D.D.C. 2009).............................................................23

*Luxpro Corp. v. Apple Inc.*,
 2011 WL 1086027 (N.D. Cal. Mar. 24, 2011).............................................22

*M.V.B. Collision, Inc. v. Allstate Ins. Co.*,
 728 F. Supp. 2d 205 (E.D.N.Y. 2010)..........................................................44

*Maio v. Aetna, Inc.*,
 221 F.3d 472 (3d Cir. 2000)..........................................................................23

*Mar-Jac Poultry, Inc. v. Katz*,
 773 F. Supp. 2d 103 (D.D.C. 2011)..............................................................14

*Maryland v. EPA*,
 958 F.3d 1185 (D.C. Cir. 2020) (per curiam)..............................................21

*McBride v. Merrell Dow & Pharms., Inc.*,
 800 F.2d 1208 (D.C. Cir. 1986)..............................................................15, 17

*McClanahan v. Anti-Defamation League*,
 2023 WL 8704258 (W.D. Mo. Dec. 15, 2023).............................................12

*McFadden v. Wash. Metro. Area Transit Auth.*,
 949 F. Supp. 2d 214 (D.D.C. 2013)..............................................................38

*McFarlane v. Esquire Mag.*,
 74 F.3d 1296 (D.C. Cir. 1996)......................................................................19

*McKenzie v. Dow Jones & Co.*,
 355 F. App'x 533 (2d Cir. 2009)..............................................................43, 44

*Mirbaha v. Pompeo*,
    513 F. Supp. 3d 179 (D.D.C. 2021) ............................................................................4

*Mittleman v. United States*,
    104 F.3d 410 (D.C. Cir. 1997) ................................................................................36

*Moldea v. N.Y. Times Co.*,
    22 F.3d 310 (D.C. Cir. 1994) ...................................................................................9

*Mullin v. Wash. Free Wkly., Inc.*,
    785 A.2d 296 (D.C. 2001) ..............................................................................36, 37

*Murray v. HuffingtonPost.com, Inc.*,
    21 F. Supp. 3d 879 (S.D. Ohio 2014) ....................................................................12

*N.Y. Times Co. v. Sullivan*,
    376 U.S. 254 (1964) ...............................................................................................20

*Nat'l Rifle Ass'n v. Cuomo*,
    350 F. Supp. 3d 94 (N.D.N.Y. 2018) .....................................................................12

*Novecon, Ltd. v. Bulgarian-Am. Enter. Fund*,
    977 F. Supp. 45 (D.D.C. 1997) ..............................................................................17

*NOW, Inc. v. Scheidler*,
    510 U.S. 249 (1994) .................................................................................................9

*Nunes v. WP Co.*,
    513 F. Supp. 3d 1 (D.D.C. 2020) ...........................................................................19

*Octane Fitness, LLC v. ICON Health & Fitness, Inc.*,
    572 U.S. 545 (2014) ...............................................................................................22

*\*Ollman v. Evans*,
    750 F.2d 970 (D.C. Cir. 1984) ....................................................................10, 12, 13

*Oparaugo v. Watts*,
    884 A.2d 63 (D.C. 2005) ........................................................................................38

*Parisi v. Sinclair*,
    774 F. Supp. 2d 310 (D.D.C. 2011) .......................................................................39

*Percival Partners Ltd. v. Nduom*,
    99 F.4th 696 (4th Cir. 2024) ..................................................................................26

*Phila. Newspapers, Inc. v. Hepps*,
    475 U.S. 767 (1986) ...............................................................................................18

*Pyles v. HSBC Bank USA, N.A.*,
　　172 A.3d 903 (D.C. 2017) ...................................................................38

*Rehberg v. Paulk*,
　　566 U.S. 356 (2012)..........................................................................10

*Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*,
　　487 U.S. 781 (1988)..........................................................................20

*\*RJR Nabisco v. Eur. Cmty.*,
　　579 U.S. 325 (2016).......................................................23, 26, 29, 30

*Robertson v. Cartinhour*,
　　867 F. Supp. 2d 37 (D.D.C. 2012) ....................................................41

*RSM Prod. Corp. v. Freshfields Bruckhaus Deringer U.S. LLP*,
　　682 F.3d 1043 (D.C. Cir. 2012) .........................................................35

*Rynn v. Jaffe*,
　　457 F. Supp. 2d 22 (D.D.C. 2006) .....................................................37

*Sabre Int'l Sec. v. Torres Advanced Enter. Sols., Inc.*,
　　857 F. Supp. 2d 97 (D.D.C. 2012) .....................................................42

*Savage v. Council on Am.-Islamic Rels., Inc.*,
　　2008 WL 2951281 (N.D. Cal. July 25, 2008)........................................9

*Settles v. Universal Prot. Serv., LLC*,
　　2024 WL 1328464 (D.D.C. Mar. 28, 2024)..........................................10

*Snyder v. Phelps*,
　　562 U.S. 443 (2011)............................................................................9

*Sorrell v. IMS Health Inc.*,
　　564 U.S. 552 (2011)..........................................................................20

*Sosa v. DIRECTV, Inc.*,
　　437 F.3d 923 (9th Cir. 2006) .............................................................21

*Stone v. Landis Constr. Co.*,
　　120 A.3d 1287 (D.C. 2015) ...............................................................39

*Stovell v. James*,
　　810 F. Supp. 2d 237 (D.D.C. 2011) ...................................................39

*Tavoulareas v. Piro*,
　　817 F.2d 762 (D.C. Cir. 1987) .....................................................16, 17

x

*In re Taxable Mun. Bond Sec. Litig.*,
  51 F.3d 518 (5th Cir. 1995) .................................................................24, 25

*Taylor v. D.C. Water & Sewer Auth.*,
  957 A.2d 45 (D.C. 2008) ...........................................................................42

*In re Teledyne Def. Contracting Derivative Litig.*,
  849 F. Supp. 1369 (C.D. Cal. 1993) .........................................................23

*Time, Inc. v. Hill*,
  385 U.S. 374 (1967)....................................................................................20

*Tu Nguyen v. Duy Tu Hoang*,
  318 F. Supp. 3d 983 (S.D. Tex. 2018) .......................................................13

*Twin Lab'ys, Inc. v. Weider Health & Fitness*,
  900 F.2d 566 (2d Cir. 1990).......................................................................43

*United States v. Hendricks*,
  950 F.3d 348 (6th Cir. 2020) ..................................................................4, 13

*United States v. Kabir*,
  51 F.4th 820 (9th Cir. 2022) ......................................................................11

*United States v. Philip Morris USA, Inc.*,
  396 F.3d 1190 (D.C. Cir. 2005) .................................................................18

*United States v. Philip Morris USA, Inc.*,
  855 F.3d 321 (D.C. Cir. 2017) .....................................................................9

*United States v. Turkette*,
  452 U.S. 576 (1981)..............................................................................32, 33

*Venetian Casino Resort, LLC v. NLRB*,
  793 F.3d 85 (D.C. Cir. 2015) .....................................................................20

*W. Assocs. Ltd. P'ship v. Mkt. Square Assocs.*,
  235 F.3d 629 (D.C. Cir. 2001) .......................................................29, 31, 32

*W.S. Kirkpatrick & Co. v. Envt'l Tectonics Corp., Int'l*,
  493 U.S. 400 (1990)....................................................................................26

*Waldbaum v. Fairchild Publ'ns, Inc.*,
  627 F.2d 1287 (D.C. Cir. 1980).................................................14, 15, 16, 18

*Wallace v. Skadden, Arps, Slate, Meagher & Flom*,
  715 A.2d 873 (D.C. 1998) ..........................................................................38

*Wash. Post v. Robinson*,
  935 F.2d 282 (D.C. Cir. 1991) ...................................................................................4

*Weyrich v. New Republic, Inc.*,
  235 F.3d 617 (D.C. Cir. 2001) .................................................................................10

*Wolf v. Menh*,
  810 F. App'x 10 (D.C. Cir. 2020)........................................................................36, 37

*Xereas v. Heiss*,
  933 F. Supp. 2d 1 (D.D.C. 2013) .............................................................................40

*\*Yegiazaryan v. Smagin*,
  599 U.S. 533 (2023)...............................................................................26, 27, 28, 29

**Statutes**

18 U.S.C. § 1344 ..........................................................................................................30

18 U.S.C. § 1961 ....................................................................................................29, 31

18 U.S.C. § 1962 ...............................................................................7, 22, 30, 32, 34

18 U.S.C. § 1964 ...................................................................................7, 22, 23, 26

22 U.S.C. § 618 .............................................................................................................36

26 U.S.C. § 7201 ..........................................................................................................36

D.C. Code § 12–301 .....................................................................................................36

D.C. Code § 28–3901 ...................................................................................................40

D.C. Code § 28–3904 ...................................................................................................40

**Other Authorities**

American Heritage Dictionary (5th ed. 2012) ............................................................13

Laurie Cohen et al., *A Rare Look at Secretive Brotherhood in America*, Chi. Trib.
  (Sept. 19, 2004)......................................................................................................16

Farid Hafez, *Anas Schafkeh. Das österreichische Gesicht des Islams* (Braumüller,
  Vienna: 2012).............................................................................................................5

Farid Hafez, *How Prominent Muslims in Austria Were Painted as Enemies of the
  State*, New Lines Mag. (Aug. 26, 2024) .........................................5, 10, 11, 12, 18

*Hamas' Benefactors: A Network of Terror: Hearing Before the H. Subcomm. on the Middle E. & N. Africa & the H. Subcomm. on Terrorism, Nonproliferation, and Trade*, 113th Cong. (Sept. 9, 2014) ....................................................15

Murtaza Hussain, *Lawsuit Links Wild UAE-Financed Smear Campaign to George Washington University*, The Intercept (Apr. 20, 2024) .........................................18

Maggie Hyde, *Washington In A War Of Words On How To Label Terrorists*, HuffPost (July 23, 2010).........................................................................................11

*Identifying the Enemy: Radical Islamist Terror: Hearing Before the H. Subcomm. on Oversight & Mgmt. Efficiency*, 114th Cong. (Sept. 22, 2016)............................15

*Islamic Extremism in Europe: Hearing Before H. Subcomm. on Eur. and Emerging Threats*, 109th Cong. (Apr. 27, 2005) ....................................................15

Ian Johnson, *How Islamic Group's Ties Reveal Europe's Challenge*, Wall St. J. (Dec. 29, 2005) ....................................................................................................15

Diana Mautner Markhof, *Fighting Smear Campaigns Against Muslims in Europe: The Case of Professor Farid Hafez*, iGlobe News (Apr. 26, 2024).........................18

Mark Memmott, *Here's Why We Use The Word 'Islamist,'* NPR (Feb. 18, 2015) .....................11

Merriam-Webster's Collegiate Dictionary (11th ed. 2020)....................................11, 13

*The Muslim Brotherhood's Global Threat: Hearing Before the H. Subcomm. on Nat'l Sec.*, 115th Cong. (July 11, 2018)....................................................................15

*Muslim Brotherhood: Hearing Before H. Subcomm. on Terrorism, HUMINT, Analysis & Counterintelligence*, 112 Cong. (Apr. 13, 2011).....................................4

Michael Schaffer, *An Autocratic US Ally Is Accused of Smearing an American. His Lawsuit Could Air a Lot of Dirty Laundry*, Politico (Apr. 5, 2024)................................18

Felicia Schwartz & Jay Solomon, *U.S. Weighs Terror Label on Iran Revolutionary Guard, Muslim Brotherhood*, Wall St. J. (Feb. 8, 2017)................................16

Lorenzo Vidino, *Austria, Not France, Is the Model for Europe's Crackdown on Islamists*, Foreign Policy (Nov. 11, 2020) ...........................................7, 22, 28, 37

Lorenzo Vidino, *The Muslim Brotherhood in Austria* (Aug. 2017) ..................................5, 10, 22

**INTRODUCTION**

Farid Hafez, an Austrian professor who studies and writes on Islamophobia, asserts various claims based on vague and allegedly false statements associating him with the Muslim Brotherhood. Hafez conjectures that these statements were in service of a vast and international network of "bad actors" befitting a pulp spy novel—from a Middle Eastern nation-state and its crown prince to private investigatory firms and their personnel throughout Europe—who conspired to destroy his reputation and career. Dkt. 5 (Compl.) at 12. Apparently, this purported cabal was remarkably unsuccessful in its task; Hafez now occupies a distinguished professorship at Williams College. Hafez has nonetheless filed a 69-page complaint that seeks millions in damages against these entities and individuals for their purported malfeasance.

This legal dragnet has also ensnared a minnow: Dr. Lorenzo Vidino. Neither a prince nor private investigator, Dr. Vidino is an academic who writes and speaks about the Muslim Brotherhood. This meritless suit against Dr. Vidino marks the latest salvo in a long-running exchange of academic broadsides on that topic that began when Hafez published a book chapter in 2016 criticizing Dr. Vidino for his allegedly "inaccurat[e]" description of the relationship between the Muslim Brotherhood and a Muslim organization in Austria. Compl. ¶ 58. According to the Complaint, Dr. Vidino subsequently wrote a 54-page report on Islamic extremism in Austria (which mentioned Hafez only once), and delivered testimony on extremism to Austrian officials, purportedly resulting in a "raid" on Hafez's home in Austria, his emigration to the United States, and his eventual assumption of his distinguished professorship in the United States.

Though heavy on rhetoric, Hafez does not plausibly allege an international conspiracy and resultant "'dark' public relations campaign" against him. Compl. ¶ 1. The Complaint is also largely devoid of specific allegations about any action the "conspirators" took against him. As for

1

Dr. Vidino, specifically, the Complaint simply alleges that a private investigatory firm (Alp Services) hired him to conduct research on the Muslim Brotherhood and related organizations and individuals.  But it never asserts that Alp directed Dr. Vidino to target Hafez.  Nor did Alp even disclose who the underlying client was for the research—much less that it would play some role in a sprawling, transnational conspiracy.

Hafez's claims against Dr. Vidino ultimately bear all the hallmarks of an attempt to assert defamation.  But the Complaint conspicuously lacks a defamation claim.  For good reason:  Hafez acknowledges that "'you cannot sue'" Dr. Vidino "'for libel, because he does not actually say you are a member of the Muslim Brotherhood'" and has a "complete right to" his "own opinions" about who "might . . . have some association with the Brotherhood."  Compl. ¶¶ 38, 48.

With that path foreclosed, Hafez repackages his claims under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), and under D.C. law for common-law fraud, violations of the consumer protection act, tortious interference, and "prima facie tort."  His claims are meritless, and they should be dismissed for multiple reasons.

*First*, Hafez's claims are barred by the First Amendment.  Rhetoric aside, Hafez's claims against Dr. Vidino rest entirely on two statements allegedly associating Hafez with the Muslim Brotherhood, but both statements are constitutionally protected opinion.  And even if those statements could be construed as statements of fact, Hafez fails to allege that Dr. Vidino acted with actual malice, a showing required by Hafez's status as a public figure and his request for punitive damages.  Hafez's claims are doubly barred under the *Noerr-Pennington* doctrine, which forecloses efforts to impose liability for speech (like Dr. Vidino's) that aims to influence government policy.

*Second*, Hafez fails to plausibly allege virtually *any* element of a RICO claim.  His asserted reputational injuries do not qualify as the statutorily mandated injuries to "business or property"; are not "domestic" (instead arising exclusively from purported conduct and injuries abroad); do not stem from RICO predicate offenses; do not arise from a "pattern" of racketeering activity (given the single, discrete scheme alleged); and implicate no racketeering "enterprise" (which requires the continuous existence of an unlawful association, not a single, ad hoc transaction).  The Complaint likewise presents no facts plausibly suggesting that Dr. Vidino *directly* caused Hafez's asserted injuries, as Supreme Court precedent requires, and expressly admits that every harm Hafez claims to have suffered arose from the intervening conduct of third parties.  Nor does the Complaint come close to plausibly pleading that Dr. Vidino *knowingly* joined a transnational racketeering conspiracy.

*Third*, Hafez's state-law causes of action are time-barred and meritless.  Each claim turns on allegedly defamatory statements published years before Hafez filed suit, rendering them untimely under the one-year statute of limitations applicable to claims seeking to recover for reputational harms from speech.  And, again, Hafez fails to plausibly allege virtually *any* element of his claims:  He cannot establish the reliance, fraudulent intent, or knowledge of falsity required for common-law fraud.  His unfair trade practices claim fails for want of an allegedly unlawful "trade practice" or the required consumer-merchant relationship.  His tortious-interference claim fails because Hafez does not plausibly allege a cognizable contract or expectancy, knowledge of any such expectancy, causation, or intent to interfere.  Finally, Hafez's prima facie tort claim is a New York law claim not recognized in the District.

This Court should dismiss Hafez's claims against Dr. Vidino with prejudice.

**STATEMENT OF THE CASE**

Dr. Vidino is a "credible and highly credentialed" "'expert on the Muslim Brotherhood'" and its activities in Europe and North America.  Compl. ¶¶ 41, 79.  Dr. Vidino has studied the Brotherhood for nearly "'twenty-five years,'" including in his role as Director of the Program on Extremism at the George Washington University.  *Id.* ¶¶ 27, 38.  A self-described "'one-trick pony,'" Dr. Vidino conducts the "'same research'" on extremism no matter the context:  He serves as an "'adviser'" and "'consultant for several European governments,'" a "'research[er] for private firms,'" *id.* ¶¶ 38, 41, and as an expert witness in criminal prosecutions, *e.g.*, *United States v. Hendricks*, 950 F.3d 348, 351 (6th Cir. 2020).  He has also repeatedly testified before Congress about Islamic fundamentalists, including the Muslim Brotherhood, and advocated for legislative, diplomatic, and law-enforcement responses based on his academic research.  *E.g.*, *Muslim Brotherhood: Hearing Before H. Subcomm. on Terrorism, HUMINT, Analysis & Counterintelligence*, 112 Cong. (Apr. 13, 2011), https://perma.cc/73Q3-K88J.[1]

Hafez claims similar academic stature.  According to the Complaint, he is a prominent "scholar and professor of Islamophobia," "politics and religion, far-right parties and movements, race, and racism, and decolonial studies," who "has published more than 150 books and academic articles."  Compl. ¶¶ 15, 52.  He is currently "the Class of 1955 Distinguished Visiting Professor of International Studies at Williams College" and "a non-resident Researcher at Georgetown University's The Bridge Initiative."  *Id.* ¶ 15.  Until 2021, Hafez worked as a Senior Researcher at the University of Salzburg in Austria.  *Id.*  By his own description, Hafez was a "well known . . .

---

[1] This Court may take judicial notice "'of facts on the public record'" in prior federal court decisions, *Covad Commc'ns Co. v. Bell Atl. Corp.*, 407 F.3d 1220, 1222 (D.C. Cir. 2005), as well as the "existence of newspaper articles," *Wash. Post v. Robinson*, 935 F.2d 282, 291 (D.C. Cir. 1991), and "congressional testimony," *Mirbaha v. Pompeo*, 513 F. Supp. 3d 179, 185 n.2 (D.D.C. 2021).

public commentator" in Austria who "was regularly interviewed about daily political events on television," a "writer for many of" the "Austrian news media['s]" "most prestigious publications," "an interlocutor on Muslim issues for the Austrian public," and a "critic" of the Austrian prime minister's "anti-Muslim policies." Farid Hafez, *How Prominent Muslims in Austria Were Painted as Enemies of the State*, New Lines Mag. (Aug. 26, 2024), https://perma.cc/3REN-CFTD ("*New Lines* Editorial").

In 2016, Hafez allegedly published a book chapter criticizing Dr. Vidino for drawing connections between the Austrian Muslim Youth Organization and the Muslim Brotherhood. Compl. ¶ 58.  A year later, with funding from the Austrian government, Dr. Vidino published a report on the Muslim Brotherhood in Austria.  *Id.* ¶ 56; *see* Lorenzo Vidino, *The Muslim Brotherhood in Austria* (Aug. 2017), https://perma.cc/29L6-W8Q5 ("Austria Report").  Hafez does not dispute the truth of the Report's single brief reference to him—that he was "once a key leader of the" Austrian Muslim Youth Organization and is "currently a prominent Islamophobia expert at the University of Salzburg."  Austria Report 34.  Yet after the issuance of the Report, Hafez claims to have lost unspecified "speaking engagements" and relationships with other "academic and publishing venues."  *E.g.*, Compl. ¶¶ 59, 168, 197.[2]

In January 2018, several months after Dr. Vidino published the Austria Report, he was allegedly invited to a meeting in Geneva with an employee of the Swiss investigative firm Alp Services ("Alp").  Compl. ¶¶ 38, 80.  The Complaint alleges that, in an effort to "disguise the identity" of Alp's client, the employee stated that he was working for a "'London-based law firm.'"

---

[2] The Austria Report also cited a book written by Hafez as support for an unrelated proposition. *See* Austria Report 18 & n.40 (citing Farid Hafez, *Anas Schafkeh. Das österreichische Gesicht des Islams* 26–28 (Braumüller, Vienna: 2012), for the proposition that, "In 1968, Schakfeh also co-founded the Moslemische Studentenunion (MSU), of which he became Secretary General and later President").

*Id.* ¶ 80.  Two weeks after the meeting, Dr. Vidino allegedly "signed a contract with Alp to provide '[i]nteresting leads/rumours . . . regarding the subject of investigation organisations/individuals/funding in Europe' and a '[l]ist of alleged members of the first-tier organisations in European countries'" in exchange for "3,000" euros.  *Id.* ¶ 81.  The Complaint avers that Dr. Vidino "'delivered to Alp a series of gossipy reports about the Brotherhood's reach,'" including a February 2020 report on the Muslim Brotherhood in Germany ("Germany Report"), which supposedly identified Hafez as a "'close MB operator.'"  *Id.* ¶¶ 38, 41, 90 n.24.

Unbeknownst to Dr. Vidino, Alp and its sister firm Diligence SARL ("Diligence") were allegedly working at the behest of the United Arab Emirates ("UAE") to discredit "Qatar and its networks, including the Muslim Brotherhood."  Compl. ¶ 73.  According to the Complaint, Alp's leadership "oversaw the execution of the campaign" from Switzerland.  *Id.* ¶ 78.  Emirati officials allegedly met with Alp employees in Zurich and Abu Dhabi, and provided "guidance" by telephone, "'encrypted channels,'" and anonymous email.  *Id.* ¶¶ 76, 78, 82, 84, 91–92, 94.  For all the alleged globetrotting and spycraft, however, Hafez does not claim that Alp ever took any action against him beyond "obtain[ing] his phone records."  *Id.* ¶ 7.

In November 2020, as part of "Operation Luxor," Austrian police carried out a raid targeting suspected terrorists—including Hafez.  Compl. ¶¶ 38, 56, 91.  Attributing talismanic significance to a single scholar's writing, the Complaint implausibly asserts that Dr. Vidino's Austria Report singlehandedly moved the Austrian government to conduct Operation Luxor.  *Id.* ¶ 56.  (Somewhat less fantastically, the Complaint alleges that the Report was cited in the search warrant authorizing the raid—although never in relation to Hafez.  *Id.*)  Dr. Vidino also allegedly provided testimony to Austrian law enforcement both before the raid in January 2020, and after the raid in March and December 2022.  *Id.*  The post-raid testimony, the Complaint asserts,

"associated Dr. Hafez with terrorism."  *Id.* ¶ 60.  A year after the raid, Hafez allegedly left the University of Salzburg and moved to the United States to take up his current position at Williams College.  *See id.* ¶¶ 15, 188.

In the raid's wake, Dr. Vidino published an editorial in *Foreign Policy* encouraging European governments to avoid actions that could be perceived as targeting "Islam and . . . Muslim identity."  Lorenzo Vidino, *Austria, Not France, Is the Model for Europe's Crackdown on Islamists*, Foreign Policy (Nov. 11, 2020), https://perma.cc/UCV6-C6ZL ("*Foreign Policy* Editorial").  There, Dr. Vidino referred to Hafez as a "'known Islamist actor[] and supporter[].'"  Compl. ¶ 90 n.24.  Hafez does not allege that the Editorial had any connection to Alp.  *Id.*

In a 2023 *New Yorker* article discussing Alp, Hafez acknowledged that "'you cannot sue'" Dr. Vidino "'for libel, because he does not actually say you are a member of the Muslim Brotherhood!'"  Compl. ¶ 38.  Nevertheless, nearly four years after the raid, Hafez filed this action on March 27, 2024, on behalf of himself and a putative class seeking actual, punitive, and treble damages under RICO, 18 U.S.C. §§ 1962(c)–(d), 1964(c), and D.C. law.  *See* Dkt. 1.  Hafez filed an amended complaint on April 16, 2024.  The Complaint names as defendants Dr. Vidino, George Washington University and the Program on Extremism, Alp, Diligence, several supposed Alp employees and contractors, Ariaf Studies and Research LLC, and 25 "John Does" who allegedly assisted Alp.  *See* Compl. ¶¶ 1, 18–25, 27.

## LEGAL STANDARDS

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  The claims "must rise 'above the speculative level,'" and they "cannot survive a motion to dismiss if based on inferences 'unsupported by facts' or legal conclusions disguised as

factual allegations." *Bernhardt v. Islamic Republic of Iran*, 47 F.4th 856, 866 (D.C. Cir. 2022). Likewise, a pleading "'will not do'" if it offers only "'naked assertion[s]'" or "'a formulaic recitation of the elements of a cause of action.'" *Iqbal*, 556 U.S. at 678.

Claims for fraud and RICO predicate acts of mail, wire, or bank fraud must be alleged with "the specificity required by the heightened pleading standard of" Federal Rule of Civil Procedure 9(b). *Bates v. Nw. Hum. Servs., Inc.*, 466 F. Supp. 2d 69, 88 (D.D.C. 2006). To meet that standard, the Complaint must plausibly allege the "'who,'" "'what,'" "'when,'" "'where,'" and "'how'" of the purported fraud. *Brink v. Cont'l Ins. Co.*, 787 F.3d 1120, 1127 (D.C. Cir. 2015).

## ARGUMENT

This Court should dismiss the claims against Dr. Vidino with prejudice. The First Amendment and the *Noerr-Pennington* doctrine bar all of Hafez's claims, which seek to impose liability for fully protected speech and petitioning activity. Hafez's RICO claims independently fail because the Complaint's conclusory allegations fall well short of plausibly pleading a RICO violation, and the Complaint fails to plead any facts showing that Dr. Vidino *knowingly* joined a RICO "conspiracy" to injure Hafez. And Hafez's state-law claims are both time-barred and meritless.

### I.   The First Amendment Bars Hafez's Claims.

Hafez's claims are barred both by the First Amendment's Free Speech Clause and by the Petition Clause and *Noerr-Pennington* doctrine.

#### A.   Hafez Cannot Overcome The Free Speech Clause's Protection.

The First Amendment defeats the Complaint (and its repackaged defamation claims) for two independent reasons. First, all of Hafez's claims target constitutionally protected opinion, which the First Amendment prohibits. Second, even if Dr. Vidino's statements could be construed

as statements of fact, Hafez failed to plausibly allege that Dr. Vidino acted with actual malice, as the First Amendment requires in light of Hafez's status as a limited-purpose public figure and his request for punitive damages.

### i. The Free Speech Clause applies regardless of the claim asserted.

Efforts to impose civil liability must meet the First Amendment's strictures, which apply regardless of the cause of action asserted. *Snyder v. Phelps*, 562 U.S. 443, 451 (2011) (explaining that the Free Speech Clause is a "defense" to civil liability). Courts "applying RICO" therefore must "bear in mind" that "RICO predicate acts may turn out to be fully protected First Amendment activity." *NOW, Inc. v. Scheidler*, 510 U.S. 249, 264–65 (1994) (Souter, J., concurring). A plaintiff cannot "'end-run the requirements for a defamation claim' by pleading it as a RICO violation." *E.g.*, *Ctr. for Immigr. Stud. v. Cohen*, 410 F. Supp. 3d 183, 191 (D.D.C. 2019); *Savage v. Council on Am.-Islamic Rels., Inc.*, 2008 WL 2951281, at *12 (N.D. Cal. July 25, 2008); *cf. United States v. Philip Morris USA, Inc.*, 855 F.3d 321, 327–28 (D.C. Cir. 2017) (applying First Amendment scrutiny to RICO injunction). Nor can a plaintiff "avoid the constitutional requisites of a defamation claim" by using other "related causes of action." *E.g.*, *Moldea v. N.Y. Times Co.*, 22 F.3d 310, 319–20 (D.C. Cir. 1994) ("false light invasion of privacy"); *Snyder*, 562 U.S. at 460 ("intentional infliction of emotional distress or intrusion upon seclusion"); *Hustler Mag., Inc. v. Falwell*, 485 U.S. 46, 56 (1988) ("intentional infliction of emotional distress"); *Farah v. Esquire Mag.*, 736 F.3d 528, 540 (D.C. Cir. 2013) ("false light" and "tortious interference"). Hafez therefore must surmount the Free Speech Clause's protection to prevail on any of his claims.

### ii. The Complaint targets constitutionally protected opinion.

The Complaint specifically identifies only two allegedly defamatory statements by Dr. Vidino: (1) his reference to Hafez as a "'known Islamist actor[] and supporter[]'" in the *Foreign Policy* Editorial, and (2) his suggestion that Hafez "'is known to be a close MB operator

from Austria'" in the Germany Report.  Compl. ¶ 90 n.24.  Both statements are fully protected

First Amendment opinions.[3]

A "'statement of opinion relating to matters of public concern which does not contain a

provably false factual connotation will receive full constitutional protection.'"  *Weyrich v. New*

*Republic, Inc.*, 235 F.3d 617, 624 (D.C. Cir. 2001).  That is so when the statement lacks "a precise

core of meaning for which a consensus of understanding exists."  *Ollman v. Evans*, 750 F.2d 970,

979 (D.C. Cir. 1984) (en banc).  "[S]ubjective description," *Couch v. Verizon Commc'ns Inc.*, 105

F.4th 425, 435 (D.C. Cir. 2024), and "judgement-based terms that 'admit[] of numerous

interpretations,'" fall short, *Cheng v. Neumann*, 51 F.4th 438, 446 (1st Cir. 2022).  In assessing

whether statements are protected "opinion," "'context'" is key.  *Couch*, 105 F.4th at 435.

The Complaint all but concedes that Dr. Vidino's two allegedly actionable statements are

protected opinion.  By Hafez's own admission, Dr. Vidino has a "complete right to" his "own

opinions" about who "might . . . have some association with the Brotherhood."  Compl. ¶ 48.  The

mere suggestion that a party has "'some kind of a relationship to people who are related to the

Muslim Brotherhood,'" as Hafez appears to recognize, is too vague and amorphous to constitute a

---

[3] The Complaint gestures vaguely towards other statements but fails to specifically identify any.
For instance, it suggests that the Austria Report somehow contributed to Hafez's inclusion in
Operation Luxor, Compl. ¶ 56, but does not dispute the truth of the Report's single statement about
Hafez: that he was "once a key leader of the" Austrian Muslim Youth Organization.  Austria Report
34; *see also New Lines* Editorial (acknowledging that the Austria Report "did not name me" as
being "suspected of affiliation with the" "Muslim Brotherhood").  In a similar vein, the conclusory
assertion that Dr. Vidino's post-raid testimony to Austrian law enforcement "associated Dr. Hafez
with terrorism," Compl. ¶ 60, falls far short of the specificity necessary for "the Court" to
"determine whether" the testimony was "false and capable of a defamatory meaning," *Settles v.
Universal Prot. Serv., LLC*, 2024 WL 1328464, at *6 (D.D.C. Mar. 28, 2024) (dismissing based on
failure to "set forth the verbatim language or the substance of the allegedly defamatory matter").
Regardless, Dr. Vidino's testimony would be immunized by the judicial-proceedings privilege.
*E.g.*, *Rehberg v. Paulk*, 566 U.S. 356, 359 (2012) (immunizing "grand jury and trial witnesses");
*Bouchet v. Nat'l Urb. League, Inc.*, 730 F.2d 799, 806 (D.C. Cir. 1984) ("An absolute privilege
attaches to statements made during the course of a judicial proceeding.").

statement of fact.  *Id.* ¶ 38.  Consequently, as Hafez told the *New Yorker*, "'you cannot sue'" Dr. Vidino "'for libel, because he does not actually say you are a member of the Muslim Brotherhood!'"  *Id.*  Hafez is right:  Both statements alleged by the Complaint are constitutionally protected opinion.

    *Known Islamist actor and supporter*.  Dr. Vidino's statement that Hafez is a "'known Islamist actor[] and supporter[]'" is a constitutionally protected opinion.  The First Amendment treats "political labels" (such as "Islamist") as protected opinions because they "are concepts whose content is . . . debatable, loose and varying."  *Buckley v. Littell*, 539 F.2d 882, 893–94 (2d Cir. 1976).  "Islamist" enjoys no agreed-upon definition, and Hafez himself acknowledges that the "category of 'known Islamist actors and supporters'" is "amorphous" and "vague."  *New Lines Editorial*.  Many definitions suggest some connotation of "'fundamentalism.'"  *E.g.*, Mark Memmott, *Here's Why We Use The Word 'Islamist*,*'* NPR (Feb. 18, 2015), https://perma.cc/9EGS-KMB9 ("'Islamist' is a noun meaning 'an advocate or supporter of Islamism'—which in turn is defined as 'a movement advocating the social and political establishment of Islamic fundamentalism'"); *United States v. Kabir*, 51 F.4th 820, 824 n.1 (9th Cir. 2022) ("This term—as opposed to terms such as 'Islamic' or 'Muslim' that refer generally to Islam as a religion—indicates a connection with a radical political ideology based on fundamentalist forms of Islam.").  Others do not.  *E.g.*, *Islamist*, Merriam-Webster's Collegiate Dictionary 663 (11th ed. 2020) (adherent of "a popular reform movement advocating the reordering of government and society in accordance with laws prescribed by Islam").  A spokesman for the Council for American Islamic Relations even once stated that he had "no idea what the term 'Islamist' means."  Maggie Hyde, *Washington In A War Of Words On How To Label Terrorists*, HuffPost (July 23, 2010), https://perma.cc/RQX3-SRW2.  Faced with similar labels of fundamentalism or extremism, courts invariably find them to

be "subjective judgments that lack verifiable truth" and thus to be protected "opinion." *E.g.*, *McClanahan v. Anti-Defamation League*, 2023 WL 8704258, at *5 (W.D. Mo. Dec. 15, 2023) ("'extremists'"); *Lewis v. Abramson*, 673 F. Supp. 3d 72, 91 (D.N.H. 2023) ("'radical,' 'militant,' 'dangerous,' or 'extremists'"); *Cheng*, 51 F.4th at 446 ("'far-right'"); *Nat'l Rifle Ass'n v. Cuomo*, 350 F. Supp. 3d 94, 133 (N.D.N.Y. 2018) ("'extremist organization'"); *Murray v. HuffingtonPost.com, Inc.*, 21 F. Supp. 3d 879, 885–88 (S.D. Ohio 2014) ("'extremist'"); *Carpenter v. King*, 792 F. Supp. 2d 29, 36–37 (D.D.C. 2011) ("terrorist"); *Buckley*, 539 F.2d at 893–95 ("'radical right'" and "'openly fascist'").

Were there any doubt, the context of Dr. Vidino's *Foreign Policy* Editorial confirms that the statement is one of subjective opinion. "It is reasonable to assume that the 'Arguments' section of FP"—where Dr. Vidino's editorial was published—"is one in which readers expect to find analytical and opinionated pieces that reflect a particular viewpoint." *Abbas v. Foreign Pol'y Grp., LLC*, 975 F. Supp. 2d 1, 17 (D.D.C. 2013). After all, "the general understanding of the nature of the statements on the editorial page" "predispose[s] the average reader to regard what is found there to be opinion." *Ollman*, 750 F.2d at 984, 987. Consider, for example, a recent editorial penned by Hafez: In *New Lines* Magazine, Hafez accused Dr. Vidino of being a "mercenar[y]" and an "ideological extremist[]" pushing "authoritarian policies . . . while undermining democratic basic principles under the guise of combating extremism." *New Lines* Editorial. Fortunately for Hafez, his vituperations are protected opinion.

*Close Muslim Brotherhood Operator*. The same is true of Dr. Vidino's statement that Hafez is a "'close MB operator.'" Compl. ¶ 90 n.24. "When used in political discourse, terms of relation and association often have meanings that are 'debatable, loose, and varying,' rendering the relationships they describe insusceptible of proof of truth or falsity." *Egiazaryan v. Zalmayev*,

12

880 F. Supp. 2d 494, 512 (S.D.N.Y. 2012). Short of asserting "provable" "membership" in "a formal organization with defined parameters," *Couch*, 105 F.4th at 435, such associational terms carry "a whole range of meanings and characteristics" that render them "protected opinion," *Buckley*, 539 F.2d at 894 ("'fellow traveler' of 'fascism'"); *see, e.g.*, *Couch*, 105 F.4th at 435 ("'member of the alt-right'"); *Flynn v. Cable News Network, Inc.*, 2024 WL 1765566, at *4–10 (S.D.N.Y. Apr. 24, 2024) ("'QAnon follower'"); *Tu Nguyen v. Duy Tu Hoang*, 318 F. Supp. 3d 983, 1009–11, 1013–15 (S.D. Tex. 2018) ("'puppet'" of, "'form a tag team'" with, "'lending a hand' to," "serving the interests of," and "'being a tool of'" the "'Communist Party of Vietnam'"); *Egiazaryan*, 880 F. Supp. 2d at 512 ("'leader'" of political party).

Dr. Vidino's statement here fits comfortably within those precedents. An "operator" is "a shrewd and skillful person who knows how to circumvent restrictions or difficulties," a "mountebank" or "fraud," *Operator*, Merriam-Webster's Collegiate Dictionary 870 (11th ed. 2020), or one "adept at accomplishing goals shrewdly or unscrupulously," *Operator*, American Heritage Dictionary 588 (5th ed. 2012). A person or entity, moreover, can operate in support of or on behalf of an organization without being a member of that organization. *E.g.*, *Hendricks*, 950 F.3d at 353–54 (defendant "was operating or seeking to operate on behalf of ISIS" despite lack of evidence of formal membership); *Lexington Ins. Co. v. Swanson*, 240 F.R.D. 662, 667 (W.D. Wash. 2007) (noting that "attorneys" can simultaneously "operate on behalf of both [an] insured and the insurer"). It is therefore "difficult to imagine, much less construct, a means of deciding the quantum of" alignment with the Muslim Brotherhood to "justif[y] the label" Muslim Brotherhood operator. *Ollman*, 750 F.2d at 987.

Context again confirms that the statement is protected opinion. A defendant cannot be held liable for offering "conjecture" and a "hypothesis" on matters of public concern; those are

quintessential First Amendment opinions. *Levin v. McPhee*, 119 F.3d 189, 197 (2d Cir. 1997); *Mar-Jac Poultry, Inc. v. Katz*, 773 F. Supp. 2d 103, 123 (D.D.C. 2011) (similar). The Complaint derides Dr. Vidino's Germany Report as just that—conjecture, "gossip[]," and "'[i]nteresting leads/rumours'" on the Muslim Brotherhood. Compl. ¶¶ 38, 81. Taken as true solely for purposes of this motion to dismiss, those allegations run headlong into the First Amendment. *See DiFolco v. MSNBC Cable LLC*, 831 F. Supp. 2d 634, 650 (S.D.N.Y. 2011) (statements of a "gossip-laden nature" are protected opinions).

Because the only two allegedly actionable statements identified in the Complaint are constitutionally protected opinion, the Complaint should be dismissed.

### iii. *Alternatively, Hafez must overcome the actual-malice standard to recover.*

Even if Dr. Vidino's statements could be construed as statements of fact, Hafez must allege that Dr. Vidino made *knowingly* false statements—*i.e.*, made the statements with actual malice—because (1) Hafez is a limited-purpose public figure and (2) he seeks punitive damages. Hafez falls well short of that standard.

*Public figure.* As a "'public figure,'" Hafez must plead actual malice. *Liberty Lobby, Inc. v. Rees*, 852 F.2d 595, 597 (D.C. Cir. 1988). Although Hafez is not a "public figur[e] for all purposes," he is a textbook "limited-purpose public figure"—one who "'voluntarily injects himself or is drawn into a particular public controversy and therefore becomes a public figure for a limited range of issues.'" *Waldbaum v. Fairchild Publ'ns, Inc.*, 627 F.2d 1287, 1292 (D.C. Cir. 1980). The D.C. Circuit applies a three-part test to make that determination. First, the court identifies "the relevant controversy and determine[s] whether it is a public controversy." *Jankovic v. Int'l Crisis Grp.*, 822 F.3d 576, 585 (D.C. Cir. 2016). Second, the subject of the speech must have "played a significant role in th[e] controversy." *Id.* And third, the allegedly defamatory statement must be "germane" to the figure's participation in the controversy. *Id.*

Hafez amply satisfies that three-part test. *First,* the Muslim Brotherhood's operations and associations in Europe and the United States are a prototypical public controversy. "An issue is a public controversy if it is 'being debated publicly' and has 'foreseeable and substantial ramifications for nonparticipants.'" *Kahl v. Bureau of Nat'l Affs., Inc.*, 856 F.3d 106, 114 (D.C. Cir. 2017). "[C]ontroversies" are often "broader than the narrower discussion contained in the defamatory document." *Jankovic*, 822 F.3d at 586.

The Complaint leaves little doubt that the "Muslim Brotherhood," "its motives," and who "might . . . have some association with the Brotherhood"—again, about which Dr. Vidino admittedly has "a complete right to" his "own opinion[]"—are the subjects of public controversy. Compl. ¶ 48. Hafez's own 2016 book chapter recognizes the Brotherhood's controversial character, publicly excoriating Dr. Vidino's statements drawing an association between the Austrian Muslim Youth Organization and the Muslim Brotherhood. *Id.* ¶ 58. The Brotherhood and its potential associations have "begotten a widespread and heated public controversy," *McBride v. Merrell Dow & Pharms., Inc.*, 800 F.2d 1208, 1211 (D.C. Cir. 1986), and were "being debated publicly" both in the "press," *Waldbaum*, 627 F.2d at 1297, and "in congressional hearings," *Franchini v. Bangor Publ'g Co.*, 109 F.4th 13, 32 (1st Cir. 2024).[4]

---

[4] The following represents just a tiny fraction of the debate. *E.g.*, *The Muslim Brotherhood's Global Threat: Hearing Before the H. Subcomm. on Nat'l Sec.*, 115th Cong. (July 11, 2018), https://perma.cc/NEP6-M5EL (debating "connections of American Islamist leaders to the Muslim Brotherhood" and designation of the group as a "foreign terrorist organization"); *Identifying the Enemy: Radical Islamist Terror: Hearing Before the H. Subcomm. on Oversight & Mgmt. Efficiency*, 114th Cong. (Sept. 22, 2016), https://perma.cc/BE7Y-QP7S (identifying "Muslim Brotherhood legacy groups in America"); *Hamas' Benefactors: A Network of Terror: Hearing Before the H. Subcomm. on the Middle E. & N. Africa & the H. Subcomm. on Terrorism, Nonproliferation, and Trade*, 113th Cong. (Sept. 9, 2014), https://perma.cc/HP35-D2T4 (exploring Brotherhood's links to Qatar, Turkey, and Egypt); Ian Johnson, *How Islamic Group's Ties Reveal Europe's Challenge*, Wall St. J. (Dec. 29, 2005), https://perma.cc/8HHS-WCVV ("From its beachhead in Germany, the Brotherhood has gone on to influence the most important Islamic group in France and a key council setting Islamic ideology in Europe."); *Islamic Extremism in Europe:*

The government's response to the Muslim Brotherhood—which could include designating it a foreign terrorist organization—also "affects the general public" and "will be felt by persons who are not direct participants" in the debate. *Waldbaum*, 627 F.2d at 1296; *see* Felicia Schwartz & Jay Solomon, *U.S. Weighs Terror Label on Iran Revolutionary Guard, Muslim Brotherhood*, Wall St. J. (Feb. 8, 2017), https://perma.cc/XKF9-G5LM (describing the U.S. government's consideration of designation). Such questions of national security and "foreign policy" are "unquestionably" matters "of public concern." *Desai v. Hersh*, 719 F. Supp. 670, 674 (N.D. Ill. 1989). And they invariably rise to the level of public controversies. *E.g.*, *Deripaska v. Associated Press*, 282 F. Supp. 3d 133, 138–40, 142 (D.D.C. 2017) (extent to which "Russian oligarchs" are "acting on behalf of the Russian government" in case involving statements that oligarch was engaged in criminality and concocted scheme with Paul Manafort to "'greatly benefit the Putin Government'"); *Abbas*, 975 F. Supp. 2d at 7, 12 ("The relationship between the United States and the Palestinian Authority" in case involving statements questioning whether son of the leader of the Palestinian Authority grew rich through corruption).

*Second*, Hafez assumed a public role in the controversy. A plaintiff does so "when he use[s] his" platform "to promote his cause," *Kahl*, 856 F.3d at 115, or "purposefully tr[ies] to influence the outcome" of a public controversy, *Lohrenz v. Donnelly*, 350 F.3d 1272, 1280 (D.C. Cir. 2003). Making "speeches" and "publish[ing] articles" are classic examples. *Tavoulareas v. Piro*, 817 F.2d 762, 774 (D.C. Cir. 1987) (en banc). So are "writing . . . books," "giving . . . lectures," and "serving as [an] editor." *Hoffman v. Wash. Post Co.*, 433 F. Supp. 600, 604 (D.D.C. 1977); *e.g.*,

---

*Hearing Before H. Subcomm. on Eur. and Emerging Threats*, 109th Cong. (Apr. 27, 2005), https://perma.cc/6LYP-4PU8 (discussing European "Youth associations acting as front organisations for the Muslim Brothers"); Laurie Cohen et al., *A Rare Look at Secretive Brotherhood in America*, Chi. Trib. (Sept. 19, 2004), https://perma.cc/QF8X-Z2CW (describing "U.S. Brotherhood['s] . . . significant and ongoing impact on Islam in America").

*Joseph v. Xerox Corp.*, 594 F. Supp. 330, 333 (D.D.C. 1984) (noting that plaintiff "has written chapters in books, newspaper articles, and several books").  That is particularly true in the academic realm, where "articles are inherently subject to robust criticism, and . . . entry into controversy and debate is expected and even required as a matter of course." *Chandok v. Klessig*, 648 F. Supp. 2d 449, 458 (N.D.N.Y. 2009).  Indeed, the "very purpose of writing articles in . . . journals, lecturing at universities, and opining in news shows and documentaries is to influence public discourse." *Biro v. Conde Nast*, 963 F. Supp. 2d 255, 271 (S.D.N.Y. 2013).  Those who do so "cannot be said to have entered the public arena haphazardly or otherwise in the absence of [their] own volition." *Chandok*, 648 F. Supp. 2d at 458.

Hafez's conduct fits that standard to a tee.  According to the Complaint, Hafez has "published more than 150 books and academic articles" and regularly participates in "panel discussions and symposiums" at "international universities and think tanks."  Compl. ¶¶ 15, 174, 191.  Hafez allegedly used his platform to "speak truth to power," *id.* ¶ 169, and to "challeng[e] Dr. Vidino's false accusations against Western Muslims," *id.* ¶ 57.  In 2016, for example, Hafez specifically criticized Dr. Vidino for associating the Austrian Muslim Youth Organization with the Muslim Brotherhood.  *Id.* ¶ 58.  By "spearheading a public counterattack on" Dr. Vidino, *Tavoulareas*, 817 F.2d at 773, and "fir[ing] the first shot," *Novecon, Ltd. v. Bulgarian-Am. Enter. Fund*, 977 F. Supp. 45, 49 (D.D.C. 1997), Hafez "assumed" the "'risk of closer public scrutiny than might otherwise be the case,'" *McBride*, 800 F.2d at 1211.

Hafez's "access to the press further bolsters" the "conclusion that [he] is a limited purpose public figure." *Jankovic v. Int'l Crisis Grp.*, 72 F. Supp. 3d 284, 303 n.17 (D.D.C. 2014) (citing *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 344 (1974)).  The Complaint relies extensively on favorable press coverage, including a *New Yorker* article parroting Hafez's criticism of Dr. Vidino.

17

Compl. ¶ 38; *see also id.* ¶ 41 (*Der Spiegel* article).  And just months ago, Hafez published an editorial describing himself as a major player in this controversy.  *New Lines* Editorial.  There, he characterized himself as a "well known . . . public commentator" in Austria who "was regularly interviewed about daily political events on television," a "writer for many of" the "Austrian news media['s]" "most prestigious publications," "an interlocutor on Muslim issues for the Austrian public," and a "critic" of the Austrian prime minister's "anti-Muslim policies."  *Id.*  Hafez, in short, is a paradigmatic example of one who "'voluntarily injects himself'" into a "'particular public controversy.'"  *Waldbaum*, 627 F.2d at 1292.[5]

*Third*, Dr. Vidino's alleged statements were germane to the controversy.  A statement fails the germaneness prong only if it is "'*wholly unrelated* to the controversy.'"  *Jankovic*, 822 F.3d at 589.  Statements "highlighting a plaintiff's . . . 'motives'" relate "to the individual's role in the public controversy."  *Id.*  Here, Dr. Vidino's statements suggesting that Hafez is a known Islamist and close Muslim Brotherhood operator relate both to the extent of the Brotherhood's connections and influence and to Hafez's motives and credibility.  They are germane to the controversy.

*Punitive damages.*  The actual-malice standard also independently applies because the Complaint seeks "to recover . . . punitive damages."  *Phila. Newspapers, Inc. v. Hepps*, 475 U.S. 767, 774 (1986).  Hafez seeks "punitive . . . damages" for his state-law claims, Compl. at 68(ii), and "treble damages" for his RICO claims, *id.*, which are punitive in nature, *United States v. Philip*

---

[5] A review of coverage demonstrates that Hafez has had no difficulty advancing his perspective in the press. *E.g.*, Michael Schaffer, *An Autocratic US Ally Is Accused of Smearing an American. His Lawsuit Could Air a Lot of Dirty Laundry*, Politico (Apr. 5, 2024), https://perma.cc/K7ZN-86MS; Murtaza Hussain, *Lawsuit Links Wild UAE-Financed Smear Campaign to George Washington University*, The Intercept (Apr. 20, 2024), https://perma.cc/SJY3-9FMT; Diana Mautner Markhof, *Fighting Smear Campaigns Against Muslims in Europe: The Case of Professor Farid Hafez*, iGlobe News (Apr. 26, 2024), https://perma.cc/32TD-5PUK.

*Morris USA, Inc.*, 396 F.3d 1190, 1200 (D.C. Cir. 2005) (explaining that in civil RICO cases "defendants [are] punished through treble damages under 18 U.S.C. § 1964(c)").

### iv.    The Complaint falls far short of plausibly alleging actual malice.

To plead actual malice "at the motion-to-dismiss stage," the plaintiff must "plausibly allege[] . . . facts that, if proven, would show" by "'clear and convincing' evidence" "that the defendants either knew their statements were false, had high awareness that the statements were probably false, or had serious doubts about the accuracy of the statements." *Couch*, 105 F.4th at 432 & n.2. The actual-malice standard is a "daunting" hurdle to clear, *McFarlane v. Esquire Mag.*, 74 F.3d 1296, 1308 (D.C. Cir. 1996), and courts time and again have rejected "conclusory label[s]," *Couch*, 105 F.4th at 434, "'bald allegations,'" *Hourani v. PsyberSolutions LLC*, 690 F. App'x 1, 3 (D.C. Cir. 2017) (per curiam), and "naked assertion[s] that [d]efendants knew" statements "were false," *Nunes v. WP Co.*, 513 F. Supp. 3d 1, 7 (D.D.C. 2020). It is not enough to allege actual malice "'in the abstract'"—rather, the plaintiff "'must demonstrate actual malice in conjunction with a false defamatory statement.'" *Boley v. Atl. Monthly Grp.*, 950 F. Supp. 2d 249, 262 (D.D.C. 2013).

Shorn of conclusory assertions, the Complaint fails to plausibly allege that Dr. Vidino made the two allegedly actionable statements with actual malice. *E.g.*, Compl. ¶ 46 ("Defendants made a series of fraudulent or continuing and knowingly false representations"); *id.* ¶ 162 ("Defendants knew that the documents and statements . . . were materially false and misleading"). At most, the Complaint suggests a speculative motive: that Dr. Vidino was "retaliati[ng]" for Hafez's scholarly "critici[sm]," *id.* ¶ 58, and seeking to "appease powerful donors," *id.* ¶ 170. But "'ill will toward the plaintiff or bad motives are not elements of actual malice.'" *Jankovic*, 822 F.3d at 590. And "'caselaw resoundingly rejects the proposition that a motive to disparage someone is evidence of actual malice.'" *Nunes*, 513 F. Supp. 3d at 8.

The Complaint cannot close this gap by asserting that the "Defendants knew *or should have known* that the adverse facts specified herein had not been verified" "[b]ecause of their positions and access to material non-public information," Compl. ¶ 17 (emphasis added), and "by virtue of their receipt of information reflecting the true facts," *id.* ¶ 162. For one, "actual malice requires 'much more'" than the allegation that a defendant "*should have known*" a statement was false. *Blankenship v. NBCUniversal, LLC*, 60 F.4th 744, 759 (4th Cir. 2023). For another, the Complaint's vague, collective assertions are purely conclusory, and the Complaint never describes or identifies what purported "material non-public information" could have established that Hafez is not an Islamist or is not operating in support of the Muslim Brotherhood.

Hafez's allegation that Dr. Vidino received compensation for the Austria and Germany Reports is likewise "immaterial." *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 266 (1964). An "economic motive" does not remove protected speech from the First Amendment's ambit. *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 567 (2011). Were it otherwise, the vast majority of speech that informs public debate through print, broadcasts, and mass media would be unprotected. *E.g.*, *N.Y. Times Co.*, 376 U.S. at 266 ("paid" newspaper "advertisement"); *Time, Inc. v. Hill*, 385 U.S. 374, 396–97 (1967) (article published "'for trade purposes'"); *Joseph Burstyn, Inc. v. Wilson*, 343 U.S. 495, 502 (1952) ("motion pictures"). In short, a "speaker is no less a speaker because he or she is paid to speak." *Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 801 (1988).

### B.  The Petition Clause and *Noerr-Pennington* Doctrine Independently Preclude Liability.

"The First Amendment's Petition Clause protects 'the right of the people . . . to petition the Government for a redress of grievances.'" *Venetian Casino Resort, LLC v. NLRB*, 793 F.3d 85, 89 (D.C. Cir. 2015). The *Noerr-Pennington* doctrine implements that constitutional guarantee by requiring courts to construe causes of action not to cover petitioning activity. *E.g.*, *E. R.R.*

*Presidents Conf. v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 138 (1961) (refusing to "lightly impute to Congress an intent to invade" the "right of petition"). The doctrine is "broad," *Feld Ent., Inc. v. Am. Soc'y for Prevention of Cruelty to Animals*, 873 F. Supp. 2d 288, 307 (D.D.C. 2012), and protects "'indirect' petitioning" such as "publicity campaign[s]," as well as speech "incidental to a valid effort to influence governmental action," *Allied Tube & Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492, 502–03 (1988). Because the doctrine is rooted in the Petition Clause, it applies to statutory and common-law claims of all stripes. *E.g.*, *Bill Johnson's Rests., Inc. v. NLRB*, 461 U.S. 731, 742–43 (1983) (federal labor laws); *Feld Ent. Inc.*, 873 F. Supp. 2d at 307–08 (civil RICO); *Sosa v. DIRECTV, Inc.*, 437 F.3d 923, 930–31 (9th Cir. 2006) (same); *Cheminor Drugs, Ltd. v. Ethyl Corp.*, 168 F.3d 119, 128 (3d Cir. 1999) ("state law claims"); *E. Sav. Bank, FSB v. Papageorge*, 31 F. Supp. 3d 1, 19 (D.D.C. 2014) (same).

The *Noerr-Pennington* doctrine, moreover, is not limited to petitioning domestic governments. To be sure, the Petition Clause itself does not "protect the right to petition foreign governments." *Austl./E. U.S.A. Shipping Conf. v. United States*, 537 F. Supp. 807, 812 (D.D.C. 1982). But the *Noerr-Pennington* doctrine is a "rule" of "construction" grounded in "constitutional avoidance." *E.g.*, *Sosa*, 437 F.3d at 931 n.5; *BE & K Constr. Co. v. NLRB*, 536 U.S. 516, 535 (2002) ("limiting construction"). "[S]tatutes are not chameleons, acquiring different meanings when presented in different contexts." *Maryland v. EPA*, 958 F.3d 1185, 1202 (D.C. Cir. 2020) (per curiam). Once a provision is narrowly construed to avoid "constitutional problems," that narrow construction governs "whether or not those constitutional problems pertain to the particular litigant before the Court." *Clark v. Martinez*, 543 U.S. 371, 380–81 (2005). Accordingly, *Noerr-Pennington* shields "efforts to influence foreign governments" no less than domestic ones. *E.g.*, *Coastal States Mktg., Inc. v. Hunt*, 694 F.2d 1358, 1366 (5th Cir. 1983); *Carpet Grp. Int'l v.*

*Oriental Rug Imps. Ass'n, Inc.*, 256 F. Supp. 2d 249, 266 (D.N.J. 2003); *Luxpro Corp. v. Apple Inc.*, 2011 WL 1086027, at *5 (N.D. Cal. Mar. 24, 2011).

Each aspect of Dr. Vidino's alleged speech targeted by the Complaint—the Austria Report, *Foreign Policy* Editorial, testimony to Austrian law enforcement, and Germany Report—involved protected conduct "aimed at influencing decisionmaking by the government." *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 572 U.S. 545, 556 (2014). The Austria Report advised "policymakers in Austria" to adopt a "case-by-case approach" to the Muslim Brotherhood, potentially including "tactical engagements with elements within the movement." Austria Report 50. The *Foreign Policy* Editorial encouraged European governments to avoid actions that could be perceived as targeting "Islam and . . . Muslim identity" to ensure that "the silent majority of Muslims . . . do not see themselves as targets." *Foreign Policy* Editorial. The same goes for Dr. Vidino's alleged testimony to Austrian law enforcement—which is classic petitioning activity. *E.g.*, *King v. Twp. of E. Lampeter*, 17 F. Supp. 2d 394, 414 (E.D. Pa. 1998) (testifying in court). And the Germany Report, which involved the "'same research,'" Compl. ¶ 38, was "incidental to" Dr. Vidino's long-running advocacy against the Brotherhood, *Allied Tube*, 486 U.S. at 502–03. The *Noerr-Pennington* doctrine therefore requires dismissal of Hafez's claims.

## II.    The Complaint Fails To State A RICO Claim (Counts 1-5) Against Dr. Vidino.

Beyond its constitutional infirmities, each of Hafez's claims fails on the merits. First up: The Complaint asserts that Dr. Vidino's handful of (constitutionally protected) statements violated the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1962(d), 1964(c), the federal prohibition on criminal racketeering. *See* Compl. ¶¶ 112–138. But Hafez's attempt to repackage (an admittedly non-viable) state-law defamation claim into a sprawling federal conspiracy is meritless. In Hafez's telling, Dr. Vidino managed to commit virtually every predicate

RICO violation in the book, *see id.* ¶¶ 103, 126, 132—a conduct-to-violation ratio that would make a mobster blush.  But the Complaint's reams of statutory citations cannot disguise Hafez's failure to plausibly plead *any* of RICO's most basic requirements.  He suffered no injury to "business or property"—much less a "domestic" one—from any RICO predicate offense.  Nor did he fall victim to a "pattern" of racketeering activity perpetrated by a RICO "enterprise" that Dr. Vidino "knowingly" joined.  For any of these reasons, the RICO claims fail.

### A.  Hafez Suffered No Injury To "Business Or Property."

To begin, the Complaint fails to plausibly plead the injury to "business or property" required under RICO.  RICO provides a "civil cause of action for '[a]ny person injured in his business or property by reason of a violation' of" its criminal prohibitions on the "activities of organized criminal groups in relation to an enterprise." *RJR Nabisco v. Eur. Cmty.*, 579 U.S. 325, 329 (2016) (quoting 18 U.S.C. § 1964(c)).  "The terms 'business or property' are . . . words of limitation which preclude recovery for personal injuries and the pecuniary losses incurred therefrom." *Doe v. Roe*, 958 F.2d 763, 767 (7th Cir. 1992).  And "[d]amage to reputation is generally considered personal injury and thus is not an injury to 'business or property' within the meaning of 18 U.S.C. § 1964(c)." *Hamm v. Rhone-Poulenc Rorer Pharms., Inc.*, 187 F.3d 941, 954 (8th Cir. 1999); *see also In re Teledyne Def. Contracting Derivative Litig.*, 849 F. Supp. 1369, 1372 n.1 (C.D. Cal. 1993) (injury to "'business reputation' . . . is not cognizable under RICO").

Even when the plaintiff does allege an injury to "business or property," RICO still requires "proof of a concrete financial loss," rather than "speculative" assertions of "intangible" injury. *Lopez v. Council on Am.-Islamic Rels. Action Network, Inc.*, 657 F. Supp. 2d 104, 114 (D.D.C. 2009) (citing *Maio v. Aetna, Inc.*, 221 F.3d 472, 483 (3d Cir. 2000)); *cf. Hourani v. Mirtchev*, 796 F.3d 1, 11 (D.C. Cir. 2015) (affirming dismissal of RICO claim where "complaint nowhere alleges

that [the plaintiffs] were injured in any way").  Accordingly, RICO "simply does not provide a remedy before a plaintiff has suffered reasonably ascertainable damages."  *D'Addario v. D'Addario*, 901 F.3d 80, 95 (2d Cir. 2018).  Courts routinely reject RICO claims where the plaintiff's "claimed damages . . . requir[e] extensive speculation" and do not "entail a calculation of present, actual damages."  *In re Taxable Mun. Bond Sec. Litig.*, 51 F.3d 518, 523 (5th Cir. 1995); *see also id.* ("lost opportunity" to obtain loan too speculative); *Hecht v. Com. Clearing House, Inc.*, 897 F.2d 21, 24 (2d Cir. 1990) (same result with "lost commissions in the future").

The Complaint flunks both requirements.  *First*, Hafez alleges only reputational injury. Page after page, the Complaint asserts that the "objectiv[e]" of Defendants' purported conspiracy was "destroying the *reputations* of their targets."  Compl. ¶ 21 (emphasis added).  The Complaint alleges that Hafez's "reputation [was] tarnished" and "severely damaged," leaving him "stigmatiz[ed]" and his "psychological well-being" impaired.  *Id.* ¶ 52.  Hafez thus seeks damages for "emotional," "psychological," and "reputational" harms, *id.*, to make right Defendants' allegedly "reputation-destroying lies," *id.* ¶ 78.  But these purported psychological and reputational injuries are not cognizable under RICO.  They are "personal injuries"—not damage to "'business or property'"—and accordingly run afoul of Section 1964(c)'s "words of limitation." *Doe*, 958 F.2d at 767.  Hafez cannot "'federalize[]'" a "'garden-variety'" dispute about Dr. Vidino's academic commentary by "'squeezing'" it into RICO.  *Gamboa v. Velez*, 457 F.3d 703, 710 (7th Cir. 2006).

*Second*, the Complaint's flimsy allegations of monetary injury do not pass plausible.  The sums it invokes are both internally inconsistent and devoid of plausible supporting facts.  Hafez frenetically asserts that the "total amount due and owing is $5.2 million plus punitive damages and attorneys' fees," Compl. ¶ 103; that he is entitled to compensatory damages of $1 million, *id.*

¶¶ 137, 203(a); and to $75,000 for "costs associated with relocating," *id.* ¶ 203(b).  But nowhere does he plead facts plausibly explaining how he suffered these stratospheric losses.  Attempting to divine the extent (and existence) of any such monetary harms would accordingly diverge from the "calculation of present, actual damages"—which RICO requires—and degenerate into "extensive speculation"—which RICO forbids.  *In re Taxable Mun. Bond Sec. Litig.*, 51 F.3d at 523.

Hafez's waffling and vague descriptions of his purported injuries only underscore this infirmity.  The Complaint alleges that Hafez lost *one* speaking engagement at an unnamed educational institution, Compl. ¶ 59, and likewise lost "standing" and "seniority" at others, *id.* ¶¶ 201–03.  But these "lost opportunities," which have no "readily ascertainable" monetary value, are precisely the kinds of injuries courts routinely reject as speculative under RICO.  *See supra* 23–24.  And despite Hafez's contention that he was effectively "blacklisted" by Defendants' conduct, Compl. ¶¶ 57, 146, Hafez himself touts his new distinguished professorship at Williams, *id.* ¶¶ 15, 57—rendering his purported injuries even more implausible.

Likewise, the alleged raid on Hafez's home in Austria cannot supply a cognizable RICO injury under Section 1964(c).  The "stigma" and "false detention" Hafez asserts as a result of the raid, Compl. ¶¶ 146, 203(a), are merely personal injuries that are non-cognizable under RICO.  The "loss of funds" Hafez alleges is likewise entirely speculative, given that the associated figures Hafez purports to have lost ($75,000 and $1,000,000, *id.* ¶ 203(a)–(b)) rest on no plausibly pleaded facts.  And they are not cognizable in any event, since these alleged economic losses are merely "derivative of" Hafez's alleged personal injuries.  *Aston v. Johnson & Johnson*, 248 F. Supp. 3d 43, 50 & n.4 (D.D.C. 2017) ("courts in this District and elsewhere have consistently rejected the argument that pecuniary losses derivative of personal injuries are injuries to 'business or property' cognizable under RICO"); *see also Klayman v. Obama*, 125 F. Supp. 3d 67, 88 (D.D.C. 2015)

(similar); *Burnett v. Al Baraka Inv. & Dev. Corp.*, 274 F. Supp. 2d 86, 102 (D.D.C. 2003) (similar).[6] Because Hafez has failed to plead any cognizable or non-speculative injury to "business or property" under RICO, 18 U.S.C. § 1964(c), his claims fail across the board.

### B.  Hafez's Purported Injures Are Not "Domestic."

Even if Hafez had plausibly pleaded the requisite injury to "business or property," 18 U.S.C. § 1964(c), the Complaint still fails because his purported injuries are not "domestic" under RICO. "Section 1964(c) requires a civil RICO plaintiff to allege and prove a *domestic* injury to business or property and does not allow recovery for foreign injuries."  *RJR Nabisco*, 579 U.S. at 354 (emphasis added); *accord Percival Partners Ltd. v. Nduom*, 99 F.4th 696, 697 (4th Cir. 2024) (RICO's private "cause of action . . . does not extend to injuries suffered outside the United States").  Enforcing this domestic-injury requirement is especially crucial to defuse the "potential for international friction."  *RJR Nabisco*, 579 U.S. at 347.  Otherwise, foreign plaintiffs could "unjustifiably . . . bypass . . . less generous remedial schemes" in foreign nations, thereby "upsetting" the "balance" those nations have chosen to strike.  *Id.*  Such concerns apply forcefully where, as here, the plaintiff's claim hinges on the "official act of a foreign sovereign performed within its own territory," *i.e.*, Austria's actions in Operation Luxor.  *W.S. Kirkpatrick & Co. v. Envt'l Tectonics Corp., Int'l*, 493 U.S. 400, 405 (1990).

Whether an injury is "'domestic'" is "'a context-specific inquiry that turns largely on the particular facts alleged in a complaint.'"  *Yegiazaryan v. Smagin*, 599 U.S. 533, 544 (2023); *see United States ex rel. Hawkins v. Mantech Int'l Corp.*, 2024 WL 4332117, at *6 (D.D.C. Sept. 27, 2024) (Jackson, J.).  Residency is not "determinative"; instead, "courts should look to the

---

[6] The Supreme Court is currently considering whether and to what extent economic losses derivative of personal injury are cognizable under RICO.  *See Med. Marijuana, Inc. v. Horn*, No. 23-365 (U.S.) (argued Oct. 15, 2024).

circumstances surrounding the alleged injury," including "the nature of the alleged injury, the racketeering activity that directly caused it, and the injurious aims and effects of that activity." *Smagin*, 599 U.S. at 543–44 (footnote omitted).  And it must be "clear" that the "injury arose domestically."   *Id.* at 545.  The *Smagin* factors confirm that Hafez's purported injuries are not "domestic" at all—much less "clear[ly]" so.  *Id.*

*First*, as to the "nature of the alleged injury," *Smagin*, 599 U.S. at 544, nothing in the Complaint links Hafez's asserted injuries to the United States.  Hafez claims that a foreign country (the United Arab Emirates) colluded with private investigatory firms in Switzerland (Alp and Diligence) to perpetrate "online misinformation."   Compl. ¶¶ 64–66, 69.   As part of the disinformation campaign, Alp would seek to discredit another foreign country (Qatar) "and its networks."  *Id.* ¶ 73.  Swiss personnel from Alp met "UAE officials" in "Abu Dhabi" to discuss the scheme.  *Id.* ¶ 76.  The conspiracy then reached out to Dr. Vidino, whom the Complaint describes as "Washington, D.C.-based."   *Id.*  ¶ 78.   Dr. Vidino then supposedly met an Alp employee "in Geneva" to discuss performing research on the Muslim Brotherhood for Alp.  *Id.* ¶ 80.  Later, Dr. Vidino received payment—*in euros*, *id.* ¶ 81—and "provided testimony . . . to the Austrian intelligence services," *id.*  ¶ 56.   Dr. Vidino's report on the Muslim Brotherhood in Austria—written before he had any contact with Alp—also allegedly led to a search warrant in Austria and the corresponding "raid" on Hafez's residence in Austria.  *Id.*  Dr. Vidino's speech purportedly interfered with Hafez's "business relationship with The University of Salzburg" (in Austria), *id.* ¶ 167, and other "employers and academic partners" in unspecified locations, *id.* ¶ 201.

Hafez's claimed injuries therefore have nothing to do with the United States.  Hafez "now resides in the USA," Compl. ¶ 57, but residency is not "determinative," *Smagin*, 599 U.S. at 544, and Hafez only moved to the United States *after* the purported scheme unfolded—where he

subsequently obtained a prestigious professorship, Compl. ¶ 57.   Conversely, Hafez alleges the "raid" targeted his home in Austria and was executed by "Austrian authorities," *id.* ¶ 56—attacking foreign officials' conduct and thus raising the precise international-friction concerns undergirding the domestic-injury requirement—and claims interference with employers either in Austria (the University of Salzburg) or in locales he never identifies, *id.* ¶ 175.

*Second*, the "racketeering activity" that purportedly "caused" Hafez's injuries also was not "domestic."   *Smagin*, 599 U.S. at 544.   Virtually all the alleged conspirators are either foreign nations (the UAE), Compl. ¶ 1, or foreign individuals and entities based in Switzerland, *id.* ¶¶ 18–21.   Critical meetings were held in Abu Dhabi, Geneva, and Zurich.   *Id.* ¶¶ 76, 80, 94.   The only apparent links to the United States are Dr. Vidino's purported residence, *id.* ¶ 27, and the location of his employer, George Washington University, *id.* ¶ 79.   But the Complaint does not allege that any key decisions or meetings were undertaken in the United States, and it does not even allege that Dr. Vidino authored the offending writings in the United States.   And his testimony to Austrian officials presumably was delivered in Austria.   *Id.* ¶ 56.

*Third*, the "injurious aims and effects of" the purported racketeering activity likewise are not "domestic."   *Smagin*, 599 U.S. at 544.   Hafez resided in Austria when his home was targeted in 2020, Compl. ¶¶ 55–56, Dr. Vidino's reports concerned the Muslim Brotherhood *in Austria and Germany*, *id.* ¶ 55, his editorial provided guidance to European governments and critiqued the actions of France and Austria, *Foreign Policy* Editorial, and his testimony was delivered to the Austrian government, Compl. ¶ 56.   "All of this was felt" abroad.   *Mantech Int'l*, 2024 WL 4332117, at *6.   And, again, Hafez's purportedly diminished business opportunities are either expressly pleaded to have occurred in Austria or in locations never specified.   *E.g.*, Compl. ¶ 190.

In sum, the Complaint utterly fails to allege that any of Dr. Vidino's conduct had "domestic" aims or effects as their "'central purpose'"—much less "clear[ly]" so. *Smagin*, 599 U.S. at 545–46.

### C.  The Complaint Fails To Plausibly Allege Any RICO Predicate Offense.

The Complaint fails plausibly to allege a third RICO prerequisite—a RICO predicate offense. *See RJR Nabisco*, 579 U.S. at 329.  RICO's underlying criminal prohibitions specifically enumerate the only crimes that may constitute RICO predicates, including specific federal statutes, "certain crimes 'chargeable' under state law," and certain "bankruptcy or securities fraud or drug-related activity that is 'punishable' under federal law." *Id.* at 330.  The "law is clear" that "defamation"—the core of Hafez's allegations—"is not a predicate act under RICO." *Ctr. for Immigr. Stud.*, 410 F. Supp. 3d at 191–92 (citing *Hourani*, 796 F.3d 1).  And where RICO predicates are alleged to rest on purportedly fraudulent conduct—like mail or wire fraud—Rule 9's "heightened pleading requirements" apply, mandating identification with "particularity" of the fraudulent statements and the "specific intent to defraud." *Feld Ent. Inc.*, 873 F. Supp. 2d at 317. Fraud claims under RICO "'must be particularly scrutinized because of the relative ease with which a plaintiff may mold a RICO pattern from allegations that, upon closer scrutiny, do not support it.'" *W. Assocs. Ltd. P'ship v. Mkt. Square Assocs.*, 235 F.3d 629, 637 (D.C. Cir. 2001).

The Complaint is miles from satisfying these standards.  Hafez *cites* (and *cites*, and *cites*) more than forty statutes, some of which are not even RICO predicate acts.  *Compare* 18 U.S.C. § 1961(1) (defining "racketeering activity"), *with, e.g.*, Compl. ¶¶ 126, 132 (listing, for example, non-RICO predicates "Federal Principal and Aider and Abettor Liability: Title 18 U.S.C.A. §2(a)-(b)" and "Federal Intangible Personal Property Right Deprivation: Title 18 U.S.C.A. §1346").  But reciting the *names* of predicate acts obviously does not suffice to plausibly plead them.  For the overwhelming majority, Hafez does not bother to provide even "[t]hreadbare recitals of the

elements of a cause of action," much less the plausible allegations required to survive a motion to dismiss.  *Iqbal*, 556 U.S. at 678.

The only predicate acts the Complaint goes beyond casually mentioning are mail, wire, and bank fraud.  Compl. ¶¶ 45 n.11, 115, 135.  But nowhere does the Complaint meet Rule 9's heightened requirements for alleging fraud.  As to bank fraud, it is devoid of supporting facts about how Dr. Vidino "defraud[ed]" or "obtain[ed]" money from a financial institution "by means of false or fraudulent pretenses, representations, or promises."  18 U.S.C. § 1344(1)–(2).  The Complaint's other efforts likewise fall well short.  The Complaint alleges that Dr. Vidino committed "mail and wire fraud" by purportedly accepting payment from the UAE and "fail[ing] to disclose" that source of income, Compl. ¶ 54 & n.12, and asserts that "Defendants" committed "tax evasion" by "failing to report foreign payments," *id.* ¶¶ 49–50.  But these "'[t]hreadbare recitals . . . do not suffice' for Rule 12(b)(6), let alone Rule 9(b)."  *Brink*, 787 F.3d at 1127.  Completely absent are the "'specific fraudulent statements, who made the statements, what was said, when or where these statements were made, and how or why the alleged statements were fraudulent.'"  *Id.*[7]

Without a RICO predicate, Hafez has no RICO cause of action at all.

### D.  The Complaint Fails To Plausibly Allege A "Pattern" Of Racketeering Activity.

What's more, RICO claims are cognizable only when there was a "*pattern*" of RICO predicate violations, 18 U.S.C. § 1962(a)–(c) (emphasis added)—"a series of related predicates that together demonstrate the existence or threat of continued criminal activity," *RJR Nabisco*, 579 U.S. at 330.  A "'pattern of racketeering activity'" under RICO "requires at least two acts of

---

[7] The Complaint mentions "the Espionage Act" once, but otherwise fails to explain the relevance of that statute.  Compl. ¶ 50.

racketeering activity" that occurred "within ten years" of each other.  18 U.S.C. § 1961(5).  And to plead a "pattern" of racketeering activity, the plaintiff must allege more than "a single scheme, a single injury, and few victims."  *W. Assocs.*, 235 F.3d at 634.  Conversely, when a purported "'pattern'" of conduct *is* asserted to rest on a single scheme featuring a single victim and single injury, stating a RICO claim is "'virtually impossible.'"  *Id.*  Likewise, it is "virtually impossible" to state a RICO claim where the purported "pattern" was merely in pursuit of a "single discrete goal."  *Edmondson & Gallagher v. Alban Towers Tenants Ass'n*, 48 F.3d 1260, 1265 (D.C. Cir. 1995).  Where the alleged scheme has only "a 'single discrete goal,'" "the number of predicate acts and the length of time over which the acts occurred [are] far less important," and cannot, by themselves, state a claim.  *E. Sav. Bank*, 31 F. Supp. 3d at 13.

Judged by these standards, the Complaint is a textbook example of how *not* to plead a "pattern" of racketeering activity.  The Complaint alleges only a single scheme with a single discrete goal—an "overarching scheme" (singular) with the lone goal of damaging the "reputation and viability of key MB European groups."  Compl. ¶¶ 2, 12.  The Complaint gamely attempts to plead that the scheme victimized "dozens of other targets," *id.* ¶ 19, including unspecified "members of the general public," *id.* ¶ 136, but never plausibly pleads (or even mentions) who these people were, what was said about them (if anything), why any specific information asserted about them was false, or how any were concretely injured.  That yawning gap persists despite Hafez purportedly having reviewed "[m]ore than 8,000 of the enterprise's internal documents, procured by anonymous hackers," which laid out "the enterprise's objectives."  *Id.* ¶ 2.  And Hafez's allegations amount to only a single injury: the purported "damage caused" to his "reputation," which resulted in various downstream consequences (such as "trauma," "anxiety," and "feelings of social isolation").  *Id.* ¶ 52 (explaining Hafez's "damages").  By failing to

plausibly plead that *others* likewise suffered a predicate violation, Hafez defaults on his obligation

to show a pattern of racketeering activity that was the product of something other than a single

scheme with a single purpose.  *W. Assocs.*, 235 F.3d at 636.

In sum, "[w]ith no injury," and "no injurious predicate acts at all, let alone a pattern of

them," "[t]he wheels have completely come off of [Hafez's] civil RICO claim."  *Hourani*, 796

F.3d at 11.

### E.  The Complaint Fails To Plausibly Allege A RICO "Enterprise."

RICO also requires that the predicate violations be perpetrated by a RICO "enterprise."  18

U.S.C. § 1962(a)–(c).  That term encompasses "association-in-fact enterprise[s]," in which a group

of individuals "'associated in fact'" has come together "'for a common purpose of engaging in a

course of conduct.'"  *Boyle v. United States*, 556 U.S. 938, 944–45 (2009).  The enterprise must

be a "'continuing unit,'" with "longevity sufficient to permit these associates to pursue the

enterprise's purpose."  *Id.* at 945–46.  In other words, an "enterprise" is not established simply

because a "pattern of racketeering activity" occurred; the "enterprise" must be an "ongoing" entity

that exists "separate and apart from the pattern of [racketeering] activity in which it engages."

*United States v. Turkette*, 452 U.S. 576, 583 (1981).  Thus, a plaintiff has not alleged an "enterprise"

where the "common denominator among the . . . defendants . . . is their involvement in the

particular transaction which is the subject of th[e] suit."  *Dist. Telecomms. Dev. Corp. v. Dist.

Cablevision, Inc.*, 638 F. Supp. 418, 421 (D.D.C. 1985).

The Complaint tries to allege such an association-in-fact enterprise, Compl. ¶ 113, but it

fails to plead the required existence of any "enterprise" "separate and apart" from the allegedly

tortious transaction that occurred, *Turkette*, 452 U.S. at 583.  As the Complaint describes the

"unlawful enterprise," Compl. at 27, Alp purportedly approached the UAE to engage in a "'viral'"

disinformation campaign, *id.* ¶ 64, and prepared a "detailed proposal," *id.* ¶ 73, to which UAE officials apparently assented, *id.* ¶¶ 77–78.  Alp personnel then approached Dr. Vidino, *id.* ¶ 80, who signed a contract to deliver "'[i]nteresting leads/rumours'" on the Muslim Brotherhood, *id.* ¶ 81.  Other than the conclusory assertion that Alp "unlawfully obtained" Hafez's "phone records," *id.* ¶ 7, the Complaint alleges no *other* predicate act in which the "conspirators" partook (and certainly not Dr. Vidino).  The only action binding them together was the purported "smear campaign" against Hafez.  *Id.* ¶ 97.  That lone transaction is insufficient to establish even a pattern of racketeering activity, and it certainly fails to establish that an "enterprise" acted as a "'continuing unit'" and "'ongoing'" entity.  *Boyle*, 556 U.S. at 945; *Turkette*, 452 U.S. at 583.  For that reason, too, Hafez's RICO claims fail.

### F.   The Complaint Fails To Plausibly Allege That Dr. Vidino Proximately Caused Hafez's Purported Injuries.

The Complaint also fails to plausibly allege that any RICO violation perpetrated by Dr. Vidino proximately caused Hafez's alleged injuries.  Proximate causation under RICO requires both "'but for'" causation *and* a "direct relationship" between an alleged RICO violation and the plaintiff's injuries.  *Hemi Grp., LLC v. City of New York*, 559 U.S. 1, 9–10 (2010).  The "direct relationship" requirement is substantially more demanding than the common-law reasonable "foreseeability" test, which the Supreme Court has expressly disavowed.  *Id.* at 12.  Under this "'requirement of a direct causal connection,'" there is no proximate causation when the defendant is injured by an intervening actor, even if the intervening actor's behavior was the foreseeable consequence of the defendant's conduct—in other words, when the plaintiff's causal chain hinges on "separate actions carried out by separate *parties*."  *Id.* at 10–11.

The Complaint utterly fails these requirements.  Hafez attributes to Dr. Vidino the awesome power to move nations with his writings, alleging that Dr. Vidino's Austria Report spurred the raid

on his home in Austria despite containing only a single, uncontested statement about him.  Compl.
¶ 56.  But the Austria Report was penned in 2017—*before* Dr. Vidino was even purportedly
engaged by the "enterprise."  *Id.* ¶¶ 56, 80.  It thus cannot have been *a RICO violation* causing
Hafez's injuries.  Equally serious causation problems afflict the claims arising from Dr. Vidino's
alleged testimony to Austrian officials, *id.* ¶ 56, and the *Foreign Policy* Editorial, *id.* ¶ 90 n.24.
Neither is alleged to have any connection to Alp.  They therefore do not satisfy even but-for
causation, much less direct causation.  And both these allegations *and* the conduct alleged to have
occurred pursuant to the scheme (such as Dr. Vidino's supposed provision of the Germany Report,
*id.* ¶ 41, with which Alp is not alleged to have done *anything*) flunk the direct-relationship
requirement.  Every harm that Hafez alleges arose only because some *other* party chose to take
action against him—whether the "Austrian authorities" during the raid, *id.* ¶ 56, or the other
unnamed institution(s) that purportedly somehow injured Hafez, *id.* ¶¶ 59, 190.  These "causal
theor[ies]" all hinge on the intervening conduct of third parties—precisely the sort of "attenuated"
chains the Supreme Court has rejected.  *Hemi*, 559 U.S. at 9.

### G.  The Complaint Fails To Plausibly Allege That Dr. Vidino Knowingly Joined A Conspiracy To Commit At Least Two Predicate Acts.

Finally, Count 2 alleges that Dr. Vidino joined a conspiracy to commit racketeering under
18 U.S.C. § 1962(d).  Compl. ¶ 123.  That conspiracy count is derivative of Hafez's substantive
RICO claims, because without a predicate RICO violation, "there can be no conspiracy to violate
§ 1962(c)."  *Fay v. Humane Soc'y of U.S.*, 2021 WL 184396, at *11 (D.D.C. Jan. 19, 2021);
*Danielsen v. Burnside-Ott Aviation Training Ctr. Inc.*, 941 F.2d 1220, 1224 (D.C. Cir. 1991) (noting
that "[s]ubsection (d) adds nothing substantive to the law" but instead "makes it unlawful to
conspire to violate any of the preceding" subsections).

34

Anyway, the conspiracy claim fails on its own terms.  A conspiracy claim under Section 1962(d) requires that "'(1) the defendant agreed to maintain an interest in or control of an enterprise or to participate in the affairs of an enterprise through a pattern of racketeering activity, and (2) the defendant further agreed that someone would commit at least two predicate acts to accomplish those goals.'"  *DeGuelle v. Camilli*, 664 F.3d 192, 204 (7th Cir. 2011).  There must be "subjective agreement" by the defendant "to further the predicate acts allegedly carried out by the [other] defendants."  *Doe I v. Israel*, 400 F. Supp. 2d 86, 120 (D.D.C. 2005).  In other words, the defendant must have "kn[own] of" and "agreed to further" the racketeering conspiracy.  *RSM Prod. Corp. v. Freshfields Bruckhaus Deringer U.S. LLP*, 682 F.3d 1043, 1052 (D.C. Cir. 2012).

No such knowledge is alleged here.  The Complaint alleges that Dr. Vidino agreed to provide Alp "'[i]nteresting leads/rumours'" and that Alp would "pay Dr. Vidino € 3,000 for his work."  Compl. ¶ 81.  But the Complaint also admits that Dr. Vidino was not sure *who* the actual client was.  Alp misinformed Dr. Vidino that he "had been hired by a 'London-based law firm.'"  *Id.* ¶ 80.  Dr. Vidino privately doubted that representation, but it ultimately "'wasn't clear cut'" to him who wanted the research.  *Id.* ¶ 38.  Regardless, according to the Complaint, the client's identity did not matter to Dr. Vidino:  He is "'a one-trick pony'" and does "'the same research'" on the Brotherhood "'no matter what, so it does not really matter who the final client is.'"  *Id.*  Dr. Vidino's agnosticism about who had hired him directly undercuts any claim of a "knowing[]" and "subjective agreement" to join and advance a racketeering enterprise.  *Doe I*, 400 F. Supp. 2d at 120.

The ultimate client aside, the Complaint lacks any allegation even hinting that Dr. Vidino was aware of any broader conspiracy or illegal conduct.  To be sure, the Complaint repeatedly asserts that, for instance, the scheme was undertaken "with knowledge of the Defendants to

varying degrees," and that "Defendants knew their acts were part of a pattern of racketeering activity." Compl. ¶¶ 105, 124.  But those are textbook "conclusory" allegations.  *Iqbal*, 556 U.S. at 678.  They cannot save Hafez's RICO claims from dismissal.

## III.   Hafez's State-Law Claims (Counts 6-10) Are Untimely And Meritless.

### A.   The State-Law Claims Are Barred By The Statute Of Limitations.

Hafez's common-law fraud, unfair trade practices, tortious-interference, and prima facie tort claims are time-barred, falling well outside the applicable one-year statute of limitations.[8]

"The statute of limitations for a defamation claim in the District of Columbia is one year." *Mullin v. Wash. Free Wkly., Inc.*, 785 A.2d 296, 298 (D.C. 2001) (citing D.C. Code § 12–301(4)). For "any cause of action which is not 'specially prescribed,'" the statute of limitations is three years.  *Mittleman v. United States*, 104 F.3d 410, 415 (D.C. Cir. 1997) (quoting D.C. Code § 12–301(8)).  But if a "cause of action is 'intertwined' with one for which a limitations period is prescribed, District courts apply the specifically stated period, not the three-year catch-all." *Id.*

A claim is "'intertwined'" with defamation when it is "'based on,'" *Wolf v. Menh*, 810 F. App'x 10, 11 (D.C. Cir. 2020) (per curiam), or "premised directly upon" "false statements regarding [the] Plaintiff," *Jovanovic v. US-Alg. Bus. Council*, 561 F. Supp. 2d 103, 114 (D.D.C. 2008).  And a plaintiff need not bring a defamation claim for the "intertwined" doctrine to apply, so long as the claims brought "involve publication of false statements about another."  *E.g.*, *Mittleman*, 104 F.3d at 415; *Greenpeace, Inc. v. Dow Chem. Co.*, 97 A.3d 1053, 1062 (D.C. 2014)

---

[8] The Complaint mentions the Foreign Agents Registration Act, 22 U.S.C. § 618, and criminal tax evasion, 26 U.S.C. § 7201, but neither pleads these theories as causes of action nor plausibly supports them with factual allegations.  *E.g.*, Compl. ¶¶ 14, 32, 49, 54.  For good reason—neither statute permits a private right of action.  *E.g.*, *Gong v. Sarnoff*, 2023 WL 5372473, at *11 (S.D.N.Y. Aug. 22, 2023) ("every court to have considered the issue . . . has held that no private right of action can be implied in FARA"); *Abram v. United States*, 2023 WL 8891002, at *3 (D.D.C. Dec. 26, 2023) ("§ 7201 does not permit a private right of action").

(one-year limitations period applies to "invasion of privacy" claims because they are "akin" to defamation).  The limitations period "'runs from the date of publication.'"  *Mullin*, 785 A.2d at 298.

Here, the Complaint is suffused with the language of defamation, accusing the Defendants of "smear[ing] dozens of innocent victims," Compl. ¶ 1, "discredit[ing] . . . critics," *id.* ¶ 37, leveling "false charges," *id.* ¶ 38, launching a "character assassination project," *id.* ¶ 45, "spreading bile" and "disinformation," *id.* ¶¶ 48, 68, concocting a "false narrative," *id.* ¶ 117, "disseminating false statements," *id.*, and "publishing . . . false and misleading articles," *id.* ¶ 123. The specific allegations underlying each claim confirm that they do not involve "conduct separate from" defamation.  *Rynn v. Jaffe*, 457 F. Supp. 2d 22, 24 (D.D.C. 2006).  The fraud claim rests on "false accusations" allegedly made by Dr. Vidino about Hafez, which allegedly caused "a serious loss of reputation."  Compl. ¶¶ 146, 150.  The same holds true for the unfair trade practices claim, which is predicated on allegedly "deceptive and misleading practices."  *Id.* ¶ 154.  So too for the tortious-interference claims, which reference "false allegations" and "false reports" about Hafez allegedly causing the loss of "speaking engagements."  *Id.* ¶¶ 169, 197.  And likewise for the prima facie tort claim, which alleges "subterfuge, misrepresentations, and innuendo" resulting in a "stigma placed upon Plaintiff."  *Id.* ¶¶ 201, 203(a).  Because each claim is based on the same "allegedly false statements" about Hafez, they are "all are subject to the one year statute of limitations" for defamation.  *Wolf*, 810 F. App'x at 12.

Hafez filed suit on March 27, 2024, Dkt. 1, so his state-law claims can proceed only if the allegedly defamatory material was published *after* March 27, 2023.  They were not.  The Germany Report and *Foreign Policy* Editorial were allegedly penned in February and November 2020, respectively—four years before Hafez filed suit.  Compl. ¶¶ 41, 90 n.24; *Foreign Policy* Editorial.

The state-law claims are therefore untimely even under the three-year catchall statute of limitations. Had Hafez specifically identified allegedly false statements in Dr. Vidino's testimony to Austrian officials, which allegedly ceased in December 2022, or in the 2017 Austria Report, Compl. ¶ 56, claims predicated on those statements would also be untimely.

The discovery rule, which provides an equitable exception to ordinary claim-accrual principles when a "'defamatory statement [is] inherently undiscoverable,'" cannot save Hafez's claims from dismissal. *McFadden v. Wash. Metro. Area Transit Auth.*, 949 F. Supp. 2d 214, 221 (D.D.C. 2013). That rule does not apply when the plaintiff "does not deny" his "aware[ness] of the defamatory statements . . . at the time the statements were made," *Wallace v. Skadden, Arps, Slate, Meagher & Flom*, 715 A.2d 873, 882 (D.C. 1998), or when the statements were "'public in nature,'" *Oparaugo v. Watts*, 884 A.2d 63, 74 n.8 (D.C. 2005). Just so here: Dr. Vidino's statements were public, and Hafez was aware of Dr. Vidino's alleged "attacks" at the time they were made. Compl. ¶ 43. Hafez's state-law claims are therefore time-barred.

### B. The Common-Law Fraud Claim (Count 6) Fails.

To establish common-law fraud, "a plaintiff must show that the defendant, with the intent to deceive the plaintiff, knowingly made a false representation of a material fact on which plaintiff justifiably and detrimentally relied." *Pyles v. HSBC Bank USA, N.A.*, 172 A.3d 903, 907 (D.C. 2017). Hafez fails to plausibly allege reliance, intent to deceive, or knowledge of falsity under Federal Rule of Civil Procedure 9(b).

*Reliance.* Hafez cannot allege reliance. "A plaintiff may recover for a defendant's fraudulent statement only if *the plaintiff* took some action in reliance on that statement." *Aktieselskabet AF 21. Nov. 2001 v. Fame Jeans Inc.*, 525 F.3d 8, 22 (D.C. Cir. 2008) (emphasis added). "[R]eliance by 'third parties'" cannot satisfy the "'reliance element required for fraud

claims under D.C. law.'"  *E. Sav. Bank*, 31 F. Supp. 3d at 18.  Here, Hafez does not allege that *he was deceived by any false statements*.  Nor could he; the allegedly false statements were about *Hafez himself*.  Hafez also identifies no action he took in putative reliance on Dr. Vidino's statements.   Any  actions  Hafez  undertook  "voluntarily"  to  "challenge  the  veracity  of" "misrepresentations"  are  "reaction,  not  reliance."   *Stovell v. James*, 810 F. Supp. 2d 237, 245 (D.D.C. 2011).  Simply put, Hafez "cannot sustain a fraud claim on a representation which he did not believe and on which he did not rely."  *Applegate v. Dobrovir, Oakes & Gebhardt*, 628 F. Supp. 378, 384 (D.D.C. 1985).

*Intent to Induce Reliance.*  Pleading fraud requires alleging that the defendant "'intended to induce'" the plaintiff "'to rely on the misrepresentation.'"  *Jovanovic*, 561 F. Supp. 2d at 115. The Complaint does not allege Dr. Vidino intended Hafez to rely on any allegedly false statements.

*Knowledge of Falsity.*  Finally, Hafez cannot allege that Dr. Vidino "knowingly made a false representation."  *Daskalea v. Wash. Humane Soc'y*, 480 F. Supp. 2d 16, 37 (D.D.C. 2007). "[C]onclusory allegations" of a defendant's "knowledge" of "the falsity of the statements at issue" do not suffice.  *Parisi v. Sinclair*, 774 F. Supp. 2d 310, 319 (D.D.C. 2011).  That is all Hafez offers here.  *See supra* 19–20.

### C.  The Unfair Trade Practices Claim (Count 7) Fails.

Perhaps most frivolous is Hafez's claim that Dr. Vidino engaged in an "unfair or deceptive trade practice" under the D.C. Consumer Protection Procedures Act ("CPPA").  The CPPA "'was designed to police trade practices arising *only* out of consumer-merchant relationships.'"  *Ali v. Tolbert*, 636 F.3d 622, 628 (D.C. Cir. 2011) (emphasis added).  It is plainly inapplicable here. Hafez and Dr. Vidino are not alleged to have *any* economic relationship, let alone a consumer-merchant relationship.  Nor does the Complaint allege that Dr. Vidino engages in any "trade practice"—an act involving "'a sale, lease or transfer, of consumer goods or services.'"  *Stone v.*

*Landis Constr. Co.*, 120 A.3d 1287, 1290 (D.C. 2015) (quoting D.C. Code § 28–3901(a)(6)). Dr. Vidino, of course, does not sell "consumer goods or services," *i.e.*, those "use[d] for personal, household, or family purposes."  D.C. Code § 28-3901(a)(2)(B)(i).  So he cannot have engaged in "an unfair or deceptive trade practice."  Compl. ¶ 153 (quoting D.C. Code § 28–3904).

### D.  The Tortious-Interference Claims (Counts 8 & 9) Fail.

To state claims for tortious interference under District of Columbia law, a plaintiff must allege "(1) the existence of a valid business relationship or expectancy, (2) knowledge of the relationship or expectancy on the part of the interferer, (3) intentional interference inducing or causing a breach o[r] termination of the relationship or expectancy, and (4) resultant damage." *Bennett Enters., Inc. v. Domino's Pizza, Inc.*, 45 F.3d 493, 499 (D.C. Cir. 1995).  Hafez fails across the board.

*Expectancy.*   Hafez fails to "identify the specific business relationships with which defendants are alleged to have interfered" and allege "[s]pecific facts about the terms of the relationships."  *Econ. Rsch. Servs., Inc. v. Resol. Econ.*, *LLC*, 208 F. Supp. 3d 219, 229 (D.D.C. 2016); *e.g.*, *Xereas v. Heiss*, 933 F. Supp. 2d 1, 11 (D.D.C. 2013) (requiring identification of the "specific future employment prospect").  The Complaint's vague references to a lecture at "an educational institution," Compl. ¶ 59, "invitations to other academic and publishing venues," *id.* ¶ 166, "business relationships with many colleges and universities," *id.* ¶ 173, or speaking opportunities "at innumerable international universities and think tanks," *id.* ¶ 191, do not approach the required specificity.  Hafez also fails to allege that any of the unspecified future relationships—for example, invitations to speak at "universities and think tanks," *id.*—were

sufficiently concrete to be "'commercially reasonable to anticipate,'" as opposed to "'a mere possibility,'" *Robertson v. Cartinhour*, 867 F. Supp. 2d 37, 60 (D.D.C. 2012).[9]

*Knowledge.*   Hafez also fails to plausibly allege Dr. Vidino's knowledge of any specific cognizable contract or business expectancy.   The Complaint asserts only that "Defendants knew that Plaintiff was a vis[it]ing professor or guest speaker at innumerable international universities and think tanks," Compl. ¶ 191, but that is a textbook conclusory assertion.

*Causation.*   Even as to the one business relationship the Complaint does identify by name, the Complaint fails to plausibly allege that Dr. Vidino *caused* the termination of Hafez's relationship with the University of Salzburg.   Causation is lacking when, as here, the "causal chain" is too "attenuated," *Allen v. District of Columbia*, 312 A.3d 207, 212 (D.C. 2024), or the plaintiff's injury is "self-inflicted," *Ellis v. Jackson*, 319 F. Supp. 3d 23, 32 (D.D.C. 2018).   Hafez claims that Austrian law enforcement cited Dr. Vidino's Austria Report in the search warrant authorizing Operation Luxor.   Compl. ¶ 56.   But the Complaint does not allege that the Austria Report's single statement about Hafez—that he was previously a leader of the Austrian Muslim Youth Organization—is false.   Nor does the Complaint allege that Dr. Vidino's pre-raid testimony to Austrian law enforcement even *mentioned* Hafez, or that Dr. Vidino had any awareness Austrian officials were contemplating a raid.   *See id.* ¶¶ 56, 60.   If any connection exists at all between Dr. Vidino's statements and Hafez's inclusion in the raid, it is far too "attenuated" to support liability.   *Allen*, 312 A.3d at 212.

Compounding his causation problems, Hafez's ultimate decision to leave the University of Salzburg is a classic "self-inflicted" injury, "sever[ing]" any "causal nexus" to Dr. Vidino.   *Ellis*,

---

[9] The one business relationship Hafez does identify by name is the University of Salzburg, but he fails to plausibly allege that Dr. Vidino *caused* the termination of that relationship.   *See infra* 41–42.

319 F. Supp. 3d at 32.  Hafez does not allege that the University of Salzburg—where he remained a researcher for a year after the raid—terminated his employment.  *See* Compl. ¶¶ 15, 91.  Instead, Hafez says that after the raid, he felt that he "had to leave Austria."  *Id.* ¶ 188.  He therefore accepted a position at Williams College and took "up permanent residence in the United States." *Id.* ¶¶ 15, 188.  Hafez's voluntary choice to terminate his relationship with the University of Salzburg and move to the United States cannot be contorted into a tortious-interference claim.

*Intent to interfere.*  Finally, Hafez fails to allege that Dr. Vidino *intended* to interfere with any alleged business expectancy.  "[I]n order to survive a motion to dismiss, a claimant must allege far more than a 'general intent to interfere or knowledge that the conduct will injure [the plaintiff's] business dealings.'"  *Sabre Int'l Sec. v. Torres Advanced Enter. Sols., Inc.*, 857 F. Supp. 2d 97, 103–04 (D.D.C. 2012).  Instead, the Complaint must specifically allege "a 'strong showing of intent' to disrupt ongoing business relationships."  *Bennett Enters.*, 45 F.3d at 499.  Here, again, stripped of conclusory assertions, *e.g.*, Compl. ¶ 176 ("Defendants . . . intentionally harmed the Plaintiff"), the Complaint fails to plausibly allege facts suggesting that Dr. Vidino specifically intended to interfere with any contract or expectancy.

### E.  The Prima Facie Tort Claim (Count 10) Is Not Recognized In The District And Would Fail Anyway.

The Complaint's final count invokes the New York claim of prima facie tort, but Hafez apparently forgets that this is a D.C. case.  "[P]rima facie tort" is not "recognized . . . in the District." *Taylor v. D.C. Water & Sewer Auth.*, 957 A.2d 45, 50 (D.C. 2008).  And there is no basis for applying New York law:  None of the parties is alleged to reside in New York, nor is any of the relevant conduct alleged to have occurred there.

Hafez could not state a prima facie tort claim anyway.  "Under New York law, there are four elements to a claim of prima facie tort: '(1) an intentional infliction of harm; (2) without

excuse or justification and motivated solely by malice; (3) resulting in special damages; (4) by an act that would otherwise be lawful.'"  *McKenzie v. Dow Jones & Co.*, 355 F. App'x 533, 536 (2d Cir. 2009).  "*Prima facie* tort is a highly disfavored cause of action in New York," *Katz v. Travelers*, 241 F. Supp. 3d 397, 405 (E.D.N.Y. 2017), and does not extend to conduct "'sounding in a known or recognized tort,'" *Jain v. McGraw-Hill Cos.*, 827 F. Supp. 2d 272, 279 (S.D.N.Y. 2011).  Hafez cannot plausibly allege that Dr. Vidino was motivated solely by malice or lacked justification for his statements, fails to particularly allege special damages, and impermissibly repackages a defamation claim.

*Malice.*  When the defendant is alleged to have acted based—even in part—on "motives other than disinterested malevolence, 'such as profit, self-interest, or business advantage,'" a "prima facie tort" claim fails.  *Twin Lab'ys, Inc. v. Weider Health & Fitness*, 900 F.2d 566, 571 (2d Cir. 1990).  The Complaint makes Dr. Vidino's expressive motive clear:  It acknowledges that Dr. Vidino is a "'recognized expert on the Muslim Brotherhood'" who has been performing the "'same research'" on "'the Muslim Brotherhood in Europe for almost twenty-five years.'"  Compl. ¶¶ 38, 41.  It admits that Dr. Vidino published the Austria Report *before* he was allegedly approached by Alp.  *Id.* ¶¶ 38, 56, 80.  And it even concedes that Dr. Vidino has "a complete right to" his "own opinions about the Muslim Brotherhood."  *Id.* ¶ 48.  That "expressi[ve]" motive forecloses the prima facie tort claim.  *McKenzie*, 355 F. App'x at 536.

At a minimum, the Complaint alleges that Dr. Vidino acted based on a pecuniary motive— *i.e.*, to "keep[]" the "gravy train rolling," Compl. ¶ 4, "secure undisclosed funding," *id.* ¶ 105, and "appease powerful donors," *id.* ¶ 170.  The Complaint's assertion of a financial motive, taken as true solely for purposes of a motion to dismiss, independently "defeat[s] a prima facie tort claim." *Twin Lab'ys, Inc.*, 900 F.2d at 571.

*Lack of justification.*  When there is a "'reasonable basis'" for a defendant's expression, "'this must be deemed a justification which the law will recognize.'"  *McKenzie*, 355 F. App'x at 537.  Just as the Complaint comes nowhere close to alleging actual malice, *see supra* 19–20, it offers no plausible allegation that Dr. Vidino lacked a reasonable basis for his statements.

*Special damages.*  Special damages are a "'specific and measurable loss,'" *M.V.B. Collision, Inc. v. Allstate Ins. Co.*, 728 F. Supp. 2d 205, 224 (E.D.N.Y. 2010), "'of something having economic or pecuniary value,'" *Albert v. Loksen*, 239 F.3d 256, 271 (2d Cir. 2001).  Special damages "'must be alleged with sufficient particularity to identify actual losses and round sums without any attempt at itemization are insufficient.'"  *M.V.B. Collision, Inc.*, 728 F. Supp. 2d at 224.  Here, the Complaint offers only impermissibly "round sums"—seeking "the cost to relocate to the United States, as well as lost business opportunities including seniority at a value of no less than $1,000,000," and "[t]ravel costs and costs associated with relocating Plaintiff, including new schools and sundry other costs of $75,000."  Compl. ¶ 203.  Indeed, the request for damages "at a value of *no less than* $1,000,000," *id.* ¶ 203(a) (emphasis added), isn't even a round figure but instead an improper *minimum* to "'to be established at trial,'" *ESI, Inc. v. Coastal Power Prod. Co.*, 995 F. Supp. 419, 435 (S.D.N.Y. 1998).

*Repackaged defamation claim.*  "'A cause of action sounding in a known or recognized tort . . . cannot[] be characterized as a prima facie tort.'"  *Jain*, 827 F. Supp. 2d at 279.  Thus, when "'[t]he factual allegations underlying [a prima facie tort] cause of action relate to the dissemination of allegedly defamatory materials,' that cause of action 'must fail.'"  *McKenzie*, 355 F. App'x at 536.  The Complaint "repeatedly avails itself of the terminology of defamation," and therefore "cannot properly be considered to raise a claim of prima facie tort."  *Id.*; *see supra* 37.

In sum, Hafez's state-law claims are meritless.

## CONCLUSION

The Complaint's defects are fatal. Hafez cannot allege facts to overcome the First Amendment's protection because, as a matter of law, Dr. Vidino's speech was protected opinion and petitioning activity. As to RICO, Hafez's own allegations foreclose the possibility that any "enterprise," through a "pattern" of racketeering activity, proximately caused his purported reputational injuries—injuries that, in any event, are neither "business or property" injuries nor "domestic." No amount of re-pleading can save Hafez's state-law claims from untimeliness or rehabilitate their numerous deficiencies on the merits. Hafez cannot state a common-law fraud claim, for example, because he cannot plausibly allege that he detrimentally relied on an allegedly false statement *about himself*. He cannot state a CPPA claim because he cannot plausibly allege the existence of a consumer-merchant relationship between himself and Dr. Vidino. He cannot state a tortious-interference claim because he cannot plausibly allege that Dr. Vidino caused the termination of any concrete business relationship. And Hafez's prima facie tort claim is not even recognized in the District. Under these circumstances, amendment would be futile.

The Court should dismiss the Complaint with prejudice.

Dated:  October 18, 2024

Respectfully submitted,

*/s/ Matthew D. McGill*
Matthew D. McGill (D.C. Bar #481430)
Jeffrey Liu (D.C. Bar #1672057)
M. Christian Talley (D.C. Bar #1735656)
GIBSON, DUNN & CRUTCHER LLP
1700 M Street, N.W.
Washington, D.C. 20036
T: (202) 887-3680
F: (202) 530-9662
mmcgill@gibsondunn.com
jyliu@gibsondunn.com
ctalley@gibsondunn.com

*Counsel for Lorenzo Vidino*