**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| FARID HAFEZ, individually and on behalf of all others similarly situated, <br><br>    Plaintiff, <br><br>    v. <br><br> LORENZO VIDINO, individually and in his respective corporate capacities, GEORGE WASHINGTON UNIVERSITY, PROGRAM FOR EXTREMISM AT THE GEORGE WASHINGTON UNIVERSITY, ALP SERVICES SA, DILIGENCE SARL, MARIO BRERO, MURIEL CAVIN, LIONEL BADAL, ARIAF STUDIES AND RESEARCH LLC, and DOES 1 through 25, <br><br>    Defendants. | Case No. 1:24-cv-00873-ABJ |

**MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS
OF GEORGE WASHINGTON UNIVERSITY AND THE PROGRAM
ON EXTREMISM AT THE GEORGE WASHINGTON UNIVERSITY**

Tracy A. Roman (DC #443718)
Scott L. Winkelman (DC #416747)
Rachael Padgett (DC # 1616574)
**CROWELL & MORING LLP**
1001 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
troman@crowell.com
swinkelman@crowell.com
rpadgett@crowell.com
Telephone: (202) 624-2500

Counsel for Defendants
George Washington University and the
Program on Extremism at the George
Washington University

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ..................................................................................................................1

SUMMARY OF ALLEGATIONS ......................................................................................2

LEGAL STANDARDS ........................................................................................................6

ARGUMENT .......................................................................................................................8

**I.**   The Amended Complaint Violates Rule 8. ...............................................................8

**II.**   The Amended Complaint Fails To State A RICO Claim Against The
University (Counts 1-5). .......................................................................................10

    A.   Plaintiff Lacks Standing To Bring A Civil RICO Suit. ..............................10

        1.   The Amended Complaint fails to allege domestic injury to
business or property. ......................................................................10

        2.   The Amended Complaint fails to allege proximate
causation. .......................................................................................11

    B.   The RICO Conspiracy Count Fails For Lack Of Allegations
Showing That The University Agreed To Commit Or Further A
RICO Offense. .............................................................................................13

    C.   The Amended Complaint Alleges No RICO Predicate Act
Committed By The University .....................................................................14

**III.**   Dr. Vidino's Alleged Conduct Cannot Be Attributed To The University. ....................15

**IV.**   Plaintiff's State Law Claims Fail. .........................................................................17

    A.   The Fraud Claim Fails For Multiple Reasons (Count VI). ..................................17

    B.   The CPPA Claim Is Defective (Count 7). .............................................................21

    C.   The Claims For Tortious Interference With Existing Or
Prospective Business Relations Fail (Counts 8 and 9) ...........................................22

    D.   DC Law Does Not Recognize "Prima Facie Tort" (Count 10) .........................26

    E.   Plaintiff's State Law Claims Are Time-Barred. ...................................................26

**V.**   The Program on Extremism Is Not A Legal Entity Capable Of Being
Sued .......................................................................................................................26

CONCLUSION ..................................................................................................................28

## TABLE OF AUTHORITIES

Page(s)

**Cases**

\* *Acosta Orellana v. CropLife Int'l,*
  711 F. Supp. 2d 81 (D.D.C. 2010) ............................................................16, 18, 19

*Aktieselskabet AF 21. Nov. 2001 v. Fame Jeans Inc.,*
  525 F.3d 8 (D.C. Cir. 2008) ...................................................................................20

*Ambellu v. Re'ese Adbarat Debre Selam Kidist Mariam,*
  387 F. Supp. 3d 71 (D.D.C. 2019) .........................................................................19

*Archie v. U.S. Bank, N.A. as Tr. for RMAC Tr., Series 2016-CTT,*
  255 A.3d 1005 (D.C. 2021) ...................................................................................21

*Art–Metal–U.S.A., Inc. v. United States,*
  577 F. Supp. 182 (D.D.C. 1983) ...........................................................................26

*Ashcroft v. Iqbal,*
  556 U.S. 662 (2009) ................................................................................................8

*Aston v. Johnson & Johnson,*
  248 F. Supp. 3d 43 (D.D.C. 2017) ........................................................................11

*Barlow v. McLeod,*
  666 F. Supp. 222 (D.D.C. 1986) ...........................................................................13

*Bates v. Nw. Hum. Servs., Inc.,*
  466 F. Supp. 2d 69 (D.D.C. 2006) ..........................................................................7

\* *Bradley v. Nat'l Collegiate Athletic Ass'n,*
  249 F. Supp. 3d 149 (D.D.C. 2017) ...........................................................9, 16, 20

*Burnett v. Al Baraka Inv. & Dev. Corp.,*
  274 F. Supp. 2d 86 (D.D.C. 2003) ...................................................................10, 11

*Byrne v. Brock,*
  No. 19-7120, 2020 WL 1487757 (D.C. Cir. Feb. 27, 2020) ..................................14

*Carr v. Brown,*
  395 A.2d 79 (D.C. 1978) .......................................................................................25

*Cheeks v. Fort Myer Constr. Corp.,*
  216 F. Supp. 3d 146 (D.D.C. 2016), *aff'd*, 728 F. App'x 12 (D.C. Cir. 2018) ......13

*Ciralsky v. C.I.A.*,
  355 F.3d 661 (D.C. Cir. 2004) ....................................................................................7

*Command Consulting Grp., LLC v. Neuraliq, Inc.*,
  623 F. Supp. 2d 49 (D.D.C. 2009) ............................................................................23

\* *Council on Am.-Islamic Rels. Action Network, Inc. v. Gaubatz*,
  891 F. Supp. 2d 13 (D.D.C. 2012) .....................................................................16, 17

\* *Ctr. for Immigration Studies v. Cohen*,
  410 F. Supp. 3d 183 (D.D.C. 2019) (A.B. Jackson, J.), *aff'd*, 806 F. App'x 7
  (D.C. Cir. 2020) ....................................................................................13, 15, 21

*Dist. Cablevision Ltd. P'ship v. Bassin*,
  828 A.2d 714 (D.C. 2003) ........................................................................................22

*E. Sav. Bank, FSB v. Papageorge*,
  31 F. Supp. 3d 1 (D.D.C. 2014), *aff'd*, 629 F. App'x 1 (D.C. Cir. 2015)...........12, 14

*E.E.O.C. v. St. Francis Xavier Parochial Sch.*,
  77 F. Supp. 2d 71 (D.D.C. 1999) .............................................................................27

*Frese v. City Segway Tours of Washington, DC, LLC*,
  249 F. Supp. 3d 230 (D.D.C. 2017) .........................................................................22

*Galiano v. Institute of Governmental Studies at Univ. of California Berkeley*,
  No. 07-05557, 2008 WL 4155594 (N.D. Cal. Sept. 5, 2008) ..................................27

*George v. Bank of Am. N.A.*,
  821 F. Supp. 2d 299 (D.D.C. 2011) ...........................................................................7

*Greenpeace, Inc. v. Dow Chem. Co.*,
  808 F. Supp. 2d 262 (D.D.C. 2011) ....................................................................10, 15

*Hakki v. Zima Co.*,
  No. 03-9183, 2006 WL 852126 (D.C. Super. Ct. Mar. 28, 2006) ...........................22

*Hamm v. Rhone-Poulenc Rorer Pharm., Inc.*,
  187 F.3d 941 (8th Cir. 1999) ....................................................................................11

*Han. Fin. Supervisory Serv.*, No. 18-141, 2022 WL 2438513 (D.D.C. Jul. 5, 2022)...................26

*Havilah Real Prop. Servs., LLC v. VLK, LLC*,
  108 A.3d 334 (D.C. 2015) ........................................................................................22

*Hawthorne v. Rushmore Loan Mgmt. Servs., LLC*,
  No. CV 20-393, 2021 WL 3856626 (D.D.C. Aug. 30, 2021)..................................21

*Hemi Grp., LLC v. City of New York,*
    559 U.S. 1 (2010) ...........................................................................................12

*Holmes v. Sec. Inv. Prot. Corp.,*
    503 U.S. 258 (1992) ........................................................................................12

*Houlahan v. World Wide Ass'n of Specialty Programs & Sch.,*
    No. CIV.A. 04-01161, 2006 WL 785326 (D.D.C. Mar. 28, 2006)......................25

*Hourani v. Mirtchev,*
    943 F. Supp. 2d 159 (D.D.C. 2013) ...................................................................9

*In re McWade Properties, LLC,*
    No. 12-00634, 2012 WL 5897184 (Bankr. D.D.C. Nov. 7, 2012) .......................25

*Jefferson v. Collins,*
    905 F. Supp. 2d 269 (D.D.C. 2012) ...............................................................7, 22

*Jia Di Feng v. See-Lee Lim,*
    786 F. Supp. 2d 96 (D.D.C. 2011) ....................................................................16

*Jiggetts v. D.C.,*
    319 F.R.D. 408 (D.D.C. 2017), *aff'd sub nom. Cooper v. D.C.,* No. 17-7021,
    2017 WL 5664737 (D.C. Cir. Nov. 1, 2017) ..............................................6, 7, 9

*Johnson v. Comm'n on Presidential Debates,*
    202 F. Supp. 3d 159 (D.D.C. 2016), *aff'd,* 869 F.3d 976 (D.C. Cir. 2017)...............23, 24

*Kaempe v. Myers,*
    367 F.3d 958 (D.C. Cir. 2004) ..........................................................................8

*Kaupthing ehf. v. Bricklayers and Trowel Trades Int'l Pension Fund Liquidation
    Portfolio,* 291 F. Supp. 3d 21 (D.D.C. 2017)..............................................27, 28

*Kemp v. George State Univ. Admissions,*
    No. 1:07-CV-0212, 2008 WL 113320118 (N.D. Ga. June 16, 2008)....................27

*Kimm v. Lee,*
    No. 04-cv-5724, 2005 WL 89386 (S.D.N.Y. Jan. 13, 2005) ..............................11

*Kowal v. MCI Commc'ns Corp.,*
    16 F.3d 1271 (D.C. Cir. 1994) .......................................................................7, 8

*\* Lopez v. Council on Am.-Islamic Relations Action Network, Inc.,*
    657 F. Supp. 2d 104 (D.D.C. 2009) .........................................................10, 11, 13

*Maio v. Aetna, Inc.,*
    221 F.3d 472 (3d Cir. 2000)..............................................................................11

*Malek v. Flagstar Bank*,
    70 F. Supp. 3d 23 (D.D.C. 2014) .................................................................. 20

*McMullen v. Synchrony Bank*,
    164 F. Supp. 3d 77 (D.D.C. 2016) ................................................................ 22

*McNamara v. Picken*,
    866 F. Supp. 2d 10 (D.D.C. 2012) ........................................................... 23, 25

*Mittleman v. United States*,
    104 F.3d 410 (D.C. Cir. 1997) ..................................................................... 26

*Mouzan v. Radiancy, Inc.*,
    85 F. Supp.3d 361 (D.D.C. 2015) ................................................................ 22

*Murphy v. Price Waterhouse Coopers*,
    357 F. Supp. 2d 230 (D.D.C. 2004), *aff'd in part, rev'd in part on other
    grounds, Schuler v. PricewaterhouseCoopers, LLP*, 595 F.3d 370 (D.C. Cir.
    2010) ......................................................................................................... 27

*Naartex Consulting Corp. v. Watt*,
    722 F.2d 779 (D.C. Cir. 1983) ..................................................................... 13

*Peirick v. Indiana Univ.-Purdue Univ. Indianapolis Athletics Dep't*,
    510 F.3d 681 (7th Cir. 2007) ....................................................................... 27

*Pietrangelo v. Wilmer Cutler Pickering Hale & Dorr, LLP*,
    68 A.3d 697 (D.C. 2013) ............................................................................. 25

*Pushkin v. Nat'l Academies Bd. on Sci. Educ.*,
    No. 10-1765, 2012 WL 4889277 (D.D.C. Aug. 26, 2012) ............................... 28

*Ray v. Proxmire*,
    581 F.2d 998 (D.C. Cir. 1978) ..................................................................... 24

* *Rodriguez v. Lab'y Corp. of AmericaHoldings*,
    13 F. Supp. 3d 121 (D.D.C. 2014) ....................................................... 18, 20, 24

*RSM Prod. Corp. v. Freshfields Bruckhaus Deringer U.S. LLP*,
    682 F.3d 1043 (D.C. Cir. 2012) ............................................................... 13, 14

* *Samuel v. Wells Fargo & Co.*,
    311 F. Supp. 3d 10 (D.D.C. 2018) ..................................................... 7, 17, 20, 21

*Sharpe v. Am. Acad. of Actuaries*,
    285 F. Supp. 3d 285 (D.D.C. 2018) .............................................................. 22

*Sheppard v. Dickstein, Shapiro, Morin & Oshinsky*,
　59 F. Supp. 2d 27 (D.D.C. 1999) ........................................................................23

*Smartdoor Holdings, Inc. v. Edmidt Indus., Inc.*,
　78 F. Supp. 3d 275 (D.D.C. 2015) ......................................................................27

*Soliman v. George Washington Univ.*,
　658 F. Supp. 2d 98 (D.D.C. 2009) ......................................................................25

*Solomon v. Dechert LLP*,
　No. 22-cv-3137, 2023 WL 6065025 (D.D.C. Sept. 18, 2023) ...................11, 12, 19

*Son Ly v. Solin, Inc.*,
　910 F. Supp. 2d 22 (D.D.C. 2012) ......................................................................15

*Taylor v. District of Columbia*,
　957 A.2d 45 (D.C. 2008) ....................................................................................26

*Teltschik v. Williams & Jensen, PLLC*,
　748 F.3d 1285 (D.C. Cir. 2014), *aff'd*, 806 F. App'x 7 (D.C. Cir. 2020) ...............15

*Toumazou v. Turkish Republic of N. Cyprus*,
　71 F. Supp. 3d 7 (D.D.C. 2014) ...........................................................................8

*United States ex rel. Hawkins v. ManTech Int'l Corp.*,
　No. 15-2105, 2020 WL 435490 (D.D.C. Jan. 28, 2020) .........................................7

*United States ex rel. Joseph v. Cannon*,
　642 F.2d 1373 (D.C. Cir. 1981) ......................................................................7, 18

*United States ex rel. Williams v. Martin–Baker Aircraft Co.*,
　389 F.3d 1251 (D.C. Cir. 2004) ..........................................................................19

*Vince v. Mabus*,
　956 F. Supp.2d 83 (D.D.C. 2013) .......................................................................28

*Washington Metro. Area Transit Auth. v. Quik Serve Foods, Inc.*,
　No. CIV. 04-687, 2006 WL 1147933 (D.D.C. Apr. 28, 2006) ..............................23

*Williams v. Wells Fargo*,
　No. 23-cv-00514, 2023 WL 8600508 (D.D.C. Nov. 9. 2023) .................................9

*Witherspoon v. Philip Morris Inc.*,
　964 F. Supp. 455 (D.D.C. 1997) .........................................................................22

*Xereas v. Heiss*,
　933 F. Supp. 2d 1 (D.D.C. 2013) ........................................................................24

**Statutes**

18 U.S.C. § 1961 ................................................................................................................6

18 U.S.C. § 1962 .........................................................................................................6, 14

18 U.S.C. § 1964 .........................................................................................................6, 10

18 U.S.C. § 1965 ................................................................................................................6

D.C. Code § 12–301 ........................................................................................................26

D.C. Code § 28-3904 ................................................................................................6, 9, 22

**Rules**

Fed. R. Civ. P. 8 ..............................................................................................1, 2, 6, 7, 8

Fed. R. Civ. P. 9 ................................................................................................................1

Fed. R. Civ. P. 12 ..............................................................................................................1

Fed. R. Civ. P. 17 ............................................................................................................27

Defendants George Washington University (the "University") and the Program on Extremism at the George Washington University (the "Program") respectfully ask this Court to dismiss plaintiff Farid Hafez's claims against them with prejudice under Federal Rules of Civil Procedure 8(a), 9(b), and 12(b)(6), for the reasons set forth below, as well as those set forth in the Motions to Dismiss filed by defendants Alp Services SA, Diligence SARL, Mario Brero, Muriel Cavin, Lionel Badal, and Lorenzo Vidino (ECF Nos. 28-1, 29-1).

## INTRODUCTION

This case asserting a "smear campaign" carried out against plaintiff Dr. Farid Hafez by various foreign actors, and not even purportedly involving the University and its Program, is itself a smear. The sole stated role of the University and the Program,[1] and the sole sin they supposedly committed, is their employment of defendant Dr. Lorenzo Vidino. Dr. Vidino is employed by the University and is the Director of the Program. This lawsuit's connection to the University ends there.

Mere employment, with nothing more, is not sufficient to state a legally sufficient claim, and these defendants should be dismissed.

For example, there are no allegations plausibly linking the University to the purported "smear campaign." There are no allegations that the University knew about, let alone encouraged or enabled, Dr. Vidino's independent consulting work supposedly in aid of the campaign. There are no allegations that the University interacted with any of the other alleged participants in the

---

[1] As discussed in Section VI of this motion, the GW Program on Extremism is not a legally distinct entity; rather, it is an unincorporated unit within the University and accordingly the claims against the Program should be dismissed on that basis alone. For ease of reference, however, the term "University" in this motion refers to both the University and the Program.

campaign. The Amended Complaint's attempts to lump the University in with the other defendants' purported scheme is classic improper group pleading, vague and empty at every turn.

*First*, the Amended Complaint should be dismissed under Rule 8 because it impermissibly (and implausibly) lumps together all defendants and incorporates hundreds of allegations by reference, without putting the University on notice of the specific facts that underlie plaintiff's legal claims against it.

*Second*, labels aside, this is not a RICO case. Even if it were, plaintiff does not have RICO standing. Counts 1-4 should thus be dismissed as a failed attempt to dress up a defamation suit as a RICO claim.

*Third*, plaintiff has not alleged an agency relationship between the University and Dr. Vidino.

*Fourth*, plaintiff's state-law claims (Counts 5-10) are meritless.

*Fifth*, the Court should dismiss the Program because it lacks the legal capacity to be sued.

### SUMMARY OF ALLEGATIONS

The supposed "smear campaign" at the center of this lawsuit is detailed at length by other defendants.[2] The following summary focuses on the allegations most relevant to the present motion.

At the time the Amended Complaint was filed, plaintiff was a professor at Williams College[3] and researcher at Georgetown University's The Bridge Initiative; his "main areas of study include politics and religion, far-right parties and movements, race, racism, and decolonial

---

[2] The University incorporates by reference the recitation of facts and statements of the case set forth in the other defendants' Memoranda of Law in support of their Motions to Dismiss (ECF Nos. 28-1, 29-1).

[3] Plaintiff apparently has left his position at Williams College and is now employed at the College of William & Mary. *See* https://www.wm.edu/as/internationalrelations/faculty/hafez_f.php.

studies." Amended Complaint ("Am. Compl.") ¶ 15. Plaintiff alleges that, due to his perceived "pro-Islamic" views, he was a "target" of a "public relations campaign" conducted by, among others, Swiss defendants Alp Services S.A. (Alp), Mario Brero, and Muriel Cavin and their company Diligence SARL (collectively, the European Defendants), and funded by the United Arab Emirates (UAE) under the cover of defendant Ariaf Studies and Research LLC, with the purpose of "'destroy[ing]' their targets' businesses and reputations." *Id.* ¶¶ 1-4, 9. The European Defendants reportedly achieved this goal by, among other things, "publiciz[ing] a false narrative accusing Dr. Hafez of terrorist ties and Muslim Brotherhood associations." *Id.* ¶ 5; *see also id.* ¶¶ 57, 116, 177 (alleging "Defendants" worked with Alp to "disseminate false information about Plaintiff"). The "smear campaign" allegedly caused plaintiff "significant emotional and psychological damages" and reputational damage. *Id.* ¶ 52.

Plaintiff also purports to represent a class of other "targets" of this campaign, vaguely defined as "persons who have been damaged by or misled by Defendants[.]" *Id.* ¶ 37. *See id.* ¶¶ 155-61.[4]

Dr. Vidino is an "expert on Islamism in Europe and North America" and the Director of the Program on Extremism, an academic research center at the University which focuses on "all forms of extremism." *Id.* ¶¶ 23, 27, 79. According to plaintiff, the European Defendants hired Dr. Vidino "as a contractor to provide leads on new targets, research, and analysis on the Muslim Brotherhood" and to use "his academic credentials [as] a way to legitimize the false and misleading statements" about the campaign's targets. *Id.* ¶¶ 27, 36. The European Defendants reportedly met with Dr. Vidino in January 2018 in Geneva, Switzerland; thereafter, Dr. Vidino signed a contract

---

[4] Plaintiff's class allegations should be dismissed or stricken for reasons stated in the European Defendants' Motion to Dismiss (ECF No. 29-1). The University does not waive, and here reserves, its right to oppose class certification at a later date should class allegations survive this case phase.

with Alp by which he agreed, for a €3,000 payment, to provide Alp "[i]nteresting leads/rumours .

. . regarding the subject of investigation organisations/individuals/funding in Europe," and a "[l]ist

of alleged members of the first-tier organisations in European countries," as well as "an overview

of key MB [Muslim Brotherhood] individuals[.]" *Id.* ¶¶ 80-81, 88. The Amended Complaint does

***not*** allege that Dr. Vidino entered into this agreement as the University's agent, on the University's

behalf, or even with the University's knowledge.

The Amended Complaint says nothing to justify the University's insertion in this suit. In

69 pages and more than 200 paragraphs of allegations, there are only ***nine*** allegations that relate

in any specific way to the University or the Program, and not one involves Dr. Vidino's alleged

research for the European Defendants. *See id.* ¶¶ 17, 22-23, 37, 43, 46, 54-55, 62.

As to the University and the Program, the Amended Complaint alleges only that:

- "Institutional Defendants were provided with copies of the various reports and
  correspondences alleged herein to be misleading . . . and had the ability and opportunity to
  prevent their issuance or cause them to be corrected"; [5] "knew or should have known that
  the adverse facts specified herein had not been verified" ; and "knew or should have known
  that funding was being provided by regimes with an agenda and concealed this from the
  public, and that the representations which were being made were then materially false and
  misleading." *Id.* ¶ 17. Tellingly, plaintiff never specifies the "various reports and
  correspondences" or "adverse facts" to which he vaguely refers.

- "Between 2019 and 2023, GWU has received an estimated $12,032,657 in funds from the
  United Arab Emirates pursuant to certain contracts" (*id.* ¶ 22), and "The Program on
  Extremism at GWU, and particularly Dr. Vidino, has been linked to the UAE Minister of
  Foreign Affairs and the UAE Ambassador to the United States . . . ." *Id.* ¶ 62. The Amended
  Complaint does not explain what these alleged "contracts" are, or contend that any of the
  alleged funds related in any way to Dr. Vidino's independent consulting work for Alp, or
  that Dr. Vidino's supposed "links" to the UAE ambassador relate to the University or his
  consulting work for Alp.

- The Program "was used as a platform for its Director, Dr. Vidino, to undertake working on
  the service of Alp . . . funded by the [UAE]. . . ." *Id.* ¶ 37. At the same time, the Amended
  Complaint's other allegations undermine the notion that the University had any control

---

[5] Presumably, the "institutional defendants" are the University and the Program.

over or knowledge of his independent consulting work with Alp, including allegations that "***Dr. Vidino*** was rewarded monetarily" for his work for Alp. *Id.* ¶ 53 (emphasis added).

- The University in some unspecified way committed tax evasion by "acting on behalf of foreign governments without registering under FARA and, in the case of GWU, in contravention of its 501(c)3 purposes and its stated mission . . ." *Id.* ¶¶ 43, 49. The Amended Complaint later backtracks, however, and instead pushes the theory that because ***Dr. Vidino*** allegedly violated FARA, "GWU and The Program on Extremism, ***because of their complicity***, are also responsible for these violations." *Id.* ¶ 54 (emphasis added).

- The University "sought to obscure the basis of The Program on Extremism by structuring it in such a way that has shielded it from proper oversight. Unlike a typical university department or center, The Program on Extremism does not report to any broader administrative unit. Instead, it is linked directly to the Office of the Vice President on Research.[6] Accordingly, the Memorandum of Understanding filed to establish it is not available for examination by anyone outside the Office of the Vice President on Research, even though the UAE's political machinations are now known." *Id.* ¶ 55. The Amended Complaint, however, never explains ***how*** the Program's structure within the University has anything to do with the purported "smear campaign" at the center of this case.

Notably, when the Amended Complaint sets about identifying who led or conducted the purported smear campaign, the University and the Program are nowhere named. *See, e.g.*, *id.* ¶ 114 (identifying other defendants, but not the University or the Program, as having "**carried out the enterprise's day-to-day operations**, among other things, proposing targets, hiring sources, and commissioning false and misleading articles"); ¶ 116 (naming other defendants as having "**managed and operated** the enterprise's affairs") (emphasis added).

The Amended Complaint's remaining allegations are thrown generically at "Defendants." *See, e.g.*, *id.* ¶ 3 ("Defendants' concealment of their actions being taken at the behest of a foreign regime and their continuing false representations, and Defendants' failure to disclosure [sic] that they were acting as unregistered foreign agents"); ¶ 14 ("This collective enterprise's lies were outlandish but devastating."); ¶ 47 ("Defendants, under the veil of scholarship, accused Plaintiff

---

[6] The allegation that the Program is "linked directly to the [University's] Office of the Vice President on Research" (Am. Compl. ¶ 55) further supports the argument in Section VI of this Motion that the Program is not an independent entity capable of being sued.

and at least 50 other persons and institutions of illicit or improper ties with the Muslim Brotherhood

. . . ."); ¶ 49 ("Defendants violated tax evasion under Title 26 of the United States Code Section

7201 . . . by maintaining undisclosed foreign accounts and/or failing to report foreign payments .

. . .").

The Amended Complaint asserts ten causes of action against "all defendants": Civil

Racketeering, 18 U.S.C. § 1962(c) (Count One); Racketeering Conspiracy, 18 U.S.C. § 1962(d)

(Count Two); Multi Complex RICO Artifice and Scheme to Defraud [Title 18 U.S.C. § 1964(C)]

re: Destruction and Injury to Business and Property Interests – Integrational Money Laundering

and Obtaining Monies by and Through False Pretense, Fraud, Theft, and Conversion (Count

Three); RICO § 1961(4) Enterprise Allegations re: RICO § 1962(C) Claim for Relief [18 U.S.C.

§ 1961(4)] (Count Four); RICO § 1965(5) Pattern of Racketeering Activity Allegations [Title 18

U.S.C. § 1961(5)], Commission of Primary Contravention of RICO Section 1962(C) [Title 18

U.S.C. § 1962(C)], and Commission of RICO § 1961(1)(B) Racketeering Activity [Title 18 U.S.C.

§ 1961(1)(B)] (Count Five); Common Law Fraud (Count Six); Violation of D.C. Code § 28-3904

Unfair or Deceptive Trade Practices (Count Seven); Tortious Interference with Existing Business

Relations (Count Eight); Tortious Interference with Prospective Business Relations (Count Nine);

and Prima Facie Tort (Count Ten).

## LEGAL STANDARDS

*Rule 8.* "Federal Rule of Civil Procedure 8(a) mandates that a complaint 'must contain . .

. a short and plain statement of the claim showing that the pleader is entitled to relief'. Rule 8(d)(1)

further elucidates this mandate, by requiring that '[e]ach allegation must be simple, concise, and

direct.'" *Jiggetts v. D.C.*, 319 F.R.D. 408, 413 (D.D.C. 2017), *aff'd sub nom. Cooper v. D.C.*, No.

17-7021, 2017 WL 5664737 (D.C. Cir. Nov. 1, 2017) (citations omitted). Taken together, these

standards "underscore the emphasis placed on clarity and brevity by the federal pleading rules."

*Ciralsky v. C.I.A.*, 355 F.3d 661, 669 (D.C. Cir. 2004) (citation omitted). A complaint that "lacks sufficient clarity to give fair notice of the claims raised and their basis" violates Rule 8. *Jiggetts*, 319 F.R.D. at 414. "Cursory, unexplained allegations of misconduct do not satisfy the pleading standards of Federal Rule 8." *Samuel v. Wells Fargo & Co.*, 311 F. Supp. 3d 10, 17 (D.D.C. 2018).

**Rule 9.** To state a claim based in fraud, plaintiff must set forth his factual allegations "with particularity. [This] 'normally . . . means that the pleader must state the time, place and content of the false misrepresentations, the fact misrepresented and what was retained or given up as a consequence of the fraud.'" *United States ex rel. Joseph v. Cannon*, 642 F.2d 1373, 1385 (D.C. Cir. 1981). "[B]ecause 'fraud' encompasses a wide variety of activities, the requirements of Rule 9(b) guarantee all defendants sufficient information to allow for preparation of a response." *Id.*; *see Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1279 (D.C. Cir. 1994) (dismissing fraud claim pled "only in the vaguest terms" without "factual specificity."). This "heightened pleading standard is designed to 'discourage the initiation of suits brought solely for their nuisance value, and safeguard potential defendants from frivolous accusations of moral turpitude[.]'" *United States ex rel. Hawkins v. ManTech Int'l Corp.*, No. 15-2105, 2020 WL 435490, at *4 (D.D.C. Jan. 28, 2020) (A.B. Jackson, J.). Additionally, if a RICO plaintiff alleges predicate acts based in fraud, as here, the complaint's allegations must meet "the specificity required by the heightened pleading standard" of Rule 9(b). *Bates v. Nw. Hum. Servs., Inc.*, 466 F. Supp. 2d 69, 88 (D.D.C. 2006).

**Rule 12.** "A Rule 12(b)(6) motion tests whether the complaint 'states a claim upon which relief can be granted.'" *Jefferson v. Collins*, 905 F. Supp. 2d 269, 276 (D.D.C. 2012) (citation omitted). To survive a motion to dismiss, allegations must "contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face" and "must be enough to raise a right to relief above the speculative level." *George v. Bank of Am. N.A.*, 821 F. Supp. 2d 299,

301 (D.D.C. 2011) (quoting *Ashcroft v. Iqbal,* 556 U.S. 662 (2009)) (citations omitted). The Court need not "accept inferences drawn by plaintiff[] if such inferences are unsupported by the facts set out in the complaint. Nor must [a] court accept legal conclusions cast in the form of factual allegations." *Kowal,* 16 F.3d at 1276. Nor need the Court "accept as true the complaint's factual allegations insofar as they contradict exhibits to the complaint or matters subject to judicial notice." *Kaempe v. Myers*, 367 F.3d 958, 963 (D.C. Cir. 2004).

## ARGUMENT

## I.     THE AMENDED COMPLAINT VIOLATES RULE 8.

The Amended Complaint, despite its 69 pages and more than 200 paragraphs of allegations, is striking for its lack of specificity, especially with respect to the University. Only nine paragraphs discuss the University's alleged conduct, and, even then, only in the most conclusory terms. Otherwise, plaintiff relies on allegations that lump all defendants together, without identifying a single thing the University supposedly did wrong. *See, e.g.*, Am. Compl. ¶¶ 154, 167–69, 182, 200.

This pleading violates Rule 8's mandate for a "short and plain statement of the claim" and "simple, concise, and direct" allegations. Fed. R. Civ. P. 8(a)(2); Fed. R. Civ. P. 8(d)(1). "Generally, a plaintiff cannot satisfy the minimum pleading requirements under Rule 8 . . . by 'lumping all the defendants together in each claim and providing no factual basis to distinguish their conduct.'" *Toumazou v. Turkish Republic of N. Cyprus*, 71 F. Supp. 3d 7, 21 (D.D.C. 2014) (citation omitted).

For example, before the "substantive allegations" even begin, plaintiff allocates 31 paragraphs to explaining how "Alp, GWU, and Dr. Vidino Organize an Unlawful Enterprise," yet not one pleads anything about how "GWU" helped organize the enterprise. *See* Am. Compl. ¶¶ 64–95. The resulting vacuum makes it "nearly impossible" for the University "to discern the *essential* facts that underlie [Dr. Hafez's] legal claims" or "determine the basis for [Dr. Hafez's] claims, as

necessary to prepare a proper answer." *Jiggetts*, 319 F.R.D. at 415; *see also Bradley v. Nat'l Collegiate Athletic Ass'n*, 249 F. Supp. 3d 149, 171 (D.D.C. 2017) (finding conclusory fraud allegations failed Rule 8).

Making matters worse, each count impermissibly "generally 'incorporates by reference' every paragraph before it, and most counts fail to give any indication of the particular allegations that correspond to the legal theories and claims that are alleged in the count at issue." *Jiggetts*, 319 F.R.D. at 416. Plaintiff's seventh cause of action (for violation of the District of Columbia Consumer Protection Procedures Act) is illustrative. This cause incorporates by reference "every allegation contained in paragraphs '1' through '156,'" Am. Compl. ¶ 152, and then baldly states: "[b]y engaging in the acts and practices above, Defendants have engaged in deceptive and misleading practices in violation of DCC § § 28–3904." *Id.* ¶ 154. This cause of action follows 59 "pages of facts that recount numerous events that may (or may not) pertain to [this] claim[,]" making it impossible to discern what conduct ties to which defendant. *See Jiggetts*, 319 F.R.D. at 416–417. The Amended Complaint condemns the University to pure guesswork as to what it supposedly did wrong.

Because Rule 8 demands more, all claims against the University should be dismissed with prejudice.[7]

---

[7] Having already amended his complaint once and taken "two bites at the proverbial apple," *Hourani v. Mirtchev*, 943 F. Supp. 2d 159, 172 (D.D.C. 2013), plaintiff still cannot meet Rule 8's pleading standards.  The Court should not permit him to amend yet again in the hopes of pleading sustainable claims supported by actual facts, and instead should dismiss his claims with prejudice. *See Williams v. Wells Fargo*, No. 23-cv-00514, 2023 WL 8600508, at *2 (D.D.C. Nov. 9. 2023) ("[D]ismissal with prejudice is proper" where plaintiff "has already filed an amended complaint.").

## II.   THE AMENDED COMPLAINT FAILS TO STATE A RICO CLAIM AGAINST THE UNIVERSITY (COUNTS 1-5).

Plaintiff alleges that the University conspired with other defendants to commit violations of the Racketeer Influenced and Corrupt Organization Act, 18 U.S.C. § 1964(c) ("RICO"), by engaging in what can only be described as a kitchen sink of purported predicate offenses, including wire and bank fraud and maybe tax evasion and perhaps a violation of foreign registration law. *See* Am. Compl. ¶¶ 50, 115. For the sake of brevity, the University incorporates by reference Dr. Vidino's and the European Defendants' arguments explaining why the RICO claims are untenable and should be dismissed with prejudice under Rule 12(b)(6). But as to the University, plaintiff's factual allegations of RICO misconduct are so sparse, and the legal support so feeble, that certain of the most glaring pleading deficiencies bear mention.

### A.   Plaintiff Lacks Standing To Bring A Civil RICO Suit.

The RICO civil statute is not an all-purpose tool for righting all wrongs. Rather, it confers standing on only those private plaintiffs who have plausibly suffered (1) domestic injury to business or property (2) by reason of a RICO violation (*i.e.*, proximate causation). *Greenpeace, Inc. v. Dow Chem. Co.*, 808 F. Supp. 2d 262, 268-69 (D.D.C. 2011). The Amended Complaint alleges neither.

#### 1.   The Amended Complaint fails to allege domestic injury to business or property.

"[P]ersonal injuries, and economic losses derived therefrom, but not any specific injuries to business or property that are separate from . . . personal injuries" do not confer RICO standing. *Burnett v. Al Baraka Inv. & Dev. Corp.*, 274 F. Supp. 2d 86, 100 (D.D.C. 2003). Nor is a "speculative" and non-quantifiable injury enough. *See Lopez v. Council on Am.-Islamic Relations Action Network, Inc.*, 657 F. Supp. 2d 104, 114 (D.D.C. 2009). Plaintiff instead must allege a

"concrete financial loss" to business or property. *See id.* (citing *Maio v. Aetna, Inc.*, 221 F.3d 472, 483 (3d Cir. 2000)). He has not done so.[8]

Instead, plaintiff vaguely alleges that the defendants' actions impacted his "credibility and career[]" and "businesses and reputation[]" and had a "direct impact . . . on [his] personal life and emotional, physical, and psychological well-being." Am. Compl. ¶¶ 14, 52. This type of personal and non-concrete reputational injury does not confer RICO standing. *See Burnett*, 274 F. Supp.2d at 102 (citing cases); *Aston v. Johnson & Johnson*, 248 F. Supp. 3d 43, 50 (D.D.C. 2017) ("courts in this District and elsewhere have consistently rejected the argument that pecuniary losses derivative of personal injuries are injuries to 'business or property' cognizable under RICO") (citing cases); *Hamm v. Rhone-Poulenc Rorer Pharm., Inc.*, 187 F.3d 941, 954 (8th Cir. 1999) (damage to reputation not cognizable under RICO); *Kimm v. Lee*, No. 04-cv-5724, 2005 WL 89386, at *5 n. 7 (S.D.N.Y. Jan. 13, 2005) ("allegations of harm to [plaintiff's] professional reputation are not compensable in a RICO claim"). Intoning the words "economic harm" is not enough either, especially when the Amended Complaint does not otherwise allege facts showing any actual, specific financial harm plaintiff suffered as a direct result of the alleged smear campaign. *See* Section V.C.

### 2.     The Amended Complaint fails to allege proximate causation.

"A RICO plaintiff must show that a RICO predicate act proximately caused his alleged injuries." *Solomon v. Dechert LLP*, No. 22-cv-3137, 2023 WL 6065025, at *9 (D.D.C. Sept. 18, 2023). This requires a showing of a "'direct relationship' between the injury and the predicate act;" "[a] direct relationship does not exist where 'a plaintiff . . . complain[s] of harm flowing merely

---

[8] Nor does plaintiff specifically allege a *domestic* injury, referencing only a cancelled speaking engagement in Austria and a lost business relationship with the University of Salzburg. *See* Am. Compl. ¶¶ 52, 175.

from the misfortunes visited upon a third person by the defendant's acts.'" *Id.* (citing *Holmes v. Sec. Inv. Prot. Corp.*, 503 U.S. 258, 268-69 (1992)). "Put differently, if 'the conduct directly causing the harm [is] distinct from the conduct giving rise to the [offense],' causation is overly attenuated.'" *Id.* (citing *Hemi Grp., LLC v. City of New York*, 559 U.S. 1, 11 (2010)). Proximate cause in RICO cases thus uniquely turns on "the existence of a sufficiently 'direct relationship' between the fraud and the harm," rather than foreseeability. *Hemi Group, LLC*, 559 U.S. at 12.

The Amended Complaint pleads nothing to proximately tie the supposed smear campaign to cognizable injury. Instead, the Amended Complaint alleges exactly the type of attenuated causal relationship that courts in this Circuit have condemned: that defendants' actions caused third parties, such as universities, news outlets, and banks, to cut ties with plaintiff (although again, no specifics are alleged), which in turn allegedly caused plaintiff financial hardship. Am. Compl. ¶¶ 2, 10. *See Solomon*, 2023 WL 6065025, at *10-11 (no RICO proximate causation where defendants' fraud "enabled" third parties to cause plaintiff's economic injury).

The most plaintiff alleges about any "tangible financial consequences" are that his "bank accounts were frozen," which "caused significant financial hardship . . . leading to additional stress and anxiety." Am. Compl. ¶ 52. This does not save his claims, for it is not enough for plaintiff to allege that unnamed ***third parties*** froze his bank accounts as a result of defendants' purported actions. *See E. Sav. Bank, FSB v. Papageorge*, 31 F. Supp. 3d 1, 15 (D.D.C. 2014), *aff'd*, 629 F. App'x 1 (D.C. Cir. 2015) (affirming dismissal where lawsuits causing economic harm were "wholly removed from the alleged predicate acts" of extortion and witness tampering). When the purported objective of defendants' alleged scheme is to target third parties (here, to "defraud[] banks, their targets' business partners, government decision makers, and the public" (Am. Compl.

¶ 2)), the resulting effects plaintiff alleges are not the type of recoverable harm contemplated by RICO.[9]

### B.   The RICO Conspiracy Count Fails For Lack Of Allegations Showing That The University Agreed To Commit Or Further A RICO Offense.

To state a claim for a RICO conspiracy, "the complaint must allege that (1) two or more people **agreed to commit** a [RICO] offense, and (2) a **defendant agreed to further** that endeavor." *See Ctr. for Immigration Studies v. Cohen*, 410 F. Supp. 3d 183, 188 (D.D.C. 2019) (A.B. Jackson, J.), *aff'd*, 806 F. App'x 7 (D.C. Cir. 2020) (emphasis added) (citation omitted). The complaint must allege that *each defendant* "endeavored to carry out the objectives of" the alleged RICO scheme. *See Lopez v. Council on Am.-Islamic Relations Action Network, Inc.*, 657 F. Supp. 2d 104, 112 (D.D.C 2009); *Cheeks v. Fort Myer Constr. Corp.*, 216 F. Supp. 3d 146, 162 (D.D.C. 2016), *aff'd*, 728 F. App'x 12 (D.C. Cir. 2018) (citation omitted); *RSM Prod. Corp. v. Freshfields Bruckhaus Deringer U.S. LLP*, 682 F.3d 1043, 1048 (D.C. Cir. 2012) (defendant must "adopt the goal of furthering or facilitating the criminal endeavor" to be held liable for RICO conspiracy) (citation omitted); *Barlow v. McLeod*, 666 F. Supp. 222, 225 (D.D.C. 1986) ("A RICO conspiracy allegation requires pleading the existence of at least one overt act by a defendant in furtherance of the conspiracy and the assent of each defendant to the conspiracy.") (citation omitted). A conclusory statement that a defendant "conspired to violate RICO" is not enough. *See Cheeks*, 216 F. Supp. at 162; *Naartex Consulting Corp. v. Watt*, 722 F.2d 779, 787–88 (D.C. Cir. 1983).

Here, there are *zero* plausible allegations that the University knew about *any* of the alleged RICO predicate acts, let alone agreed to further them or participated in any knowing way in the

---

[9] The lack of standing is underscored by the Amended Complaint's failure to allege any tie between what defendants – especially the University – allegedly said about plaintiff (*see* Section V.A), or identify what lost business opportunities and economic losses plaintiff allegedly suffered as a result. *See* Section V.C.

purported scheme. Conspicuously absent are allegations that the University was even aware of Dr. Vidino's alleged independent consulting work for Alp, let alone the alleged purpose of that work or the work product itself.  This is fatal to plaintiff's attempt to embroil the University in the defamatory scheme he posits.

As for plaintiff's vague and utterly speculative allegation that the University was "funded" by the UAE (Am. Compl. ¶¶ 37, 43), the Amended Complaint does not allege (because it cannot do so within the bounds of Rule 11) that any purported relationship between the University and the UAE has anything to do with Dr. Vidino's independent consulting work for Alp, or that the University received any improper monetary benefits from the UAE. Instead, the Amended Complaint alleges that *Dr. Vidino* was paid by the UAE through his agreement with Alp. *See, e.g.*, Am. Compl. ¶ 53 (*Dr. Vidino* "was rewarded monetarily . . . ."); ¶ 63 (*Dr. Vidino* was paid "untold sums"). At any rate, allegations of UAE funding could not, even if proven, establish the University's knowledge of or participation in the alleged scheme. *See RSM Prod. Corp.*, 682 F.3d at 1050 (plaintiffs failed to plead RICO conspiracy even though complaint alleged defendant was aware of source of payments received, because complaint did not allege defendant was "aware of the essential nature and scope of the RICO enterprise" or "knew of and agreed to the overall objective of the RICO offense") (citations omitted).

### C.   The Amended Complaint Alleges No RICO Predicate Act Committed By The University.

A claim of RICO conspiracy fails absent plausible allegations of one or more RICO predicate offenses. *See Byrne v. Brock*, No. 19-7120, 2020 WL 1487757, at *2 (D.C. Cir. Feb. 27, 2020); *E. Sav. Bank, FSB*, 31 F. Supp. at 15  ("Since the plaintiff has failed to plead a RICO violation under 18 U.S.C. § 1962(a)–(c), its claim under § 1962(d) must fail, because there was no violation in which the defendant could have conspired."), *aff'd*, 629 F. App'x 1 (D.C. Cir. 2015);

*Son Ly v. Solin, Inc.*, 910 F. Supp. 2d 22, 28 (D.D.C. 2012); *Greenpeace*, 808 F. Supp. at 274. No

such predicate acts are alleged, especially as to the University. *See* ECF No. 28-1 at p. 29-30; ECF

No. 29-1 at p. 14-18.[10]

Plaintiff's inability to identify a single actionable predicate act reveals the true identity of

his claims: defamation. Plaintiff even admitted as much, acknowledging that "'you cannot sue'"

Dr. Vidino "'for libel, because he does not actually say you are a member of the Muslim

Brotherhood'" and has a "complete right to" his "own opinions" about who "might . . . have some

association with the Brotherhood." Am. Compl. ¶¶ 38, 48. As this Court has made clear, "a

plaintiff 'complaining about a defamatory statement cannot end-run the requirements for a

defamation claim' by pleading it as a RICO violation." *Ctr. for Immigr. Studs.*, 410 F. Supp. at

191) (quoting *Teltschik v. Williams & Jensen, PLLC*, 748 F.3d 1285, 1288 (D.C. Cir. 2014), *aff'd*,

806 F. App'x 7 (D.C. Cir. 2020). This is exactly what the Amended Complaint does.

## III.   DR. VIDINO'S ALLEGED CONDUCT CANNOT BE ATTRIBUTED TO THE UNIVERSITY.

It is ironic that a case claiming guilt of association sues the University purely on guilt *by*

association. As shown above, the Amended Complaint offers no reason the University *qua*

University belongs in this case. None. To overcome this most basic pleading defect, the Amended

Complaint generically alleges that "Dr. Vidino was a director or employee, or agent of the

Defendant institutional entities listed herein at all relevant times." Am. Compl. ¶ 16. These

conclusory allegations fail because plaintiff does not plausibly allege that Dr. Vidino acted as an

agent of the University regarding his alleged consulting work, or allege any facts otherwise

---

[10] Plaintiff does not allege, nor can he, that the allegations of "tax evasion" and FARA violations against the University constitute a RICO predicate act. Am. Compl. ¶¶ 37, 43, 49, 162. It is unclear what purpose these vague and unfounded allegations serve.

showing that the University is vicariously liable for Dr. Vidino's conduct. *See Jia Di Feng v. See-Lee Lim*, 786 F. Supp. 2d 96, 104 (D.D.C. 2011).[11]

Merely alleging that Dr. Vidino was employed by the University is not enough; to plead vicarious liability, plaintiff must allege ***facts*** showing that Dr. Vidino was ***acting within the scope of his employment*** when he committed the alleged misconduct. *See id*. The Amended Complaint alleges the opposite. *See* Am. Compl. ¶ 13 ("the enterprise hired . . . *Dr. Vidino*"); ¶ 27 ("*Dr. Vidino* was hired by Alp as a *contractor* to provide leads on new targets, research, and analysis on the Muslim Brotherhood. . ..); ¶ 36 ("*Dr. Vidino* consulted Alp about Dr. Hafez"); ¶ 81 ("*Dr. Vidino* signed a *contract* with Alp" and "Alp agreed to pay *Dr. Vidino* € 3,000 for his work") (emphasis added in all).

Nor does plaintiff put forth any ***facts*** showing that the University ***exercised control*** over Dr. Vidino, including over the work Dr. Vidino allegedly performed for Alp as an independent consultant (including the "various reports and correspondences" that plaintiff alleges were misleading or false, Am. Compl. ¶ 17)—a required element of any viable agency relationship. *Acosta Orellana v. CropLife Int'l*, 711 F. Supp. 2d 81, 111-12 (D.D.C. 2010); *Council on Am.-Islamic Rels. Action Network, Inc. v. Gaubatz*, 891 F. Supp. 2d 13, 28-29 (D.D.C. 2012). Again, the Amended Complaint contradicts any suggestion of control, specifically alleging instead that "*Dr. Vidino* possessed the *power and authority to control* the contents of said institutional Defendants' reports, press releases, and presentations . . . ." Am. Compl. ¶ 17 (emphasis added);

---

[11] Dispensing of an agency theory at the outset of a case where a plaintiff has not adequately "pled the existence of an agency relationship is entirely appropriate" *Acosta Orellana,* 711 F. Supp. 2d at 111 n.36), and the Court should do so here. *See Bradley v. Nat'l Collegiate Athletic Ass'n*, 249 F. Supp. 3d 149, 177 (D.D.C. 2017).

*see also id.* ¶ 37 (alleging that the Program on Extremism "was *used as a platform for its Director,*

*Dr. Vidino*, to undertake working in the service of Alp . . . .") (emphasis added).

At most, the Amended Complaint vaguely alleges that the University somehow "had the

ability and opportunity to prevent" Dr. Vidino's purportedly misleading and false "reports and

correspondences" from being issued—communications not associated with the Program—and was

somehow "complicit" in Dr. Vidino's alleged actions (Am. Compl. ¶¶ 17, 54). "Ability" and

"opportunity" are not legal claims. There are no allegations that the University **controlled** Dr.

Vidino's work, especially his independent contractor work, or that the University had the right to

**direct** Dr. Vidino "'in the performance of his work[,]'" either for the Program or in his independent

contractor work, "'and the manner in which the work [was] to be done'—the *sine qua non* of an

agency relationship." *Council on Am.-Islamic Rels. Action Network, Inc.*, 891 F. Supp. 2d at 29.

Critically, plaintiff has not alleged, nor can he, that Dr. Vidino was acting at the control or direction

of the University when he was engaged by Alp to perform independent contracting services—and

the very allegations in the Amended Complaint contradict this premise. *See, e.g.*, Am. Compl.

¶¶ 13, 17, 27, 36-37, 81.

This leaves plaintiff with mere association. And mere association, in this instance

between employer and employee, is not actionable.

## IV.   PLAINTIFF'S STATE LAW CLAIMS FAIL.

The Court should dismiss the state-law claims with prejudice under Rule 12(b)(6) for

failure of essential elements.

### A.   The Fraud Claim Fails For Multiple Reasons (Count VI).

"Under D.C. law, '[t]he essential elements of common law fraud are: (1) a false

representation (2) in reference to material fact, (3) made with knowledge of its falsity, (4) with the

intent to deceive, and (5) action is taken in reliance upon the representation.'" *Samuel v. Wells*

*Fargo & Co.*, 311 F. Supp. 3d 10, 19 (D.D.C. 2018) (citation omitted). Plaintiff cannot state a fraud claim by merely lumping together defendants with respect to each element, as he does here (Am. Compl. ¶¶ 139-51, 162); rather, he must allege sufficient facts amounting to fraud against each and every defendant. *See Acosta Orellana*, 711 F. Supp. 2d at 96-97 (dismissing fraud claim where complaint failed "to adequately identify with specificity the defendants responsible for" the alleged misrepresentations or "to provide any indication of the role played by the individual defendants or distinguish the specific acts of fraudulent activity allegedly committed by" each).

Plaintiff does not even come close to pleading with the specificity Rule 9 requires to state a fraud claim against the University. Plaintiff has not stated the "time, place and content of the false misrepresentations" required to plead the first element of fraud. *United States v. Cannon,* 642 F.2d 1373, 1385 (D.C. Cir. 1981). Plaintiff's claim essentially rests on one supposed "misrepresentation": "that Plaintiff was associated with the Muslim Brotherhood or by implication some agent of the Muslim Brotherhood rather than a voice against Islamophobia and in favor of religious tolerance." Am. Compl. ¶ 147. But plaintiff cannot point to alleged false representations or misleading reports in the abstract; he must identify "what specific statement or other communication by [which defendant] was false or misleading." *See Rodriguez v. Lab'y Corp. of AmericaHoldings*, 13 F. Supp. 3d 121, 129 (D.D.C. 2014).

The Amended Complaint identifies no false statements the University purportedly made about plaintiff, no specific University-affiliated "reports and correspondences" these apparent

18

statements were contained in,[12] or where or when the statements were published.[13] It speaks in generalities only, offering that the University "disseminated reports masquerading as academic, rooted in fact, and with the façade of independence and scholarly integrity when in fact undisclosed agents funded as such." Am. Compl. ¶¶ 145, 148. But what are those reports? What did they specifically say about plaintiff that was false? Who are the University's "undisclosed agents"? The Amended Complaint does not say. These "'vague, potentially damaging accusations of fraud'" are "precisely what Rule 9(b) seeks to prevent." *Acosta Orellana*, 711 F. Supp. 2d at 97 (citing *United States ex rel. Williams v. Martin–Baker Aircraft Co.*, 389 F.3d 1251, 1257 (D.C. Cir. 2004)).

Nor does the Amended Complaint plausibly allege that the University acted with intent to deceive anyone, let alone plaintiff. To the contrary, plaintiff's theory seems to be that the University somehow ***should have known*** of the other defendants' intentions and prevented Dr. Vidino from publishing any reports or otherwise providing information about plaintiff to the other defendants. *See* Am. Compl. ¶ 17 (alleging that the University "had the ability and opportunity to prevent" issuance of the allegedly false reports "or cause them to be corrected" "knew or should have known that the adverse facts specified herein had not been verified" or that "funding was being provided by regimes with an agenda). This is not the adequate pleading of the requisite intent, much less an intentional tort like fraud.

---

[12] Despite its references to false and misleading "reports," the Amended Complaint cites only a ***single report*** actually affiliated with the Program: Dr. Vidino's August 2017 publication, "The Muslim Brotherhood in Austria," available at [MB in Austria- Print.pdf (gwu.edu)](). *See* Am. Compl. ¶ 38. Notably, this report was published ***before Dr. Vidino entered into*** his 2018 consulting agreement with Alp, only mentions plaintiff twice, by referring to him as "once a key leader of the [Muslim-Jugend Österreichs] and currently a prominent Islamophobia expert at the University of Salzburg," and citing one of plaintiff's articles.

[13] The same deficiencies condemn plaintiff's attempts to plead substantive RICO predicate acts. *See Solomon,* 2023 WL 6065025, at *12 ("A RICO claim cannot rely on 'wire fraud allegations [that] identify no false statements or misrepresentations.'") (quoting *Ambellu v. Re'ese Adbarat Debre Selam Kidist Mariam*, 387 F. Supp. 3d 71, 85 (D.D.C. 2019)).

The Amended Complaint's only other allegations about intent and knowledge merely pile on more impermissible, conclusory group pleading. *See* Am. Compl. ¶¶ 46-47. Such "threadbare recital[s]" of intent are insufficient without alleging ***facts***. *See Bradley*, 249 F. Supp. 3d at 171 (dismissing fraud claim where plaintiff failed to allege any facts that demonstrated defendant's representations "were 'made with knowledge of its falsity [or] with the intent to deceive'") (citation omitted); *Rodriguez*, 13 F. Supp. 3d at 130 ("[B]eyond a formulaic recitation of the elements of fraud, [plaintiff] has not alleged any facts suggesting that [defendant] or any of its employees knew or believed the Report was inaccurate, or intended to deceive [plaintiff], or anyone else, by providing false information.").

Plaintiff's fraud claim is also missing any allegations that ***plaintiff himself*** relied on any defendant's purported misrepresentations. Instead, he alleges that defendants collectively attempted to "induc[e] the Plaintiff's business associates, employers, academics, and others, to break ties" with him. Am. Compl. ¶ 116. There is no cause of action under D.C. law that permits a plaintiff to plead general fraud on the world without the "'critical element" of "reasonable reliance to [***plaintiff's***] detriment on the defendant's conduct.'" *See Samuel*, 311 F. Supp. 3d at 19 (quoting *Malek v. Flagstar Bank*, 70 F. Supp. 3d 23, 31 (D.D.C. 2014)). The omission of this critical element is fatal. *See Aktieselskabet AF 21. Nov. 2001 v. Fame Jeans Inc.*, 525 F.3d 8, 22 (D.C. Cir. 2008) ("A plaintiff may recover for a defendant's fraudulent statement only if ***the plaintiff*** took some action in reliance on that statement." (emphasis added)); *Rodriguez*, 13 F. Supp. 3d at 129 (rejecting argument that fraud claim can rest on allegations of third-party reliance).

Plaintiff's allegations that, as a result of the purported fraud, he "had to defend himself against false accusations, false detention and being blacklisted" (Am. Compl. ¶ 146) does not save his claim, because ***harm*** is not ***detrimental reliance***. *See E. Sav. Bank, FSB v. Papageorge*, 629

F. App'x 1, 3 (D.C. Cir. 2015) ("[E]ven if [plaintiff] were *harmed* by defendants' alleged fraud perpetrated against the courts, [plaintiff] does not show that it *detrimentally relied* on the defendants' allegedly fraudulent statements." (emphasis in original)).

These pleading deficiencies highlight an overarching flaw in the Amended Complaint: plaintiff does not have grievances with any fraudulent statements; his grievances are with the perceived defamatory effect of *opinions* about his association with the Muslim Brotherhood expressed in Dr. Vidino's published works. *See* ECF No. 28-1 at p. 8-22; *see also Ctr. for Immigration Studies*, 410 F. Supp. 3d at 189-92, *aff'd*, 806 F. App'x 7 (D.C. Cir. 2020) ("[T]he complaint is devoid of any allegation that defendants made a statement that was false. The upshot of the complaint is that defendants advanced a conclusion that was debatable, and that this expression of a flawed opinion harmed plaintiff's reputation.") (citing cases). This is not a fraud claim, and certainly not as pleaded.

### B.     The CPPA Claim Is Defective (Count 7).

Plaintiff's attempted claim under the District of Columbia Consumer Protection Procedures Act (CPPA) fails for multiple reasons.

*First*, the Act does not apply to the facts of this case. D.C. courts have "'repeatedly concluded that the CPPA was designed to police trade practices arising only out of ***consumer-merchant*** relationships.'" *Archie v. U.S. Bank, N.A. as Tr. for RMAC Tr., Series 2016-CTT*, 255 A.3d 1005, 1020 (D.C. 2021) (emphasis added) (citation omitted). The Amended Complaint does not even attempt to allege that plaintiff is a "consumer" within the meaning of the CPPA or that the University is a "merchant," let alone that plaintiff's claims against the University arise out of a consumer-merchant relationship. The CPPA claim should be dismissed for this reason alone. *See Samuel v. Wells Fargo & Co.*, 311 F. Supp. 3d 10, 19 (D.D.C. 2018); *Hawthorne v. Rushmore Loan Mgmt. Servs., LLC*, No. CV 20-393, 2021 WL 3856626, at *12 (D.D.C. Aug. 30, 2021).

*Second*, plaintiff alleges no "unlawful trade practice," as the Act requires. *See* D.C. Code § 28-3904 (listing 39 types of unlawful trade practices); *Hakki v. Zima Co.*, No. 03-9183, 2006 WL 852126, at *3 (D.C. Super. Ct. Mar. 28, 2006) ("To state a claim under the CPPA, a plaintiff must allege one of the unlawful trade practices enumerated in D.C. Code § 28-3904 or one that is prohibited by another District of Columbia law." (citing *Dist. Cablevision Ltd. P'ship v. Bassin*, 828 A.2d 714, 722–23 (D.C. 2003))).

Additionally, to the extent plaintiff is attempting to allege fraud-based deceptive trade practices, his allegations of the University's supposedly misleading and fraudulent acts are defectively vague. *See* Section V.A.[14]

Yet again, the Amended Complaint impermissibly deprives the University of its fundamental right to know what it is alleged to have done wrong. The CPPA claim should be dismissed with prejudice.

**C.      The Claims For Tortious Interference With Existing Or Prospective Business Relations Fail (Counts 8 and 9).**

"To make out a prima facie case of tortious interference, the plaintiff must demonstrate: (1) existence of a valid contractual or other business relationship; (2) the defendant's knowledge of the relationship; (3) intentional interference with that relationship by the defendant; and (4) resulting damages." *Havilah Real Prop. Servs., LLC v. VLK, LLC*, 108 A.3d 334, 345–46 (D.C. 2015) (internal quotation marks omitted). For existing business relationships, a plaintiff must describe the allegedly lost relationship with specificity. *See Sharpe v. Am. Acad. of Actuaries*, 285

---

[14] To the extent plaintiff's CPPA claim is based on fraud, some courts in this Circuit have applied Rule 9(b)'s heightened pleading standards (*see Mouzan v. Radiancy, Inc.*, 85 F. Supp.3d 361, 379 (D.D.C. 2015), *Witherspoon v. Philip Morris Inc.*, 964 F. Supp. 455, 464 (D.D.C. 1997), and *Jefferson v. Collins*, 905 F. Supp. 2d 269, 289 (D.D.C. 2012)), while others have not (*see McMullen v. Synchrony Bank*, 164 F. Supp. 3d 77, 91 (D.D.C. 2016), and *Frese v. City Segway Tours of Washington, DC, LLC*, 249 F. Supp. 3d 230, 235 (D.D.C. 2017)).

F. Supp. 3d 285, 292 (D.D.C. 2018) (stating that plaintiff must "plead the specific contracts" that were interfered with). For prospective business relationships, a plaintiff must allege "'business expectancies, not grounded on present contractual relationships, but which are commercially reasonable to expect'" and are probable, "'not a mere possibility.'" *Johnson v. Comm'n on Presidential Debates*, 202 F. Supp. 3d 159, 176 (D.D.C. 2016), *aff'd*, 869 F.3d 976 (D.C. Cir. 2017) (citations omitted); *Command Consulting Grp., LLC v. Neuraliq, Inc.*, 623 F. Supp. 2d 49, 52 (D.D.C. 2009). The Amended Complaint does not plead a single requisite element.

*First*, the Amended Complaint pleads only a single business relationship that plaintiff allegedly lost—his prior status as a "researcher and lecturer" at the University of Salzburg—in support of both his existing and prospective interference claims. Am. Compl. ¶ 166-68.[15] Even if this generic allegation—which does not identify the specific contract lost and omits details about the pecuniary or specific employment aspects of the relationship—were pled with enough specificity to establish an ***existing*** business relationship, it is plainly insufficient to support plaintiff's ***prospective*** business relationship claim (Am. Compl. ¶ 182), which requires articulation of a "commercially reasonable" and specific expected future relationship that cannot be "grounded in present contractual relationships." *McNamara v. Picken*, 866 F. Supp. 2d 10, 15 (D.D.C. 2012) (citation and internal quotation marks omitted); *see Washington Metro. Area Transit Auth. v. Quik Serve Foods, Inc*., No. CIV. 04-687, 2006 WL 1147933, at *6 (D.D.C. Apr. 28, 2006); *Sheppard v. Dickstein, Shapiro, Morin & Oshinsky*, 59 F. Supp. 2d 27, 34 (D.D.C. 1999). Likewise, plaintiff's vague allegations about his lost relationships with "many colleges and universities"

---

[15] While plaintiff also alleges that Dr. Vidino's 2017 report "The Muslim Brotherhood in Austria" caused him to be disinvited from a lecture at an unnamed educational institution (*see* Am. Compl. ¶ 59), he does not list this as a lost business relationship for purposes of his tortious interference allegations (*id.* ¶¶ 165-80), nor explain what business relationship he purportedly lost, if any.

(Am. Compl. ¶ 173) do not suffice. *See Xereas v. Heiss*, 933 F. Supp. 2d 1, 11 (D.D.C. 2013) (dismissing claim for tortious interference based on general allegations that defendants interfered with plaintiff's "long standing business relationships" and "ability to maintain contact and relationships, and continue doing business" with "current and prospective customers and industry players") (internal quotation marks omitted).

*Second*, the Amended Complaint does not plausibly (or at all) allege that the University knew about plaintiff's relationship with the University of Salzburg, nor of plaintiff's unspecified relationships with "academic and publishing venues." Am. Compl. ¶ 168. Beyond a bald assertion of the collective knowledge of "Defendants" (*id.* ¶¶ 167, 174, 191), plaintiff does not allege **facts** explaining why or how the University knew or would have known about his business relationships and dealings. *See Ray v. Proxmire*, 581 F.2d 998, 1002 n.19 (D.C. Cir. 1978) ("Without at least an inference that appellees knew of an existing contract between the organization and appellant . . ., tortious interference is not sufficiently raised."). The University's "mere awareness" that plaintiff "could have been adversely affected" is insufficient, where the Amended Complaint otherwise does not plausibly allege that the University intended to interfere with any of plaintiff's relationships with the University of Salzburg or any other institution. *See Rodriguez*, 13 F. Supp. 3d at 134.

*Third*, plaintiff does not allege a single fact to support his conclusory allegation that defendants (let alone the University) intentionally interfered with his business relationships, existing or prospective. "[A] plaintiff cannot establish liability" for tortious interference "without a strong showing of intent to disrupt ongoing business relationships." *Johnson*, 202 F. Supp. 3d at 176 n. 11 (D.D.C. 2016). "In order to state a claim, a plaintiff . . . is required to plead affirmative, intentional acts of interference." *Id.* at 176.

Here, while the Amended Complaint seeks to hide behind colorful assertions of defendants' "active conspiracy to stymie and then kill Plaintiff's ability to speak . . . and to destroy Plaintiff's reputation" (Am. Compl. ¶169), it does not describe any specific affirmative acts committed by the University to support this conclusion. *See Soliman v. George Washington Univ.*, 658 F. Supp. 2d 98, 103-04 (D.D.C. 2009) (noting absent special circumstances not present here, a plaintiff cannot plead tortious interference with "barebones" allegations of intent).

*Fourth*, plaintiff does not plausibly plead harm that he purportedly suffered as a result of lost business relations. *See Pietrangelo v. Wilmer Cutler Pickering Hale & Dorr, LLP*, 68 A.3d 697, 712 (D.C. 2013); Section II.A.1. His allegations that he suffered reputational harm and "cannot easily travel for fear of further retribution" (Am. Compl. ¶¶ 169, 188) point to the type of damages appropriate for a defamation or libel, not tortious interference with business expectations. *See Carr v. Brown*, 395 A.2d 79, 83 (D.C. 1978); *Houlahan v. World Wide Ass'n of Specialty Programs & Sch.*, No. CIV.A. 04-01161, 2006 WL 785326, at *4 (D.D.C. Mar. 28, 2006). Indeed, it appears from the Amended Complaint that the single business relationship he identifies with the University of Salzburg never actually terminated any employment contract with him; rather, plaintiff made the personal choice "to leave Austria" and take "up permanent residence in the United States." Am. Compl. ¶¶ 15, 91, 188. Plaintiff must allege what business relationships he specifically lost or is reasonably likely to lose, why he lost those relationships as a result of the University's conduct, and articulate an "actual loss of business, time, or money as a result of the alleged interference." *McNamara*, 866 F. Supp. 2d at 15; *see In re McWade Properties, LLC*, No. 12-00634, 2012 WL 5897184, at *4 (Bankr. D.D.C. Nov. 7, 2012). Because he has failed to do so, the Court should dismiss his tortious interference claims against the University with prejudice.

**D.      DC Law Does Not Recognize "Prima Facie Tort" (Count 10).**

Finally, plaintiff's prima facie tort claim misapprehends D.C. law. While this "generic" tort may be recognized in New York (where plaintiff's counsel is accustomed to practicing), D.C. law does not entertain this claim. *See, e.g. Han. Fin. Supervisory Serv.,* No. 18-141, 2022 WL 2438513, at \*5 n. 4 (D.D.C. Jul. 5, 2022) (citing *Taylor v. District of Columbia*, 957 A.2d 45, 50 (D.C. 2008)) (noting that unlike New York, D.C. law does not recognize a claim for *prima facie* tort); *Art–Metal–U.S.A., Inc. v. United States*, 577 F. Supp. 182, 184 (D.D.C. 1983) (observing that D.C. courts have "not embraced a form of generic tort like the *prima facie* tort" and dismissing claim under FTCA for failing "to allege an established cause of action").

**E.      Plaintiff's State Law Claims Are Time-Barred.**

For the reasons more fully explained in Dr. Vidino's Motion to Dismiss (ECF No. 28-1 at p. 36-38), each of plaintiff's claims under D.C. law should be dismissed for the additional reason that they were filed outside of the one-year statute of limitations applicable to defamation claims. *Mittleman v. United States*, 104 F.3d 410, 415 (D.C. Cir. 1997) (D.C. Code § 12–301(8)) (noting that if a "cause of action is 'intertwined' with one for which a limitations period is prescribed, district courts apply the specifically stated period"). As explained above, the Amended Complaint cites only a ***single report*** actually affiliated with the Program: Dr. Vidino's August 2017 Austrian report, "The Muslim Brotherhood in Austria," (*see* Am. Compl. ¶ 59), which was published in the year ***before Dr. Vidino entered into*** his January 2018 independent consulting agreement with Alp, and well outside of any applicable statute-of-limitations period.

**V.      THE PROGRAM ON EXTREMISM IS NOT A LEGAL ENTITY CAPABLE OF BEING SUED.**

The Program on Extremism should be dismissed because, as an internal unit of the University, it lacks legal capacity to be sued.

A non-corporate entity's capacity to be sued is determined by the law of the state where the court is located, with limited exception for suits brought against an "unincorporated association" that seek to assert a federal right. Fed. R. Civ. P. 17(b)(3)(A). A mere division of a larger corporate entity does not have capacity to be sued under D.C. or federal law, because "an unincorporated division does not possess separate assets; all of its assets are owned by the corporation." *E.E.O.C. v. St. Francis Xavier Parochial Sch.*, 77 F. Supp. 2d 71, 76 (D.D.C. 1999). *See, e.g.*, *Kaupthing ehf. v. Bricklayers and Trowel Trades Int'l Pension Fund Liquidation Portfolio*, 291 F. Supp. 3d 21, 27-30 (D.D.C. 2017); *EEOC v. St. Francis Xavier Parochial Sch.*, 77 F. Supp. 2d 71, 76-79 (D.D.C. 1999). Federal courts applying these principles regularly find that university departments cannot be independently sued. *See Peirick v. Indiana Univ.-Purdue Univ. Indianapolis Athletics Dep't*, 510 F.3d 681 (7th Cir. 2007); *Kemp v. George State Univ. Admissions*, No. 1:07-CV-0212, 2008 WL 113320118, at *8 (N.D. Ga. June 16, 2008); *Galiano v. Institute of Governmental Studies at Univ. of California Berkeley*, No. 07-05557, 2008 WL 4155594, at *4-5 (N.D. Cal. Sept. 5, 2008).

Nor could the Program, as an internal unit within the University, fall within Rule 17's "federal right" exception because it is not an "unincorporated association." D.C. law defines an "unincorporated association" as "a body of persons, ***acting without a charter***, for the purposes of promoting a common objective." *Murphy v. Price Waterhouse Coopers*, 357 F. Supp. 2d 230, 241 n. 9 (D.D.C. 2004) (emphasis added), *aff'd in part, rev'd in part on other grounds*, *Schuler v. PricewaterhouseCoopers, LLP*, 595 F.3d 370 (D.C. Cir. 2010). "A division of a corporation does operate with a charter—the charter of the larger corporation." *Smartdoor Holdings, Inc. v. Edmidt Indus., Inc.*, 78 F. Supp. 3d 275, 277-78 (D.D.C. 2015) (quoting *E.E.O.C*, 77 F. Supp. at 77).

That is the case with the Program. Plaintiff admits that the Program was "founded" by the University (Am. Compl. ¶ 23), going so far as to criticize it as being "linked directly to the [University's] Office of the Vice President on Research[.]" *Id.* ¶ 55. Indeed, donations to the Program to support its mission statement are made directly to the University. *See id.* ¶ 23. (citing the Program's Mission Statement page).[16] As such, the Program operates under the University's "charter[]," *id.* ¶ 22, meaning it lacks capacity to be sued. In any event, the Amended Complaint does not allege that the Program is an entity that is separate and apart from the University.

For these reasons, the Program should be dismissed with prejudice on the grounds that it lacks the capacity to be sued. *See Kaupthing*, 291 F. Supp. 3d at 28 ("[C]apacity to be sued may be raised on a motion to dismiss where . . . the defect appears on the face of the complaint or in materials attached thereto."); *Pushkin v. Nat'l Academies Bd. on Sci. Educ.*, No. 10-1765, 2012 WL 4889277, at *3 (D.D.C. Aug. 26, 2012).

## CONCLUSION

Because plaintiff already has amended his complaint once, and any future amendment would be futile for the reasons set forth above (*see Vince v. Mabus*, 956 F. Supp.2d 83, 92 (D.D.C. 2013)), the University and the Program respectfully request that the Court dismiss plaintiff's claims against them with prejudice.

---

[16] Available at
https://extremism.gwu.edu/about#:~:text=Our%20Mission&text=The%20Program%20spearheads%20innovative%20and,leaders%2C%20and%20the%20general%20public.

October 18, 2024                         Respectfully submitted,


                                         /s/   *Tracy A. Roman*
                                         Tracy A. Roman (DC #443718)
                                         Scott L. Winkelman (DC #416747)
                                         Rachael Padgett (DC #1616574)
                                         **CROWELL & MORING LLP**
                                         1001 Pennsylvania Avenue, N.W.
                                         Washington, D.C. 20004
                                         troman@crowell.com
                                         swinkelman@crowell.com
                                         rpadgett@crowell.com
                                         Telephone: (202) 624-2500

                                         *Counsel for Defendants George Washington*
                                         *University and the Program on Extremism at*
                                         *the George Washington University*

29