**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**
-------------------------------------------------------------------X
                                  :

FARID HAFEZ, individually and on behalf of    :
all others similarly situated,                  :
                                  :  Civil Action No.: 1:24-cv-00873-AHA

           Plaintiff,         :
                                  :  **ORAL ARGUMENT REQUESTED**

      *v.*                          :
                                  :

LORENZO VIDINO, individually and in his    :
respective corporate capacities, GEORGE    :
WASHINGTON UNIVERSITY, PROGRAM    :
FOR EXTREMISM AT THE GEORGE    :
WASHINGTON UNIVERSITY, ALP    :
SERVICES SA, DILIGENCE SARL, MARIO    :
BRERO, MURIEL CAVIN, LIONEL BADAL,    :
ARIAF STUDIES AND RESEARCH LLC, and    :
DOES 1 through 25,                    :
                                :
          Defendants.       :
-------------------------------------------------------------------X

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO**
**DEFENDANT LORENZO VIDINO'S MOTION TO DISMISS**
**PLAINTIFF'S FIRST AMENDED COMPLAINT**

          AIDALA, BERTUNA & KAMINS, P.C.

          David M. Schwartz, Esq.
          Arthur L. Aidala, Esq.
          (*Pro Hac Vice Admission Forthcoming*)
          Imran H. Ansari, Esq.
          (*Pro Hac Vice Admission Forthcoming*)
          546 Fifth Avenue, 6th Floor
          New York, New York 10036
          (212) 486-0011
          david@davidschwartzesq.com
          aidalaesq@aidalalaw.com
          iansari@aidalalaw.com

          *Attorneys for Plaintiff Farid Hafez*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................................... i

PRELIMINARY STATEMENT ............................................................................................... 1

FACTUAL BACKGROUND ................................................................................................... 1

LEGAL STANDARD ............................................................................................................. 1

ARGUMENT ......................................................................................................................... 3

   I.     DR. HAFEZ FULLY INCORPORATES HIS ARGUMENTS IN OPPOSITION TO THE OTHER DEFENDANTS' MOTIONS TO DISMISS ................................................................ 3

   II.   DR. HAFEZ'S CLAIMS ARE NOT BARRED BY THE FIRST AMENDMENT ........... 4

     A. The FAC Alleges Actionable Misconduct Outside the Scope of First Amendment Protection ............................................................................................................................ 4

       i. The Free Speech Clause Does Not Protect False and Harmful Statements Supporting Racketeering Activities ...................................................................................................... 4

       ii. Context Confirms the Intentional and Harmful Nature of Vidino's Statements ............ 5

       iii. The FAC Plausibly Alleges Actual Malice and Actionable Racketeering Activities ... 6

     B. THE NOERR-PENNINGTON DOCTRINE DOES NOT APPLY ................................. 8

   III.    THE FAC STATES A RICO CLAIM AGAINST VIDINO ....................................... 10

     A.   DR. HAFEZ SUFFERED INJURY TO BUSINESS OR PROPERTY ...................... 11

     B.   DR. HAFEZ'S INJURIES ARE DOMESTIC ............................................................ 13

     C.   THE FAC PLAUSIBLY ALLEGES RICO PREDICATE OFFENSES ..................... 16

     D.   THE FAC PLAUSIBLY ALLEGES A PATTERN OF RACKETEERING ACTIVITY …………………………………………………………………………21

     E.   THE FAC PLAUSIBLY ALLEGES A RICO ENTERPRISE .................................... 24

     F.   THE FAC PLAUSIBLY ALLEGES THAT VIDINO PROXIMATELY CAUSED DR. HAFEZ'S PURPORTED INJURIES ...................................................................................... 26

     G.   THE FAC PLAUSIBLY ALLEGES THAT VIDINO KNOWINGLY JOINED A CONSPIRACY TO COMMIT AT LEAST TWO PREDICATE ACTS, EVEN IF HE DID NOT KNOW BROADER SCOPE OF CONSPIRACY OR ALL CO-CONSPIRATORS.. 29

IV.    DR. HAFEZ'S STATE LAW CLAIMS ARE TIMELY AND MERITORIOUS........ 34

  A.    THE STATE LAW CLAIMS ARE TIMELY ................................................................ 34

    i.  Alternatively Equitable Tolling Should Apply ................................................................ 35

  B.    THE COMMON LAW FRAUD CLAIM IS PROPER ................................................. 36

  C.    THE UNFAIR TRADE PRACTICES CLAIM IS PROPER ....................................... 39

  D.    THE TORTIOUS-INTERFERENCE CLAIM IS PROPER........................................ 41

  E.    THE PRIMA FACIE TORT CLAIM IS PROPER....................................................... 43

CONCLUSION ………………………………………………………………………44

# TABLE OF AUTHORITIES

**CASES**                      **PAGE(S)**

*ABB Daimler-Benz Transport. (N. Amer.), Inc. v. Nat'l RR Passenger Corp.,*
14 F. Supp. 2d 75 (D.D.C. 1998) ................................................................ 3

*Abhe & Svoboda, Inc. v. Chao,*
508 F.3d 1052 (D.C. Cir. 2007) ................................................................ 3

*Allied Tube & Conduit Corp. v. Indian Head,*
486 U.S. 492 (1998) ................................................................ 9, 8

*Alqahtani v George Washington Univ.,*
1996 US Dist LEXIS 4213 [Mar. 29, 1996, Civ. No. 95-803 (TFH) ( ......... 2

*Ashcroft v. Iqbal,*
556 U.S. 662 (2009) ................................................................ 1

*Bailey v. Greenberg,*
516 A.2d 934 (D.C. 1986) ................................................................ 36

*Banneker Ventures, LLC v Graham,*
798 F3d 1119 (2015) ................................................................ 42

*Bates v. Nw. Human Servs., Inc.,*
466 F. Supp. 2d 69 (D.D.C. 2006) ................................................................ 17

*Bell Atl. Corp. v. Twombly,*
550 U.S. 544 (2007) ................................................................ 2

*Berry Petroleum Co. v. Adams & Peck,*
518 F.2d 402 (2d Cir. 1975) ................................................................ 36

*Boyle v. United States,*
556 U.S. 938 (2009) ................................................................ 25

*Bridge v. Phoenix Bond & Indem. Co.,*
553 U.S. 639 (2008) ................................................................ 14, 20, 27, 29

*Browning v. Clinton,*
292 F.3d 235 [D.C. Cir. 2002] ................................................................ 42

*Bussineau v. President & Directors of Georgetown Coll.,*
518 A.2d 423 (D.C. 1986) ................................................................ 35

*Cal. Motor Transp. Co. v. Trucking Unltd.,*
404 U.S. 508 (1974) ................................................................ 9

*Carpenter v. United States,*
484 U.S. 19 (1987) ................................................................ 18

*Carr v. Brown,*
395 A.2d 79 (D.C. 1978) ................................................................ 42

i

*Cedric Kushner Promotions, Ltd. v. King,*
   533 U.S. 158 (2001) ........................................................................... 25

*Citizens Bank of Clearwater v. Hunt,*
   927 F.2d 707, 711 (2d Cir. 1991) ...................................................... 39

*Companhia Brasileira Carbureto de Calcio-CBCC v. Applied Industrial Materials Corp.,*
   887 F. Supp. 2d 9 (D.D.C. 2012) ....................................................... 29

*Conley v. Gibson,*
   355 U.S. 41 [1957] .......................................................................... 2, 3

*Conwood Co. v. U.S. Tobacco Co.,*
   290 F.3d 768 (6th Cir. 2002) ............................................................. 18

*Cook v. Avien, Inc.*
   e. g., , 573 F.2d 685 (1st Cir. 1978) ................................................. 36

*Cross v Price Waterhouse & Co.,*
   1983 US Dist LEXIS 17895 (Apr. 7, 1983, No. 80-410) .................... 36

*D'Ambrosio v. Colonnade Council of Unit Owners,*
   717 A.2d 356 [D.C. 1998] .................................................................. 37

*Diamond v Davis,*
   680 A2d 364 (DC 1996) ..................................................................... 35

*Doe v. Exxon Mobil Corp.,*
   573 F. Supp. 2d 16 (D.D.C. 2008) ..................................................... 36

*Dura Pharms., Inc. v. Broudo,*
   544 U.S. 336 [2005] ............................................................................ 3

*E. R.R. Presidents Conference v. Noerr Motor Freight, Inc.*
   E. R.R. Presidents Conference v. Noerr Motor Freight, Inc., 365 U.S. 127 (1961) ............................ 8

*Edmondson & Gallagher v. Alban Towers Tenants Ass'n,*
   48 F.3d 1260 (D.C. Cir. 1995) ....................................................... 9, 24

*Ehrenhaft v. Malcolm Price, Inc.,*
   483 A.2d 1192 [D.C. 1984] ............................................................ 9, 24

*E.M. v. Shady Grove Reprod. Sci. Ctr. P.C.,,*
   496 F. Supp. 3d 338 [D.D.C. 2020]) .............................................. 9, 24

*Exxon Mobil Corp. v. Corporacion CIMEX, S.A.,*
   111 F.4th 12 (D.C. Cir. 2024) ....................................................... 28-29

*Federal Prescription Serv., Inc. v. Am. Pharmaceutical Ass'n,*
   663 F.2d 253 (D.C. Cir. 1981) ...................................................... 28-29

*Feld Ent., Inc. v. Am. Soc'y for the Prevention of Cruelty to Animals,*
   873 F. Supp. 2d 288 (D.D.C. 2012) ................................................... 19

*Fitzgerald v. Seamans*,
  76 F.3d 1205 (D.C. Cir. 1996) ................................................................ 36

*Firestone v. Firestone*,
  76 F.3d 1205 (D.C. Cir. 1996) ................................................................ 36

*Fleming v United States*,
  224 A3d 213 [DC 2020] ................................................................. 27, 29

*Flowers v. Carville*,
  310 F.3d 1118 [9th Cir. 2002] ................................................................ 26

*Friedman v. 24 Hour Fitness USA, Inc.*,
  580 F. Supp. 2d 985 (C.D. Cal. 2008) ...................................................... 26

*Fuji Photo Film U.S.A., Inc. v. McNulty*,
  640 F. Supp. 2d 300 (S.D.N.Y. 2009) ...................................................... 30

*Gagan v. Am. Cablevision, Inc.*,
  77 F.3d 951 (7th Cir. 1996) .................................................................... 31

*Gertz v. Robert Welch, Inc.*,
  418 U.S. 323 (1974) .............................................................................. 5

*Gomez v. Trs. of Harvard Univ.*,
  677 F. Supp. 23 (D.D.C. 1988) ................................................................ 7

*H.J. Inc. v. Nw. Bell Tel. Co.*,
  492 U.S. 229 (1989) ......................................................................... 22-23

*Hemi Group, LLC v. City of New York*,
  559 U.S. 1–9 (2010) ............................................................................. 29

*Hill v. Opus Corp.*,
  841 F. Supp. 2d 1070 (C.D. Cal. 2011) .............................................. 21-22

*Hughes v Abell*,
  867 F Supp 2d 76 (DDC 2012) ............................................................... 37

*Illinois ex rel. Madigan v. Telemarketing Associates, Inc.*,
  538 U.S. 600 (2003) .............................................................................. 5

*In re Avandia Mktg., Sales Pracs. & Prod. Liab. Litig.*,
  804 F.3d 633 (3d Cir. 2015) .................................................................. 28

*In re Korean Airlines Disaster of September 1*,
  704 F. Supp. 1135 (D.D.C. 1988) ........................................................... 39

*In re Search of Multiple Email Accts. Pursuant to 18 U.S.C. §2703*,
  585 F. Supp. 3d 1 (D.D.C. 2022) ............................................................ 21

*Jankovic v. Int'l Crisis Grp.*,
  822 F.3d 576 (D.C. Cir. 2016) ................................................................. 8

*Jericho Baptist Church Ministries, Inc. (D.C.) v. Jericho Baptist Church Ministries, Inc. (Md.)*,
    223 F. Supp. 3d 1 (D.D.C. 2016) ................................................................... 18, 21

*Kiwanuka v Bakilana*,
    844 F Supp 2d 107 (DDC 2012) ................................................................... 36

*Klein v. Bower*,
    421 F.2d 338 (D.C. Cir. 1970) ..................................................................... 36

*Lively v. Flexible Packaging Ass'n*
    830 A.2d 874 (D.C. Cir. 2003) ..................................................................... 35

*Lu v. Lezell*,
    45 F. Supp. 3d 86 (D.D.C. 2014) ................................................................. 22, 23

*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1992) .................................................................................... 11

*Marous Bros. Const., LLC v. Ala. Stat. Univ*,
    07-CV-384, 2008 U.S. Dist. LEXIS 10867 [M.D. Ala. Feb. 11, 2008]............... 11

*McBryde v. Amoco Oil Co.*,
    404 A.2d 200 [D.C. 1979] ............................................................................. 2

*McEvoy Travel Bureau, Inc. v. Heritage Travel, Inc.*,
    904 F.2d 786 [1st Cir. 1990] ........................................................................ 20

*McIntyre v. Ohio Elections Comm'n*,
    514 U.S. 334 (1995) ...................................................................................... 5

*Mod. Mgmt. Co. v. Wilson*,
    997 A.2d 37 [D.C. 2010] .............................................................................. 40

*Moonblatt v District of Columbia*,
    572 F Supp 2d 15 (DDC 2008) ............................................................... 3, 35, 37

*Nakhid v Am. Univ.*,
    2020 US Dist LEXIS 49608 [DDC Mar. 23, 2020, No. 19-cv-03268 (APM)] ......... 3

*Narce v. Mervilus*,
    2023 US Dist LEXIS 193795 .................................................................... 2, 31

*Nat'l R.R. Passenger Corp. v. Morgan*,
    536 U.S. 101 (2002) ..................................................................................... 35

*Nat'l Org. for Women, Inc v. Scheidler*,
    510 U.S. 249 ............................................................................................ 5, 11

*Neder v. United States*,
    527 U.S. 1 (1999) ........................................................................................ 20

*RSM Production Corp. v. Freshfields Bruckhaus Deringer U.S. LLP*
    682 F.3d 1043 (D.C. Cir. 2012) ................................................................... 34

*Oxbow Carbon & Mins. LLC v. Union Pac. R.R. Co.*,
 81 F. Supp. 3d 1 (D.D.C. 2015) ........................................................... 1-2, 2

*O'Boyle v Sweetapple*,
 2015 US Dist LEXIS 192278 (SD Fla June 4, 2015, No. 9:14-CV-81250-KAM) ............. 7

*Pulaski Constr. Co. v. Air Frame Hangars, Inc.*,
 950 A.2d 868 [N.J. 2008] ...................................................................... 44

*Pullman-Standard v. Swint*,
 456 U.S. 273 (1982) ............................................................................ 7

*Qureshi v Am. Univ.*,
 2023 US Dist LEXIS 38041 [DDC Mar. 7, 2023, No. 20-cv-1141 (CRC)] ............... 40, 41

*Regency Communs., Inc. v Cleartel Communs., Inc.*,
 160 F Supp 2d 36 (DDC 2001) ........................................................... 20, 40

*Robinson v. Dep't of Homeland Sec. Off. of Inspector Gen.*,
 71 F.4th 51 (D.C. Cir. 2023) ................................................................. 36

*Salinas v. United States*,
 522 U.S. 52 (1997) ......................................................................... 33, 30

*Schacht v. Brown*,
 711 F.2d 1343 (7th Cir.1983) ............................................................ 26, 27

*Sedima, S.P.R.L. v. Imrex Co.*,
 473 U.S. 479 (1985) .......................................................................... 11

*Shaw v. United States*,
 580 U.S. 63 (2016) ..................................................................... 20-21, 21

*Simmons v Abruzzo*,
 49 F3d 83 (2d Cir 1995) ..................................................................... 45

*Simpson v Dist. of Columbia Off. of Human Rights*,
 597 A2d 392 [DC 1991] ...................................................................... 37

*Stokes v Cross*,
 327 F3d 1210 [2003] ........................................................................... 3

*Sturdza v. United Arab Emirates*,
 281 F.3d 1287 [D.C. Cir. 2002] ............................................................. 42

*Swierkiewicz v. Sorema N.A.*,
 534 U.S. 506 [2002] ............................................................................ 3

*Tah v. Global Witness Publishing, Inc.*,
 991 F.3d 231 (D.C. Cir. 2021) ................................................................ 8

*Taylor v Dist. of Columbia Water & Sewer Auth.*,
 957 A2d 45 (DC 2008) ................................................................... 2-3, 44

*Turner v. Cook*,
  362 F.3d 1219 (9th Cir. 2004) ............................................................................. 22

*United States v Philip Morris USA, Inc.*,
  337 F Supp 2d 15 (DDC 2004) ................................................................. 9, 18, 39, 5

*United States v Philip Morris USA, Inc.*,
  2006 US Dist LEXIS 118375 (DDC Aug. 17, 2006, Civil Action No. 99-2496 (GK) ...................... 30

*United States v Sutton*,
  2022 US Dist LEXIS 216313 (DDC Nov. 30, 2022, No. 21-0598 (PLF) .................................... 27, 29

*United States v. Alston*,
  609 F.2d 531 (D.C. Cir. 1979) ............................................................................. 39

*United States v. Brito*,
  136 F.3d 397 (5th Cir. 1998) .............................................................................. 31

*United States v. Coyle*,
  63 F.3d 1239 (3rd Cir. 1995) .............................................................................. 39

*United States v. Crisci*,
  273 F.3d 235 (2d Cir. 2001) ............................................................................... 21

*United States v. Elliott*,
  571 F.2d 880 (5th Cir. 1978) ........................................................................ 25, 31, 32

*United States v. Jackson*,
  513 F.2d 456 (D.C. Cir. 1975) ........................................................................... 7, 33

*United States v. Lemire*,
  720 F.2d 1327 (D.C. Cir. 1983) ........................................................................... 17

*United States v. Munoz*,
  233 F.3d 1117 (9th Cir. 2000) ............................................................................ 39

*United States v. Oreto*,
  37 F.3d 739 (1st Cir. 1994) .............................................................................. 27

*United States v. Philip Morris Inc.*,
  130 F. Supp. 2d 96 (D.D.C. 2001) ...................................................................... 30, 32

*United States v. Philip Morris USA Inc.*,
  566 F.3d 1095 (D.C. Cir. 2009) ............................................................................ 7

*United States v. Porat*,
  76 F.4th 213 (3d Cir. 2023) ........................................................................... 17, 18

*United States v. Prows*,
  118 F.3d 686 (10th Cir. 1997) ............................................................................ 39

*United States v. Rastelli*,
  870 F.2d 822 (2d Cir. 1989) .............................................................................. 26

*United States v. Reid*,
   533 F.2d 1255 (D.C. Cir. 1976) ................................................................. 39

*United States v. Ring*,
   628 F. Supp. 2d 195 (D.D.C. 2009) ........................................................... 19

*United States v. Sawyer*,
   85 F.3d 713 (1st Cir. 1996) ........................................................................ 39

*United States v. Stewart*,
   872 F.2d 957 (10th Cir. 1989) ................................................................... 20

*Jericho Baptist Church Ministries, Inc. (D.C.) v. Jericho Baptist Church Ministries, Inc. (Md.)*,
   223 F. Supp. 3d 1 (D.D.C. 2016) ......................................................... 18, 21

*Virden v. Graphics One*,
   623 F. Supp. 1417 (C.D. Cal. 1985) ......................................................... 26

*Virginia Acad. of Clinical Psychologists v. Group Hospitalization & Med. Servs., Inc.*,
   878 A.2d 1226 [D.C. 2005] ....................................................................... 37

*Ward v. District of Columbia Dep't of Youth Rehab. Servs.*,
   768 F. Supp. 2d 117 (D.D.C. 2011) ............................................................. 3

*Washington Post v. Robinson*,
   935 F.2d 282 (D.C. Cir. 1991) ................................................................... 22

*Whelan v. Abell*
   48 F.3d 1247 (D.C. Cir. 1995) ..................................................................... 9

*William J. Davis, Inc. v. Young*,
   412 A.2d 1187 (D.C. 1980) ........................................................................ 37

*Yegiazaryan v. Smagin*,
   599 U.S. 533 (2023) ............................................................................ 14, 15

*Youming Jin v. Ministry of State Sec.*,
   335 F. Supp. 2d 72 (D.D.C. 2004) ....................................................... 31, 34

## <u>STATUTES AND OTHER SOURCES</u>                     <u>PAGE(S)</u>

18 U.S.C. §1961 ................................................................................... 16, 22

18 U.S.C. §1962 ......................................................................... 11, 22, 30, 31

18 U.S.C. §2703 ......................................................................................... 21

18 U.S.C. § 1344 ............................................................................. 17, 20, 21

D.C. Code § 12-301 .................................................................................... 37

D.C. Code § 28-3901 .................................................................................. 40

D.C. Code § 28-3904 ................................................................................................ 40, 41

Federal Rules of Civil Procedure 8 ............................................................................. 3

Federal Rules of Civil Procedure 9 ................................................................... 7, 20, 22

Federal Rules of Civil Procedure 12 ................................................................ 2, 3, 22

Restatement (Second) of Torts §766 ......................................................................... 42

Restatement (Second) of Torts §870 ..............................................................................44

## PRELIMINARY STATEMENT

Plaintiff, Farid Hafez ("Dr. Hafez" or "Plaintiff") respectfully submits this Memorandum of Law in Support of Plaintiff's Opposition to Lorenzo Vidino's ("Vidino") Motion to Dismiss (ECF Doc. No. 28). This Court should deny Vidino's Motion to Dismiss in its entirety. Neither the First Amendment nor the *Noerr-Pennington* doctrine shield Vidino's conduct, as the claims are rooted in actionable misconduct beyond the scope of protected speech or legitimate petitioning activity. Dr. Hafez's RICO claims are sufficiently pleaded, as Plaintiff's First Amended Complaint (ECF Doc. No. 5) ("FAC") provides detailed allegations that plausibly establish Vidino's involvement in a pattern of racketeering activity and demonstrate her knowing participation in a RICO conspiracy aimed at harming Dr. Hafez. Additionally, Dr. Hafez's state law claims are timely filed and supported by well-pleaded factual allegations that state a plausible basis for relief.

## FACTUAL BACKGROUND

For an accurate factual background, the Court is respectfully referred to Plaintiff's FAC, Plaintiff's Declaration accompanying this Memorandum ("Pl. Decl."), Aaron Rock-Singer's Declaration accompanying this Memorandum, David Schwartz's Declaration accompanying this Memorandum, and all the exhibits and appendixes annexed thereto, as well as the references to said documents included herein.

## LEGAL STANDARD

To overcome a Federal Rule of Civil Procedure ("Fed. R. Civ. P." or "Rule") 12 motion to dismiss, a plaintiff need only "plead[] factual content that allows the court to draw the reasonable inference that the defendant is liable." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "'[D]etailed factual allegations' are not necessary." *Oxbow Carbon & Mins. LLC v. Union Pac. R.R. Co.*, 81 F. Supp. 3d 1, 8 (D.D.C. 2015) (internal quotations omitted). The facts alleged need only be "enough

to raise a right to relief above the speculative level." *Id.* "Under Rule 12, a claim should not be dismissed 'unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'" *Alqahtani v George Washington Univ.*, 1996 US Dist LEXIS 4213, at *5-6 [Mar. 29, 1996, Civ. No. 95-803 (TFH) (quoting *Conley v. Gibson,* 355 U.S. 41, 45-46 [1957]). Courts "must consider the whole complaint, accepting all factual allegations in the complaint as true, 'even if doubtful in fact,' and construing all reasonable inferences in the plaintiff's favor." *Narce v Mervilus*, 2023 US Dist LEXIS 193795, at *9 [DDC Oct. 30, 2023, Civil Action No. 23-200 (BAH)]. "The plausibility standard is not akin to a 'probability requirement,'" (*Iqbal*, 556 U.S. at 678), and "a well-pleaded complaint may proceed even if it appears 'that a recovery is very remote and unlikely,'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555–56 (2007). Indeed, "[a] complaint survives a motion to dismiss even if there are two alternative explanations, one advanced by the defendant and the other advanced by the plaintiff, both of which are plausible." *Narce*, 2023 US Dist LEXIS 193795, at *8.

A motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6) challenges the adequacy of a complaint on its face. Fed. R. Civ. P. 12(b)(6). A complaint must be sufficient "to give a defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Twombly*, 550 U.S. at 555 (internal citations omitted). To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim for relief that is "plausible on its face"" *Twombly*, 550 U.S. at 570. "'Dismissal for failure to state a claim upon which relief can be granted is proper Rule 12 (b)(6) . . . only where it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'" *Taylor v Dist. of Columbia Water & Sewer Auth.*, 957 A2d 45, 49-50 (DC 2008) (quoting *McBryde v. Amoco Oil Co.*, 404 A.2d 200, 202 [D.C. 1979]). "Rule 8's liberal pleading standard requires only 'a short and

plain statement of the claim showing that the pleader is entitled to relief,', and courts are charged with construing the complaint 'so … as to do substantial justice.'" *Stokes v Cross*, 327 F3d 1210, 1215 [2003]) (quoting Fed. R. Civ. P. 8[a][2] and 8[f]). "The Rules 'do not require a claimant to set out in detail the facts upon which he bases his claim.'" Id. (quoting *Conley*, 355 U.S. at 47). "To satisfy the pleading standard of Federal Rule of Civil Procedure 8(a), a plaintiff asserting a claim of discrimination need only allege facts that 'give[ ] [the defendant] fair notice of the basis for [the plaintiff's] claims.'" *Nakhid v Am. Univ.*, 2020 US Dist LEXIS 49608, at *1 [DDC Mar. 23, 2020, No. 19-cv-03268 (APM)]) (quoting *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 514 [2002]). The notice pleading rules are not meant to impose a great burden on a plaintiff. *Moonblatt v District of Columbia*, 572 F Supp 2d 15, 19 (DDC 2008) (citing *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 347 [2005]; *Swierkiewicz*, 534 U.S. at 512-13).

In deciding a motion under Rule 12(b)(6), a court may consider the facts alleged in the complaint, documents attached as exhibits or incorporated by reference in the complaint, or documents upon which the plaintiff's complaint necessarily relies even if the document is produced not by the plaintiff in the complaint. *See*, *Ward v. District of Columbia Dep't of Youth Rehab. Servs.*, 768 F. Supp. 2d 117, 119 (D.D.C. 2011). The court may also consider documents in the public record of which the court may take judicial notice. *Abhe & Svoboda, Inc. v. Chao*, 508 F.3d 1052, 1059 (D.C. Cir. 2007).

## ARGUMENT

## I. DR. HAFEZ FULLY INCORPORATES HIS ARGUMENTS IN OPPOSITION TO THE OTHER DEFENDANTS' MOTIONS TO DISMISS

First and foremost, Dr. Hafez herein incorporates and fully adopts the arguments set forth in the separate Opposition to Defendants George Washington University ("GWU") and the

Program on Extremism at GWU's ("POE") Motion to Dismiss Plaintiff's FAC (ECF Doc. No. 30) and the separate Opposition to Defendants Alp Services SA ("Alp"), Diligence SARL ("Diligence"), Mario Brero ("Brero"), Muriel Cavin ("Cavin"), Lionel Badal ("Badal") (collectively, the "European Defendants") Motion to Dismiss Plaintiff's FAC (ECF Doc. No. 29). The FAC alleges that Vidino is liable for his actions as part of the RICO enterprise formed with the other Defendants, as well as for state law claims, including common law fraud, unfair trade practices, tortious interference, and prima facie tort. Likewise, the other Defendants are equally liable for both the RICO violations and the state law claims asserted in the FAC.

## II.    DR. HAFEZ'S CLAIMS ARE NOT BARRED BY THE FIRST AMENDMENT

### A. The FAC Alleges Actionable Misconduct Outside the Scope of First Amendment Protection

The First Amendment does not shield Vidino from liability under the allegations set forth in the FAC, which focus on actionable racketeering activities and RICO violations rather than constitutionally protected speech. Vidino's attempt to frame the allegations as a misuse of free speech protections and potential defamation claims misconstrues both the legal principles and the nature of the misconduct alleged, in a clear attempt to mislead and distract the Court from the actual nature of the claims brought forth.

### i. The Free Speech Clause Does Not Protect False and Harmful Statements Supporting Racketeering Activities

While the First Amendment ensures robust free expression, its protections are not absolute and do not extend to conduct involving the intentional dissemination of false statements that further racketeering activities and cause tangible harm. *Cf. Nat'l Org. for Women, Inc.*, 510 U.S. at 252–53 (holding that RICO applied to antiabortion protest activities). The Supreme Court

reiterated, albeit in a different factual context, that "the First Amendment does not shield fraud." *Illinois ex rel. Madigan v. Telemarketing Associates, Inc.,* 538 U.S. 600 (2003); *see also*, *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 357 (1995) (stating that the government "may, and does, punish fraud directly"). In *Madigan*, the Court held that "what the First Amendment … emphatically does not require … is a blanket exemption from fraud liability for a [defendant] who intentionally misleads [his audience]." *Id.* at 1831; *see also*, *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 340 (1974) (the intentional lie [does not] materially advance society's interest in uninhibited, robust, and wide-open debate on public issues"); *United States v Philip Morris USA, Inc.*, 337 F Supp 2d 15, 25 (DDC 2004).

Defendant Vidino's statements were not mere opinions or conjectures but were intentionally presented as factual assertions to further the RICO enterprise's objectives and purposely disseminate false or misleading information and language aimed at painting Dr. Hafez as a terrorist in the public eye. These statements, amplified by Vidino's professional reputation and authority, along with his role as director of the POE at George Washington University ("POE"), mischaracterized Dr. Hafez in ways that directly supported the enterprise's scheme to discredit him and harm his professional standing and safety. Vidino's argument that his statements constitute "conjecture" or "hypothesis" is simply unavailing. The FAC alleges that Vidino deliberately presented false and damaging information as verified and credible, using his academic expertise and institutional role to lend weight to his claims. These actions fall outside the scope of First Amendment protections and exemplify the type of misconduct actionable under RICO.

**ii. Context Confirms the Intentional and Harmful Nature of Vidino's Statements**

As Vidino himself acknowledges in his motion, the context in which the statement at issue is given is critical in assessing the impact and intent of speech under First Amendment standards.

Here, Vidino's statements were disseminated through public platforms and channels such as government inquiries and media outlets aimed at identifying terrorist organizations' supporters and operators, where readers and listeners would interpret them as factual rather than speculative. This deliberate context amplifies the harm caused by Vidino's statements and reveals their integral role in the racketeering scheme alleged in the FAC, further underscoring their actionable nature.

Vidino's reliance on vague terms such as "conjecture," "gossip," or "'[i]nteresting leads/rumours'" is both disingenuous and insufficient to escape liability. The FAC demonstrates that these statements were carefully crafted and disseminated as part of a broader enterprise goal to damage Dr. Hafez's reputation and falsely associate him with extremist organizations. Such conduct cannot be immunized under the First Amendment, independent of the terms used to describe it. Moreover, Vidino's argument that a person or entity can operate in support of or on behalf of an organization without being a member of that organization does not exonerate him from liability here, and in fact strengthens Dr. Hafez's claims concerning the statements at issue in the FAC, as those statements were sufficient to proximately cause damages to Dr. Hafez.

Last, any distortions of Dr. Hafez's statements reported by media and public outlets are improper, irrelevant, and fail to destroy Dr. Hafez's claims. For example, stating that Dr. Hafez is rightful in his purported allegation that both statements alleged by the FAC are constitutionally protected opinion is inaccurate and highly misleading, as Dr. Hafez never stated so and never intended to immunize or justify Vidino's despicable misconduct.

### iii. The FAC Plausibly Alleges Actual Malice and Actionable Racketeering Activities

Even if Dr. Hafez were considered a limited-purpose public figure for purposes of analysis, which he disputes, the FAC adequately alleges the requisite actual malice.[1] As an initial matter,

---

[1] "The debate whether a plaintiff is indeed a limited public figure required to demonstrate actual malice lends itself more readily to a motion for summary judgment rather than a motion to dismiss." *O'Boyle v Sweetapple*, 2015 US

questions of intent are "particularly ill suited for summary disposition." *Gomez v. Trs. of Harvard Univ.*, 677 F. Supp. 23, 25 (D.D.C. 1988); *accord Pullman-Standard v. Swint*, 456 U.S. 273, 288 (1982) ("Treating issues of intent as factual matters for the trier of fact is commonplace."). Indeed, even under Rule 9's heightened pleading standard, "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b). "Intent may, and generally must, be proved circumstantially; normally, the natural probable consequences of an act may satisfactorily evidence the state of mind accompanying it." *United States v. Jackson*, 513 F.2d 456, 461 (D.C. Cir. 1975); *United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1118–19 (D.C. Cir. 2009) ("[T]he factfinder 'is permitted to impute knowledge of the falsity of the statements to the accused ... as a consequence of inferences reasonably drawn.'"). In any event, the actual malice standard requires a plaintiff to prove that the false or misleading statements were made with either actual "knowledge" that the statements were "false," or "reckless disregard" of the statements' accuracy. *Jankovic v. Int'l Crisis Grp.*, 822 F.3d 576, 589-90 (D.C. Cir. 2016) (cleaned up). Reckless disregard requires proof that at the time the statements were made, the defendants either had "a high degree of awareness of probable falsity" or "entertained serious doubts as to the truth of" their statements. *Tah v. Global Witness Publishing, Inc.*, 991 F.3d 231, 240 (D.C. Cir. 2021) (cleaned up).

In any event, Vidino's conduct, as detailed in the FAC, meets the heightened standard of pleading malice required, and the deliberate propagation of falsehoods and misleading information in furtherance of the enterprise's scheme to damage Dr. Hafez provides a clear basis for liability.

---

Dist LEXIS 192278 at *13 (SD Fla June 4, 2015, No. 9:14-CV-81250-KAM) (citing, *Marous Bros. Const., LLC v. Ala. Stat. Univ.*, 07-CV-384, 2008 U.S. Dist. LEXIS 10867 at *3 [M.D. Ala. Feb. 11, 2008] [collecting cases and concluding that "whether [counter plaintiffs] are limited-purpose public figures is more appropriate for resolution at the summary judgment stage on the basis of evidentiary facts"]; *Flowers v. Carville*, 310 F.3d 1118, 1131 [9th Cir. 2002] [the issue of 'actual malice' . . . cannot be properly disposed of by a motion to dismiss]).

The FAC alleges with specificity that Vidino's statements were made with actual malice, a standard satisfied by demonstrating Vidino's knowledge of their falsity or reckless disregard for the truth. Vidino's dissemination of false information, coupled with the absence of credible materials supporting his positions, evidences his intent to harm Dr. Hafez as part of the enterprise's unlawful objectives laid out in the FAC. Moreover, Vidino's argument that there is no public information disproving that Dr. Hafez is not operating in support of the Muslim Brotherhood is highly improper and surprising, even on counsel's account.

### B. THE NOERR-PENNINGTON DOCTRINE DOES NOT APPLY

The *Noerr-Pennington* doctrine is rooted in the Petition Clause of the First Amendment, that protects "an attempt to *persuade* the legislature or the executive to take *particular action* with respect to *a law* . . . ." *E. R.R. Presidents Conference v. Noerr Motor Freight, Inc*., 365 U.S. 127, 136 (1961). The protection does not "cover activity that was not genuinely intended to influence government action." *Allied Tube & Conduit Corp. v. Indian Head*, 486 U.S. 492, 508 n.10 (1998). Relevantly, the *Noerr-Pennington* doctrine does not apply to the RICO claims. The doctrine's protections are aimed at shielding legitimate petitioning activities directed at government action, but its application is narrowly tailored and does not extend to racketeering activities or other unlawful conduct. Courts have consistently rejected attempts to extend *Noerr-Pennington* protections to activities constituting racketeering or other violations of statutory law. Vidino's invocation of the *Noerr-Pennington* doctrine is misplaced and reflects a fundamental misunderstanding of its scope and limitations.

As a threshold matter, "[a]ttempts to influence governmental action through overtly corrupt conduct, such as bribes (in any context) and misrepresentation (in the adjudicatory process) are **not** normal and legitimate exercises of the right to petition, and activities of this sort have been

held beyond the protection of *Noerr*." *Whelan v. Abell*, 48 F.3d 1247, 1255 (D.C. Cir. 1995) (quoting *Federal Prescription Serv., Inc. v. Am. Pharmaceutical Ass'n*, 663 F.2d 253, 263 (D.C. Cir. 1981)); *see also*; *Cal. Motor Transp. Co. v. Trucking Unltd.*, 404 U.S. 508, 512-13 (1974). Vidino's attempt to invoke *Noerr-Pennington* as protection fails because the doctrine does not protect deliberately false or misleading statements. "[N]either the *Noerr-Pennington* doctrine nor the First Amendment more generally protects petitions predicated on fraud or deliberate misrepresentation." *Edmondson & Gallagher v. Alban Towers Tenants Ass'n*, 48 F.3d 1260, 1267 (D.C. Cir. 1995); *see also*, *Whelan*, 48 F.3d at 1255 ("However broad the First Amendment right to petition may be, it cannot be stretched to cover petitions based on known falsehoods.") Moreover, the doctrine does not automatically characterize (and therefore immunize) every campaign or activity as "petitioning" of the government.[2] If that were the case, the *Noerr-Pennington* doctrine would extend to virtually all activities. Only statements made directly to legislative bodies merit *Noerr-Pennington* immunity. On the contrary, Defendants' statements were made with the primary purpose of influencing Dr. Hafez's business counterparties, academic and financial institutions, Dr. Hafez's network, governmental officials, and the general public, and are, therefore, not protected by the *Noerr-Pennington* doctrine. Here, Vidino's unlawful activities – including the dissemination of false or misleading reports, editorials, and testimony – are not bona fide petitioning or advocacy activities but are instead integral to the broader racketeering scheme outlined in the FAC. His conduct was undertaken pursuant to a multifaceted fraudulent scheme aimed at defrauding Dr. Hafez's business counterparties, academic

---

[2] It is well established that a determination of whether the challenged predicate acts constitute petitioning is a fact-intensive inquiry that can only be resolved at trial. *See*, *Indian Head*, 486 U.S.at 499 (applicability of *Noerr* immunity "varies with the context and the nature of the activity"); *Philip Morris USA, Inc.*, 337 F Supp 2d at 26-27 (DDC 2004).

and financial institutions, Dr. Hafez's network, governmental officials, and the general public, not – as required – as an exercise of First Amendment rights to influence legislators.

Vidino's argument also suffers from an inherent contradiction. In the preceding sections of his motion, Vidino attempts to characterize his statements as protected free speech or opinion, immune from liability. Then, however, he pivot to claim that the same statements constitute specific petitioning activity aimed at influencing governmental action. These positions are irreconcilable: if the statements are mere opinions or general speech, they cannot simultaneously serve as specific petitioning efforts to demand or influence government action. This inconsistency undermines Vidino's argument and calls into question the credibility of their reliance on *Noerr-Pennington*.

Therefore, the *Noerr-Pennington* doctrine does not apply to the facts of this case. Vidino's arguments, particularly their attempt to characterize the same conduct as both free speech and petitioning activity, reveal a fundamental incoherence. This lack of consistency further highlights the weakness of their position and the impropriety of dismissing Plaintiff's claims under this doctrine.

## III.     THE FAC STATES A RICO CLAIM AGAINST VIDINO

Dr. Hafez's FAC sufficiently alleges and state claims for substantive RICO violations against Vidino, GWU, POE, Alp, Diligence, Brero, Cavin, Badal, Ariaf Studies and Research LLC ("Ariaf"), and the other yet unidentified Defendants under 18 U.S.C. §1962(c). Under Section 1962(c), a plaintiff must allege "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 (1985). Here, Plaintiff plausibly pleads all the requirements the law foresees and sufficiently alleges that the UAE, Alp, Diligence, Brero, Cavin, Badal, Ariaf, their employees, and a broad network of co-conspirators –

including Vidino, GWU, POE, and others – knowingly formed an association-in-fact enterprise. That enterprise conducted offensive viral communications campaigns against dozens of victims to destroy perceived rivals of the UAE. The enterprise had a distinct modus operandi, publishing fraudulent statements to banks, compliance monitors, business partners, the media, and the general public falsely linking its victims to terrorism. The enterprise carried out this pattern of racketeering activity for years, and its own documents indicate that the conspiracy is ongoing. As a proximate result of the enterprise's unlawful conduct, Dr. Hafez suffered "domestic" injury to his "business or property," as properly plead in the FAC and further argued herein. *See also*, Pl. Decl.

## A.  DR. HAFEZ SUFFERED INJURY TO BUSINESS OR PROPERTY

Vidino's argument that Dr. Hafez suffered no injury to "business or property" under RICO is fundamentally flawed. "At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992); *National Organization of Women v. Scheidler*, 510 U.S. 294, 256 (1994) (finding RICO standing adequately pleaded where complaint alleged conspiracy "injured the business and/or property interests of the [petitioners]"). Contrary to Vidino's assertions, Plaintiff has alleged substantial financial harm resulting directly from Defendants' actions, including those associated with and causing Operation Luxor. These injuries include lost income from canceled speaking engagements and professional opportunities, as well as significant reputational damage that led to the withdrawal of numerous invitations to academic and professional forums, domestically and abroad. *See*, **EXHIBITS F, G, H**. This exclusion curtailed Plaintiff's ability to engage with peers, secure professional collaborations, and maintain his standing in his field, all of which inflicted concrete harm on his business and career prospects. The freezing of Plaintiff's bank accounts and assets further exacerbated these injuries, creating immediate and significant financial strain. The

inability to access funds disrupted Plaintiff's ability to meet ongoing financial obligations, including mortgage payments, and significantly hindered his economic stability. Additionally, Plaintiff incurred substantial relocation expenses as he was compelled to move to the United States, due to Defendants' unlawful scheme and Vidino's misleading reports, articles, and testimonies. These costs, among others, represent tangible and compensable injuries under RICO.

Vidino's characterization of the raid on Plaintiff's home during Operation Luxor as mere personal injury is incorrect. The raid resulted in significant material harm, including property damage to the entrance door, window, and alarm system, inter alia. Plaintiff also incurred financial costs associated with repairing this damage. These losses are distinct from emotional or psychological harm and constitute injuries to property cognizable under RICO.

Defendant's reliance on Plaintiff's distinguished professorship at Williams College to undermine his claims is utterly misleading. This position was secured prior to the events surrounding Operation Luxor, and was postponed due to the global pandemic, not through any fault of Dr. Hafez. The temporary nature of the position – since concluded – underscores the disruption to Plaintiff's professional trajectory, which included the loss of his position at the University of Salzburg due to political pressure stemming from Defendants' actions and the fallout from Operation Luxor.

The protracted delay in processing Plaintiff's U.S. visa further disrupted his career. Normally a routine procedure, the process was delayed for six months due to the investigation linked to Operation Luxor and the associated stigma, causing professional uncertainty and forcing Plaintiff to accept interim employment in London, incurring in additional and unexpected financial burdens and expenses. This sequence of events not only disrupted Plaintiff's transition to the United States but also imposed additional financial and emotional burdens on him.

Defendants' actions – including Vidino's – delineated in the FAC inflicted severe reputational harm on Plaintiff, resulting in the withdrawal of professional opportunities and invitations to significant academic forums. For years, Plaintiff was effectively excluded from the academic and professional circles essential to his career advancement. This reputational harm had direct and measurable effects on Plaintiff's financial and professional prospects, further compounding the injuries to his business and property.

In sum, Plaintiff has sufficiently alleged specific and tangible injuries to his business and property under RICO. These include lost income, professional disruptions, financial hardship from frozen assets, and reputational damage, all of which directly resulted from Defendants' actions, including Vidino's. These injuries are neither speculative nor implausible but are instead not only the natural and foreseeable consequences of Defendants' misconduct but also their intended goal. Defendant's attempt to dismiss these claims fails to account for the full extent and context of Plaintiff's injuries, which are both substantial and cognizable under RICO. *See*, generally, Pl. Decl.

## B. DR. HAFEZ'S INJURIES ARE DOMESTIC

Vidino's argument that Dr. Hafez's injuries are not "domestic" under RICO mischaracterizes the nature and location of the harms alleged. Plaintiffs' application of RICO to conduct that is both foreign and domestic is not impermissibly extraterritorial where, as here, there is domestic injury. While some of the injuries Dr. Hafez suffered originated or developed abroad, several significant injuries were developed, reflected, or otherwise occurred on U.S. soil, making them cognizable under the domestic-injury requirement of RICO.

Vidino cites *Yegiazaryan v. Smagin*, 599 U.S. 533 (2023), for the proposition that determining domestic injury is a context-dependent inquiry. But that case clarifies that the loss of an expected benefit in the United States *is* a cognizable domestic injury in the RICO context. *Id.*

13

at 543. In *Yegiazaryan*, a Russian-citizen-plaintiff alleged that the defendant's unlawful conduct denied him access to a California arbitral judgment. *Id.* The court held that denial of access to the judgment was domestic injury because, "while some of [the defendant's] scheme to avoid collection occurred abroad, the scheme was directed toward frustrating the California judgment." *Id.* The court continued: "While it may be true, in some sense, that [the plaintiff] has felt his economic injury in Russia, focusing solely on that fact would miss central features of the alleged injury." *Id.* at 545; *see also Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 649 (2008) (finding injury where respondents "lost valuable liens they otherwise would have been awarded."). The same reasoning applies here. Focusing on Dr. Hafez's country of residence at the time Operation Luxor took place, Defendants' countries of origin or where they are based, and where meetings and conversations in furtherance of the enterprise's scheme took place, as Vidino suggests, would miss central features of the alleged injury.

Vidino also attempts to downplay the relevance of Hafez's residence and occupation in the United States. While that may not be dispositive, it is certainly relevant. More generally, Vidino misses the crucial inquiry in determining domestic injury: whether the "circumstances surrounding the alleged injury" indicate that it "arose in the United States." *Yegiazaryan*, 599 U.S. at 543–44. Here, the circumstances unmistakably do. Vidino himself, a U.S. citizen, resides in Washington, D.C., where he is employed by an American academic institution – GWU – and serves as the director of one of its programs – POE. He has even admitted that a U.S.-based private entity linked to the United Arab Emirates may have been involved as a client in his work for the enterprise, underscoring the domestic nexus of his activities. Moreover, evidence in the public domain demonstrates that the UAE is leveraging American platforms, including GWU's POE and Vidino,

to shape narratives about Islam in the West.[3] This includes collaborations between Vidino and UAE officials, such as the UAE Minister of Foreign Affairs and UAE Ambassador to the United States, Yousef Al Otaiba. These efforts escalated into a coordinated campaign of "offensive viral communication" targeting U.S. platforms. For instance, the campaign manipulated results on U.S.-based search engines like Google, Yahoo!, and Bing, fabricated negative Wikipedia pages through U.S.-based companies, and aimed to publish disparaging articles in English-speaking media outlets, including Daily Kos and the San Francisco-based blogging platform Medium. Internal documents further reveal that Vidino contributed to these efforts by drafting an "overview of key MB individuals/organisations/companies in the USA," as detailed in a March 2018 Alp communication plan and an April 2018 to-do list labeled "Arnica." The goal of these documents was to showcase capabilities by acquiring updated information in the United States, aligning directly with the campaign's emphasis on disseminating negative information in the U.S. and UK media. These actions not only demonstrate Vidino's active role in a U.S.-focused enterprise but also highlight the misuse of American institutions, such as GWU's POE, to project foreign agendas under the guise of independent scholarship, enriching participants in the process while concealing their roles as foreign agents. Defendants, including Vidino, purposefully directed their fraudulent statements to the United States—by sending emails to U.S. journalists and bank compliance monitors, publishing their fraudulent blog posts, reports, and articles on U.S. websites, creating false English-language Wikipedia entries, and manipulating U.S. search engines – for the express purpose of influencing U.S. audiences and destroying Dr. Hafez. These actions caused the intended harm on Dr. Hafez, both abroad and in the United States.

---

[3] *See*, Pl. Decl., p. 4 n. 2; *see also*, Elham Fakhro. The Abraham Accords: The Gulf States, Israel, and the Limits of Normalization (New York City: Columbia University Press, 2024).

### C.  THE FAC PLAUSIBLY ALLEGES RICO PREDICATE OFFENSES

Racketeering activity is broadly defined as any of the predicate offenses specifically enumerated in Section 1961 of the RICO Act. 18 U.S.C. §1961(1)(B). This list of predicate acts includes wire fraud, mail fraud, and bank fraud—the racketeering activities alleged here. To satisfy RICO, a plaintiff need only allege two related predicate acts over a ten-year period. 18 U.S.C. §1961(5). Plaintiff easily clears this low bar. The FAC plausibly alleges that Defendants, including Vidino, committed multiple RICO predicate acts, including wire fraud, mail fraud, and bank fraud, as defined under 18 U.S.C. § 1961(1)(B). Contrary to Vidino's assertions, the FAC provides a sufficient factual basis for these allegations, detailing the use of U.S. wires and mail to disseminate false and misleading information, and the direction of same statements to U.S. banks and financial institutions, with the specific intent to harm Dr. Hafez's reputation, deprive him of access to his financial assets, and limit his income-generating opportunities.

First, the FAC alleges that false and misleading information was knowingly transmitted via U.S. wires and mail to financial institutions and government entities, intending to cause reputational and financial harm to Dr. Hafez. These acts include providing misleading information that directly contributed to the freezing of Dr. Hafez's financial assets, which resulted in significant financial hardship and disrupted his ability to transition to professional opportunities in the United States. Second, articles and reports containing defamatory and misleading statements were disseminated widely online, including through platforms accessible in the United States. These materials, authored with the purpose of undermining Dr. Hafez's professional credibility and career prospects, were directed toward U.S.-based academic and professional institutions, creating clear domestic effects. The use of U.S. wires to publish and distribute these reports further establishes wire fraud as a predicate offense. Third, the FAC alleges that Defendants knowingly

provided false information to financial institutions to cause the freezing of Dr. Hafez's accounts, which constitutes bank fraud under 18 U.S.C. § 1344. This conduct was carried out with the intent to deprive Dr. Hafez of his assets and inflict financial harm, satisfying the requirement for a specific intent to defraud.

Wire fraud and bank fraud involve schemes to defraud and deprive victims of money or property through deceitful conduct, not merely defamatory statements. *See*, *United States v. Lemire*, 720 F.2d 1327, 1334–35 (D.C. Cir. 1983); *United States v. Porat*, 76 F.4th 213, 218 (3d Cir. 2023). In particular, a plaintiff "alleging mail and wire fraud must establish two essential elements: (1) a scheme to defraud; and (2) use of the mails or wires for the purpose of executing the scheme." *Bates v. Nw. Human Servs., Inc.*, 466 F. Supp. 2d 69, 89 (D.D.C. 2006) (citations omitted).[4] A "scheme to defraud" broadly encompasses any scheme to deprive someone of money or property through false statements of material fact. *Carpenter v. United States,* 484 U.S. 19, 27 (1987) ("'[T]o defraud' ... [has] the common understanding of wrongdoing one in his property rights by dishonest methods or schemes."); *Jericho Baptist Church Ministries, Inc. (D.C.) v. Jericho Baptist Church Ministries, Inc. (Md.)*, 223 F. Supp. 3d 1, 8 (D.D.C. 2016) (the term defraud "signif[ies] the deprivation of something of value by trick, deceit, chicane or overreaching"). Here, Defendants' actions were not incidental; they were deliberately orchestrated to deprive Plaintiff of financial resources and professional opportunities. For example, Defendants used U.S. wires to spread false accusations linking Plaintiff to terrorism, resulting in reputational and financial harm, and provided fabricated information to financial institutions, inducing them to restrict Plaintiff's access to funds.

---

[4] "The requisite elements of 'scheme to defraud' under the wire fraud statute … and the mail fraud statute … are identical. Thus, cases construing mail fraud apply to the wire fraud statute as well." *United States v Philip Morris, Inc.*, 304 F Supp 2d 60, 69, n. 5 [DDC 2004]) (quoting *Lemire*, 720 F.2d at 1335, n.6).

Defendants' attempt to dismiss these allegations as defamation misconstrues the FAC. While false and misleading statements form part of the narrative, they are components of a broader scheme that includes fraudulent acts targeting Plaintiff's livelihood and financial stability. The mere presence of alleged defamatory statements does not convert Plaintiff's claims into defamation, as the legal and factual context transcends such characterization. As a matter of fact, the same statement can give rise to claims for defamation and wire fraud. *See*, *Conwood Co. v. U.S. Tobacco Co.*, 290 F.3d 768, 783–84 (6th Cir. 2002). Both involve false statements of fact. What sets wire fraud apart is the intent to deprive the victim of money or property. The victim's loss of money or property cannot be "only an incidental byproduct of the scheme"; it must be "an 'object of the fraud.'" *United States v. Porat*, 76 F.4th 213, 218 (3d Cir. 2023). The perpetrator need not "end[] up with the victim's property or money." *Feld Ent., Inc. v. Am. Soc'y for the Prevention of Cruelty to Animals*, 873 F. Supp. 2d 288, 318 (D.D.C. 2012).

The FAC's well-pleaded allegations of predicate acts are sufficient to state a RICO claim. Here, Defendants, including Vidino, intended to (and did) deprive Plaintiffs of money and property, as confirmed by Defendants' own internal documents. For example, in a February 2018 Action Plan, Alp acknowledged that it would "[A]lert compliance databases and watchdogs, which are used by banks and multinationals, about … links to terrorism." "[D]iscreetly notify banks of MB … [associates] … links to terrorism and Political Exposed Persons (PEPs), the objective being to block their bank accounts and business." (FAC ¶11) Alp added: "Should you give us the green light, we believe that we could seriously damage, if not destroy, the reputation and viability of key MB European groups through our confidential offensive viral communication." (FAC ¶12). Alp would also alert banks and bank compliance monitors to the false claims Alp manufactured to get banks to stop lending to Alp's targets, including Dr. Hafez, isolating them financially. Dr. Hafez

also allege with particularity that Defendants, including Vidino, sent numerous emails and published numerous articles, reports, and blog posts, making the false claims that Plaintiff was linked to the Muslim Brotherhood and terrorism. Vidino, along with GWU and its POE, penned and published the relevant report on the Muslim Brotherhood in Austria, making it available online worldwide, including in the United States. *See*, **EXHIBIT E**. These statements were communicated using interstate wires. *United States v. Ring*, 628 F. Supp. 2d 195, 217 (D.D.C. 2009). That use of interstate wires was not only foreseeable, but it was also and foremost an essential element of Defendants' scheme that allowed them to disseminate their fraudulent statements to specific audiences around the globe, including in the United States, and to do so pseudonymously.[5]

Dr. Hafez also alleges that Defendants' claims were false and misleading, identifying each fraudulent statement with particularity as required by Federal Rule of Civil Procedure 9(b). Vidino's argument that Plaintiff fails to identify the fraudulent statements with particularity is disingenuous and ignores Plaintiff's well-pleaded allegations. Plaintiff provides each statement's date, contents, speaker, recipient, and medium, including but not limited to the "Muslim Brotherhood in Austria" report and substantive correspondence using encrypted email accounts between members of the enterprise regarding the targets of their scheme, which included Dr. Hafez. Each of these emails, and each of the enterprise's reports, articles, and blog posts, was a separate act of wire fraud. *See Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 648 (2008). Here, more particularly, Plaintiff identifies several fraudulent statements (including statements

---

[5] "In the RICO context, it is well-accepted that 'the scope of fraud under [the wire and mail fraud] statutes is broader than common law fraud'" *Regency Communs., Inc. v Cleartel Communs., Inc.*, 160 F Supp 2d 36, 43-44 (DDC 2001) (quoting *McEvoy Travel Bureau, Inc. v. Heritage Travel, Inc.*, 904 F.2d 786 [1st Cir. 1990]); *see also*, *Neder v. United States,* 527 U.S. 1, 24-25 (1999) ("common-law requirements of 'justifiable reliance' and 'damages,' for example, plainly have no place in the federal fraud statutes"); *United States v. Stewart*, 872 F.2d 957, 960 (10th Cir. 1989) ("an offense under [the mail fraud statute], unlike common law fraud, does not require the successful completion of the scheme to defraud").

falsely linking him to the Muslim Brotherhood and terrorism) with particularity, pleads that (and how) those statements were designed to deprive him of money and property (and in fact did so), and identifies Vidino and the other Defendants' actions that constitute RICO predicate acts.

Plaintiffs also allege predicate acts of bank fraud. The bank fraud statute makes it unlawful to participate in a "scheme ... to defraud a financial institution." 18 U.S.C. §1344(1). Under Section 1344(1), the defendant need not actually deprive the financial institution of anything of value, or even intend to do so—the scheme itself is sufficient for liability. *Shaw v. United States*, 580 U.S. 63, 67 (2016) ("[T]he statute ... demands neither a showing of ultimate financial loss nor a showing of intent to cause financial loss."). Here, Defendants, including Vidino, made statements falsely accusing Plaintiff of having links to the Muslim Brotherhood and terrorism directed at banks and bank compliance monitors to fraudulently induce banks to stop dealing with and providing access to funds to Plaintiff. That is exactly what Defendants intended to happen, and that is exactly what several financial institutions did. Defendants do not seriously contest that Plaintiffs adequately pleaded predicate acts of bank fraud. Vidino only mentions bank fraud in a paragraph in which it asserts that as to bank fraud, the FAC is devoid of supporting facts about how Vidino "defraud[ed]" or "obtain[ed]" money from a financial institution "by means of false or fraudulent pretenses, representations, or promises." 18 U.S.C. § 1344(1)–(2). However, in *United States v. Crisci*, 273 F.3d 235 (2d Cir. 2001), the court *affirmed* an indictment charging the defendant with bank fraud, noting that "'[t]he bank need not be the immediate victim of the fraudulent scheme' and need not have suffered actual loss." 273 F.3d at 240. And even though *Crisci* can be read to suggest that the fraudulent scheme must be "designed to deceive" a bank "into releasing property," this is not the law following the Supreme Court's subsequent decision in *Shaw*, which expressly held that bank fraud does *not* require intent to harm a bank—knowledge that a bank would likely suffer harm to

a property interest is sufficient. *Shaw*, 580 U.S. at 64; *see also In re Search of Multiple Email Accts. Pursuant to 18 U.S.C. §2703*, 585 F. Supp. 3d 1, 15 (D.D.C. 2022) ("[A] §1344(1) violation does not require that a defendant intended to cause financial harm ... to a financial institution."). Regardless, here Defendants, including Vidino, *did* intend to induce banks to stop lending and providing funds to Plaintiff. For example, in *Jericho Baptist Church*, this District denied a motion to dismiss RICO claims premised on predicate acts of mail, wire, and bank fraud asserted by a church, not a financial institution. 223 F. Supp. at 8; *see also*, *Hill v. Opus Corp.*, 841 F. Supp. 2d 1070, 1098 (C.D. Cal. 2011). If a plaintiff suffers injury to money or property, that plaintiff has standing to assert predicate acts of bank fraud.

Therefore, the FAC adequately pleads RICO predicate acts, including wire fraud, mail fraud, and bank fraud, supported by allegations of intentional fraudulent conduct aimed at destroying Dr. Hafez's reputation, limiting his financial autonomy, and curtailing his professional opportunities. These allegations are far from the "threadbare recitals" suggested by Defendants and are sufficient to withstand a motion to dismiss under Rule 12(b)(6) and to meet Rule 9(b) pleading requirements.

## D. THE FACT PLAUSIBLY ALLEGES A PATTERN OF RACKETEERING ACTIVITY

The FAC plausibly pleads a pattern of racketeering activity, as required under 18 U.S.C. § 1962(a)–(c), by alleging a series of related predicate acts demonstrating the existence and threat of continued criminal activity. Contrary to Vidino's assertions, the allegations extend far beyond a single scheme or discrete goal, and the Court can take notice of additional factual circumstances

further substantiating the pattern.[6] Defendants, including Vidino, engaged in a pattern of racketeering activity by conducting multiple schemes over several years targeting dozens of victims using nearly identical methods. To satisfy RICO's pattern requirement, a plaintiff need only show two related predicate acts over a ten-year period.18 U.S.C. §1961(5); *see Lu v. Lezell*, 45 F. Supp. 3d 86, 96 (D.D.C. 2014). "[E]vidence of multiple schemes is not required . . . and, indeed, proof of a single scheme can be sufficient so long as the predicate acts involved are not isolated or sporadic." *Turner v. Cook*, 362 F.3d 1219, 1229 (9th Cir. 2004); *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 240 (1989) ("[I]t is implausible to suppose that Congress thought continuity might be shown *only* by proof of multiple schemes"). For predicate acts to form a "pattern," there must be sufficient "continuity" between the defendant's unlawful actions. *Lezell*, 45 F. Supp. 3d at 99 (allowing RICO case to proceed where defendants allegedly "defraud[ed] three separate Plaintiffs on three distinct occasions").

First, the FAC identifies multiple predicate acts – including mail fraud, wire fraud, and bank fraud – targeting not just Dr. Hafez but also other individuals and entities, as evidenced by the documents and materials obtained by anonymous hackers. These records detail a coordinated and premeditated enterprise whose unlawful conduct extended beyond the injury to Dr. Hafez and impacted other victims through similar predicate acts. *See*, Pl. Decl. ¶¶50-51. FAC ¶¶ 96-102. Second, the Arnica-labeled documents and other leaked action-plan documents referenced in the FAC highlights the enterprise's "Global Action Plan" and its premeditated strategy to target multiple individuals and organizations through coordinated racketeering activities. This document evidences not only the continuity of the enterprise's unlawful conduct but also its clear intent to

---

[6] Taking judicial notice of the existence of . . . articles is entirely proper." *See*, *Washington Post v. Robinson*, 935 F.2d 282, 291 (D.C. Cir. 1991) (a "court may take judicial notice of the existence of newspaper articles in the Washington, D.C., area that publicized" certain facts).

engage in further predicate acts over an extended period, satisfying the requirement for demonstrating the threat of continued criminal activity. *See*, FAC ¶73. Third, the FAC also pleads that the enterprise's conduct caused harm to numerous other individuals, including reputational and financial injuries, as part of a broader scheme to silence, discredit, or financially incapacitate its targets. While the FAC focuses on Dr. Hafez as a primary victim, it refers to "dozens of other targets" – identifying some – similarly impacted by the enterprise's unlawful conduct, further evidencing the existence of multiple victims and a broader pattern of racketeering activity. A compelling example of said pattern, the FAC's detailed reference of which Vidino appears to ignore, is evidenced by Hazim Nada and his company Lord Energy, who have filed a separate lawsuit in this District against the same Defendants, alleging substantially identical claims and identifying the same RICO enterprise. This parallel lawsuit serves as an independent corroboration of the ongoing and systemic nature of the enterprise's conduct, demonstrating that the pattern of racketeering activity was not limited to Dr. Hafez's case alone. Moreover, said lawsuit itself identifies other schemes perpetrated by the same enterprise to other individuals and entities with an almost identical modus operandi, including the instant action initiated by Dr. Hafez. While Vidino appears to disregard the FAC's detailed account of the circumstances involving Hazim Nada and Lord Energy's matter, the existence of this parallel action alone undercuts Defendants' argument that the enterprise had only a singular goal or victim. *See*, Pl. Decl. ¶¶50-51. FAC ¶¶ 96-102. Vidino, in addition to ignoring and downplaying the scope of the conspiracy alleged, relies on cases that lack anything close to the number of schemes and victims, the yearslong temporal scope, and the targeted, repeated, and continuous conduct that characterize the Defendants' pattern of racketeering activity. For example, *Edmondson & Gallagher*, 48 F.3d 1260 involved a "single scheme . . . designed to frustrate one transaction and inflicting a single, discrete injury on a small

number of victims." *Id.* at 1263. Those facts are not comparable to the facts here. The allegations

in the FAC and in Plaintiff's Declaration are more than sufficient at the pleading stage to establish

that the enterprise conducted similar, yet distinct campaigns involving numerous predicate acts of

wire fraud, mail fraud, and bank fraud against other individuals and entities targeted as Dr. Hafez.

When viewed in conjunction with publicly available evidence and related legal

proceedings, the allegations in the FAC unequivocally establish a pattern of racketeering activity

involving numerous predicate acts, victims, and goals. This plainly meets the statutory

requirements for pleading a RICO claim, and Vidino's attempt to dismiss the pattern as a single

scheme with a singular purpose fails in light of the FAC's comprehensive allegations and the

available evidence.

### E.  THE FAC PLAUSIBLY ALLEGES A RICO ENTERPRISE

While also incorporating and fully adopting the arguments set forth with regards to the

sufficiently pleaded existence pattern of racketeering activity, Plaintiff's allegations in his

pleadings are more than sufficient to satisfy the low bar for pleading an association-in-fact RICO

enterprise. A plaintiff need only "allege ... the existence of two distinct entities: (1) a 'person'; and

(2) an 'enterprise' that is not simply the same 'person' referred to by a different name." *Cedric

Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 158 (2001). "[T]he definition [of enterprise] has

a wide reach, and the very concept of an association in fact is expansive." *Boyle v. United States*,

556 U.S. 938, 944 (2009) (citations omitted). An association-in-fact enterprise need only possess

three characteristics: "a purpose, relationships among those associated with the enterprise, and

longevity sufficient to permit these associates to pursue the enterprise's purpose." *Id.* at 946, 948

(association-in-fact enterprise is "simply a continuing unit that functions with a common purpose"

and the term should be "liberally construed"). All that is required is "evidence of an ongoing

organization, formal or informal, and … evidence that the various associates function as a continuing unit." *Boyle*, 556 U.S. at 945; *see United States v. Elliott*, 571 F.2d 880, 897–900 (5th Cir. 1978) ("A jury is entitled to infer the existence of an enterprise on the basis of ... circumstantial evidence. ... [A] RICO enterprise cannot be expected to maintain a high profile in the community. Its affairs are likely to be conducted in secrecy and to involve a minimal amount of necessary contact.").

Consistent with the Supreme Court's instruction that the enterprise requirement should be broadly construed, courts have held that a RICO enterprise can include "those merely associated with an enterprise—who participate directly and indirectly in the enterprise's affairs." *Schacht v. Brown*, 711 F.2d 1343, 1360 (7th Cir.1983); *see also*, *Virden v. Graphics One*, 623 F. Supp. 1417, 1432–33 (C.D. Cal. 1985). Moreover, Plaintiffs need not allege that all participants in the enterprise shared the Defendants' "fraudulent purpose." *Friedman v. 24 Hour Fitness USA, Inc.*, 580 F. Supp. 2d 985, 991 (C.D. Cal. 2008) (plaintiffs alleged association-in-fact enterprise even though two participants in scheme were "unwitting"). Rather, "[i]t is sufficient that the defendant know the general nature of the enterprise and know that the enterprise extends beyond his individual role." *United States v. Rastelli*, 870 F.2d 822, 828 (2d Cir. 1989).

Here, Dr. Hafez alleges an enterprise in which the UAE, Alp, Diligence, Ariaf, their employees, co-conspirators like Vidino, GWU, and POE, along with dozens of other yet unidentified participants functioned as a continuing unit for years. Dr. Hafez identifies the enterprise's clear organization and structure. The UAE provided funding, strategic guidance, and ultimate approval for the enterprise's operations. Alp, Diligence, and their employees oversaw its day-to-day actions by identifying targets, hiring sources, sending fraudulent emails, and writing, commissioning, and publishing articles, blog posts, and Wikipedia entries. The enterprise's vast

network of other witting participants and co-conspirators gathered information, published articles and reports written or commissioned by the Alp Defendants, and ensured false Wikipedia entries were not corrected, among other things. Each member of the enterprise was aware of and shared the common purpose of destroying the UAE's rivals using similar viral communication campaigns to falsely link their targets to terrorism, inducing banks, business partners, academic institutions, and others to stop dealing with those targets. Vidino's attempt to minimize this complex and structured mechanism as a "lone transaction" fails in front of the available evidence arising from Defendants' own internal documents and the allegations in the FAC, as the ongoing collaboration shown evidences an association that extended beyond a single transaction or isolated action.

These allegations adequately plead an association-in-fact enterprise. After all, "the RICO net is woven tightly to trap even the smallest fish, those peripherally involved with the enterprise." *Schacht*, 711 F.2d at 1360 (quotation marks omitted); *see also*, *United States v. Oreto*, 37 F.3d 739, 751 (1st Cir. 1994) ("Congress intended to reach all who participate in the conduct of that enterprise, whether they are generals or foot soldiers.").

## F. THE FAC PLAUSIBLY ALLEGES THAT VIDINO PROXIMATELY CAUSED DR. HAFEZ'S PURPORTED INJURIES

Vidino's argument that the FAC fails to plausibly allege proximate causation lacks merit and misrepresents the nature and scope of the allegations. Plaintiff alleges that Defendants' offensive viral communications campaign against him was the direct and proximate cause of his injuries. More broadly, the FAC clearly alleges that all the activities carried out by the enterprise— including Vidino's contributions—proximately caused Dr. Hafez's reputational, financial, and other injuries. Although proximate cause in the RICO context requires that the plaintiff's injury be directly caused by the defendant's scheme, "a plaintiff [may be] directly injured by a fraudulent

misrepresentation . . . even though it was a third party, and not the plaintiff, who relied on the defendant's misrepresentation." *Bridge*, 553 U.S. at 656. "The D.C. Court of Appeals has made clear that "the intervening actions of a third party do not by themselves defeat proximate cause if those intervening actions were reasonably foreseeable to the defendant.'" *United States v Sutton*, 2022 US Dist LEXIS 216313, at *16 (DDC Nov. 30, 2022, No. 21-0598 (PLF)) (quoting *Fleming v United States*, 224 A3d 213, 226 [DC 2020]).

That is what Plaintiff precisely alleges here. Defendants, including Vidino, knowingly made fraudulent statements to third parties, intending to interfere with those parties' relationships with Plaintiff and deter them from continuing to engage with Plaintiff. Specifically, following Vidino's 2017 report, he also gave testimony to Austrian officials reiterating that Dr. Hafez was an operator for the Muslim Brotherhood and closely tied to the organization. Both the report and testimony predated the raid on Dr. Hafez's home in Austria and directly contributed to the injuries and damages suffered by Dr. Hafez. The scores of reports, articles, testimonies to government officials, and blog posts that the enterprise—not independent journalists and scholars—published and spread in the public arena, and the false Wikipedia entries the enterprise created also caused several other institutions, banks, and counterparties to stop dealing with Plaintiff.

These injuries to Plaintiff were not just a foreseeable and natural consequence of Defendants' offensive viral communications campaign; they were the express objectives of the enterprise and they were proximately caused by said campaign. The campaign was specifically aimed at destroying Plaintiff' business and reputable career. Defendants' own documents expressly confirm that they sought to "seriously damage, if not destroy the reputation and viability' of key MB European groups through our confidential offensive viral communication." *See*, generally, FAC and Pl. Decl.

Vidino primarily argues that there is no proximate causation because Plaintiff's injuries depended on the "intervening actions" of third parties and were too remote. His argument here fails. The mere "presence of intermediaries" does not "destroy[] proximate causation," *In re Avandia Mktg., Sales Pracs. & Prod. Liab. Litig.,* 804 F.3d 633, 645 (3d Cir. 2015), particularly where those intermediaries acted in reliance on Defendants' fraudulent statements in the manner that Defendants expected and intended, *cf. Exxon Mobil Corp. v. Corporacion CIMEX, S.A.*, 111 F.4th 12, 33 (D.C. Cir. 2024). *See also*, supra, *Bridge*, 553 U.S. at 656; *Sutton*, 2022 US Dist LEXIS 216313, at *16 (quoting *Fleming*, 224 A3d at 226). The Supreme Court's holding in *Bridge* makes that clear. In *Bridge*, a RICO plaintiff's commercial competitor submitted fraudulent attestations to a county government to secure benefits at a property auction. *Bridge*, 553 U.S. at 644–45. The Court held that the county government's decision, which was influenced by the defendant's fraudulent attestations, to let the defendant participate in the auction deprived the plaintiff of financial benefits and did not break the causal chain. *Id.* In *Companhia Brasileira Carbureto de Calcio-CBCC v. Applied Industrial Materials Corp.*, 887 F. Supp. 2d 9, 13 (D.D.C. 2012), this District similarly held that an intervening decision by the International Trade Commission did not destroy proximate causation.

In support of his proximate causation arguments, Vidino primarily relies on *Hemi Group, LLC v. City of New York*, 559 U.S. 1, 8–9 (2010). But that case does not support his position. In *Hemi*, the Supreme Court concluded there was no proximate cause because the relationship between the racketeering activity and injury was significantly more attenuated than the relationship Plaintiff alleges here. There, an out-of-state cigarette seller failed to file reports with its home state, as required by law, and New York City lost tax revenue as a result. *Hemi Group, LLC*, 559 U.S. at 8–9. The Court found proximate cause lacking because "the conduct directly responsible for the

28

City's harm was the customers' failure to pay their taxes. And the conduct constituting the alleged fraud was Hemi's failure to file Jenkins Act reports. Thus, ... the conduct directly causing the harm was distinct from the conduct giving rise to the fraud." *Id*. at 11. Not so here. Defendants' emails, blog posts, articles, Wikipedia entries, and reports, including and mainly Vidino's, were the fraud that caused Plaintiff's injuries. And to be specific, every conduct carried out by Vidino as part of the enterprise is directly tied to the injuries suffered by Dr. Hafez.

### G. THE FAC PLAUSIBLY ALLEGES THAT VIDINO KNOWINGLY JOINED A CONSPIRACY TO COMMIT AT LEAST TWO PREDICATE ACTS, EVEN IF HE DID NOT KNOW BROADER SCOPE OF CONSPIRACY OR ALL CO-CONSPIRATORS

In addition to his substantive RICO claims, Plaintiff alleges RICO conspiracy claims against all Defendants under 18 U.S.C. §1962(d) against Vidino to further the unlawful objectives of the enterprise, which included their viral communication campaign against Dr. Hafez. To state a RICO conspiracy claim, a plaintiff need only establish that the defendant "intend[ed] to further an endeavor which, if completed, would satisfy all of the elements of a substantive criminal offense." *Salinas v. United States*, 522 U.S. 52, 65 (1997). "To establish sufficient knowledge, it is only required that the defendant 'know the general nature of the conspiracy and that the conspiracy extends beyond his individual role.'" *United States v Philip Morris USA, Inc.*, 2006 US Dist LEXIS 118375 at *2474 (DDC Aug. 17, 2006, Civil Action No. 99-2496 (GK)) (quoting *United States v. Rastelli*, 870 F.2d 822, 828 [2d Cir. 1989] [collecting cases]). A defendant need not commit any predicate acts itself as long as it agreed to further the conspiracy with knowledge that another member of the conspiracy would engage in predicate acts. In other words, conspiracy liability only requires a knowing agreement to "facilitate the commission of a RICO offense by

another conspirator." *United States v. Philip Morris Inc.*, 130 F. Supp. 2d 96, 98–99 (D.D.C. 2001) (quotation marks omitted); *see also*, *United States v Philip Morris USA, Inc.*, 2006 US Dist LEXIS 118375 at *2465 (collecting cases); *Fuji Photo Film U.S.A., Inc. v. McNulty*, 640 F. Supp. 2d 300, 314, 321 (S.D.N.Y. 2009) (RICO conspiracy may consist of an individual at the enterprise's "heart" and a "collection of outside vendors" who "were aware of the general scope and nature of the conspiracy"). A plaintiff "need show only 'slight evidence' that a particular person was a member of the conspiracy," and "a party to a conspiracy need not know the identity, or even the number, of his confederates." *Elliott*, 571 F.2d at 903. It follows that "a conspiracy can be inferred from a combination of close relationships or knowing presence and other supporting circumstantial evidence." *United States v. Brito*, 136 F.3d 397, 409 (5th Cir. 1998); *Gagan v. Am. Cablevision, Inc.*, 77 F.3d 951, 961 (7th Cir. 1996) ("[A] 'RICO conspiracy, like all conspiracies, does not require direct evidence of agreement; an agreement can be inferred from the circumstances.'"); *Youming Jin v. Ministry of State Sec.*, 335 F. Supp. 2d 72, 83 (D.D.C. 2004) (defendant's close relationship to Chinese government was evidence of participation in conspiracy).

Vidino's argument that Plaintiff's RICO conspiracy claims fail since Plaintiff does not state a claim for substantive RICO violations is meritless. As explained above, Plaintiff adequately pleads substantive RICO claims (*supra,* Argument §II(C)). Moreover, Vidino argues that the RICO conspiracy claim against him should be dismissed because Plaintiff fails to allege that he knew about or agreed to further Defendants' RICO scheme or that he committed any predicate acts, and because, according to Vidino, he was allegedly not aware of any broader conspiracy or illegal conduct. As an initial matter, at the motion-to-dismiss stage the Court cannot credit Vidino's characterization of his relationship with Alp as innocent or irrelevant. Rather, it must accept all allegations in the FAC and draw all reasonable inferences in Plaintiff's favor. *Narce*, 2023 US Dist

LEXIS 193795, at *8. In any event, the argument that Vidino lacked awareness of the broader conspiracy is unpersuasive. Vidino knew that the UAE was Alp's "most realistic client"—even though he knew that it sought to conceal its identity—and that one of its targets was Dr. Hafez. Even in the unrealistic scenario where Vidino did not know that the UAE was ultimately behind the conspiracy, or did not know any of the other members of the enterprise (as he claims), he still can be held liable for RICO conspiracy under 18 U.S.C. §1962(d) because a party to a conspiracy need not know the identities of his co-conspirators. "[E]ven if one conspirator did not participate in, or was unaware of, acts undertaken by co-conspirators in furtherance of the conspiracy, it is nevertheless liable for such acts, including those that occur prior to its joining the conspiracy." *Philip Morris USA, Inc.*, 2006 US Dist LEXIS 118375 at *2467 (collecting cases). *See also*, *Elliott*, 571 F.2d at 903. What is more, multiple credible sources acknowledged Vidino's importance to the enterprise's fraudulent campaigns. As alleged in detail in the FAC, after reviewing tens of thousands of the enterprise's documents, respected German newspaper *Der Spiegel* concluded in 2023 that Vidino "played an important role" in the enterprise's campaign. And several of Vidino's employees at GWU's POE resigned after Vidino's role in the scheme became public, with one calling his conduct an "egregious ethical breach." This is sufficient to raise a plausible inference that Vidino agreed to facilitate the enterprise's fraudulent campaigns. Vidino's participation in meetings and correspondence, his awareness of Alp's proposal to the UAE, and his provision of reports that aligned with the enterprise's goals all indicate his awareness of and participation in the conspiracy's unlawful activities. His conduct further supports the inference that he knowingly advanced the enterprise's objectives, even if he was not privy to every detail or every participant's role. Plaintiff plausibly alleges that Vidino agreed to conspire with the enterprise—not only to destroy Vidino, but to further additional schemes against additional targets, underscoring his

intentional facilitation of the enterprise's unlawful acts. Specifically, Plaintiff alleges that Vidino conspired with Alp to further its unlawful "dark" public relations campaigns against Plaintiff and others. The enterprise hired Vidino to gather "interesting leads/rumors" and provide other information which lent legitimacy to the fraudulent statements published by other members of the enterprise. They did not just use Vidino as a source; they also used him as an intermediary and leveraged Vidino's prominence to amplify the reach of its fraudulent claims. As a general matter, it is hard to believe that Vidino was not aware of the enterprise's scheme concocted by Alp and the other Defendants and his agreed-upon "mandate" given the volume and frequency of the several meetings between Vidino and Alp employees and of the routinely exchanged emails, text messages, and WhatsApp messages discussing the offensive viral communications campaigns described in the FAC and when Vidino signed the very contract outlining the provision of his services to the enterprise. *See*, **EXHIBIT D**.

"Intent may, and generally must, be proved circumstantially; normally, the natural probable consequences of an act may satisfactorily evidence the state of mind accompanying it." *Jackson*, 513 F.2d at 461. Here, Plaintiff pleads facts sufficient to create a plausible inference that Vidino intended to further the enterprise's objectives by lending its fraudulent claims a veneer of legitimacy. Available documents and records internal to the enterprise show that, on January 12, 2018, Brero treated Vidino to a thousand-dollar dinner at the Beau Rivage Hotel in Geneva. Notes for the dinner suggest that he aimed to make Vidino a proposal: "Would he be available to work as a consultant, perhaps a short unnamed memo on the MB in Europe? (Confidential of course)." Two weeks after the dinner, Vidino signed the initial contract paying him three thousand euros for "interesting leads/rumours" about the Muslim Brotherhood, along with a "list of alleged members

of the first-tier organizations in European countries."[7] *See*, **EXHIBIT D**. Therefore, Vidino was hired by Alp as a contractor to provide the enterprise leads on new targets, research, and analysis on the Muslim Brotherhood. The enterprise relied on Vidino, his academic credentials, and his role at GWU's POE to legitimize the false and misleading statements it had published to discredit and destroy its targets, including Dr. Hafez. These allegations are not conclusory—it is information coming directly from the enterprise's internal documents and communications become public. These allegations alone are more than enough to create a plausible inference that Vidino knowingly agreed to further the acts of the enterprise: it suggests he knew that Alp was using viral communications to strike its targets, and that he agreed to further those operations by conducting confidential actions. In addition, the volume and frequency of the several meetings between Vidino and Alp employees and of the routinely exchanged emails, text messages, and WhatsApp messages suggest a close relationship sufficient to give rise to an inference that Vidino was a witting co-conspirator. *Youming Jin*, 335 F. Supp. 2d at 83.

Vidino relies on *RSM Production Corp. v. Freshfields Bruckhaus Deringer U.S. LLP*, 682 F.3d 1043 (D.C. Cir. 2012). There, the court dismissed RICO conspiracy claims against a law firm representing Grenada. *Id.* at 1046. The plaintiff's only evidence of the firm's intent to further Granada's illicit aims was a conclusory allegation that Grenada "had a reputation for corruption and bribery," and allegations that another law firm had declined to represent Grenada, and the defendant-firm accepted payment from a third-party. *Id.* at 1046–48. The plaintiff in *RSM Production Corp.* failed to allege that Grenada intentionally used the defendant-firm to carry out or conceal its racketeering acts. The sparse evidence of agreement in *RSM Production Corp.* stands in sharp contrast to the robust evidence of Vidino's witting participation in the enterprise.

---

[7] Compensation may evidence a co-conspirator's knowledge of a scheme. *See*, *Salinas*, 522 U.S. at 66 (defendant's receipt of "a pair of designer watches and a pickup truck" was evidence of participation in RICO conspiracy).

## IV.    DR. HAFEZ'S STATE LAW CLAIMS ARE TIMELY AND MERITORIOUS

### A.  THE STATE LAW CLAIMS ARE TIMELY

The contention that Dr. Hafez's claims are time-barred is incorrect and ignores both the continuing tort doctrine and the full scope of the allegations in the FAC. Under D.C. law, a claim usually accrues at the time the alleged injury occurs. . . . However, "where the relationship between the fact of injury and the alleged tortious conduct is obscure when the injury occurs," D.C. courts apply the more forgiving discovery rule. *See*, *Bussineau v. President & Directors of Georgetown Coll.*, 518 A.2d 423, 425 (D.C. 1986).[8] Moreover, the Supreme Court has held that, in certain situations, continuous violations extending over a period of time can be considered a single unlawful act or practice for limitations purposes, provided that some of the claims brought are timely. *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 117 (2002); *see also*. *Lively v. Flexible Packaging Ass'n*, 830 A.2d 874, 890 (D.C. Cir. 2003). Under this "continuous violation exception," isolated acts that fall outside of the limitations period can be grouped with acts that fall within it to render the claim timely, even if there are "significant gaps in the occurrence of acts . . . that take place 'over a series of days or perhaps years.'" *Lively*, 830 A.2d at 890 (citing *Morgan*, 536 U.S. at 117). *See*, *Moonblatt v District of Columbia*, 572 F Supp 2d 15, 29-30 (DDC 2008).

Contrary to Vidino's assertions, the August 2017 publication of the report is not an isolated event that would trigger the statute of limitations for Plaintiff's claims. Rather, the FAC details a series of actions that constitute a continuing pattern of tortious conduct, including the provision of the report to Alp, its ongoing availability on Defendants' website, and its retention in their archives

---

[8] Courts in D.C. recognize that when accrual actually occurred in a particular case is a question of fact, so it cannot make that determination at this stage unless no reasonable fact-finder could find otherwise. *See*, *Diamond v Davis*, 680 A2d 364, 370 (DC 1996) (citing *Ehrenhaft v. Malcolm Price, Inc.*, 483 A.2d 1192, 1204 [D.C. 1984]).

during the relevant time period and to this day.[9] This series of actions demonstrates that the alleged harm was not confined to a single moment in time but was perpetuated through a deliberate and ongoing scheme to harm Plaintiff. The continuing tort doctrine applies in this context, as the harmful conduct spanned a significant period and was not limited to the initial publication of the report. Moreover, this continued availability and dissemination of the report reinforce the timeliness of Plaintiff's claims, as each instance of publication or use contributes to the harm and resets the limitations period.

### i. Alternatively Equitable Tolling Should Apply

"When applying the statute of limitations to an action including fraud claims, such as the present case, we apply the doctrine of equitable tolling. The statute of limitations is suspended until the plaintiff discovers, or should have discovered through the exercise of reasonable diligence, the fraudulent activity in question." *Cross v Price Waterhouse & Co.*, 1983 US Dist LEXIS 17895, at *12 (Apr. 7, 1983, No. 80-410) (citing *Fitzgerald v. Seamans*, 553 F.2d 220, 228 [D.C.Cir. 1978]). The *Fitzgerald* formulation of the equitable tolling doctrine reiterated a standard long applied in federal courts. *See*, e. g., *Cook v. Avien, Inc.*, 573 F.2d 685, 695 (1st Cir. 1978); *Berry Petroleum Co. v. Adams & Peck*, 518 F.2d 402, 410 (2d Cir. 1975); *Klein v. Bower*, 421 F.2d 338, 343 (D.C. Cir. 1970). "Equitable tolling is appropriate only in rare instances where – due to circumstances external to the party's own conduct – it would be unconscionable to enforce the limitation period against the party and gross injustice would result." *Robinson v. Dep't of Homeland Sec. Off. of Inspector Gen.*, 71 F.4th 51, 58 (D.C. Cir. 2023) (cleaned up). "Fraudulent

---

[9] For further reference, Vidino's webpage on POE's website is available at https://extremism.gwu.edu/lorenzo-vidino. Moreover, a clear instance attesting that Vidino's continuing pattern of unlawful conduct is still ongoing is the 2023 report *Verbatim: What European Security Services Say About the Muslim Brotherhood in Europe*, POE, October 2023, available at https://extremism.gwu.edu/sites/g/files/zaxdzs5746/files/2023-09/verbatim-final_0.pdf, where Vidino continues to address Dr. Hafez and tie him with the Muslim Brotherhood.

concealment . . . tolls the running of the statute of limitations." *Firestone v. Firestone*, 76 F.3d 1205, 1209 (D.C. Cir. 1996); *see also*, *Doe v. Exxon Mobil Corp.*, 573 F. Supp. 2d 16, 34 (D.D.C. 2008). (establishing the "lulling doctrine," which applies when the defendant has done something that amounted to an affirmative inducement to plaintiffs to delay bringing action); *Bailey v. Greenberg*, 516 A.2d 934, 937 (D.C. 1986); *Kiwanuka v Bakilana*, 844 F Supp 2d 107, 119 (DDC 2012). Any statement, word, or act, however, which tends to suppress the truth may constitute fraudulent concealment. *William J. Davis, Inc. v. Young*, 412 A.2d 1187, 1192 (D.C. 1980).

Vidino's attempt to frame the claims as time-barred under the one-year statute of limitations applicable to defamation fails to address the nature of the claims, which include intentional misconduct that extends beyond mere defamation.[10] The FAC establishes a pattern of conduct intended to harm Plaintiff's reputation, professional relationships, and opportunities, making clear that these actions were neither incidental nor time-barred. Accordingly, Vidino's statute of limitations argument is unfounded, and Plaintiff's claims should proceed.[11]

## B. THE COMMON LAW FRAUD CLAIM IS PROPER

Vidino's arguments against Plaintiff's fraud claim are misplaced and misconstrue the allegations in the FAC. While Vidino attempts to compartmentalize Plaintiff's claims and dismiss their significance, the allegations – read holistically, accepting all factual allegations in the complaint as true, and construing all reasonable inferences in Plaintiff's favor – plausibly support each element of common-law fraud.

---

[10] The statute of limitations for Plaintiff's state law claims of fraud is three years. The same three-year statute of limitations applies to tort claims. *See,* D.C. Code § 12-301.

[11] "The D.C. Court of Appeals has plainly stated that '[i]f there is any reasonable doubt in a statute of limitations problem, the Court will resolve the question in favor of the complaint standing and against the challenge.' That directive guides the Court's decision here." *Moonblatt*, 572 F Supp 2d at 30 (quoting *Simpson v Dist. of Columbia Off. of Human Rights*, 597 A2d 392, 401 [DC 1991]).

The essential elements of common law fraud are: (1) a false representation, (2) in reference to a material fact, (3) made with knowledge of its falsity, (4) with intent to deceive, and (5) on which reliance is placed. *See*, *Hughes v Abell*, 867 F Supp 2d 76, 92 (DDC 2012) (citing *Virginia Acad. of Clinical Psychologists v. Group Hospitalization & Med. Servs., Inc.*, 878 A.2d 1226, 1233 [D.C. 2005]; *D'Ambrosio v. Colonnade Council of Unit Owners*, 717 A.2d 356, 360-61 [D.C. 1998]).

First, Plaintiff alleges specific false representations made with knowledge of their falsity, including statements published in the August 2017 report, "The Muslim Brotherhood in Austria" penned by Vidino, disseminated through the official website of GWU's POE, and still held available online. Notably, this report was later shared with Alp and other Defendants involved in the scheme, was followed by Vidino's directly related testimonies to public officials and state authorities, and served as foundational groundwork for Operation Luxor. The fact that the report predates the formal agreement between Alp and Vidino bears little relevance; the FAC plausibly alleges that Defendants' coordinated efforts to harm Plaintiff were well underway and that Vidino's resources and veneer of legitimacy and credibility enabled these actions.

Second, Vidino misinterprets the reliance element of Plaintiff's fraud claim. While the alleged misrepresentations were directed at third parties, Plaintiff sufficiently alleges that they were deliberately designed to produce detrimental consequences for him. Courts recognize that reliance can encompass scenarios where false statements made to third parties foreseeably harm the plaintiff. Plaintiff explicitly alleges that Vidino's misrepresentations caused significant harm, including reputational damage, professional setbacks, and personal hardship. The argument that harm does not equate to detrimental reliance is unpersuasive; the FAC details how Vidino's fraudulent conduct foreseeably induced third parties, including Austrian authorities, to act to

Plaintiff's detriment. Moreover, Dr. Hafez did rely on Defendants' fraudulent misrepresentations – including Vidino's – as shown, for instance, by the facts that he undertook legal action to protect his rights and that he relocated to the United States based on the effect of those fraudulent statements. *See*, generally, Pl. Decl.

Third, Vidino claims that Plaintiff fails to allege intent to deceive is unfounded.[12] Evidence establishing reckless disregard for the truth or falsity of a statement, as well as *willful blindness*, satisfies the intent standard. *United States v. Munoz*, 233 F.3d 1117, 1136 (9th Cir. 2000) ("reckless indifference to the truth or falsity of a statement satisfies the specific intent requirement in a mail fraud case"); *In re Korean Airlines Disaster of September 1*, 1983, 704 F. Supp. 1135, 1136 (D.D.C. 1988), aff'd in relevant part, 932 F.2d 1475 (D.C. Cir. 1991); *United States v. Prows*, 118 F.3d 686, 692 (10th Cir. 1997); *United States v. Coyle*, 63 F.3d 1239, 1243 (3rd Cir. 1995). In addition, "[f]raudulent intent may be inferred from the modus operandi of the scheme." *United States v. Reid*, 533 F.2d 1255, 1264 (D.C. Cir. 1976). Fraudulent intent may also be proven by inference from the totality of the circumstances, including by indirect or circumstantial evidence. *See*, e.g., *United States v. Alston*, 609 F.2d 531, 538 (D.C. Cir. 1979) (totality of the circumstances); *United States v. Sawyer*, 85 F.3d 713, 733 (1st Cir. 1996) (indirect and circumstantial evidence).

In this case, evidence of the existence and methods of the Enterprise's overall scheme to defraud and Defendants' individual roles in that Enterprise – including each Defendant's purposeful and conscious actions taken in light of its collective knowledge – reveals a cumulative pattern of decisions, actions, and inaction that is powerful circumstantial evidence of specific fraudulent

---

[12] "The question of fraudulent intent is a question of fact that is rarely appropriate for [stages of the litigation preceding trial]." *Philip Morris USA, Inc.*, 337 F Supp 2d at 24 (citing *Citizens Bank of Clearwater v. Hunt*, 927 F.2d 707, 711 (2d Cir. 1991); *ABB Daimler-Benz Transport. (N. Amer.), Inc. v. Nat'l RR Passenger Corp.*, 14 F. Supp. 2d 75, 86 (D.D.C. 1998).

intent. The FAC provides specific allegations of Vidino's intent, including their deliberate efforts to disseminate false statements and their coordination in crafting and promoting the August 2017 report. Plaintiff alleges that the Vidino, acting with the requisite knowledge and intent, perpetrated a scheme designed to damage his reputation and professional standing. The assertion that Plaintiff fails to allege knowledge of falsity is therefore unfounded. The FAC identifies specific instances where Vidino knowingly made false statements, including fabrications presented to Austrian officials. These allegations are not conclusory; they are supported by detailed accounts of Vidino's conduct, the content of the misrepresentations, and their resulting impact on Plaintiff. The FAC provides substantive facts showing Vidino's awareness of the falsity of their statements and their malicious intent. For these reasons, Plaintiff's fraud claim is adequately pled, and Vidino's arguments for dismissal should be rejected.[13]

## C. THE UNFAIR TRADE PRACTICES CLAIM IS PROPER

The District of Columbia Consumer Protection Procedures Act ("CPPA") makes it unlawful "for any person to engage in an unfair or deceptive trade practice, whether or not any consumer is in fact misled, deceived, or damaged thereby." D.C. Code § 28-3904. The statute non-exhaustively defines unfair or deceptive trade practices to include, among other things, misrepresenting or failing to state a material fact which has a tendency to mislead. *Id.* The statute likewise defines "goods and services" broadly to include "any and all parts of the economic output of society, at any stage or related or necessary point in the economic process, and includes consumer credit, franchises, business opportunities, real estate transactions, and consumer services of all types." Id. § 28-3901(a)(7). Because the "purpose of the CPPA is to protect consumers from

---

[13] Assuming arguendo that the Court were inclined to grant GWU and POE's motion to dismiss the common law fraud claim, it should be noted that "dismissal of the plaintiffs' fraud claim does not require the dismissal of the plaintiffs' RICO claims." *Regency Communs., Inc.*, 160 F Supp 2d at 43-44 (DDC 2001).

a broad spectrum of unscrupulous practices by merchants," the statute "should be read broadly to assure that the purposes are carried out." *Qureshi v Am. Univ.*, 2023 US Dist LEXIS 38041, at *7-8 [DDC Mar. 7, 2023, No. 20-cv-1141 (CRC)]) (quoting *Mod. Mgmt. Co. v. Wilson*, 997 A.2d 37, 62 [D.C. 2010]).

Vidino's arguments against Plaintiff's claim under the CPPA mischaracterize both the statute's scope and Plaintiff's allegations. While Vidino narrowly asserts that the CPPA applies only to consumer-merchant relationships, this restrictive interpretation overlooks the statute's broader intent to prevent deceptive and unfair practices that harm individuals and the public.

Plaintiff's FAC sufficiently alleges that Vidino engaged in coordinated efforts to disseminate false information, which harmed Plaintiff's reputation and professional opportunities. Although Vidino may not provide traditional consumer goods or services, their actions – directly tied to the dissemination of a report published on university-affiliated platforms and shared with other Defendants – constitute deceptive practices that align with the CPPA's goals of addressing misconduct impacting individuals and communities. Relevantly, "a 'plaintiff does not [even] have to establish intentional misrepresentation in order to make out a claim' under the CPPA's misrepresentation provisions." *Qureshi*, 2023 US Dist LEXIS 38041, at *25-28 (quoting *E.M. v. Shady Grove Reprod. Sci. Ctr. P.C.*, 496 F. Supp. 3d 338, 411 [D.D.C. 2020]).

Furthermore, Vidino's assertion that Plaintiff failed to allege an "unlawful trade practice" ignores the specificity of the FAC's claims. Plaintiff has detailed how Vidino's actions – publishing and promoting misleading reports and coordinating with others to perpetuate falsehoods – meet the criteria for deceptive practices under D.C. Code § 28-3904. These allegations are neither abstract nor conclusory; they provide sufficient detail to give Vidino notice of the wrongful conduct alleged and its connection to Plaintiff's harm, in contrast with Vidino's argument that

40

Plaintiff's allegations are vague. The CPPA's purpose embraces addressing the type of coordinated deceptive conduct alleged here, regardless of whether it arises from a traditional consumer-merchant relationship. Plaintiff's claims are supported by allegations of deliberate, harmful actions that undermine the statute's purpose of safeguarding individuals from unfair practices.

For these reasons, Plaintiff's CPPA claim is neither defective nor improperly pleaded. Vidino's arguments to dismiss the claim lack merit and should be rejected.

### D. THE TORTIOUS-INTERFERENCE CLAIM IS PROPER

Vidino's arguments for dismissing Plaintiff's tortious interference claims overlook the detailed and specific allegations in the FAC, which – along with Plaintiff's supporting declaration and accompanying exhibits – adequately establish the required elements for these claims. Plaintiff pleads with specificity the existence of multiple business relationships that were disrupted by Vidino's intentional and coordinated conduct, causing actual harm.

"To state claims for tortious interference under District of Columbia law, a plaintiff must allege the existence of a contract or business expectancy, the defendant's knowledge of the contract or business expectancy, intentional interference causing the breach of the contract or termination of the business expectancy, and damages." *Banneker Ventures, LLC v Graham*, 798 F3d 1119, 1134 (2015) (citing *Sturdza v. United Arab Emirates*, 281 F.3d 1287, 1305 [D.C. Cir. 2002]; *Bennett Enters., Inc. v. Domino's Pizza, Inc.*, 45 F.3d 493, 499 [D.C. Cir. 1995]); *see also*, Restatement § 766B (1989) (defining tortious interference with prospective business advantage to include interference consisting of "inducing . . . a third person not to enter into or continue the prospective relation").[14] "[I]nducement may be any conduct conveying to the third person the

---

[14] This theory of tortious interference protects "business expectancies, not grounded on present contractual relationships but which are commercially reasonable to anticipate, . . . from unjustified interference." *Carr v. Brown*, 395 A.2d 79, 84 (D.C. 1978). *See*, *Banneker Ventures, LLC*, 798 F3d at 1134 (quoting *Browning v. Clinton*, 292 F.3d

actor's desire to influence him not to deal with the other." Restatement § 766 cmt. k. Such conduct

may include "intimidation," but it also includes "persuasion," such as the persuasion coupled with

financial influence alleged here. *Id.* § 766 cmt. h. *See*, *Banneker Ventures, LLC*, 798 F3d at 1136.

Contrary to Vidino's contention that Plaintiff identifies only his relationship with the

University of Salzburg – and as a "self-inflicting injury" – the FAC and Plaintiff's declaration

outline with specificity several examples of existing and prospective business relationships that

were disrupted due to Defendants' conduct, including Vidino's. These include, but are not limited

to, Plaintiff's roles as a visiting professor, guest speaker, and collaborator with various academic

and professional institutions, as well as speaking engagements and publishing opportunities. *See*,

Pl. Decl.; *see also*, **EXHIBITS F, G, H**. These disrupted relationships go well beyond Plaintiff's

affiliation with the University of Salzburg. Plaintiff's declaration details how Defendants'

deliberate actions – especially those of Vidino – caused these disruptions. Plaintiff articulates an

"actual loss of business, time, or money" through examples of severed or impaired professional

relationships, including engagements at international institutions, that were affected by the false

and misleading information disseminated by Defendants. While not all of the disrupted

relationships were grounded on contractual agreements, at a minimum the outlined relationships

constituted those business expectancies commercially reasonable to anticipate that the theory of

tortious interference protects.

Vidino's arguments fail to address the detailed allegations in the FAC, which – along with

Plaintiff's supporting declaration and accompanying exhibits – clearly establish the requisite

elements for tortious interference. Plaintiff has demonstrated with specificity the existence of

---

235, 242 [D.C. Cir. 2002]) ("A business expectancy 'must be commercially reasonable to anticipate' before its loss may be actionable").

disrupted business relationships, the intentional nature of Vidino's interference, and the actual

harm caused. These claims are supported by well-pleaded facts and should not be dismissed.

### E.  THE PRIMA FACIE TORT CLAIM IS PROPER

Vidino's argument that prima facie tort is not recognized under D.C. law overlooks the

FAC's clear and specific allegations of intentional harm. While the label "prima facie tort" may

not be expressly embraced in D.C., the principles underlying such claims – intentional infliction

of harm without justification – are well-recognized under general tort law. *See*, e.g., *Taylor v Dist.*

*of Columbia Water & Sewer Auth.*, 957 A2d 45, 50 (DC 2008).

> Section 870 of the RESTATEMENT (SECOND) OF TORTS describes a prima
> facie tort, in part: 'One who intentionally causes injury to another is subject to
> liability to the other for that injury, if his conduct is generally culpable and not
> justifiable under the circumstances.' And, Comment a explains that this tort 'is
> intended to serve as a guide for determining when liability should be imposed for
> harm that was intentionally inflicted, even though the conduct does not come within
> the requirements of one of the well established and named intentional torts.'

*Taylor*, 957 A2d at 50 (citing *Pulaski Constr. Co. v. Air Frame Hangars, Inc.,* 950 A.2d

868, 870 [N.J. 2008]) ("Assuming, without deciding, that our common law may admit of a cause

of action for prima facie tort, it is solely a gap-filler. That is, the availability of the prima facie tort

doctrine is limited exclusively to those instances of intentional and culpable conduct unjustified

under the circumstances that, as a threshold matter, do not fall within a traditional tort cause of

action").

The FAC demonstrates that Defendants, including Vidino, engaged in a deliberate and

coordinated campaign to harm Plaintiff. Their actions, including the dissemination of false and

defamatory information, were calculated to disrupt Plaintiff's professional opportunities, destroy

his reputation, and cause significant economic harm. These allegations sufficiently describe

broader malicious conduct aimed at undermining Plaintiff's livelihood. Plaintiff details substantial

harm resulting from Vidino's actions, including relocation costs, disrupted career prospects, lost business relationships, and emotional damage. Vidino's argument that these claims are insufficiently precise mischaracterizes the nature of the allegations. The FAC clearly establishes that the harm was intentional, unjustified, and directly tied to Defendants' conduct.

Even if labeled differently, the intentional and malicious conduct alleged in the FAC is sufficient to support the claim. Dismissal of this claim is unwarranted, as the allegations provide a clear basis for the intentional infliction of harm and justify its continuation at this stage.

## **CONCLUSION**

For the reasons set forth, the FAC sufficiently alleges that Defendants, including Vidino, engaged in a deliberate and malicious campaign designed to harm Plaintiff's reputation, professional relationships, and economic standing. Contrary to Defendants' assertions, the FAC details actionable conduct, including significant RICO violations, intentional interference with specific business relationships, fraudulent misrepresentations, and coordinated efforts to undermine Plaintiff's professional standing, which are not protected by the First Amendment or otherwise excusable. The allegations demonstrate a clear and proximate connection between Defendants' actions and Plaintiff's injuries, establishing plausible claims under both federal and state law. Accordingly, Plaintiff respectfully requests that the Court deny Vidino's Motion to Dismiss and award such other and further relief as it deems just and proper.[15] Pursuant to LCvR 7(f), Plaintiff respectfully requests an oral hearing on Vidino's Motion to Dismiss.

---

[15] Plaintiff contends that his FAC is facially sufficient as is. However, assuming arguendo that the Court were inclined to grant GWU and POE's motion, Plaintiff respectfully requests the Court to provide him with an opportunity to amend the FAC, or that the eventual dismissal be without prejudice, and allow Plaintiff fair opportunity to file a new complaint. This is particularly applicable when the complaint asserts a claim that is on its face nonfrivolous. *See*, e.g., *Simmons v Abruzzo*, 49 F3d 83, 86-87 (2d Cir 1995). In fact, contrary to Defendants' meritless assertions, the amendment of the Original Complaint was only done to comply with Local Civil Rule ("LCvR") 5.1(c) and consisted in (i) adding names and full residence addresses of each party and (ii) using a correct civil cover sheet. *See*, Notice of New Case Error, dated March 27, 2024, on ECF. Therefore, any future amendment would not be futile, but rather warranted at this stage of the litigation, where parties have not even engaged in discovery yet.

44

Dated: January 13, 2025
New York, New York

Respectfully submitted,

**AIDALA, BERTUNA & KAMINS, P.C.**

/s/ David M. Schwartz_____.
David M. Schwartz, Esq. (DC #208813)
Arthur L. Aidala, Esq.
(*Pro Hac Vice Admission Forthcoming*)
Imran H. Ansari, Esq.
(*Pro Hac Vice Admission Forthcoming*)
546 Fifth Avenue, 6th Floor
New York, New York 10036
(212) 486-0011
david@davidschwartzesq.com
aidalaesq@aidalalaw.com
iansari@aidalalaw.com

*Attorneys for Plaintiff Farid Hafez*