**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---------------------------------------------------------------X
:
FARID HAFEZ, individually and on behalf of : Civil Action No.: 1:24-cv-00873-AHA
all others similarly situated, :
:
:
                  Plaintiff, : **DECLARATION OF AARON**
: **ROCK-SINGER IN SUPPORT OF**
         v. : **PLAINTIFF'S OPPOSITIONS TO**
: **DEFENDANTS' MOTIONS TO**
LORENZO VIDINO, individually and in his : **DISMISS PLAINTIFF'S FIRST**
respective corporate capacities, GEORGE : **AMENDED COMPLAINT**
WASHINGTON UNIVERSITY, PROGRAM :
FOR EXTREMISM AT THE GEORGE :
WASHINGTON UNIVERSITY, ALP :
SERVICES SA, DILIGENCE SARL, MARIO :
BRERO, MURIEL CAVIN, LIONEL BADAL, :
ARIAF STUDIES AND RESEARCH LLC, and :
DOES 1 through 25, :
:
                  Defendants. :
---------------------------------------------------------------X

     AARON ROCK-SINGER, pursuant to 28 U.S.C. § 1746, declares under the penalty of perjury, as follows:

     1.     I have been retained by the Plaintiff in the above-captioned action ("Plaintiff" or "Dr. Hafez") as an expert witness to provide an opinion on the relevant factual circumstances giving rise to same action. A copy of my Curriculum Vitae, including a list of my publications, is enclosed herein as **APPENDIX A**.

     2.     None of my compensation in this matter is in any way contingent on the content of my opinion, which I formulated in light of my academic and professional experience, my widespread knowledge of the relevant field and academic environment, the personal knowledge I have of the facts and circumstances surrounding this action, and the materials I relied upon – enlisted in the **APPENDIXES B** through **G** enclosed herein.

1

3.    This declaration is submitted in support of Dr. Hafez's Opposition to Defendants' Motions to Dismiss Plaintiff's First Amended Complaint.

4.    I am a research fellow at the University of Michigan's Wallenberg Institute, which is dedicated to combating religious and ethnic hatred. I am affiliated with and teach in both the Middle East Studies and Judaic Studies departments at the University of Michigan.

5.    From 2019 to 2023, I served as an Assistant Professor of Middle East and Islamic History at the University of Wisconsin-Madison, where I was also affiliated with the Middle East Studies Program.

6.    I hold a B.A. in Near Eastern Languages and Civilizations from the University of Pennsylvania (2007), an M.Phil in Modern Middle East Studies from St. Anthony's College, Oxford (2010), and a Ph.D. from Princeton University's Department of Near Eastern Studies (2016).

7.    My scholarly contributions include two books on Islamism and Salafism, as well as ten peer-reviewed articles on related topics. My works include *Practicing Islam in Egypt: Print Media and Islamic Revival* (Cambridge University Press, 2018) and *In the Shade of the Sunna: Salafi Piety in the 20th-Century Middle East* (University of California Press, 2022).

8.    I am widely recognized as a scholar in the field of Islamic Studies and serve as an Associate Editor of *Islamic Law & Society*, a leading journal in the field.

9.    My academic career has included fellowships at the University of Pennsylvania's Perry World House and the Harvard Kennedy School's Middle East Initiative, among others.

10.    An essential part of my writing and teaching is analysis of Islamism. This analysis requires knowledge of and expertise as to the internal functioning of the Muslim Brotherhood, its

development over time, the relationship among different Brotherhood branches, and broader Islamist debates over the relationship between Islam and democracy.

11. I am aware of and actively engage in professional debates concerning the ethics of consulting on Islamism. My analysis and opinions have been sought by think tanks and prominent publications including the Washington Institute for Near East Policy, the Foreign Policy Research Institute, Oxford Analytica, and *Aeon*. *See*, **APPENDIX A**.

12. My experience publishing in peer-reviewed journals and working in a university setting has also given me experience in understanding and acknowledging potential conflicts of interest.

13. I understand that the present case involves allegations regarding the effect of the actions of Dr. Lorenzo Vidino ("Dr. Vidino"), director of the Program on Extremism at George Washington University, on Dr. Hafez, and specifically the former's alleged consulting relationships with the Austrian Government and Alp Services S.A. ("Alp") and his alleged dissemination of misleading or false information regarding Dr. Hafez's ties with the Muslim Brotherhood. I further understand that the lawsuit alleges that Dr. Vidino's efforts occurred in concert with the George Washington University, its Program on Extremism, Alp, Diligence SARL, Mario Brero, Muriel Cavin, Lionel Badal, Ariaf Studies and Research, and other yet unidentified Defendants, under the broader guidance of the United Arab Emirates ("UAE") and under the guise of simple consulting activities and relationships among the mentioned entities and individuals.

14. Based on my research of relevant secondary sources, I understand that, in 2019, under the leadership of Sebastian Kurz, the Austrian government initiated a secret investigation into the Muslim Brotherhood and Hamas, aided by anti-terrorism laws that enabled a broad range of surveillance and investigation tactics. Operation Luxor, which constituted a culmination of these

efforts, employed 930 police officers to carry out 60 house searches in the cities of Vienna, Styria, and Carinthia, affecting a total of around 130 people.

15. This raid was condemned widely, including by a group of 348 scholars who signed an open letter in support of Dr. Hafez.[1]

16. Dr. Hafez alleges that Dr. Vidino's consulting activities, particularly his 2017 report titled *The Muslim Brotherhood in Austria*, were instrumental in Operation Luxor, which proximately resulted in Dr. Hafez's temporary detention and the freezing of his bank accounts and assets for a several-year period.

17. As a proximate result of Operation Luxor, Dr. Hafez and his family left Austria, leading to significant personal and professional disruptions, with Dr. Hafez finding a new (and temporary) job at Williams College as a Visiting Professor of Global Studies.

18. Dr. Hafez is now an Assistant Teaching Professor of International Relations at William & Mary University.

19. In 2017, the George Washington University's Program on Extremism published a report by Dr. Vidino, entitled *The Muslim Brotherhood in Austria*. The first numbered page of this study notes that it "was realized in cooperation with the University of Vienna, Institute of Near Eastern Studies and with support from the Austrian Integration Fund (ÖIF) and the Bundesamt für Verfassungsschutz und Terrorismusbekämpfung (BVT)."

20. The BVT was part of the Austrian Ministry of Interior, until it was replaced by the Directorate General for Public Security (known as the DSN) several years ago. At the time of Operation Luxor, it functioned as a domestic intelligence Agency.

---

[1] *See*, https://www.supporthafez.com/open-letter/.

21. Based on my analysis and evaluation of the available primary sources, I declare that there is a strong basis to conclude that Dr. Vidino's 2017 report served as the starting point for Operation Luxor.

22. In support of this contention, the current Austrian Minister of Justice, Alma Zadić, confirmed the centrality of Dr. Vidino's 2017 report to the raid, declaring: "The preliminary proceedings against (suspected) representatives of the Muslim Brotherhood were initiated on the basis of two cause reports by the Styrian State Office for the Protection of the Constitution and Counterterrorism (LVT), after Lorenzo Vidino's study provided a comprehensive picture of the Muslim Brotherhood's activities in Austria."[2]

23. Indeed, from the original list of nineteen (19) Austrian Muslims that Dr. Vidino delivered to Austrian authorities, ten (10) were later investigated as part of Operation Luxor.[3]

24. The State Office for the Protection of the Constitution's 30 January 2020 investigation of "Islamist Terrorism" similarly emphasized Dr. Vidino's significance.[4]

25. Dr. Vidino's report, *The Muslim Brotherhood in Austria*, was also mentioned 14 times in the search warrant for Operation Luxor.[5]

26. Dr. Vidino's engagement did not end with the publication of the report. He provided testimony to Austrian intelligence services – Landesamt für Verfassungsschutz und

---

[2] 13893/AB vom 27.04.2023 zu 14351/J (XXVII. GP), p. 2. As I do not read German, I utilized the DeepL Pro Translation service to translate relevant German-language documents and then confirmed this translation with a native German speaker. This document is enclosed herein as **APPENDIX B**.

[3] The metadata of this Word document, which is entitled "Core MB activists in the West," indicates that it was produced by lorenzovidino@outlook.com. This overlaps with a PDF file, which appears to have been produced for Alp Services, that contains 18 out of the 19 names that appear in the Word document under Austria. A PDF version of such Word document is enclosed herein as **APPENDIX C**. There are eight individuals who appear in Dr. Vidino's original list, as well as on the search warrant for Operation Luxor, as well as two additional individuals who appeared on Dr. Vidino's list and later faced investigations, too. For reasons of confidentiality, I am not including these individuals' names in this document.

[4] *See*, "ON 16," enclosed herein as **APPENDIX D**.

[5] *See*, "ON263," enclosed herein as **APPENDIX E**. To protect individuals targeted in Operation Luxor, this document is redacted.

Terrorismusbekämpfung Steiermark ("LVT Steiermark") – on multiple occasions, between 2020 and 2022.[6]

27. Indeed, in his testimony to LVT Steiermark, the Styrian branch of the intelligence service, Dr. Vidino explicitly associated Dr. Hafez with terrorism.[7] The provisions of the Austrian penal code cited in the December 2022 interview – §§ 278b, 278a, 278d, 246 StGB – relate specifically to the commission and financing of terrorism and membership in terrorist organizations.[8]

28. Such consulting for government entities outside the United States is unusual among scholars of Islamism within the United States precisely because of concerns as to the use of such knowledge.

29. Dr. Vidino's claims also reflect core limitations of his scholarly approach, which is rejected by scholars of diverse political viewpoints.

30. In *The Muslim Brotherhood in Austria*, Dr. Vidino argues that the leading Muslim youth organization, FEMYSO (and its predecessor, the Federation of Islamic Organizations in Europe) constitute "transnational Brotherhood initiatives and organizations."[9]

31. Dr. Vidino then elaborates, explaining that the "Muslim Brotherhood" refers to "pure brothers" (who are directly involved in Muslim Brotherhood organizations), "Brotherhood

---

[6] For March 2020, see "ON32," enclosed herein as **APPENDIX F**. For December 2022, see "ON2291," enclosed herein as **APPENDIX G**.

[7] *See*, **APPENDIX G**, "ON2291," p. 1.

[8] The Austrian penal code is available and accessible online at: https://www.jusline.at/gesetz/stgb/paragraf/278b. §278b pertains to leadership of or membership in a terrorist organization; §278a pertains to the establishment or participation in an organization that seeks to "commit serious criminal acts that threaten life, physical integrity, liberty or property…"; §278d pertains to the funding of air piracy, kidnapping or extortion, or an attack on civilians; and §246 pertains to efforts to "unlawfully undermine the independence, constitutional form of government or a constitutional institution of the Republic of Austria."

[9] Lorenzo Vidino, *The Muslim Brotherhood in Austria* (Washington, DC: GW Program on Extremism, 2017), p. 8. The report is publicly available and accessible online at: https://extremism.gwu.edu/sites/g/files/zaxdzs5746/files/MB%20in%20Austria-%20Print.pdf.

spawns" (which operate independently from any Brotherhood structure but "their ideology is still close to the Brotherhood") and "Organizations influenced by the Brotherhood" (which are founded by individuals with some ties to the Brotherhood "but have no clear organizational ties to it").[10] Based on Dr. Vidino's framework, FEMYSO presumably belongs in the second category.

32. To support the claim that FEMYSO is linked to the Brotherhood, Dr. Vidino notes that Ibrahim El-Zayat, an Egyptian-German whose father Farouk El-Zayat was a member of the Egyptian Muslim Brotherhood, led FEMYSO from 1996 to 2002. Dr. Vidino categories El-Zayat as a "quintessential 'Brotherhood spawn.'"[11]

33. This categorization is a concession that Dr. Vidino has no evidence linking El-Zayat directly to either the Egyptian Muslim Brotherhood or any other branch.

34. Dr. Vidino also claims that El-Zayat is an example of the links between European Muslims and Turkish Islamism.[12]

35. Additional "evidence" as to FEMYSO's Islamist connections is the short-lived participation of an Austrian Muslim organization (Muslimische Jugend Österreich, or MJÖ) in it between 2003 and 2005.[13]

36. Based on this information, Dr. Vidino argues that FEMYSO is the "pan-European youth and student organization of the Muslim Brotherhood."[14]

37. Dr. Vidino mentions Dr. Hafez's association with MJÖ and argues that it is ideologically linked to the Muslim Brotherhood, declaring that "So far MJÖ does not seem to have fully rescinded the umbilical cord that ties them to [a broader Islamist milieu]."[15]

---

[10] Vidino, *The Muslim Brotherhood in Austria*, p. 10.
[11] Vidino, *The Muslim Brotherhood in Austria*, p. 24.
[12] Vidino, *The Muslim Brotherhood in Austria*, pp. 25-6.
[13] Vidino, *The Muslim Brotherhood in Austria*, p. 31.
[14] Vidino, *The Muslim Brotherhood in Austria*, p. 32.
[15] Vidino, *The Muslim Brotherhood in Austria*, p. 34.

38. Dr. Vidino seeks to establish a linkage between FEMYSO to the Brotherhood by virtue of the alleged connection of a few individuals (some as long as two decades ago).

39. This linkage, however, has a much likelier explanation: student leaders are drawn from a wide range of ideological backgrounds, including the Muslim Brotherhood.

40. Such background, however, does not determine that the children themselves are members of the organization or support its goals.

41. Dr. Vidino's approach here diverges significantly from the standard approaches to the study of the Muslim Brotherhood, which emphasize the movement's rigid organizational structure and exacting membership demands (including different levels of membership and local "families" [*usar*] within the Brotherhood that regulate individual behavior).

42. While scholars of Islamism recognize that movements such as the Muslim Brotherhood both reflect and cultivate a broader religious milieu, they do not attribute Brotherhood sympathies (let alone radicalism) to those functioning within this milieu.

43. The analytical implications of this approach are inescapable: when one defines Islamism in such a broad fashion, one will "find" Islamists (or even Muslims sympathetic to aspects of Islamism) in quantities that far outstrip their actual presence.

44. The social implications of this approach are also significant: Dr. Vidino's definition of the Muslim Brotherhood is so broad as to potentially encompass almost any Western Muslim who participates in civil society and employs a different standard of membership than would be used for any other organization.

45. This approach functions to create guilt-by-association and significantly raises the risk that innocent Muslims will be swept up by governments who use this information.

46. A logical implication of this approach is that it makes it extremely difficult for Muslims dissenting political viewpoints in western democracies and it proximately results in professional, reputational, and financial disruption for the Muslim academics and intellectuals who are inaccurately categorized as Islamists.

47. It is my belief that Dr. Vidino's methodology and approach, which significantly diverge from standard practices in the study of the Muslim Brotherhood and lack the traditional rigorous, evidence-based analysis that has come to characterize the field over the past two decades, serve to conflate a wide range of ideological and social affiliations with formal membership in the Muslim Brotherhood or endorsement of the organization's goals. Such an approach is likely to cause unwarranted harm to individuals targeted based on this methodology.

48. This methodology, which assumes rather than proves the basic claim, is a longstanding feature of Dr. Vidino's work. Between 2003 and 2008, he published some 50 articles as part of Steve Emerson's Investigate Project on Terrorism, with titles such as "The Muslim Brotherhood and Islamic law in Europe," "Jihad from Europe," and "The Muslim Brotherhood's Conquest of Europe." [16] These articles, like "The Muslim Brotherhood in Austria," are premised on the inaccurate and unproven belief that a significant portion of Muslims living in the West have been radicalized.

49. Given this background, as well as the documents analyzed, the allegation that Dr. Vidino conspired with the other Defendants in this action with the deliberate goal of undermining and bringing detriment to Dr. Hafez's career, reputation, and financial stability as part of a coordinated scheme of the enterprise composed of the Defendants, directed by and serving the interests of the UAE, is fully consistent with my understanding of the factual record.

---

[16] *See*, https://www.investigativeproject.org/author/Lorenzo+Vidino.

I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct.

Executed on January 11, 2025.

_____
Aaron Rock-Singer