**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

----------------------------------------------------------------------X
                              :

FARID HAFEZ, individually and on behalf of     :
all others similarly situated,                     :
                              :   Civil Action No.: 1:24-cv-00873-AHA

               Plaintiff,        :
                              :   **ORAL ARGUMENT REQUESTED**

      *v.*                          :
                              :

LORENZO VIDINO, individually and in his    :
respective corporate capacities, GEORGE    :
WASHINGTON UNIVERSITY, PROGRAM     :
FOR EXTREMISM AT THE GEORGE       :
WASHINGTON UNIVERSITY, ALP         :
SERVICES SA, DILIGENCE SARL, MARIO   :
BRERO, MURIEL CAVIN, LIONEL BADAL,  :
ARIAF STUDIES AND RESEARCH LLC, and :
DOES 1 through 25,                  :
                              :
               Defendants.     :
----------------------------------------------------------------------X

### PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS ALP SERVICES S.A., DILIGENCE SARL, MARIO BRERO, MURIEL CAVIN, AND LIONEL BADAL'S MOTION TO DISMISS PLAINTIFF'S FIRST AMENDED COMPLAINT

AIDALA, BERTUNA & KAMINS, P.C.

David M. Schwartz, Esq. (DC #208813)
Arthur L. Aidala, Esq.
(*Pro Hac Vice Admission Forthcoming*)
Imran H. Ansari, Esq.
(*Pro Hac Vice Admission Forthcoming*)
546 Fifth Avenue, 6th FL
New York, NY 10036
212-641-0499
david@davidschwartzesq.com
aidalaesq@aidalalaw.com
iansari@aidalalaw.com

*Attorneys for Plaintiff Farid Hafez*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................. i

PRELIMINARY STATEMENT ........................................................................................ 1

FACTUAL BACKGROUND ............................................................................................. 2

LEGAL STANDARD ........................................................................................................ 2

ARGUMENT ..................................................................................................................... 4

I.  DR. HAFEZ FULLY INCORPORATES HIS ARGUMENTS IN OPPOSITION TO GEORGE WASHINGTON UNIVERSITY, THE PROGRAM ON EXTREMISM AT THE GEORGE WASHINGTON UNIVERSITY, AND LORENZO VIDINO'S MOTIONS TO DISMISS ....................................................................................... 5

II.  THE COURT HAS PERSONAL JURISDICTION OVER THE EUROPEAN DEFENDANTS ............................................................................................... 5
   A.  Specific Jurisdiction Established Through Intentional Targeting .................................. 6
   B.  Jurisdiction Under Federal Rule of Civil Procedure 4(k)(2) and 4(k)(1)(C) ................ 8

III.  PLAINTIFF HAS STATED VALID CLAIMS AGAINST THE EUROPEAN DEFENDANTS ............................................................................................... 11
   A.  Plaintiff Satisfies the Pleading Standard Under Rule 8 ............................................... 11
   B.  Heightened Pleading Standard Under Rule 9(b) .......................................................... 12
   C.  The RICO Claims Are Properly Pleaded ..................................................................... 14
      1.  Predicate Acts: Mail and Wire Fraud ............................................................... 14
      2.  Predicate Acts: Bank Fraud ............................................................................... 17
      3.  Plaintiff Adequately Pleads an Enterprise with a Pattern of Racketeering Activity ....................................................................................... 18
      4.  Plaintiff States Rico Conspiracy Claims Under 18 U.S.C. §1962(D) ................ 25
      5.  Plaintiff Suffered Injury to Business or Property .............................................. 26
      6.  Plaintiff's Injuries Are Domestic ...................................................................... 28
      7.  Plaintiff Plausibly Alleges that the European Defendants Proximately Caused Plaintiff's Injuries ................................................................................. 30
   D.  THE COMMON-LAW FRAUD CLAIM IS PROPER ................................................ 31
   E.  THE UNFAIR TRADE PRACTICES CLAIM IS PROPER ........................................ 35
   F.  THE TORTIOUS INTERFERENCE CLAIM IS PROPER ......................................... 37
   G.  THE PRIMA FACIE TORT CLAIM IS RECOGNIZED IN THE DISTRICT AND IS   PROPER ............................................................................................... 41

IV.  THE EUROPEAN DEFENDANTS' CHALLENGE TO CLASS ALLEGATIONS IS PREMATURE ................................................................... 42

CONCLUSION ................................................................................................................ 44

## <u>TABLE OF AUTHORITIES</u>

<u>CASES</u>                                                                                     <u>PAGE(S)</u>

*Abhe & Svoboda, Inc. v. Chao*,
    508 F.3d 1052, 378 U.S. App. D.C. 355 (D.C. Cir. 2007) ................................................ 4

*Akinseye v. Dist. of Columbia*,
    339 F.3d 970, 358 U.S. App. D.C. 56 (D.C. Cir. 2003) ................................................... 3

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ............................................................................................... 2, 3, 4

*Atchley v. AstraZeneca UK Ltd.*,
    22 F.4th 204 (D.C. Cir. 2022), vacated on other grounds, 144 S. Ct. 2675 (Mem) ........... 8, 9

*Atwater v. D.C. Dep't of Consumer & Regul. Affs.*,
    566 A.2d 462 (D.C. 1989) ............................................................................................ 37

*Banneker Ventures, LLC v. Graham*,
    418 US App DC 398, 798 F3d 1119 (2015) .................................................................. 38

*Banneker Ventures, LLC v. Graham*,
    798 F.3d 1119, 418 U.S. App. D.C. 398 (D.C. Cir. 2015) .............................................. 38

*Barr v. Clinton*,
    370 F. 3d 1196, 361 U.S. App. D.C. 472 (D.C. Cir. 2004) .............................................. 3

*Bates v. Nw. Human Servs*,
    466 F. Supp. 2d 69, 89 (D.D.C. 2006) ............................................................... 12, 14, 32

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544–56 (2007) ...................................................................................... 3, 4, 11

*Bennett Enters., Inc. v. Domino's Pizza, Inc.*,
    45 F.3d 493, 310 U.S. App. D.C. 192 (D.C. Cir. 1995) ................................................. 38

*Boyle v. United States*,
    556 U.S. 938 (2009) ........................................................................................ 14, 18, 19

*Browning v. Clinton*,
    292 F.3d 235, 352 U.S. App. D.C. 4 (D.C. Cir. 2002) ................................................... 38

*Carpenter v. United States*,
    484 U.S. 19 (1987) ................................................................................................. 14-15

*Carr v. Brown*,
    395 A.2d 79 (D.C. 1978) .............................................................................................. 39

*Cedric Kushner Promotions, Ltd. v. King*,
    533 U.S. 158 (2001) .............................................................................................. 18, 20

*Center for Immigration Studies v. Cohen*,
    410 F. Supp. 3d 183 (D.D.C. 2019) .............................................................................. 16

*Conley v. Gibson,*
    355 U.S. 41, 2 L. Ed. 2d 80, 78 S. Ct. 99 (1957) ................................................. 11

*Conwood Co. v. U.S. Tobacco Co.,*
    290 F.3d 768–84 (6th Cir. 2002) ...................................................................... 15

D.C. Code § 28-3904(a), (d), (e), (f), (f-1), (r) ........................................................... 37

*Edmondson & Gallagher v. Alban Towers Tenants Ass'n,*
    48 F.3d 1260 (D.C. Cir. 1995) ......................................................................... 24

*Erickson v. Pardus,*
    551 U.S. 89, 127 S. Ct. 2197, 167 L. Ed. 2d 1081 (2007) (per curiam) ........................... 11

*FC Inv. Grp. LC v. IFX Mkts., Ltd.,*
    529 F.3d 1087 (D.C. Cir. 2008) . ................................................................... 5, 10

*Feld Ent., Inc. v. Am. Soc'y for the Prevention of Cruelty to Animals,*
    873 F. Supp. 2d 288 (D.D.C. 2012) ................................................................... 15

*Foltz v U.S. News & World Report, Inc.,*
    106 FRD 338 (1984) .................................................................................... 42

*Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.,*
    592 U.S. 351, 365 (2021) ........................................................................... 9, 10

*Friedman v. 24 Hour Fitness USA, Inc.,*
    580 F. Supp. 2d 985 (C.D. Cal. 2008) ................................................................ 19

*Fuji Photo Film U.S.A., Inc. v. McNulty,*
    640 F. Supp. 2d 300 (S.D.N.Y. 2009) ................................................................. 25

*GTE New Media Servs. Inc. v. BellSouth Corp.,*
    199 F.3d 1343 (D.C. Cir. 2000) ........................................................................ 8

*Gray v. First Winthrop Corp.,*
    133 F.R.D. 39, 41 (N.D. Cal. 1990) ................................................................... 42

*H.J. Inc. v. Nw. Bell Tel. Co.,*
    492 U.S. 229 (1989) .................................................................................... 22

*Havilah Real Prop. Servs., LLC v. VLK, LLC,*
    108 A.3d 334 (D.C. 2015) .............................................................................. 38

*Hughes v. Abell,*
    867 F Supp 2d 76 (DDC 2012) ..................................................................... 31-32

*Humphrey v. GlaxoSmithKline PLC,*
    905 F.3d 694 (3d Cir. 2018) ........................................................................... 29

*In re Avandia Mktg., Sales Pracs. & Prod. Liab. Litig.,*
    804 F.3d 633 (3d Cir. 2015) ........................................................................... 31

*In re Korean Airlines Disaster of September 1,*

704 F. Supp. 1135 (D.D.C. 1988), aff'd in relevant part, 932 F.2d 1475 (D.C. Cir. 1991) ............... 34

*In re Rail Freight Fuel Surcharge Antitrust Litig.,*
[*91] 258 F.R.D. 167, 175 (D.D.C. 2009)......................................................................... 42

*In re Search of Multiple Email Accts,*
585 F. Supp. 3d 1 (D.D.C. 2022) ..................................................................................... 18

*Jericho Baptist Church Ministries, Inc. (D.C.) v. Jericho Baptist Church Ministries, Inc.* (Md.),
223 F. Supp. 3d 1 (D.D.C. 2016) ..................................................................................... 15

*Khadr v. United States*,
529 F.3d 1112, 381 U.S. App. D.C. 408 (D.C. Cir. 2008) .................................................... 4

*Kimberlin v. National Bloggers Club,*
2015 WL 1242763 (D. Md. Mar. 17, 2015) ..................................................................... 16

*Kimm v. Lee,*
2005 WL 89386 (S.D.N.Y. Jan. 13, 2005) ........................................................................ 16

*Kokkonen v. Guardian Life Ins. Co. of America,*
511 U.S. 375, 114 S. Ct. 1673, 128 L. Ed. 2d 391 (1994) ................................................ 3-4

*Lu v. Lezell*,
45 F. Supp. 3d 86 (D.D.C. 2014) ............................................................................... 22, 23

*Lujan v. Defs. of Wildlife*,
504 U.S. 555 (1992) .................................................................................................. 26, 29

*McFarlane v. Esquire Magazine*,
74 F.3d 1296 (D.C. Cir. 1996) .......................................................................................... 8

*Macklin v. Robert Logan Assocs.*,
334 Md. 287, 639 A.2d 112 (Md. 1994) ........................................................................... 37

*Marks v. City of Seattle*,
2003 WL 23024522 (W.D. Wash. Oct. 16, 2003) ............................................................. 16

*Moreover, as in Bridge v. Phoenix Bond & Indem. Co.*,
553 U.S. 639 (2008) .................................................................................................. 29, 30

*Moreover, as in Companhia Brasileira Carbureto de Calcio-CBCC v. Applied Industrial Materials Corp.*,
887 F. Supp. 2d 9 (D.D.C. 2012) ..................................................................................... 31

*Mwani v. bin Laden,* 417 F.3d 1, 11 (D.C. Cir. 2005),
417 F.3d 1 (D.C. Cir. 2005) .......................................................................................... 8, 9

*Narce v. Mervilus*,
2023 WL 7128475 (D.D.C. Oct. 30, 2023) ........................................................................ 3

*Nat'l Org. for Women, Inc. v. Scheidler*,
510 U.S. 249, 256 (1994) ........................................................................................... 26, 29

*Onyeoziri v. Spivok*,
44 A.3d 279 (D.C. 2012) ................................................................................................ 38

*Oxbow Carbon & Mins. LLC v. Union Pac. R.R. Co.*,
  81 F. Supp. 3d 1 (D.D.C. 2015) ............................................................ 2

*Philip Morris USA, Inc.*,
  337 F Supp 2d at 24 (D.D.C. 1998) ........................................................ 33

*Pulaski Constr. Co. v. Air Frame Hangars, Inc.*,
  950 A.2d 868, 870 [N.J. 2008] ................................................................ 41

*Qureshi v. Am. Univ.*,
  2023 US Dist LEXIS 38041 [DDC Mar. 7, 2023, No. 20-cv-1141 (CRC)] ............ 35

*Regency Communs., Inc.*,
  160 F Supp 2d (DDC 2001) ................................................................ 35

*Ritchie v. Sempra Energy*,
  2013 WL 12171757 (S.D. Cal. Oct. 15, 2013) ......................................... 16

*Salinas v. United States*,
  522 U.S. 52 (1997) ........................................................................... 25

*Saucier v. Countrywide Home Loans*,
  64 A.3d 428, 438 [D.C. 2013] ............................................................. 33

*Schacht v. Brown*,
  711 F.2d 1343 (7th Cir.1983) ......................................................... 19, 21

*Sedima, S.P.R.L. v. Imrex Co.*,
  473 U.S. 479 (1985) ......................................................................... 14

*Settles v. U.S. Parole Comm'n*,
  429 F.3d 1098, 368 U.S. App. D.C. 297 (D.C. Cir. 2005) ............................ 3

*Shaw v. United States*,
  580 U.S. 63 (2016) ...................................................................... 17, 18

*Sinclair v. TubeSockTedD*,
  596 F. Supp. 2d 128 (D.D.C. 2009) ....................................................... 8

*Smith v. Washington Post Co.*,
  962 F. Supp. 2d 79 (D.D.C. 2013) ........................................................ 42

*Speelman v. United States*,
  461 F. Supp. 2d 71 (D.D.C. 2006) ......................................................... 3

*Square D. Co. v. Niagara Frontier Tariff Bureau, Inc.*,
  476 U.S. 409, 90 L. Ed. 2d 413, 106 S. Ct. 1922 (1986) ........................... 11

*Sturdza v. United Arab Emirates*,
  281 F.3d 1287, 1305, 350 U.S. App. D.C. 154 (D.C. Cir. 2002) .................... 38

*Sundberg v. TTR Realty, LLC*,
  109 A.3d 1123 (D.C. 2015) ............................................................... 33

*Taylor v. Dist. of Columbia Water & Sewer Auth.*,
   957 A2d 45 (DC 2008) ........................................................................................ 41

*Turner v. Cook*,
   362 F.3d 1219 (9th Cir. 2004) ........................................................................... 22

*U.S. Dominion, Inc. v. MyPillow, Inc.*,
   2022 WL 1597420 (D.D.C. May 19, 2022) ...................................................... 20

*Under Calder v. Jones*,
   465 U.S. 783 (1984) ........................................................................................ 6, 7

*United States v. Alston*,
   609 F.2d 531, 197 U.S. App. D.C. 276 (D.C. Cir. 1979) .................................. 34

*United States v. Coyle*,
   63 F.3d 1239 (3rd Cir. 1995) ............................................................................. 34

*United States v. Crisci*,
   273 F.3d 235 (2d Cir. 2001) ......................................................................... 17, 18

*United States v. Elliott*,
   571 F.2d 880–900 (5th Cir. 1978) ..................................................................... 19

*United States v. Jackson*,
   513 F.2d 456 (D.C. Cir. 1975) ........................................................................... 13

*United States v. Lemire*,
   720 F.2d 1327–35 (D.C. Cir. 1983) ................................................................... 14

*United States v. Munoz*,
   233 F.3d 1117 (9th Cir. 2000) ........................................................................... 34

*United States v. Oreto*,
   37 F.3d 739 (1st Cir. 1994) ............................................................................... 21

*United States v. Philip Morris USA Inc.*,
   566 F.3d 1095–19 (D.C. Cir. 2009) ................................................................... 13

*United States v. Porat*,
   76 F.4th 213 (3d Cir. 2023) ............................................................................... 15

*United States v. Prows*,
   118 F.3d 686 (10th Cir. 1997) ........................................................................... 34

*United States v. Rastelli*,
   870 F.2d 822 (2d Cir. 1989) ............................................................................. 19

*United States v. Reid*,
   533 F.2d 1255, 175 U.S. App. D.C. 120 (D.C. Cir. 1976) ................................ 34

*United States v. Ring*,
   628 F. Supp. 2d 195 (D.D.C. 2009) .................................................................. 16

*United States v. Sawyer*,
  85 F.3d 713 (1st Cir. 1996) ................................................................................ 34

*United States v. Turkette*,
  452 U.S. 576 (1981) ........................................................................................... 20

*U.S. ex rel. Williams v. Martin-Baker Aircraft Co.*,
  389 F.3d 1251, 1256, 363 U.S. App. D.C. 419 (D.C. Cir. 2004) ................. 12, 32

*Urquhart-Bradley v. Mobley*,
  964 F.3d 36–46 (D.C. Cir. 2020) ......................................................................... 7

*Virden v. Graphics One*,
  623 F. Supp. 1417–33 (C.D. Cal. 1985) ............................................................. 19

*Walden v. Fiore*,
  571 U.S. 277 (2014) ............................................................................................. 7

*Western Assocs. Ltd. Pshp. v. Market Square Assocs.*,
  235 F.3d 629, 344 U.S. App. D.C. 257 (D.C. Cir. 2001) ................................... 12

*Yegiazaryan v. Smagin*,
  599 U.S. 533 (2023) ........................................................................................... 28

*Young v. New Haven Advoc.*,
  315 F.3d 256 (4th Cir. 2002) ............................................................................... 8

## **STATUTES AND OTHER SOURCES**           **PAGE(S)**

18 U.S.C. §1343 ....................................................................................................... 14

18 U.S.C. §1344 ....................................................................................................... 17

18 U.S.C. §1962 ........................................................................................... 14, 21, 25

18 U.S.C. §1965 ................................................................................................... 5, 10

18 U.S.C §1961(5) .................................................................................................... 22

18 U.S.C. §2703 ....................................................................................................... 18

Federal Rule of Civil Procedure 4 ................................................................... 5, 8, 10

Federal Rule of Civil Procedure 9 ............................................................................ 13

Federal Rule of Civil Procedure 4 ....................................................................... 5, 8

Federal Rule of Civil Procedure 12 ................................................................. 3, 4, 11

Federal Rules of Civil Procedure 8 ..................................................................... 1, 11

Federal Rule of Civil Procedure 7 ............................................................................ 44

Federal Rule of Civil Procedure 9 ........................................................ 12, 13, 16, 32

Federal Rule of Civil Procedure 12 ...................................................................... 2, 4

Federal Rule of Civil Procedure 23 ........................................................... 42, 43, 44

Restatement (Second) of Torts § 766 (1979) .......................................................... 38

Restatement (Second) of Torts § 870 ....................................................................... 41

## PRELIMINARY STATEMENT

This case arises from a calculated and egregious disinformation campaign orchestrated by Defendants Alp Services S.A. ("Alp"), Diligence Sarl ("Diligence"), Mario Brero ("Brero"), Muriel Cavin ("Cavin"), and Lionel Badal ("Badal") (collectively, the "European Defendants"), in concert with their co-conspirators, to deliberately target Plaintiff Farid Hafez ("Dr. Hafez" or "Plaintiff"). Dr. Hafez, a highly regarded academic and professional, became the focus of a coordinated enterprise aimed at destroying his reputation, dismantling his career, and destabilizing his financial standing. This enterprise utilized U.S.-based platforms and compliance mechanisms to disseminate defamatory and false narratives, manipulate professional and financial institutions, and exert undue influence on decision-makers in the United States and abroad. These actions were not incidental but rather part of a concerted scheme designed to inflict maximum harm on Dr. Hafez and others similarly situated.

The First Amended Complaint ("FAC") methodically sets forth the facts underlying this campaign, substantiated by detailed allegations of the Defendants' coordinated efforts, including their dissemination of falsehoods, internal communications evidencing their intent, and the cascading harm caused by their misconduct. The FAC exceeds the pleading requirements under Federal Rules of Civil Procedure 8 and 9(b), providing more than sufficient detail to establish plausible claims for relief.

The European Defendants' assertion that this Court lacks personal jurisdiction is entirely without merit. Their actions were expressly aimed at the United States, leveraging U.S.-hosted platforms such as WordPress, Medium, and Wikipedia, and targeting U.S.-based compliance systems and audiences with the intent to cause harm within this jurisdiction. The FAC also adequately pleads the existence of an enterprise, the commission of predicate acts under RICO, and injuries that are directly attributable to the Defendants' unlawful conduct. Further, the FAC

establishes reliance and resulting harm necessary for the common-law fraud claim, as well as the

Defendants' intentional interference with Plaintiff's business and academic relationships. The

class allegations, grounded in shared injuries inflicted by the Defendants' coordinated conduct, are

properly pleaded and must be adjudicated at the class certification stage—not dismissed

prematurely.

The European Defendants' Motion to Dismiss is substantively baseless, replete with

mischaracterizations of the FAC and a misapplication of the governing legal standards. The FAC

unequivocally demonstrates that the European Defendants orchestrated and executed a calculated

scheme that caused substantial harm to Dr. Hafez. Their efforts to evade accountability through

dismissal should be categorically rejected. As such, this Court should deny the European

Defendants' Motion to Dismiss in its entirety and allow this matter to proceed to discovery, where

the full extent of the Defendants' unlawful conduct will be further substantiated.

## FACTUAL BACKGROUND

For an accurate factual background, the Court is respectfully referred to Plaintiff's First

Amended Complaint (ECF Doc. No. 5) ("FAC"), Plaintiff's Declaration accompanying this

Memorandum ("Pl. Decl."), Aaron Rock-Singer's Declaration accompanying this Memorandum,

David M. Schwartz's Declaration, and all the exhibits and appendixes annexed thereto, as well as

the references to said documents included herein.

## LEGAL STANDARD

To overcome a Rule 12 Motion to Dismiss, a plaintiff need only "plead[] factual content

that allows the court to draw the reasonable inference that the defendant is liable." *Ashcroft v.*

*Iqbal*, 556 U.S. 662, 678 (2009). "'[D]etailed factual allegations' are not necessary." *Oxbow*

*Carbon & Mins. LLC v. Union Pac. R.R. Co.*, 81 F. Supp. 3d 1, 8 (D.D.C. 2015). The facts alleged

need only be "enough to raise a right to relief above the speculative level." *Id.* Courts "must

consider the whole complaint, accepting all factual allegations in the complaint as true, 'even if doubtful in fact,' and construing all reasonable inferences in the plaintiff's favor." *Narce v. Mervilus*, 2023 WL 7128475, at *3 (D.D.C. Oct. 30, 2023). "The plausibility standard is not akin to a 'probability requirement,'" *Iqbal*, 556 U.S. at 678, and "a well-pleaded complaint may proceed even if it appears 'that a recovery is very remote and unlikely,'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555–56 (2007). Indeed, "[a] complaint survives a Motion to Dismiss even if there are two alternative explanations, one advanced by the defendant and the other advanced by the plaintiff, both of which are plausible." *Narce*, 2023 WL 7128475, at *3.

Pursuant to Federal Rule of Civil Procedure 12(b)(1), a defendant may move to dismiss a complaint, or any portion thereof, for lack of subject-matter jurisdiction. Fed. R. Civ. P. 12(b)(1). When reviewing a Motion to Dismiss for lack of jurisdiction, a court must review the complaint liberally, granting the plaintiff the benefit of all inferences that can be derived from the facts alleged. *Barr v. Clinton*, 370 F. 3d 1196, 1199, 361 U.S. App. D.C. 472 (D.C. Cir. 2004). Nevertheless, "the court need not accept factual inferences drawn by Plaintiff if those inferences are not supported by facts alleged in the complaint, nor must the [c]ourt accept plaintiff's legal conclusions." *Speelman v. United States*, 461 F. Supp. 2d 71, 73 (D.D.C. 2006).

To determine whether it has jurisdiction over the claim, a court may consider materials outside the pleadings. *Settles v. U.S. Parole Comm'n*, 429 F.3d 1098, 1107, 368 U.S. App. D.C. 297 (D.C. Cir. 2005). No action of the parties can confer subject matter jurisdiction on a federal court because subject matter jurisdiction is both an Article III and a statutory requirement. *Akinseye v. Dist. of Columbia*, 339 F.3d 970, 971, 358 U.S. App. D.C. 56 (D.C. Cir. 2003). The party claiming subject matter jurisdiction bears the burden of demonstrating that such jurisdiction exists. *Kokkonen v. Guardian Life Ins. Co. of America*, 511 U.S. 375, 377, 114 S. Ct. 1673, 128 L. Ed.

2d 391 (1994); Khadr v. United States, 529 F.3d 1112, 1115, 381 U.S. App. D.C. 408 (D.C. Cir. 2008).

A Motion to Dismiss for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6) challenges the adequacy of a complaint on its face. Fed. R. Civ. P. 12(b)(6). A complaint must be sufficient "to give a defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007) (internal citations omitted). Although a complaint does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id*. To survive a Motion to Dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim for relief that is "plausible on its face." *Twombly*, 550 U.S. at 570.

A court must treat the complaint's factual allegations as true, "even if doubtful in fact." *Twombly*, 550 U.S. at 555. But a court need not accept as true legal conclusions set forth in a complaint. *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S. Ct. 1937, 1949, [*16] 173 L. Ed. 2d 868 (2009). In deciding a motion under Rule 12(b)(6), a court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits or incorporated by reference, and matters about which the court may take judicial notice. *Abhe & Svoboda, Inc. v. Chao*, 508 F.3d 1052, 1059, 378 U.S. App. D.C. 355 (D.C. Cir. 2007).

## **ARGUMENT**

This Court should deny the European Defendants' Motion to Dismiss the FAC in its entirety. The Court has personal jurisdiction over each European Defendant, Dr. Hafez's RICO claims are sufficiently pleaded, and Dr. Hafez's state-law claims are supported by well-pleaded factual allegations that state a plausible basis for relief.

## I. DR. HAFEZ FULLY INCORPORATES HIS ARGUMENTS IN OPPOSITION TO GEORGE WASHINGTON UNIVERSITY, THE PROGRAM ON EXTREMISM AT THE GEORGE WASHINGTON UNIVERSITY, AND LORENZO VIDINO'S MOTIONS TO DISMISS

First and foremost, Dr. Hafez herein incorporates and fully adopts the arguments set forth in the separate Oppositions to Defendants George Washington University ("GWU"), The Program on Extremism at the George Washington University ("Program on Extremism"), and Lorenzo Vidino's ("Vidino") Motion to Dismiss Plaintiff's FAC (ECF Doc. No. 28). The FAC alleges that Vidino is liable for his actions as part of the RICO enterprise formed with the other Defendants, as well as for state-law claims, including common law fraud, unfair trade practices, tortious interference, and prima facie tort. Likewise, the other Defendants—including the European Defendants—are equally liable for both the RICO violations and the state-law claims asserted in the FAC.

## II. THE COURT HAS PERSONAL JURISDICTION OVER THE EUROPEAN DEFENDANTS

The European Defendants argue that the Court lacks personal jurisdiction over them, but their arguments fail to support such arguments. The Court has jurisdiction over the European Defendants under Federal Rule of Civil Procedure 4(k)(2), which provides for personal jurisdiction over foreign Defendants based on their contacts with the United States as a whole. The Court also has jurisdiction over the European Defendants under Rule 4(k)(1)(C) and 18 U.S.C. §1965, which allows personal jurisdiction over RICO co-conspirators where personal jurisdiction is "established as to at least one defendant," *FC Inv. Grp. LC v. IFX Mkts., Ltd.*, 529 F.3d 1087, 1099 (D.C. Cir. 2008), overruled on other grounds by *Erwin-Simpson v. AirAsia Berhad*, 985 F.3d 883 (D.C. Cir. 2021).

## A.  Specific Jurisdiction Established Through Intentional Targeting

The European Defendants, engaged in a calculated disinformation campaign aimed at harming Dr. Hafez's professional and academic reputation and standing, while silencing and discrediting a prominent voice speaking out against blanket anti-Islamic sentiment and anti-middle eastern bias. Their actions, as detailed in the FAC, establish the requisite minimum contacts with the forum for specific jurisdiction.

Under *Calder v. Jones*, 465 U.S. 783 (1984), specific jurisdiction is proper where the Defendant's intentional conduct is expressly aimed at the forum and the harm is felt there. The European Defendants, and each of them, expressly targeted the United States. They used U.S.-hosted platforms, including WordPress, Medium, and Wikipedia, to publish false and defamatory statements about Dr. Hafez. These publications were deliberately crafted to reach U.S. audiences, maximizing the harm to Dr. Hafez's professional relationships and standing within the U.S.

In addition to publishing false, intentionally misleading, and harmful content, the Defendants manipulated U.S.-based search engines, including Google and Bing, ensuring that their materials appeared prominently in search results. This strategic use of U.S.-based platforms underscores their intent to target U.S.-based individuals and institutions.

Each and every European Defendant played a pivotal role in creating harm in the United States. First, Alp Services S.A. ("Alp") and Diligence SARL ("Diligence") used U.S.-hosted platforms, including WordPress, Medium, and Wikipedia, to disseminate defamatory statements about Dr. Hafez. These platforms were deliberately chosen to maximize the content's visibility among U.S. audiences. Alp and Diligence also coordinated efforts to manipulate U.S.-based search engines such as Google and Bing, ensuring that the misleading, false, and fraudulent content was prominently displayed. Second, Brero and Cavin, as the founders and operators of Alp and Diligence, played central roles in managing the enterprise's digital disinformation strategy. Brero,

in particular, proposed targeting Dr. Hafez to UAE officials and directed the dissemination of false narratives through U.S.-based platforms. Furthermore, Badal actively contributed to the smear campaign by coordinating with U.S.-based journalists and compliance officers, transmitting false and defamatory content. His actions directly impacted Dr. Hafez's reputation within U.S. academic and professional circles.

The deliberate targeting of Dr. Hafez, who holds a visiting professorship at a prominent U.S. academic institution, mirrors the intentional conduct sufficient to establish jurisdiction under *Calder*. In *Calder*, a Californian sued three Floridians for libel based on an article that was published in a national magazine. *Id*. at 784. The Supreme Court held that California could exercise jurisdiction over the Floridians based on "the reputation-based 'effects' of the alleged libel." *Walden v. Fiore*, 571 U.S. 277, 287 (2014) (citing Calder). This established what is now known as the "*Calder* effects test," under which courts may exercise personal jurisdiction over a defendant when the effects of his actions "connect[] [his] conduct to" the forum. *Id*. at 288; see also *Urquhart-Bradley v. Mobley*, 964 F.3d 36, 45–46 (D.C. Cir. 2020) (applying *Calder*).

Here, the European Defendants' actions were "expressly aimed at" the United States, and they "knew" those actions "would have a potentially devastating impact upon" Plaintiff. *Calder*, 465 U.S. at 789. In fact, they intended for those actions to "seriously damage, if not destroy," Dr. Hafez. The European Defendants should have "reasonably anticipate[d] being haled into court [in the United States] to answer for" their tortious conduct. *Calder*, 465 U.S. at 790. The European Defendants' arguments against personal jurisdiction ignore vast swaths of the FAC.

The European Defendants argue that the fact that U.S. residents can access online publications from the United States does not mean they purposefully directed their activities toward the United States. But Plaintiff does not just allege that Americans could access the

enterprise's fraudulent statements. He also alleges that the European Defendants manipulated U.S. media outlets and figures to harm him. These facts distinguish the European Defendants' caselaw. In *McFarlane v. Esquire Magazine*, the defendants wrote an article that was merely "circulated throughout the nation." 74 F.3d 1296, 1300 (D.C. Cir. 1996). In *GTE New Media Servs. Inc. v. BellSouth Corp.,* 199 F.3d 1343, 1349 (D.C. Cir. 2000), the court declined to find jurisdiction just because District residents could access the Defendants' websites.

Here, the European Defendants "purposely directed [their] activities toward" the United States in a way the publishers in the cases they cited did not. *Sinclair*, 596 F. Supp. 2d at 133. Thus, the European Defendants are similar to newspaper publishers who "manifest an intent to target and focus on" readers in a particular forum. *Young v. New Haven Advoc.*, 315 F.3d 256, 263 (4th Cir. 2002).

### B.  Jurisdiction Under Federal Rule of Civil Procedure 4(k)(2) and 4(k)(1)(C)

If specific jurisdiction is not established in any single state, jurisdiction is proper under Rule 4(k)(2), which allows for nationwide jurisdiction in federal question cases when a defendant's conduct establishes sufficient contacts with the United States as a whole. See *Mwani v. bin Laden*, 417 F.3d 1, 11 (D.C. Cir. 2005) ("[S]o long as a defendant does not concede to jurisdiction in another state, a court may use 4(k)(2) to confer jurisdiction.")..

District courts have personal jurisdiction over a defendant when "an applicable long-arm statute ... authorize[s] the court to hear the case" and exercise of personal jurisdiction "comports with due process." *Atchley v. AstraZeneca UK Ltd.*, 22 F.4th 204, 231 (D.C. Cir. 2022), vacated on other grounds, 144 S. Ct. 2675 (Mem). Federal Rule of Civil Procedure 4(k)(2) "is essentially a federal long arm-statute." *Id*. Aside from ordinary due-process restrictions, Rule 4(k)(2) requires only that the defendant be served and that they not be subject to any specific state's jurisdiction.

The European Defendants do not contest service, and they do not argue that they are subject to personal jurisdiction in any specific state. Thus, the only issue is whether jurisdiction over them comports with due process.

Due process requires "certain minimum contacts with [the forum] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *Atchley*, 22 F.4th at 232. This requirement "prevents a court from deciding claims against parties that have not in some way affiliated themselves with the forum." *Id*. Though "[c]ourts distinguish between all-purpose 'general' personal jurisdiction and claim-linked 'specific' jurisdiction," only specific jurisdiction applies here. *Id*. The "'essential foundation of specific jurisdiction' is the 'relationship among the defendant, the forum, and the litigation.'" *Id*. at 233 (quoting *Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.,* 592 U.S. 351, 365 (2021)). "The dispute here is whether that relationship is 'close enough to support specific jurisdiction.'" *Id*.

Here, each European Defendant's deliberate targeting of the United States through U.S.-based platforms, audiences, and institutions satisfies the minimum contacts requirement. Furthermore, asserting jurisdiction does not offend traditional notions of fair play and substantial justice given the foreseeable and substantial harm caused to Dr. Hafez within the United States.

These allegations are more than enough to show that the European Defendants should "reasonably anticipate being haled into" U.S. courts. *Mwani*, 417 F.3d at 4. It does not matter that they "did not physically enter the forum"—that is, the United States. *Id*. at 12. It matters only that their "efforts [were] 'purposefully directed' toward residents" of the United States and that their conduct "ha[d] an effect in the forum." *Id*. at 12–13. Here, "there is no doubt that the defendants 'engaged in unabashedly malignant actions directed at and felt in this forum.'" *Id*. The European Defendants' purposeful interactions with, *inter alia*, U.S. media gave it "clear notice of its

exposure in [the United States] to suits arising from" those interactions. *Ford*, 592 U.S. at 363. The European Defendants "could [have] do[ne] something about that exposure: [they] could [have] 'act[ed] to alleviate the risk of burdensome litigation by ... severing [their] connection with the [United States]." *Id*. at 363–64. But they did not. They sought to influence U.S. audiences to harm Dr. Hafez even more greatly.

Importantly, the U.S. have several "legitimate interest[s]" in this lawsuit. *Ford*, 592 U.S. at 360. Indeed, the United States have further interests in ensuring its media outlets are not used to deliver disinformation regarding terrorism financing and in regulating the use of American businesses. Furthermore, the enterprise severely damaged an individual who is currently a resident of the United States, which the U.S. have a strong interest in protecting from tortious behavior. See *id*. at 368 (States "have significant interests" in "providing [their] residents with a convenient forum for redressing injuries inflicted by out-of state actors" and in "enforcing their own ... regulations.").

Additionally, jurisdiction is appropriate under Rule 4(k)(1)(C) and 18 U.S.C. §1965, which permits jurisdiction over RICO co-conspirators when the "ends of justice" require bringing all members of a conspiracy before a single court. See *FC Inv. Grp. LC v. IFX Mkts*., *Ltd*., 529 F.3d 1087, 1099 (D.C. Cir. 2008). The European Defendants were heavily involved in a RICO enterprise, and the FAC alleges that the European Defendants worked as part of a coordinated racketeering enterprise targeting Dr. Hafez. The actions of Alp and Diligence, and particularly those of Brero, Cavin, and Badal—with their pillar roles in disseminating false information and misleading, inflammatory, and fraudulent content, and in coordinating with U.S.-based actors— underscore their significant involvement in the conspiracy. Because jurisdiction is established over

U.S.-based co-conspirators, such as Vidino, jurisdiction over their European counterparts is proper.

## III. PLAINTIFF HAS STATED VALID CLAIMS AGAINST THE EUROPEAN DEFENDANTS

The European Defendants argue that the FAC fails to state a claim against them, but their position collapses under the weight of the detailed and robust allegations. The claims against the Defendants are grounded in well-established legal principles and are supported by comprehensive factual assertions. The FAC not only meets the pleading standards but also establishes a clear basis for holding the European Defendants accountable under RICO and common law.

### A. Plaintiff Satisfies the Pleading Standard Under Rule 8

As a preliminary matter, under Fed. R. Civ. P. 12, a claim should not be dismissed "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45-46, 2 L. Ed. 2d 80, 78 S. Ct. 99 (1957). In evaluating the plaintiff's FAC, the Court must accept the factual allegations as true and draw reasonable inferences therefrom in favor of the plaintiff. *Square D. Co. v. Niagara Frontier Tariff Bureau, Inc.,* 476 U.S. 409, 411, 90 L. Ed. 2d 413, 106 S. Ct. 1922 (1986).

The European Defendants' assertion that the allegations fail under Rule 8 is baseless. Rule 8 requires only a "short and plain statement" that gives the opposing party fair notice of the claim and its grounds. See *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 127 S. Ct. 1955, 1964, 167 L. Ed. 2d 929 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47, 78 S. Ct. 99, 2 L. Ed. 2d 80 (1957)); accord *Erickson v. Pardus*, 551 U.S. 89, 127 S. Ct. 2197, 2200, 167 L. Ed. 2d 1081 (2007) (per curiam). The FAC exceeds this standard, presenting, *inter alia*, a detailed account of the Defendants' scheme, including their use of fraudulent emails and false and misleading publications to harm Plaintiff's reputation in the United States.

For instance, Alp's own documents, as cited in the FAC, outline their proposal to launch "massive negative articles" and "create negative Wikipedia pages" about Plaintiff, specifically targeting U.S.-based platforms and audiences. The Defendants' intent to cause harm in the United States is evident from their use of U.S.-centric compliance databases and media outlets to spread their smear campaign.

### B.  Heightened Pleading Standard Under Rule 9(b)

The European Defendants' reliance on Rule 9(b) is similarly misplaced. Rule 9(b) requires that fraud-based allegations be stated with particularity, including "time, place and content of the false misrepresentations, the fact misrepresented[,] and what was retained or given up as a consequence of the fraud." *See Bates*, 466 F. Supp. 2d at 89 (quoting *U.S. ex rel. Williams v. Martin-Baker Aircraft Co.*, 389 F.3d 1251, 1256, 363 U.S. App. D.C. 419 (D.C. Cir. 2004)); *see also Western Assocs. Ltd. Pshp. v. Market Square Assocs.*, 235 F.3d 629, 637, 344 U.S. App. D.C. 257 (D.C. Cir. 2001) ("RICO claims premised on mail or wire fraud must be particularly scrutinized because of the relative ease with which a plaintiff may mold a RICO pattern from allegations that, upon closer scrutiny, do not support it.").

The FAC meets this standard by identifying specific communications, including emails sent by Badal to U.S.-based journalists and compliance officers. These emails contained fabricated allegations about Plaintiff's associations with extremist groups, which were intentionally designed to defame him and disrupt his professional relationships. The FAC provides further details, such as Alp's 2018 "Action Plan," which explicitly stated their goal to damage Plaintiff's reputation by disseminating falsehoods through U.S.-based platforms like Wikipedia and leveraging their network of paid journalists. This plan demonstrates a calculated effort to exploit U.S. communication channels for fraudulent purposes.

What is more, even under Rule 9's heightened pleading standard, "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b). "Intent may, and generally must, be proved circumstantially; normally, the natural probable consequences of an act may satisfactorily evidence the state of mind accompanying it." *United States v. Jackson*, 513 F.2d 456, 461 (D.C. Cir. 1975); *United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1118–19 (D.C. Cir. 2009) ("[T]he factfinder 'is permitted to impute knowledge of the falsity of the statements to the accused ... as a consequence of inferences reasonably drawn.'").

The Defendants' conduct, as detailed in the FAC, meets the heightened standard of pleading malice required in such cases, and the deliberate propagation of falsehoods and misleading information in furtherance of the enterprise's scheme to damage Dr. Hafez provides a clear basis for liability. The FAC alleges with specificity that Vidino's statements were made with actual malice, a standard satisfied by demonstrating the Defendants' knowledge of their falsity or reckless disregard for the truth. The European Defendants' dissemination of false information, coupled with the absence of credible materials supporting his positions, evidences his intent to harm Dr. Hafez as part of the enterprise's unlawful objectives laid out in the FAC. Moreover, the European Defendant's argument that there is no public information disproving that Dr. Hafez is not operating in support of the Muslim Brotherhood is highly improper and surprising, even on Counsel's account. Indeed, Counsel for Defendants must know that one cannot disprove a negative. Further clarifications on how the European Defendants' campaign was aimed at destroying – which, in fact, it did – Dr. Hafez reputation and career, among other things, is evidenced by the Pl. Decl. and its exhibits.

13

### C.  The RICO Claims Are Properly Pleaded

The FAC meticulously outlines a RICO enterprise composed of the Defendants in this action. Under 18 U.S.C. §1962(C), a Plaintiff must allege "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 (1985). Among those of the other Defendants, the European Defendants' coordinated efforts were aimed, *inter alia*, at damaging Dr. Hafez and undermining his professional reputation. This enterprise, as alleged, fits squarely within the definition provided by the Supreme Court in *Boyle v. United States*, 556 U.S. 938 (2009), which requires an association-in-fact enterprise to have a purpose, relationships among its members, and sufficient longevity to achieve its objectives. The European Defendants' actions demonstrate these elements, with a specific *modus operandi*,  a shared goal of spreading false, misleading, inflammatory content to U.S. audiences, a networked collaboration in executing this campaign, and a sustained period of activity targeting Dr. Hafez.

### 1.  Predicate Acts: Mail and Wire Fraud

The Defendants' contention that Plaintiff fails to plead predicate acts is without merit. As set forth in the FAC, the European Defendants engaged in multiple acts of wire fraud in violation of 18 U.S.C. §1343. A plaintiff "alleging mail and wire fraud must establish two essential elements: (1) a scheme to defraud; and (2) use of the mails or wires for the purpose of executing the scheme." *Bates v. Nw. Human Servs., Inc.*, 466 F. Supp. 2d 69, 89 (D.D.C. 2006)  [**59] (citations omitted). Wire fraud requires (1) a scheme to defraud, (2) intent to defraud, and (3) use of interstate or international wires in furtherance of the scheme. *See* 18 U.S.C. §1343; *United States v. Lemire*, 720 F.2d 1327, 1334–35 (D.C. Cir. 1983). Moreover, a "scheme to defraud" broadly encompasses any scheme to deprive someone of money or property through false statements of material fact. *Carpenter v. United States*, 484 U.S. 19, 27 (1987) ("'[T]o defraud' ... [has] the common

understanding of wrongdoing one in his property rights by dishonest methods or schemes." (cleaned up)); *Jericho Baptist Church Ministries, Inc. (D.C.) v. Jericho Baptist Church Ministries, Inc. (Md.)*, 223 F. Supp. 3d 1, 8 (D.D.C. 2016) (the term defraud "signif[ies] the deprivation of something of value by trick, deceit, chicane or overreaching").

Needless to say, the same statement can give rise to claims for mail and wire fraud whereby Defendants are alleged to have engaged in the dissemination of false information and a hurtful smear campaign. See *Conwood Co. v. U.S. Tobacco Co.*, 290 F.3d 768, 783–84 (6th Cir. 2002). What sets wire fraud apart is the intent to deprive the victim of money or property. The victim's loss of money or property cannot be "only an incidental byproduct of the scheme"; it must be "an 'object of the fraud.'" *United States v. Porat*, 76 F.4th 213, 218 (3d Cir. 2023). The perpetrator need not "end[] up with the victim's property or money." *Feld Ent., Inc. v. Am. Soc'y for the Prevention of Cruelty to Animals*, 873 F. Supp. 2d 288, 318 (D.D.C. 2012).

Here, Plaintiff's allegations satisfy all the elements required to show mail and wire fraud. Specifically, the European Defendants disseminated false, intentionally misleading, and inflammatory statements through emails to U.S.-based journalists and compliance officers and published fraudulent articles on U.S.-hosted platforms, including WordPress and Wikipedia. These actions were intentionally designed to harm Plaintiff's reputation and professional standing, demonstrating a calculated scheme to defraud.

The FAC alleges that Alp, directed by Mario Brero and Muriel Cavin, systematically targeted Plaintiff with a disinformation campaign, smearing him with false allegations of ties to extremist organizations such as the Muslim Brotherhood. Among other things, this coordinated effort involved obtaining Plaintiff's private phone records unlawfully, using them to fabricate associations with individuals accused of extremism, and disseminating these fabrications through

various media channels. These false statements were communicated using interstate wires. *United States v. Ring*, 628 F. Supp. 2d 195, 217 (D.D.C. 2009). That use of interstate wires was not just foreseeable; it was an essential element of Defendants' scheme that allowed them to disseminate their fraudulent statements to specific audiences around the globe, including in the United States.

Furthermore, Defendants' failure to address allegations that they intended to deprive Plaintiff of money and property is fatal to their argument that Plaintiff does not allege predicate acts because the scheme was purportedly nothing more than simple defamation. Defendants discuss five cases, none of which supports their argument. In *Center for Immigration Studies v. Cohen*, 410 F. Supp. 3d 183, 190 (D.D.C. 2019), this Court held that the plaintiff failed to plead predicate acts of mail or wire fraud because the "complaint [was] devoid of any allegation that defendants made a statement that was false." In *Kimberlin v. National Bloggers Club*, 2015 WL 1242763, at *5 (D. Md. Mar. 17, 2015), the plaintiff failed to allege the "time, place, and contents of any of the alleged mail and wire communications" and thus did not satisfy Rule 9(b). In *Ritchie v. Sempra Energy*, 2013 WL 12171757, at *3 (S.D. Cal. Oct. 15, 2013), and *Kimm v. Lee*, 2005 WL 89386, at *1, *4 (S.D.N.Y. Jan. 13, 2005), the statements were "designed to injure [the Plaintiff'] goodwill and business reputation[s]," not to deprive them of money or property. In *Marks v. City of Seattle*, 2003 WL 23024522, at *3, 6 (W.D. Wash. Oct. 16, 2003), the court dismissed defamation claims for failure to plead the statements with specificity and a RICO claim for failure to allege any predicate act, noting that the complaint "did not clarify what specific actions ... constitute predicate acts."

Here, Plaintiff identifies several fraudulent statements (including statements falsely linking him to the Muslim Brotherhood and terrorism) with particularity, he pleads and specifies how those statements were designed to deprive him of money, moral authority, and property – which

they did – and identifies Defendants' actions that constitute RICO predicate acts. Plaintiff also provides further clarifications reiterating his FAC's allegations through Pl. Decl.

### 2.  Predicate Acts: Bank Fraud

Plaintiff also adequately alleges predicate acts of bank fraud. The bank fraud statute makes it unlawful to participate in a "scheme ... to defraud a financial institution." 18 U.S.C. §1344(1). Under §1344(1), the defendant need not actually deprive the financial institution of anything of value, or even intend to do so—the scheme itself is sufficient for liability. *Shaw v. United States*, 580 U.S. 63, 67 (2016) ("[T]he statute ... demands neither a showing of ultimate financial loss nor a showing of intent to cause financial loss."). In addition, a scheme to "cheat only a bank depositor, not a bank" suffices to violate §1344(1). *Id*. at 65.

Here, the European Defendants made statements falsely accusing Plaintiff of having links to the Muslim Brotherhood and terrorism directly to banks and bank compliance monitors to fraudulently induce banks to stop dealing with Plaintiff. That is exactly what the European Defendants intended to happen, and that is exactly what several financial institutions did. The European Defendants do not satisfactorily contest that Plaintiff adequately pleaded predicate acts of bank fraud. The European Defendants rely on *United States v. Crisci*, 273 F.3d 235 (2d Cir. 2001), and assert that Plaintiff does not allege bank fraud because "Plaintiff, however, does not claim that Defendants obtained any money (or other property) from the banks they allegedly defrauded; that Defendants deceived the banks into releasing any property (to Defendants or anyone else); or that Defendants intended to harm the banks." (European Defendants' Memorandum of Law, p. 15). However, *Crisci* fatally undermines that argument. In *Crisci*, the court affirmed an indictment charging the defendant with bank fraud, noting that "'[t]he bank need not be the immediate victim of the fraudulent scheme' and need not have suffered actual loss."

273 F.3d at 240. And even though *Crisci* can be read to suggest that the fraudulent scheme must be "designed to deceive" a bank "into releasing property," this is not the law following the Supreme Court's subsequent decision in *Shaw*, which expressly held that bank fraud does not require intent to harm a bank—knowledge that a bank would likely suffer harm to a property interest is sufficient. *Shaw*, 580 U.S. at 64; see also *In re Search of Multiple Email Accts*. Pursuant to 18 U.S.C. §2703, 585 F. Supp. 3d 1, 15 (D.D.C. 2022) ("[A] §1344(1) violation does not require that a defendant intended to cause financial harm ... to a financial institution."). Regardless, here the European Defendants did intend to induce banks to stop lending to Plaintiff, depriving the banks of revenue from longstanding customer relationships, and in two cases, costing the banks millions that they had to recover through bankruptcy proceedings.

### 3. Plaintiff Adequately Pleads an Enterprise with a Pattern of Racketeering Activity

The European Defendants erroneously assert that Plaintiff has failed to allege an enterprise distinct from the Defendants. These arguments fail because Plaintiff has adequately alleged each element of a RICO claim, including the existence of an enterprise, supported by detailed factual assertions that satisfy the requisite pleading standards.

A plaintiff need only "allege ... the existence of two distinct entities: (1) a 'person'; and (2) an 'enterprise' that is not simply the same 'person' referred to by a different name." *Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 158 (2001). "[T]he definition [of enterprise] has a wide reach, and the very concept of an association in fact is expansive." *Boyle v. United States*, 556 U.S. 938, 944 (2009) (citations omitted). An association-in-fact enterprise need only possess three characteristics: "a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." *Id.* at 946, 948 (association-in-fact enterprise is "simply a continuing unit that functions with a common purpose"

and the term should be "liberally construed"). All that is required is "evidence of an ongoing organization, formal or informal, and … evidence that the various associates function as a continuing unit." *Boyle*, 556 U.S. at 945; *see United States v. Elliott*, 571 F.2d 880, 897–900 (5th Cir. 1978) ("A jury is entitled to infer the existence of an enterprise on the basis of ... circumstantial evidence. ... [A] RICO enterprise cannot be expected to maintain a high profile in the community. Its affairs are likely to be conducted in secrecy and to involve a minimal amount of necessary contact.").

Consistent with the Supreme Court's instruction that the enterprise requirement should be broadly construed, courts have held that a RICO enterprise can include "those merely associated with an enterprise—who participate directly and indirectly in the enterprise's affairs." *Schacht v. Brown*, 711 F.2d 1343, 1360 (7th Cir.1983); *see also Virden v. Graphics One*, 623 F. Supp. 1417, 1432–33 (C.D. Cal. 1985). Moreover, Plaintiff need not allege that all participants in the enterprise shared the Defendants' "fraudulent purpose." *Friedman v. 24 Hour Fitness USA, Inc.*, 580 F. Supp. 2d 985, 991 (C.D. Cal. 2008) (Plaintiff alleged association-in-fact enterprise even though two participants in scheme were "unwitting"). Rather, "[i]t is sufficient that the defendant know the general nature of the enterprise and know that the enterprise extends beyond his individual role." *United States v. Rastelli*, 870 F.2d 822, 828 (2d Cir. 1989).

First, the Defendants incorrectly assert that Plaintiff has conflated the UAE with the alleged enterprise and that the enterprise is indistinguishable from the Defendants. These arguments misinterpret the nature of the enterprise as alleged in the FAC. A RICO enterprise can consist of an association-in-fact, defined as "a group of persons associated together for a common purpose of engaging in a course of conduct." See *Boyle v. United States*, 556 U.S. 938, 946 (2009). Plaintiff's allegations meet this standard.

The FAC alleges an enterprise in which the UAE, Alp, Diligence, Ariaf, Brero, Cavin, Badal, Vidino, and dozens of other participants functioned as a continuing unit for years. As such, Plaintiff identifies the enterprise's clear organization and structure. This group operated as a continuing unit to execute a disinformation campaign targeting Plaintiff and other individuals. The enterprise's purpose was to disseminate fraudulent and misleading content, as well as false allegations, using sophisticated methods to harm Plaintiff's reputation and professional relationships within the United States. This conduct is distinct from the roles of the individual Defendants and is independent of the UAE's involvement.

Plaintiff's allegations align with the Supreme Court's guidance in *United States v. Turkette*, 452 U.S. 576, 583 (1981), which requires an enterprise to have "an ongoing organization" and "functions as a continuing unit." The FAC establishes that the enterprise was organized, with specific roles assigned to each Defendant, including overseeing communications with journalists, amplifying defamatory narratives through search engine optimization, and coordinating false publications on U.S.-hosted platforms.

Furthermore, Defendants argue that the enterprise is indistinguishable from the individual Defendants, relying on the distinctness requirement outlined in *Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158 (2001). This argument is unfounded. The FAC alleges an association-in-fact enterprise distinct from the individual Defendants and their roles. Unlike the scenario in *U.S. Dominion, Inc. v. MyPillow, Inc.*, 2022 WL 1597420 (D.D.C. May 19, 2022), where the enterprise was merely a rebranding of the defendant corporation, the enterprise here involves multiple actors working in concert to achieve a shared objective independent of their personal identities or the UAE's interests.

The FAC details how the Defendants operated collectively but not solely as agents of the UAE. For example, Alp's internal communications, as revealed in its "strictly confidential" action plan, explicitly outline a five-year strategy targeting Plaintiff and others through coordinated media attacks, negative Wikipedia pages, and influencing decision-makers. These activities extend beyond a mere client-agent relationship with the UAE, showcasing an independent and structured enterprise functioning as a unit. As a general matter, the *modus operandi* was the following: the UAE provided funding, strategic guidance, and ultimate approval for the enterprise's operations; Alp, Diligence, and their employees oversaw its day-to-day actions by identifying targets, hiring sources, sending fraudulent emails, and writing, commissioning, and publishing articles, blog posts, and Wikipedia entries; The enterprise's vast network of other witting participants and co-conspirators gathered information, published articles and reports written or commissioned by the European Defendants, and ensured false Wikipedia entries were not corrected, among other things. Each member of the enterprise was aware of and shared the common purpose of destroying the UAE's rivals using similar viral communication campaigns to falsely link their targets to terrorism, inducing banks, business partners, academic institutions, and others to stop dealing with those targets.

These allegations adequately plead an association-in-fact enterprise. After all, "the RICO net is woven tightly to trap even the smallest fish, those peripherally involved with the enterprise." *Schacht*, 711 F.2d at 1360 (quotation marks omitted); *see also United States v. Oreto*, 37 F.3d 739, 751 (1st Cir. 1994) ("Congress intended to reach all who participate in the conduct of that enterprise, whether they are generals or foot soldiers.").

Additionally, the FAC plausibly pleads that the enterprise engaged in a pattern of racketeering activity, as required under 18 U.S.C. § 1962(a)–(c), by alleging a series of related

predicate acts demonstrating the existence and threat of continued criminal activity. Contrary to Defendants' assertions, the allegations extend far beyond a single scheme or discrete goal, and the Court can take notice of additional factual circumstances further substantiating the pattern. Defendants engaged in a pattern of racketeering activity by conducting multiple schemes over several years targeting dozens of victims using nearly identical methods. In fact, the FAC identifies specific actions by Alp and its co-defendants, including sending misleading, fraudulent, and false content via U.S.-hosted platforms and directly engaging with compliance officers and journalists in the United States. Alp's internal communications described a "continuous pattern of racketeering", including media manipulation, lobbying decision-makers, and activating a network of trusted journalists to amplify fraudulent, misleading, and false narratives. These actions meet both the closed-ended continuity—with years of sustained disinformation campaigns—and open-ended continuity, as Alp proposed extending its harmful campaigns through a new five-year action plan. See *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 240 (1989).

Closed-ended continuity is supported by Alp's "Action Plan," which began in 2018 and aimed to damage reputations through multi-year efforts involving negative press, compliance database manipulation, and direct lobbying of decision-makers. Open-ended continuity is evident from Alp's acknowledgment that their operations would persist well into the future, explicitly stating their intent to "maintain long-term pressure campaigns" against targets like Plaintiff.

As a general matter, to satisfy RICO's pattern requirement, a plaintiff need only show two related predicate acts over a ten-year period. 18 U.S.C . §1961(5); *see Lu v. Lezell*, 45 F. Supp. 3d 86, 96 (D.D.C. 2014). "[E]vidence of multiple schemes is not required ... and, indeed, proof of a single scheme can be sufficient so long as the predicate acts involved are not isolated or sporadic." *Turner v. Cook*, 362 F.3d 1219, 1229 (9th Cir. 2004); *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229,

240 (1989) ("[I]t is implausible to suppose that Congress thought continuity might be shown *only* by proof of multiple schemes."). For predicate acts to form a "pattern," there must be sufficient "continuity" between the defendant's unlawful actions. *Lezell*, 45 F. Supp. 3d at 99 (allowing RICO case to proceed where defendants allegedly "defraud[ed] three separate Plaintiff on three distinct occasions").

First, the FAC identifies multiple predicate acts—including mail fraud, wire fraud, and bank fraud—targeting not just Dr. Hafez but also other individuals and entities, as evidenced by the documents and materials obtained by anonymous hackers. These records detail a coordinated and premeditated enterprise whose unlawful conduct extended beyond the injury to Dr. Hafez and impacted other victims through similar predicate acts.

Second, the Arnica-labeled documents and other leaked action-plan documents referenced in the FAC and annexed as exhibits to Pl. Decl. highlights the enterprise's "Global Action Plan" and its premeditated strategy to target multiple individuals and organizations through coordinated racketeering activities. This document evidences not only the continuity of the enterprise's unlawful conduct but also its clear intent to engage in further predicate acts over an extended period, satisfying the requirement for demonstrating the threat of continued criminal activity.

Third, the FAC also pleads that the enterprise's conduct caused harm to numerous other individuals, including reputational and financial injuries, as part of a broader scheme to silence, discredit, or financially incapacitate its targets. While the FAC focuses on Dr. Hafez as a primary victim, it identifies "dozens of other targets" similarly impacted by the enterprise's unlawful conduct, further evidencing the existence of multiple victims and a broader pattern of racketeering activity. A compelling example of said pattern, the FAC's detailed reference of which the European Defendants appear to ignore, is evidenced by Hazim Nada and his company Lord

Energy, who have filed a separate lawsuit in this District against the same Defendants, alleging substantially identical claims and identifying the same RICO enterprise. This parallel lawsuit serves as an independent corroboration of the ongoing and systemic nature of the enterprise's conduct, demonstrating that the pattern of racketeering activity was not limited to Dr. Hafez's case alone. Moreover, said lawsuit itself identifies other schemes perpetrated by the same enterprise to other individuals and entities with an almost identical *modus operandi*, including the instant action initiated by Dr. Hafez. While the European Defendants appear to disregard the FAC's detailed account of the circumstances involving Hazim Nada and Lord Energy's matter, the existence of this parallel action alone undercuts Defendants' argument that the enterprise had only a singular goal or victim. Defendants, in addition to ignoring and downplaying the scope of the conspiracy alleged, relies on cases that lack anything close to the number of schemes and victims, the yearslong temporal scope, and the targeted, repeated, and continuous conduct that characterize the Defendants' pattern of racketeering activity. For example, *Edmondson & Gallagher v. Alban Towers Tenants Ass'n*, 48 F.3d 1260, 1263 (D.C. Cir. 1995) involved a "single scheme ... designed to frustrate one transaction and inflicting a single, discrete injury on a small number of victims." Those facts are not comparable to the facts here. The allegations in the FAC and in Pl. Decl. are more than sufficient at the pleading stage to establish that the enterprise conducted similar, yet distinct campaigns involving numerous predicate acts of wire fraud, mail fraud, and bank fraud against other individuals and entities targeted as Dr. Hafez.

Clearly, the allegations in the FAC, when viewed in conjunction with publicly available evidence and related legal proceedings, unequivocally establish a pattern of racketeering activity involving numerous predicate acts, victims, and goals. This plainly meets the statutory requirements for pleading a RICO claim, and Defendants' attempt to dismiss the pattern as a single

scheme with a singular purpose fails in light of the FAC's comprehensive allegations and the available evidence.

### 4.    Plaintiff State Rico Conspiracy Claims Under 18 U.S.C. §1962(D)

The FAC establishes a well-pleaded RICO conspiracy claim under 18 U.S.C. §1962(d), demonstrating that the European Defendants knowingly participated in an unlawful enterprise designed to harm Plaintiff's business, reputation, and professional opportunities through coordinated and deliberate efforts. Liability under §1962(d) does not require that each conspirator commit a predicate act; rather, it suffices to show that Defendants knowingly agreed to further the conspiracy with the understanding that predicate acts would be committed by other members. See *Salinas v. United States*, 522 U.S. 52, 65 (1997).

The FAC details Defendants' agreement and participation in the enterprise through specific actions, including orchestrating and amplifying smear and fraudulent campaigns targeting Plaintiff, disseminating false and misleading information to compliance officers and media outlets, and manipulating U.S.-focused search engines to ensure the false narratives reached their intended audience. Defendants' internal communications, which describe their roles in executing "viral communication campaigns" and their close collaboration with Alp, underscore their shared intent and agreement to advance the enterprise's unlawful objectives. Additionally, Defendants' invocation of the intracorporate conspiracy doctrine is unavailing, as the doctrine does not apply to association-in-fact enterprises involving multiple actors, each acting in concert to achieve the unlawful goals of the conspiracy. See *Fuji Photo Film U.S.A., Inc. v. McNulty*, 640 F. Supp. 2d 300, 321 (S.D.N.Y. 2009).

As such, The detailed allegations of Defendants' coordinated actions and their intent to harm Plaintiff through fraudulent schemes are more than sufficient to establish a plausible RICO conspiracy claim.

### 5. Plaintiff Suffered Injury to Business or Property

The European Defendants' argument that Plaintiff suffered no injury to "business or property" under RICO is fundamentally flawed. "At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992); *Scheidler*, 510 U.S. at 256 (finding RICO standing adequately pleaded where complaint alleged conspiracy "injured the business and/or property interests of the [petitioners]"). Plaintiff has alleged substantial financial harm resulting directly from Defendants' actions, including those associated with and causing Operation Luxor. These injuries include lost income from canceled speaking engagements and professional opportunities, as well as significant reputational damage that led to the withdrawal of numerous invitations to academic and professional forums, domestically and abroad. This exclusion curtailed Plaintiff's ability to engage with peers, secure professional collaborations, and maintain his standing in his field, all of which inflicted concrete harm on his business and career prospects. The freezing of Plaintiff's bank accounts and assets further exacerbated these injuries, creating immediate and significant financial strain. The inability to access funds disrupted Plaintiff's ability to meet ongoing financial obligations, including mortgage payments, and significantly hindered his economic stability. Additionally, Plaintiff incurred substantial relocation expenses as he was compelled to move to the United States, due to Defendants' unlawful scheme and Vidino's misleading reports, articles, and testimonies. These costs, among others, represent tangible and compensable injuries under RICO.

Defendants' characterization of the raid on Plaintiff's home during Operation Luxor as mere personal injury is incorrect. The raid resulted in significant material harm, including property damage to the entrance door, window, and alarm system, *inter alia*. Plaintiff also incurred financial costs associated with repairing this damage. These losses are distinct from emotional or psychological harm and constitute injuries to property cognizable under RICO.

Defendant's reliance on Plaintiff's distinguished professorship at Williams College to undermine his claims is utterly misleading. This position was secured prior to the events surrounding Operation Luxor, and was postponed initially due to the global pandemic, and later due to the very issues complained in Plaintiff's FAC and reiterated in Pl. Decl., not through any fault of Dr. Hafez. The temporary nature of the position – since concluded – underscores the disruption to Plaintiff's professional trajectory, which included the loss of his position at the University of Salzburg due to political pressure stemming from Defendants' actions and the fallout from Operation Luxor.

The protracted delay in processing Plaintiff's U.S. visa further disrupted his career. Normally a routine procedure, the process was delayed for six months due to the investigation linked to Operation Luxor and the associated stigma, causing professional uncertainty and forcing Plaintiff to accept interim employment in London, incurring in additional and unexpected financial burdens and expenses. This sequence of events not only disrupted Plaintiff's transition to the United States but also imposed additional financial and emotional burdens on him.

Defendants' actions delineated in the FAC inflicted severe reputational harm on Plaintiff, resulting in the withdrawal of professional opportunities and invitations to significant academic forums. For years, Plaintiff was effectively excluded from the academic and professional circles essential to his career advancement. This reputational harm had direct and measurable effects on

Plaintiff's financial and professional prospects, further compounding the injuries to his business and property. The details of such major injuries are also reiterated in Pl. Decl.

As such, Plaintiff has sufficiently alleged specific and tangible injuries to his business and property under RICO. These include lost income, professional disruptions, financial hardship from frozen assets, and reputational damage, all of which directly resulted from Defendants' actions. These injuries are neither speculative nor implausible but are instead not only the natural and foreseeable consequences of Defendants' misconduct but also their intended goal. Defendant's attempt to dismiss these claims fails to account for the full extent and context of Plaintiff's injuries, which are both substantial and cognizable under RICO.

### 6. Plaintiff's Injuries Are Domestic

The European Defendants' assertion that Plaintiff fails to allege a domestic injury is meritless. The FAC details numerous instances of harm experienced by Plaintiff. While some of the injuries Dr. Hafez suffered originated or developed abroad, several significant injuries were developed or occurred on U.S. soil, making them cognizable under the domestic-injury requirement of RICO. Crucially, Plaintiff's application of RICO to conduct that is both foreign and domestic is not impermissibly extraterritorial where, as here, there is domestic injury.

These injuries meet the standards of domestic injury. In *Yegiazaryan v. Smagin*, 599 U.S. 533 (2023), the Supreme Court explained that determining domestic injury is a context-dependent inquiry, focusing on whether the harm arose in the United States. In *Yegiazaryan*, the loss of access to a California arbitral judgment was deemed a domestic injury, despite the plaintiff's residence abroad, because the scheme was directed toward frustrating the judgment in the U.S. Similarly, here, the harm inflicted on Plaintiff—damaged reputation, lost professional opportunities, and

financial disruption—arose from Defendants' targeted actions aimed at U.S.-based audiences and entities.

The FAC alleges that Defendants disseminated false, fraudulent, and misleading narratives through U.S.-hosted platforms, directly contacted U.S.-based journalists and compliance officers, and manipulated U.S.-focused search engines to amplify these narratives. These actions led to tangible injuries within the United States, including professional exclusion, delayed visa processing, and financial losses tied to disrupted relocation efforts and missed employment opportunities.

At the pleading stage, general allegations of injury are sufficient to establish standing. See *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992); *Nat'l Org. for Women, Inc. v. Scheidler*, 510 U.S. 249, 256 (1994). Plaintiff has alleged specific harm to his professional trajectory within the United States, including exclusion from academic conferences, reputational harm, and delayed career advancements directly attributable to Defendants' actions.

Moreover, as in *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639 (2008), Plaintiff alleges that Defendants' fraudulent statements were specifically intended to influence third parties, resulting in foreseeable harm. Just as the Plaintiff in *Bridge* suffered the loss of valuable liens due to the defendants' fraudulent misrepresentations, Plaintiff here suffered harm to his reputation and professional opportunities due to Defendants' calculated campaign of misinformation.

The European Defendants' reliance on cases such as *Humphrey v. GlaxoSmithKline PLC*, 905 F.3d 694 (3d Cir. 2018), is misplaced. Unlike the Plaintiff in *Humphrey*, Plaintiff alleges specific domestic ties, including professional engagements and opportunities disrupted within the United States. Defendants' conduct was deliberately aimed at causing harm in U.S. markets and institutions, making Plaintiff's injuries fundamentally domestic in nature.

The FAC provides detailed allegations of how Defendants' actions inflicted harm within the United States, establishing a clear basis for domestic injury. As such, Defendants' Motion to Dismiss on this ground should also be denied.

### 7. Plaintiff Plausibly Alleges that the European Defendants Proximately Caused Plaintiff's Injuries

The European Defendants' argument that the FAC fails to plausibly allege proximate causation lacks merit and misrepresents the nature and scope of the allegations. Proximate cause under RICO requires that the harm be the natural and probable consequence of the racketeering activity. See *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 654 (2008).

Defendants disseminated misleading, false, and fraudulent content targeting Plaintiff to U.S.-based audiences and institutions, intending that these third parties would rely on their false representations. As the Supreme Court recognized in *Bridge*, a RICO Plaintiff can establish proximate cause even when the fraudulent misrepresentation is made to a third party, provided that the plaintiff suffers harm as a direct result of the third party's reliance. *Id*. at 656. Here, the European Defendants' false statements were expressly designed to cause U.S. academic institutions, journalists, and compliance officers to sever ties with Plaintiff, resulting in tangible harm to his reputation and career.

Defendants' campaign delayed Plaintiff's U.S. visa processing, forcing him to accept a position in London under adverse financial and professional circumstances. The financial losses incurred, including relocation expenses and missed opportunities, were direct and foreseeable consequences of Defendants' actions. Further, the campaign inflicted reputational damage that excluded Plaintiff from academic forums, professional engagements, and conference invitations, compounding the harm to his career.

Moreover, as in *Companhia Brasileira Carbureto de Calcio-CBCC v. Applied Industrial Materials Corp.*, 887 F. Supp. 2d 9 (D.D.C. 2012), where the court upheld proximate causation despite intervening third-party decisions, Plaintiff's injuries here flow directly from Defendants' fraudulent conduct. The mere presence of intermediaries does not break the causal chain when those intermediaries act in reliance on Defendants' misrepresentations. See *In re Avandia Mktg., Sales Pracs. & Prod. Liab. Litig.*, 804 F.3d 633, 645 (3d Cir. 2015).

The FAC provides detailed allegations tying these harms directly to Defendants' racketeering activities. The loss of Plaintiff's distinguished career trajectory, the financial strain from frozen assets, and the emotional toll of these events are all foreseeable and natural consequences of Defendants' conduct, meeting the proximate cause requirement under RICO. See FAC and Pl. Decl.

In light of the foregoing, it appears clear that Plaintiff has sufficiently alleged the RICO claims against the European Defendants and their Motion to Dismiss the RICO claims should be denied.

### D. THE COMMON-LAW FRAUD CLAIM IS PROPER

The European Defendants' arguments against Plaintiff's fraud claim are misplaced and misconstrue the allegations in the FAC. While the European Defendants attempt to compartmentalize Plaintiff's claims and dismiss their significance, the allegations – read holistically, accepting all factual allegations in the complaint as true, and construing all reasonable inferences in Plaintiff's favor – plausibly support each element of common-law fraud.

The essential elements of common law fraud are: (1) a false representation, (2) in reference to a material fact, (3) made with knowledge of its falsity, (4) with intent to deceive, and (5) on which reliance is placed. *See*, *Hughes v Abell*, 867 F Supp 2d 76, 92 (DDC 2012) (citing *Virginia*

*Acad. of Clinical Psychologists v. Group Hospitalization & Med. Servs., Inc.*, 878 A.2d 1226, 1233 [D.C. 2005]; *D'Ambrosio v. Colonnade Council of Unit Owners*, 717 A.2d 356, 360-61 [D.C. 1998]).

First, Plaintiff alleges specific false representations made with knowledge of their falsity, including statements published in the August 2017 report, "The Muslim Brotherhood in Austria," which bore GWU and POE's names on the cover, was disseminated through its official website, and is still held available online and in their archives. The report's funding, coordination, and publication were directly tied to GWU and POE, underscoring their involvement. Notably, this report was later shared with Alp and other Defendants involved in the scheme, was followed by Vidino's directly related testimonies to public officials and state authorities, and served as foundational groundwork for Operation Luxor. The fact that the report predates the formal agreement between Alp and Dr. Vidino bears little relevance; the FAC plausibly alleges that Defendants' coordinated efforts to harm Plaintiff were well underway and that GWU and POE's resources and veneer of legitimacy and credibility enabled these actions.

Second, Defendants' assertion that Plaintiff fails to meet the heightened pleading standards of Rule 9(b) is meritless. *See Bates v. Nw. Human Servs., Inc.*, 466 F. Supp. 2d 69, 88-89 (D.D.C. 2006) (quoting *Fink v. Nat'l Sav. & Trust Co.*, 772 F.2d 951, 963, 249 U.S. App. D.C. 33 (D.C. Cir. 1985)). Typically, compliance with Rule 9 pleading requirements means "stat[ing] the time, place and content of the false misrepresentations, the fact misrepresented[,] and what was retained or given up as a consequence of the fraud." *Bates v. Nw. Human Servs., Inc.*, 466 F. Supp. 2d 69, 88-89 (D.D.C. 2006) (quoting *U.S. ex rel. Williams v. Martin-Baker Aircraft Co.*, 389 F.3d 1251, 1256, 363 U.S. App. D.C. 419 [D.C. Cir. 2004]). Plaintiff identifies the "time, place, and content" of the fraudulent statements and misrepresentations with sufficient specificity. The August 2017

report, along with subsequent editorial articles and directly related testimonies to government officials sufficiently outlined in the FAC, falsely implied Plaintiff's association with the Muslim Brotherhood while omitting critical contextual information about his role as a voice against Islamophobia and in favor of religious tolerance.[1] These misrepresentations were deliberately crafted to manipulate perceptions among third parties, including Plaintiff's professional contacts and Austrian authorities, and to directly harm Plaintiff's reputation and career. The report's dissemination through institutional channels and its use in Operation Luxor underscore the calculated and far-reaching nature of the fraudulent scheme.

Third, Defendants misinterpret the reliance element of Plaintiff's fraud claim. While the alleged misrepresentations were directed at third parties, Plaintiff sufficiently alleges that they were deliberately designed to produce detrimental consequences for him. Courts recognize that reliance can encompass scenarios where false statements made to third parties foreseeably harm the plaintiff. Plaintiff explicitly alleges that Defendants' misrepresentations caused significant harm, including reputational damage, professional setbacks, and personal hardship. The argument that harm does not equate to detrimental reliance is unpersuasive; the FAC details how Defendants' fraudulent conduct foreseeably induced third parties, including Austrian authorities, to act to Plaintiff's detriment.

Fourth, Defendants' claim that Plaintiff fails to allege intent to deceive is unfounded.[2] Evidence establishing reckless disregard for the truth or falsity of a statement, as well as *willful*

---

[1] "A false representation may be either 'an affirmative misrepresentation or a failure to disclose a material fact when a duty to disclose that fact has arisen.'" *Sundberg v. TTR Realty, LLC*, 109 **A**.3d 1123, 1131 (D.C. 2015) (quoting *Saucier v. Countrywide Home Loans*, 64 A.3d 428, 438 [D.C. 2013]); see also, *Jericho Baptist Church Ministries, Inc. (D.C.)*, F. Supp. 3d at 8.

[2] "The question of fraudulent intent is a question of fact that is rarely appropriate for [stages of the litigation preceding trial]." *Philip Morris USA, Inc.*, 337 F Supp 2d at 24 (citing *Citizens Bank of Clearwater v. Hunt*, 927 F.2d 707, 711 (2d Cir. 1991); *ABB Daimler-Benz Transport. (N. Amer.), Inc. v. Nat'l RR Passenger Corp.*, 14 F. Supp. 2d 75, 86 (D.D.C. 1998).

*blindness*, satisfies the intent standard. *United States v. Munoz*, 233 F.3d 1117, 1136 (9th Cir. 2000) ("reckless indifference to the truth or falsity of a statement satisfies the specific intent requirement in a mail fraud case"); *In re Korean Airlines Disaster of September 1*, 1983, 704 F. Supp. 1135, 1136 (D.D.C. 1988), aff'd in relevant part, 932 F.2d 1475 (D.C. Cir. 1991); *United States v. Prows*, 118 F.3d 686, 692 (10th Cir. 1997); *United States v. Coyle*, 63 F.3d 1239, 1243 (3rd Cir. 1995). In addition, "[f]raudulent intent may be inferred from the modus operandi of the scheme." *United States v. Reid*, 533 F.2d 1255, 1264, 175 U.S. App. D.C. 120 (D.C. Cir. 1976). Fraudulent intent may also be proven by inference from the totality of the circumstances, including by indirect or circumstantial evidence. *See*, e.g., *United States v. Alston*, 609 F.2d 531, 538, 197 U.S. App. D.C. 276 (D.C. Cir. 1979) (totality of the circumstances); *United States v. Sawyer*, 85 F.3d 713, 733 (1st Cir. 1996) (indirect and circumstantial evidence).

In this case, evidence of the existence and methods of the Enterprise's overall scheme to defraud and Defendants' individual roles in that Enterprise – including each Defendant's purposeful and conscious actions taken in light of its collective knowledge – reveals a cumulative pattern of decisions, actions, and inaction that is powerful circumstantial evidence of specific fraudulent intent. The FAC provides specific allegations of Defendants' intent, including their deliberate efforts to disseminate false statements and their coordination in crafting and promoting the August 2017 report. The inclusion of the University's name on the report and the agreement between Alp and Vidino – bearing GWU as a signatory – further reinforces the institutional Defendants' involvement and intent to legitimize and amplify these falsehoods. Plaintiff alleges that the Defendants, acting with the requisite knowledge and intent, orchestrated a scheme designed to

damage his reputation and professional standing. For these reasons, Plaintiff's fraud claim is adequately pled, and Defendants' arguments for dismissal should be rejected.[3]

### E.  THE UNFAIR TRADE PRACTICES CLAIM IS PROPER

The Columbia Consumer Protection Procedures Act ("CPPA") makes it unlawful "for any person to engage in an unfair or deceptive trade practice, whether or not any consumer is in fact misled, deceived, or damaged thereby." D.C. Code § 28-3904. The statute defines unfair or deceptive trade practices to include, *inter alia*, the representation that goods or services have characteristics that they do not have, the representation that goods or services are of a particular standard, quality, or style if in fact they are of another, and the misrepresentation or failure to state a material fact which has a tendency to mislead. *See Id*. §§ 28-3904(a), (d), (e), (f). "When used as an adjective" under the statute, the word "consumer" "describes anything, without exception, that" a "person does or would purchase, lease (as lessee), or receive and normally use for personal, household, or family purposes." *Id.* § 28-3901(a)(2)(B). The statute likewise defines "goods and services" broadly to include "any and all parts of the economic output of society, at any stage or related or necessary point in the economic process, and includes consumer credit, franchises, business opportunities, real estate transactions, and consumer services of all types." *Id.* § 28-3901(a)(7). Because the "purpose of the CPPA is to protect consumers from a broad spectrum of unscrupulous practices by merchants," the statute "should be read broadly to assure that the purposes are carried out." *Qureshi v Am. Univ.*, 2023 US Dist LEXIS 38041, at *7-8 [DDC Mar. 7, 2023, No. 20-cv-1141 (CRC)], quoting *Mod. Mgmt. Co. v. Wilson*, 997 A.2d 37, 62 (D.C. 2010).

---

[3] Assuming arguendo that the Court were inclined to grant GWU and POE's motion to dismiss the common law fraud claim, it should be noted that "dismissal of the Plaintiff' fraud claim does not require the dismissal of the Plaintiff' RICO claims." *Regency Communs., Inc.*, 160 F Supp 2d at 43-44 (DDC 2001).

As such, while the European Defendants focus narrowly on the absence of a consumer-merchant relationship between Plaintiff and Defendants, this does not necessarily foreclose liability under the CPPA, as the statute's scope extends beyond direct consumer transactions in certain contexts involving deceptive or unfair conduct.

The FAC sufficiently alleges that Defendants engaged in conduct aimed at interfering with Plaintiff's professional and personal affairs through deceptive means, thereby invoking principles of unfair trade practices. While Defendant may not sell traditional "consumer goods or services," their actions can still be construed as unfair practices under the CPPA if they involve deceptive conduct impacting the public or specific individuals in a manner consistent with the statute's protective aims. Quite disturbingly, until investigative reporting exposed the enterprise's dishonesty, Plaintiff, as well as other individuals and companies similarly situated, and the general public, had no way of knowing that Defendant Vidino's unsubstantiated and unfounded attacks were, in fact, funded by the UAE, either through the European Defendants or through GWU's benefactors. The fact that Defendants GWU, the Program on Extremism, Vidino and the European Defendants were acting on behalf of foreign governments without registering under the Foreign Agents Registration Act allowed Vidino to deceive others in academia and government while silencing Plaintiff to please a foreign paymaster.

Moreover, the focus on whether Defendant engages in "trade practices" fails to account for the broader context of Defendant's conduct, which involves coordinated efforts to disseminate false information and interfere with Plaintiff's professional opportunities, under the concealed identity of commissioned agents a sovereign entity's. These actions, while not fitting neatly into the consumer-merchant framework Defendant emphasizes, nonetheless reflect practices aimed at causing harm through deception, which aligns with the CPPA's purpose of preventing such

misconduct. The CPPA's provision defining unfair or deceptive trade practices offers a long, non-exhaustive list of qualifying practices, including representing "that goods or services have a source, sponsorship, approval, certification, accessories, characteristics, ingredients, uses, benefits, or quantities that they do not have," representing that goods or services "are of particular standard, quality, grade, style, or model, if in fact they are of another," "misrepresent[ing] as to a material fact which has a tendency to mislead," "fail[ing] to state a material fact if such failure tends to mislead," using "innuendo or ambiguity as to a material fact, which has a tendency to mislead," and making or enforcing "unconscionable terms or provisions of sales or leases." *See* D.C. Code § 28-3904(a), (d), (e), (f), (f-1), (r); *see Atwater v. D.C. Dep't of Consumer & Regul. Affs., 566 A.2d 462, 466 (D.C. 1989)* (list of forbidden practices "was not designed to be exclusive").

Finally, Defendant's attempt to dismiss the claim as frivolous disregards the factual allegations and intent of the CPPA to address deceptive practices that can harm individuals, regardless of the precise nature of the underlying relationship. Plaintiff's claim is based on deliberate and malicious actions designed to mislead and harm, which are entirely within the ambit of the CPPA's protective goals. As such, the claim is neither frivolous nor inapplicable and should not be dismissed.

### F.  THE TORTIOUS INTERFERENCE CLAIM IS PROPER

The tort of intentional interference with a contract "is committed when a third party's intentional interference with another in his or her business or occupation induces a breach of an existing contract or, absent an existing contract, maliciously or wrongfully infringes upon an economic relationship." *Macklin v. Robert Logan Assocs.*, 334 Md. 287, 639 A.2d 112, 117 (Md. 1994). To state claims for tortious interference under District of Columbia law, a plaintiff must allege the existence of a contract or business expectancy, the defendant's knowledge of the contract

or business expectancy, intentional interference causing the breach of the contract or termination

of the business expectancy, and damages. *Banneker Ventures, LLC v. Graham*, 418 US App DC

398, 413, 798 F3d 1119, 1134 (2015), citing *Sturdza v. United Arab Emirates*, 281 F.3d 1287,

1305, 350 U.S. App. D.C. 154 (D.C. Cir. 2002); *Bennett Enters., Inc. v. Domino's Pizza, Inc.*, 45

F.3d 493, 499, 310 U.S. App. D.C. 192 (D.C. Cir. 1995).

 The Courts in the District of Columbia have adopted the Restatement's formulation of the

claim of tortious interference. *Havilah Real Prop. Servs., LLC v. VLK, LLC*, 108 A.3d 334, 345

(D.C. 2015). The Restatement recognizes following inducement theory: "One who intentionally

and improperly interferes with the performance of a contract . . . between another and a third person

by inducing . . . the third person not to perform the contract, is subject to liability to the other for

the pecuniary loss resulting to the other from the failure of the third person to perform the contract."

 *Onyeoziri v. Spivok*, 44 A.3d 279, 286-87 (D.C. 2012) (second ellipsis added) (quoting

Restatement (Second) of Torts § 766 (1979) ("Restatement")); *see also* Restatement §766B

(defining tortious interference with prospective business advantage to include interference

consisting of "inducing . . . a third person not to enter into or continue the prospective relation).

 Under District of Columbia law, a tortious interference with prospective contractual

relations claim requires a valid business expectancy, the defendant's knowledge of the expectancy,

intentional interference causing a termination of the expectancy, and damages. *See Banneker*

*Ventures, LLC v. Graham*, 798 F.3d 1119, 1134, 418 U.S. App. D.C. 398 (D.C. Cir.

2015); *Browning v. Clinton*, 292 F.3d 235, 242, 352 U.S. App. D.C. 4 (D.C. Cir. 2002); *Havilah*

*Real Prop. Servs., LLC v. VLK, LLC*, 108 A.3d 334, 345-46 (D.C. 2015). This theory of tortious

interference protects "business expectancies, not grounded on present contractual relationships but

which are commercially reasonable to anticipate, . . . from unjustified interference." *Carr v. Brown*, 395 A.2d 79, 84 (D.C. 1978).

The European Defendants' arguments regarding the tortious interference claim fundamentally misrepresent the detailed allegations in the FAC, which clearly identify the contractual and business relationships that Defendants intentionally sought to disrupt. The FAC outlines specific relationships, such as Plaintiff's roles as a visiting professor and guest speaker at numerous international and domestic universities and think tanks, speaking engagements at academic and professional institutions, and invitations to participate in publishing opportunities and conferences. All these relationships and engagements were suddenly curtailed following the coordinated smear campaign orchestrated by Defendants. Additionally, the FAC highlights tangible harm to Plaintiff's professional relationships, including but not limited to the freezing of bank accounts and visa-related complications, which are directly traceable to Defendants' calculated actions.

The FAC further establishes that Defendants knowingly engaged in a coordinated scheme aimed at interfering with Plaintiff's business relationships and professional opportunities. It details how Defendants disseminated false information and fabricated narratives designed to tarnish Plaintiff's reputation and sever critical relationships. For instance, Defendants provided fabricated reports, misleading content, and false information to compliance officers and academic institutions, falsely linking Plaintiff to extremist organizations. These deliberate actions were designed to erode trust in Plaintiff within his professional and academic community, leading to the cancellation of contracts and loss of critical opportunities. These actions were neither incidental nor benign; they were intentional efforts to disrupt Plaintiff's career and cause measurable harm.

Contrary to Defendants' assertion that Plaintiff's claims rely on vague or speculative allegations, the FAC provides substantial evidence of intent, including specific documents and communications detailing Defendants' coordinated efforts to undermine Plaintiff. For instance, Alp's internal communications reveal explicit instructions to "target" Plaintiff with defamatory narratives and to "amplify" these claims through international media channels and compliance watchdogs. These materials demonstrate a deliberate enterprise orchestrated to harm Plaintiff's standing and relationships within his professional community.

Defendants' attempt to diminish the impact of the allegations by portraying Plaintiff's departure from the University of Salzburg as a "self-inflicted injury" ignores the reality of the harm caused by Defendants' actions. The decision to leave Austria and accept a position elsewhere was not voluntary in any meaningful sense; it was a direct consequence of the reputational and professional damage caused by Defendants' conduct. The FAC specifically alleges that the political pressure resulting from Defendants' fraudulent campaign influenced the University of Salzburg's decision not to renew Plaintiff's contract, forcing Plaintiff to seek employment abroad under adverse circumstances. The causal connection between Defendants' interference and the resultant harm is neither attenuated nor speculative—it is well-documented and rooted in the Defendants' malicious intent, as reiterated in Pl. Decl.

Finally, the FAC explicitly alleges that the European Defendants acted with intent to interfere with Plaintiff's business relationships. Far from being generalized or conclusory, these allegations are supported by detailed descriptions of the enterprise's objectives and actions. The FAC cites Defendants' own documents, which celebrated the professional harm inflicted on Plaintiff, noting that the campaign against him was "90% complete" and that "media attacks" had successfully led to "financial difficulties" and "professional exclusion." Defendants' argument that

no intent has been sufficiently alleged is unsupported by the clear and specific evidence presented

in the FAC. Plaintiff has thus adequately stated claims for tortious interference, and these claims

should not be dismissed.

### G. THE PRIMA FACIE TORT CLAIM IS RECOGNIZED IN THE DISTRICT AND IS PROPER

Defendants' argument that prima facie tort is not recognized under D.C. law overlooks the

FAC's clear and specific allegations of intentional harm. While the label "prima facie tort" may

not be expressly embraced in D.C., the principles underlying such claims – intentional infliction

of harm without justification – are well-recognized under general tort law. *See*, e.g., *Taylor v. Dist.*

*of Columbia Water & Sewer Auth.*, 957 A2d 45, 50 (DC 2008).

> Section 870 of the RESTATEMENT (SECOND) OF TORTS describes a prima facie tort, in part: 'One who intentionally causes injury to another is subject to liability to the other for that injury, if his conduct is generally culpable and not justifiable under the circumstances.' And, Comment a explains that this tort 'is intended to serve as a guide for determining when liability should be imposed for harm that was intentionally inflicted, even though the conduct does not come within the requirements of one of the well established and named intentional torts.'

*Taylor*, 957 A2d at 50 (citing *Pulaski Constr. Co. v. Air Frame Hangars, Inc.,* 950 A.2d 868, 870

[N.J. 2008]) ("Assuming, without deciding, that our common law may admit of a cause of action

for prima facie tort, it is solely a gap-filler. That is, the availability of the prima facie tort doctrine

is limited exclusively to those instances of intentional and culpable conduct unjustified under the

circumstances that, as a threshold matter, do not fall within a traditional tort cause of action").

The FAC demonstrates that Defendants engaged in a deliberate and coordinated campaign

to harm Plaintiff. Their actions, including the dissemination of false and defamatory information,

were calculated to disrupt Plaintiff's professional opportunities, destroy his reputation, and cause

significant economic harm. These allegations sufficiently describe broader malicious conduct

aimed at undermining Plaintiff's livelihood. Plaintiff details substantial harm resulting from

Defendants' actions, including relocation costs, disrupted career prospects, lost business relationships, and emotional damage. Defendants' argument that these claims are insufficiently precise mischaracterizes the nature of the allegations. The FAC clearly establishes that the harm was intentional, unjustified, and directly tied to Defendants' conduct.

Even if labeled differently, the intentional and malicious conduct alleged in the Complaint is sufficient to support the claim. Defendants' dismissal of this claim is unwarranted, as the allegations provide a clear basis for the intentional infliction of harm and justify its continuation at this stage.

## IV.  THE EUROPEAN DEFENDANTS' CHALLENGE TO CLASS ALLEGATIONS IS PREMATURE

Historically, courts have been "hesitant to delve deep into the merits of the plaintiff's class allegations" where there had been "no discovery whatsoever." *Smith v. Washington Post Co.*, 962 F. Supp. 2d 79, 90 (D.D.C. 2013). Courts are generally cautious in delving deep into the merits of Plaintiff's class allegations. In this case, just like in *Smith*, "[t]here has been no discovery whatsoever in this matter" and, as such, the Court should not "litigate prematurely the sufficiency of the complaint and the appropriateness of class certification." *Id.*, quoting *In re Rail Freight Fuel Surcharge Antitrust Litig.,* [*91]  258 F.R.D. 167, 175 (D.D.C. 2009), *quoting Gray v. First Winthrop Corp.,* 133 F.R.D. 39, 41 (N.D. Cal. 1990).

Furthermore, The European Defendants' contention that the class action claim should be dismissed is unsupported by the facts or the law. The FAC adequately pleads the requirements for class certification under Rule 23 of the Federal Rules of Civil Procedure. "A case may proceed as a class action if the four prerequisites of Fed. R. Civ. P. 23(a) are met, and one of the three elements of Fed. R. Civ. P. 23(b) is satisfied." *Foltz v U.S. News & World Report, Inc*., 106 FRD 338, 339 (1984). The four prerequisites of Rule 23(a) require that: (1) the class is so

numerous that joinder is impractical; (2) that there are questions of law or fact which are common to the class the plaintiff seeks to represent; (3) that the claims or defenses of the representative parties are typical of the claims of the class; and (4) that the representative parties will fairly and adequately protect the interests of the class. *See* Rule 23(a).

Plaintiff meets the class action requirements, including numerosity, commonality, typicality, and adequacy of representation. *See Id*. Plaintiff identifies a class of individuals similarly harmed by Defendants' coordinated disinformation campaigns, including individuals falsely accused of extremist ties, subjected to reputational harm, and excluded from professional and financial opportunities as a result of Defendants' malicious actions.

First, the FAC states that the enterprise targeted more than 50 individuals and entities, using the same "viral communication" and "discreet lobbying" tactics they employed against Dr. Hafez, satisfies the numerosity requirement by alleging a sufficiently large group of individuals who were similarly harmed by Defendants' conduct. As such, the FAC identifies numerous individuals targeted by Defendants' smear campaigns, including academics, professionals, and other high-profile individuals, all of whom suffered comparable harm. These individuals, which are  share common grievances arising from Defendants' coordinated enterprise, making joinder impracticable.

Second, the FAC establishes commonality by identifying common questions of law and fact that unite the class. For example, the FAC details how Defendants used identical methods, including fabricated reports, false media narratives, and manipulated compliance databases, to target class members and achieve the same unlawful objectives. These common issues—such as the enterprise's use of false, misleading, inflammatory, and fraudulent narratives and the resulting professional and reputational harm—are central to the claims of all class members.

Third, Plaintiff's claims are typical of the class. As a distinguished academic and professional, Plaintiff was subjected to the same defamatory tactics, financial disruption, and reputational harm as other class members. Plaintiff's injuries stem from the same unlawful scheme and raise the same legal and factual questions, ensuring that his claims are representative of the class.

Finally, Plaintiff will adequately represent the class. The FAC demonstrates Plaintiff's commitment to seeking justice not only for himself but also for others similarly harmed by Defendants' conduct. The coordinated and systemic nature of Defendants' actions makes this case uniquely suited for class certification, as it seeks to address widespread harm caused by a singular, identifiable enterprise.

The European Defendants' arguments against the class action claim mischaracterize the allegations and misapplied the requirements of Rule 23. The FAC provides ample detail to support class certification and demonstrates that the class action claim is proper. The Motion to Dismiss this claim should therefore be denied.

## <u>CONCLUSION</u>

For the foregoing reasons, Plaintiff respectfully requests that the Court deny the European Defendants' Motion to Dismiss and award such other and further relief as it deems just and proper. Contrary to Defendants' assertions, the Complaint details actionable conduct, including significant RICO violations, intentional interference with specific business relationships, fraudulent misrepresentations, and coordinated efforts to undermine Plaintiff's professional standing. The allegations demonstrate a clear and proximate connection between Defendants' actions and Plaintiff's injuries, establishing plausible claims under both federal and state law. Accordingly, Plaintiff respectfully requests that the Court deny the European Defendants' Motion to Dismiss

and award such other and further relief as it deems just and proper.[4] Pursuant to LCvR 7(f),

Plaintiff respectfully requests an oral hearing on Defendants' Motion to Dismiss.


Dated: January 13, 2025
     New York, New York            **AIDALA, BERTUNA & KAMINS, P.C.**

                                           _/s/ David M. Schwartz_
                                     David M. Schwartz, Esq. (DC #208813)
                                     Arthur L. Aidala, Esq.
                                     (_Pro Hac Vice Admission Forthcoming_)
                                     Imran H. Ansari, Esq.
                                     (_Pro Hac Vice Admission Forthcoming_)
                                     546 Fifth Avenue, 6th Floor
                                     New York, NY 10036
                                     (212) 641-0499
                                     david@davidschwartzesq.com
                                     aidalaesq@aidalalaw.com
                                     iansari@aidalalaw.com

                                     _Attorneys for Plaintiff Farid Hafez_

---

[4] Plaintiff contends that his FAC is facially sufficient as is. However, assuming _arguendo_ that the Court were inclined to grant the European Defendants' motion, Plaintiff respectfully requests the Court to provide him with an opportunity to amend the FAC, or that the eventual dismissal be without prejudice, and allow Plaintiff fair opportunity to file a new complaint. This is particularly applicable when the Complaint asserts a claim that is on its face nonfrivolous. _See_, e.g., _Simmons v Abruzzo_, 49 F3d 83, 86-87 (2d Cir 1995). In fact, contrary to Defendants' meritless assertions, the amendment of the Original Complaint was only done to comply with Local Civil Rule ("LCvR") 5.1(c) and consisted in (i) adding names and full residence addresses of each party and (ii) using a correct civil cover sheet. _See_, Notice of New Case Error, dated March 27, 2024, on ECF. Therefore, any future amendment would not be futile, but rather warranted at this stage of the litigation, where parties have not even engaged in discovery yet.