**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---------------------------------------------------------------X
:
FARID HAFEZ, individually and on behalf of : Civil Action No.: 1:24-cv-00873-AHA
all others similarly situated, :
:
:
Plaintiff, : **DECLARATION OF FARID HAFEZ**
: **IN SUPPORT OF PLAINTIFF'S**
v. : **OPPOSITIONS TO DEFENDANTS'**
: **MOTIONS TO DISMISS**
LORENZO VIDINO, individually and in his : **PLAINTIFF'S FIRST AMENDED**
respective corporate capacities, GEORGE : **COMPLAINT**
WASHINGTON UNIVERSITY, PROGRAM :
FOR EXTREMISM AT THE GEORGE :
WASHINGTON UNIVERSITY, ALP :
SERVICES SA, DILIGENCE SARL, MARIO :
BRERO, MURIEL CAVIN, LIONEL BADAL, :
ARIAF STUDIES AND RESEARCH LLC, and :
DOES 1 through 25, ;
:
Defendants. :
---------------------------------------------------------------X

FARID HAFEZ, pursuant to 28 U.S.C. § 1746, declares under the penalty of perjury, as follows:

1. I am Plaintiff in the above captioned action, and as such, I have personal knowledge of the facts and circumstances of this action.

2. This declaration is submitted in support of Plaintiff's Oppositions to Defendants' Motions to Dismiss Plaintiff's First Amended Complaint ("Complaint").

3. I believe and contend that I am one of the targeted victims of a years-long "dark" public relations campaign managed and directed through the Swiss private investigative firms, Alp Services S.A. ("Alp") and Diligence SARL ("Diligence"), which were founded, owned, and run by Mario Brero ("Mr. Brero") and Muriel Cavin ("Ms. Cavin") and bankrolled by the United Arab

1

Emirates ("UAE"), including but not limited through Ariaf Studies and Research LLC ("Ariaf"). The UAE and its officials, along with Alp, Mr. Brero, Ms. Cavin, and their employees, including Lionel Badal ("Mr. Badal"), operated as an association-in-fact enterprise that leveraged a network of co-conspirators – including but not limited to private operatives, paid journalists, and, most relevantly, the Director of the Program on Extremism at the George Washington University in Washington, D.C. ("GWU"), Lorenzo Vidino ("Dr. Vidino") – to smear dozens of innocent victims.

4. The enterprise has a clear organization and structure. Under the guidance and instructions of the UAE through Ariaf, Alp, Mr. Brero, Ms. Cavin, and Mr. Badal carried out the enterprise's day-to-day operations, among other things, proposing targets, hiring sources, and commissioning false and misleading articles. Among the co-conspirators, Alp led the misleading articles. The articles' main initiative was to be published and disseminate the enterprise's false and misleading claims. To carry out this fraudulent scheme, Alp hired and worked with several academics, journalists, and reporters – including Dr. Vidino, GWU, and its Program on Extremism – to disseminate false information about me and other similarly situated targets with the specific intent of fraudulently inducing the targets' business associates, employers, academics, and others, to break ties with them.

5. For years, this enterprise made false and misleading statements to the press, on Wikipedia – placing them on American search engines such as Google, Yahoo!, and Bing, and elsewhere online – and to the world's top financial risk compliance monitors as part of an overarching scheme to "destroy" their targets' businesses and reputations by defrauding banks, their targets' business partners, employers, academics, government decision makers, and the public.

6. More than 8,000 of the enterprise's internal secret documents, which came to light through action of anonymous hackers in April 2021 and were shared with law enforcement agencies, evidence the enterprise's objectives, its longevity, and its devastating consequences. This only became a matter of public knowledge after a number of renowned periodicals started to report on it, including but not limited to *The New Yorker* and *Der Spiegel*, which directly mention Dr. Vidino, the GWU, its Program on Extremism, and their ties to the UAE and the other Defendants in this action.

7. These articles, along with subsequent press pieces in American and international papers, uncovered the fact that Dr. Vidino is a paid mouthpiece of the UAE and the other foreign entities part of the enterprise. Dr. Vidino, as part of his work for the UAE and the enterprise, has engaged in demonization campaigns against the political rivals of the UAE and any of their perceived enemies here in the United States. To add insult to injury, under the false aegis of scholarship, he assembled enemies lists and, through an intermediary (Alp), fed it back up to the UAE. For his spurious work product, Dr. Vidino was rewarded monetarily, but also with his standing with UAE-based think tanks, one being closely associated with the UAE royal family.[1]

8. Notably, Dr. Vidino leveraged his role as the Director of The Program on Extremism at GWU in furtherance of the UAE and the Defendants' enterprise's agendas. Ample

---

[1] For further reference, relevant portions of the articles in The New Yorker and Der Spiegel are included in my Complaint, located at pages 14 through 18. The original articles are available online and accessible through the following links: David D. Kirkpatrick, "The Dirty Secrets of a Smear Campaign," *The New Yorker*, March 27, 2023, https://www.newyorker.com/magazine/2023/04/03/the-dirty-secrets-of-a-smear-campaign; Muriel Kalisch, Monika Bolliger, Rafael Buschmann, Nicola Naber und Sven Becker, "Abu Dhabi Secrets - How United Arab Emirates Seeks to Leverage Its Influence in Europe," *Der Spiegel*, November 7, 2023, https://www.spiegel.de/international/world/abu-dhabi-secrets-how-qatar-seeks-to-leverage-its-influence-in-europe-a-d0058776-2806-464d-9e0b-1fd3b6a07282.

evidence now in the public domain substantiates that the UAE are working to influence the narrative on Islam in the West through the GWU's Program on Extremism and Dr. Vidino.[2]

9. I was targeted by Defendants' illicit activities, which included branding anyone whom the UAE perceived to be pro-Islamic as terrorists or extremists with ties to groups like the Muslim Brotherhood, to my extreme detriment – as delineated herein and in my Complaint.[3] Accordingly, Alp – along with the members of the enterprise – concocted and widely publicized a false narrative accusing me of terrorist ties and Muslim Brotherhood associations, notwithstanding the complete absence of credible or evidenced associations between myself and any radicalized Islamists or the Muslim Brotherhood.

10. This is evidenced by a series of internal documents – usually labeled with the term "Arnica" – circulated within the enterprise portraying their action plans and proposals to the UAE. Said documents explicitly described plans to launch "widespread offensive actions" against Qatar and its networks, including the Muslim Brotherhood. Alp proposed making "advanced cartographies of our targets' secret influence networks in Europe and the US," conducting "investigations to obtain damaging negative material on our key targets," and engaging in "offensive viral communication to discredit and embarrass key targets" using "dark PR" and "fake news."[4] With respect to the offensive viral communications, Alp explained that, once it identified key targets and obtained "negative intelligence about them," it would "launch highly aggressive online negative campaigns, relaying and spreading in a viral and strategic manner the previously

---

[2] Elham Fakhro. *The Abraham Accords: The Gulf States, Israel, and the Limits of Normalization* (New York City: Columbia University Press, 2024). Fakhro speaks of the UAE's "tolerance-washing" of its authoritarian policies including the crackdown on civil society and free speech.
[3] *See*, ECF Doc. No. 5.
[4] Examples of Alp's "cartographies of our targets' secrete influence networks" are annexed hereto as **EXHIBIT A** and **EXHIBIT B**. Annexed hereto as **EXHIBIT C** is also a photo of UAE government official Matar Humaid al-Neyadi reviewing a similar, if not identical, cartography.

4

identified negative intelligence, which could then appear in mainstream media." Alp claimed it would use "tested advanced confidential techniques in 'dark PR'" and "aim to discredit [its] targets by discreetly, and subtly, diffusing embarrassing and compromising intelligence" to make their targets "appear as either perverts, corrupts, hypocrites and/or terrorists" in the "eyes of the media/public/officials." Alp wrote that it "could also use creative and particularly damaging actions, which [it] would describe verbally," and cautioned the UAE not to underestimate the "power of 'dark PR.'"

11. In addition to fabricating negative pages on Wikipedia, a U.S.-based company, and manipulating results on U.S.-based search engines like Google, Yahoo!, and Bing, the proposal and action plan documents emphasized publication of negative information in "English-speaking media," including "Daily Kos in the USA (which was once described as 'the second-best blog' by Time Magazine)" and the San Francisco-based blogging website Medium. The action plan also mentioned "[i]nform[ing] media UK + USA."

12. Upon information and belief, Alp also created a file linking individuals and institutions together alleging they are part of the Muslim Brotherhood network. I am included in this image, and specifically linked to the research project "The Bridge Initiative" at Georgetown University in Washington, D.C., arguing that this institution – whose director is Prof. John Esposito – is linked to the "US Muslim Brotherhood." This image was shared widely in anti-Muslim circles in Austria. *See*, **EXHIBIT A**.

13. Relevantly, Alp stated in said internal documents that "we believe that we could seriously damage, if not destroy, the reputation and viability of key MB European groups through our confidential offensive viral communication."[5]

---

[5] For further reference, see also **EXHIBIT A** and **EXHIBIT B**.

14. On April 30, 2018, Alp drafted a document with the file name "arnica 6-lorenzo-to do list-20180430," which included having Dr. Vidino prepare an "overview of key MB individuals/organisations/companies in the USA and interesting elements/rumours…to show our capacities by obtaining new, concrete, up-to-date information in the US."

15. The enterprise's campaign to "continue to critically reshape the reputation of [its] initial targets" was evidently successful. As a result of the enterprise's efforts, various financial institutions and business partners ended their long-existing relationships with the agenda's targets – including me – and others refused to start new business dealings with the targets.

16. To be specific and as it pertains to my specific situation, the Defendants' enterprise unlawfully manufactured and disseminated a false narrative accusing me of using scholastic posts and related associations as fronts to support the Muslim Brotherhood, even though there was no evidence that I ever had any ties to the Muslim Brotherhood.

17. What is more, Defendants' enterprise decided to hire "scholar" Dr. Vidino to provide a veneer of respectability and academic expertise to Alp's false claims accusing me of being a Muslim Brotherhood associate and providing these false claims the illusion of academic rigor – especially thanks to the direct association with and the publication of reports and presentations bearing the brand of a prestigious and renowned institution as GWU and its Program on Extremism, of which Dr. Vidino was the director.

18. Dr. Vidino had several meetings with other members of the enterprise – including but not limited to a $1,000 dinner at the Beau Rivage Hotel in Geneva with Mr. Brero – and engaged in several and mostly encrypted communications with them. On January 24, 2018, Dr. Vidino signed a contract with Alp to provide "[i]nteresting leads/rumours…regarding the subject of investigation organisations/individuals/funding in Europe" and a "[l]ist of alleged members of

the first tier organisations in European countries." Interestingly, the signature line of said agreement signed by Dr. Vidino listed GWU as a signatory of the agreement – "Lorenzo Vidino/G.W. University." A screenshot of the referenced portion of said contract including Dr. Vidino's "mandate," a reference to the agreed-upon compensation, and the executed signature lines is annexed hereto as **EXHIBIT D**.

19. After holding a position as a Class of 1955 Distinguished Visiting Professor of International Studies at Williams College between 2021 and 2024 and as a non-resident Researcher at Georgetown University's The Bridge Initiative, I am currently the Assistant Teaching Professor of International Relations at William and Mary in Williamsburg, VA.

20. My credentials, including over 150 authored or co-authored books and academic articles, reflect my distinguished career in combating Islamophobia and promoting understanding and inclusion. I secured the position at Williams College position a year prior to Operation Luxor, intending to start in July 2020, but delayed due to the global pandemic. However, the Defendants' actions caused additional visa-related delays, ultimately preventing me from beginning my role until after the semester had started in September 2021, resulting in significant professional and financial setbacks.

21. I was previously a Senior Researcher at the University of Salzburg from 2014 to 2021. I earned my Ph.D. from the University of Vienna, Austria, and have served as a visiting scholar at prominent institutions such as Columbia University and the University of California, Berkeley. Despite earning my habilitation, a prestigious qualification in European academia, my contract at the University of Salzburg was not renewed due to political pressure and negative publicity in the press stemming from the Defendants' smear campaign. The Ministry of Education as well as political parties put pressure on the public school. This decision, coupled with the phone-

tapping and surveillance activities associated with Operation Luxor that completely violated my privacy and personal sphere, forced me to leave Austria and disrupted my once-stable academic career.

22. My scholarly work includes founding and editing the *Islamophobia Studies Yearbook* and co-editing the *European Islamophobia Report*. I have authored over 150 books and academic articles, including my latest book *Politicizing Islam in Austria: The Far-Right Impact in the Twenty-First Century* with Rutgers University Press (2024).

23. My professional and personal life has been devastated by the Defendants' malicious enterprise, which aimed to destroy my reputation, career, and livelihood. Indeed, I have been the victim of such coordinated enterprise that operated with the intent to destroy my reputation and career. This enterprise involved creating and disseminating false narratives, falsely associating me with extremist groups such as the Muslim Brotherhood, and targeting me through smear campaigns orchestrated by Alp, Dr. Vidino, GWU, and the other Defendants, under the guidance and instructions of the UAE. Critically, such smear campaigns led to invasive surveillance, including phone tapping and shadowing, and general loss of privacy for me and my family.

24. In May 2017, Dr. Vidino and his employee Mokhtar Awad, a Research Fellow in the Program on Extremism at George Washington University, met with the UAE ambassador to the US, Yousef Al-Otaiba, together with the UAE Minister of Foreign Affairs, Abdullah Bin Zayed in his residency to discuss "a paper on empowering the moderate voice of Islam in the US in order to balance and eventually defeat the voices of Islamism," which Mokhtar and Dr. Vidino had authored for ambassador Al-Otaiba, as a leaked email conversation revealed.[6]

---

[6] Middle East Monitor, "EXCLUSIVE: UAE works to 'defeat voices of Islamism' in the West, reveal leaked emails," *MEMO*, Nov 9, 2017, https://www.middleeastmonitor.com/20171109-exclusive-uae-works-to-defeat-voices-of-islamism-in-the-west-reveal-leaked-emails/.

8

25. In 2017, the Program on Extremism at George Washington University published a report authored by Dr. Vidino, titled *The Muslim Brotherhood in Austria*, a copy of which is annexed hereto as **EXHIBIT E**. To my surprise and dismay, I was included in Dr. Vidino's report, which – among other allegations – mentioned me as a "prominent Islamophobia expert at the University of Salzburg," only to then argue that "Islamophobia has … become a useful political weapon in the Western Brothers' quiver" and: "The use of the Islamophobia weapon has unquestionably silenced many critics of the New Brothers and led many policymakers to engage them out of fear of being tarnished as a racist or Islamophobe. *See*, **EXHIBIT E** at pp. 34, 47." This report was later cited as a foundational ground for conducting Operation Luxor, the largest peacetime raid in Austrian history, targeting Austrian Muslims.

26. Thereafter, Alp, in collaboration with Dr. Vidino and under the influence of the UAE, fabricated baseless accusations against me. These accusations included unfounded claims of my involvement with extremist groups and were disseminated through reports, media channels, and professional circles.

27. Alp employed deliberate methods such as creating fake Wikipedia entries, hiring journalists to fabricate and disseminate false articles, and using search engine optimization to amplify their misleading and fraudulent content. These actions were aimed to ensure that damaging misinformation about me remained prominent in American search engine results, thereby causing permanent reputational harm and undermining my ability to engage professionally.

28. Operation Luxor, conducted on December 9, 2020, involved over 930 officers and raids on 70 homes, including mine. Alp was informed about the secret police raid and communicated the "more aggressive [handling] in the coming months with the local MB" on

August 24, 2024 – anonymously and via encrypted communications – to its contact in the UAE.[7] My home was ransacked, personal belongings were damaged or destroyed, and my bank accounts and assets were frozen, resulting in severe financial hardship. The raid caused immediate damage to my home's entrance door, windows, and alarm system, requiring costly repairs. The emotional toll on my wife and three young children, who witnessed the invasion, was profound, with symptoms consistent with PTSD. No arrests or convictions followed the raids, underscoring the baseless nature of the allegations against me.

29. Following the Austrian Appellate Court's ruling that the raid was unlawful for nine individuals who had appealed, I promptly pleaded for a halt of the investigations. However, the Regional Court (first instance) decided to proceed with the investigations, citing, among other reasons, that "activities in the preparation of the so-called Islamophobia Report and his activity with the Bridge Initiative at Georgetown University is intended to disseminate the fighting term 'Islamophobia' with the goal of preventing any critical engagement with Islam as a religion . . . in order to establish an Islamic state . . . ." Notably, this reasoning mirrors the logic advanced by Dr. Vidino in his report on the Muslim Brotherhood in Austria.

30. The dissemination of misleading information and false accusations severely damaged my reputation, leading to canceled speaking engagements, withdrawn job opportunities, and exclusion from academic forums. For example, I was disinvited from teaching in the Master's Program on Migration Management organized by the University of Salzburg and the Austrian Integration Fund, a state institution that had paid Dr. Vidino 80,000 Euros for his Muslim Brotherhood report. The disinvitation was communicated through email on October 30, 2017,

---

[7] Stefan Melchiar and Anna Thalhammer, "Inside the United Arab Emirate's spy campaign in Europe," *Profil*, 19 September, 2023, https://www.profil.at/investigativ/inside-the-united-arab-emirates-spy-campaign-in-europe/402598541.

shortly after the publication of the report, with the host citing pressure from the Integration Fund. Email correspondence including the original invitation to teach in the Master's Program and the subsequent disinvitation is annexed hereto as **EXHIBIT F**.

31. In another instance, I was disinvited from contributing to the "European State of Hate Report," a publication by the Amadeu Antonio Foundation, *Hope Not Hate*, and the Swedish foundation EXPO. The organizers emailed me in 2021, stating, "While we pass no judgment on your guilt or innocence in this matter, we have collectively decided to remove your contribution from the report. Our concern is that your inclusion could lead to a controversy that overshadows the report and undermines a year of work." The referenced email correspondence including the disinvitation is annexed hereto as **EXHIBIT G**. This disinvitation followed the Operation Luxor raid and was directly tied to the allegations propagated by the Defendants' smear campaign.

32. I further received several invitations to international academic conferences and events, including an invitation from the Brussels-based European Network on Religion and Belief to participate in the European Action Day Against Islamophobia on September 21, 2022, and an invitation to the Doha campus of Georgetown University to participate in an academic workshop on Global Histories and Practices of Islamophobia at the Center for International and Regional Studies on October 8 and 9, 2022. However, since I was not able to travel due to my affected visa status at that time, I was not able to participate in these events in person. This meant a loss of ability to network with civil society actors and policy makers in real-life, which directly and negatively impacted my professional and academic standing.

33. The campaign also disrupted my long-standing relationship with the renowned D.C.-based Brookings Institution, where I had collaborated on a multi-year project on Islamophobia and the far-right. After the Operation Luxor raid, Andreas Mölzer, a far-right

11

Austrian politician I had successfully engaged for the project, withdrew his participation, citing new circumstances. Email correspondence including Andreas Mölzer's acceptance of my invitation to participate in the project and his subsequent withdrawal is annexed hereto as **<u>EXHIBIT H</u>**. This loss undermined my ability to act as a broker across social and political milieus, a crucial part of my academic work, and to preserve my political connections, including with adversaries, who no longer view me in a favorable light.

34. Most recently, following the publication of my book *Politicizing Islam in Austria: The Far-Right Impact in the Twenty-First Century* in April 2024, I reached out to 22 local colleges in Massachusetts, including German Studies and Political Science departments, to organize book talks. Despite the quality of my work and its relevance, only one institution, Brandeis University, expressed interest in hosting a talk, with the rest either not responding or explicitly declining. The loss of potential compensation from these talks, typically ranging from $500 to $1,000 per event, along with the missed opportunity to expand my academic network, further reflects the financial, professional, and reputational harm I have suffered.

35. Additionally, in July 2024, I was invited to present a memoir on the Operation Luxor in the Austrian Parliament by the Green Party. However, due to significant political pressure and objections within the party itself, the invitation was canceled, despite the fact that the Operation Luxor investigation had been ruled unlawful and I had been exonerated. This episode underscores the enduring stigma attached to my name as a result of the Defendants' actions.

36. Furthermore, my contract at the University of Salzburg was not renewed, due to political pressure and negative publicity in the press stemming from the events alleged herein and in the Complaint. Although I eventually secured a temporary visiting position at Williams College,

this was not a reflection of my professional standing but rather an effort to rebuild after being wrongfully discredited.

37. Last but not least, since 2021, far-right and center-right Members of the European Parliament ("MEPs") have leveraged Dr. Vidino's smear campaign to attack my reputation and professional standing. This is evident in formal parliamentary questions raised in 2021[8] and again in 2024.[9] Prior to that, I was assigned with two research projects, both related to the study of and the advocacy against Islamophobia, which were both funded with a total of 700,000 Euros (730,000 USD). These attacks culminated in an official resolution by the European Parliament that led to the cessation of funding for my projects in April 2021, where MEPs were able to hide behind their political immunity.[10] This loss of funding, a direct result of the Defendants' actions and the political targeting that directly followed, severely impacted my ability to conduct research and secure academic projects.

38. Nonetheless, I suffered damages that go beyond major professional setbacks. Personally, I suffered immense emotional and psychological distress. The smear campaign left me feeling isolated and stigmatized within both my professional community and society at large. I experienced anxiety, depression, and symptoms consistent with post-traumatic stress disorder (PTSD) due to the raids and the continued defamation.

39. My family also suffered greatly from these events. The invasive raid at our home caused significant emotional distress, particularly for my children, who were deeply affected by the sight of police officers ransacking their living space. This created a sense of insecurity and fear that continues to impact on them, long after the raid.

---

[8] https://www.europarl.europa.eu/doceo/document/E-9-2021-002519_EN.html.
[9] https://www.europarl.europa.eu/doceo/document/E-9-2024-001200_EN.html.
[10] https://eur-lex.europa.eu/legal-content/EN/TXT/PDF/?uri=CELEX:52021BP1543.

13

40. Financially, the freezing of my bank accounts caused substantial hardship, preventing me from meeting basic financial obligations, including interest rates on mortgage. This compounded the financial strain of legal fees incurred to defend myself against baseless allegations and investigations within the context of Operation Luxor.

41. Furthermore, the prolonged visa delays resulting from the Operation Luxor allegations further exacerbated this strain, significantly disrupting my ability to transition to my position in the United States, which was secured prior to the Operation Luxor. While previous U.S. visas were issued to me in approximately two weeks, the process to secure a visa for my role as a Visiting Professor of International Studies at Williams College took approximately six months. The delay – directly associated with Defendant's unlawful conduct and its immediate consequences – left me in a state of uncertainty and compelled me to accept a position in London, where I began relocating. However, just two days after signing a lease agreement in London, I received my U.S. visa. Despite the logistical challenges, I ultimately decided to accept the offer from Williams College. The disruption and associated financial and emotional costs, including the expenses of relocating and the stress related to the uncertainty of my move to the U.S., have been overwhelming.

42. After relocating to the United States, I applied for a Green Card in September 2022. Although I was granted EB-1A status, the process of securing my Green Card has faced significant delays. While the EB-1A visa was approved within just two weeks, the remainder of the process has been stalled for over two years. Evidencing the proximate link between Defendants' actions and the complications I suffered, the final document requested by the American immigration authorities was a translation of the Austrian Appellate Court's decision which fully exonerated me of all allegations stemming from Operation Luxor. This legal ordeal, triggered by the Defendant's

smear campaign, has not only delayed my permanent residency but also caused ongoing uncertainty and disruption in both my professional and personal life. The repeated need to update my documentation, the uncertainty surrounding travel, and the resulting inability to accept several international invitations have further compounded these challenges.

43.     The reputational damage extended to my professional community, where colleagues and collaborators distanced themselves from me due to the false narratives. Invitations to keynote conferences and academic collaborations were rescinded, further isolating me from opportunities to engage and contribute to my field. In the U.S., this harm included the inability to secure a full professorship after my temporary position at Williams College ended in 2024, forcing me to accept a lower-paying assistant role at William & Mary College, where I currently earn nearly half my prior salary.

44.     Part of Defendants' coordinated campaign, Dr. Vidino's allegations, falsely linking me to the Muslim Brotherhood and leading directly to the Operation Luxor investigation, also had a profound impact on my ability to travel to certain countries. This situation was exacerbated when Austrian authorities shared information with other international security forces, extending the consequences of these baseless accusations beyond Austria's borders. The Muslim Brotherhood is designated as a terrorist organization in Egypt, Saudi Arabia, the United Arab Emirates, Bahrain, and Libya. As a result, being investigated for alleged terrorism and supposed membership in the Muslim Brotherhood has put my life in danger on every occasion I am visiting those countries. Notably, one individual who traveled to Egypt and was investigated in connection with Operation Luxor was subsequently detained by Egyptian security forces and has since disappeared, with media reporting on the unfortunate occurrence and the related investigations. In fact, Operation Luxor was shared on Egyptian television since its beginning. Interestingly, Mouhanad Khorchide,

15

who was interviewed by the Egyptian media covering Operation Luxor, is the Director of the Documentation Center Political Islam's academic advisory board, a state institution in Austria Dr. Vidino is a high-profile member of. This deeply troubling incident highlights the grave risks involved.

45.     My inability to travel to Egypt, my father's birthplace, has prevented me from visiting my paternal relatives, causing significant emotional distress. Furthermore, the inability to travel to Saudi Arabia hampers me from visiting the holy sites of Islam, Mecca and Medina, which is also a significant source of spiritual and emotional pain. The stress, anxiety, and disruption to my personal, spiritual, and familial life are immeasurable, and compensation for these damages is warranted.

46.     Moreover, for an extended period while I was residing in the U.S., I was subjected to additional security checks on many domestic flights I took within the country, a deeply humiliating experience that my family had to witness. The intrusion into my privacy, the significant degree of harassment, and the professional and personal distress it caused, especially when traveling with my children and wife, were substantial.

47.     This coordinated campaign was driven by the Defendants' agenda to suppress voices critical of Islamophobia and to promote narratives aligning with the UAE's geopolitical interests. Dr. Vidino's role, under the guise of academic integrity, was central to amplifying these false narratives and lending them unwarranted credibility. The financial compensation he received corroborates his active participation in this enterprise.

48.     Notably, Dr. Vidino's collaboration with Alp Services extended beyond the report. He received financial compensation for his work, including payments exceeding 13,000 Euros, and acted as an intermediary to funnel misleading and fraudulent content into academic and

governmental channels. These actions were part of a broader scheme to discredit individuals like me under the guidance of the UAE, and cause subsequent harm to careers and reputations.

49. The raid itself caused immediate and significant harm. My home's entrance door, windows, and alarm system were destroyed during the operation. The invasive nature of the raid inflicted lasting psychological trauma, affecting both me and my family. The financial burden of these damages added to the hardship caused by the Defendants' actions.

50. The damage caused by this enterprise was not limited to me alone. It extended to my family, who also suffered from the reputational harm and emotional trauma caused by the Defendants' actions. Notably, my wife and children were stigmatized and subjected to unwarranted scrutiny, further compounding their distress.

51. Notably, I am not the only victim of Defendants' coordinated efforts. For instance, another individual, Hazim Nada ("Mr. Nada"), and his company Lord Energy SA ("Lord Energy"), were similarly targeted by the Defendants. In 2021, Mr. Nada learned through hacked documents that Alp Services had orchestrated a campaign of false narratives against him, linking him and Lord Energy to terrorism. These discrediting and smearing tactics led to the financial collapse of Lord Energy in 2019, showcasing the destructive reach of the Defendants' enterprise.[11]

52. The documents reviewed by Mr. Nada revealed that between 2017 and 2021, the Defendants targeted over 50 individuals and entities, employing strategies similar to those used against me. These actions included media attacks, dissemination of false claims, and influencing

---

[11] Mr. Nada and Lord Energy filed an action in this District against the same Defendants, among others, asserting claims that are substantially identical to those raised in the instant matter, among others, and grounded in the same or comparable factual allegations. For further reference, the case number of Mr. Nada and Lord Energy's pending lawsuit is *1:24-cv-00206-ABJ*.

decision-makers such as banks and compliance databases, all of which exemplify the Defendants' systemic pattern of unlawful conduct.[12]

53. Based on the allegations set forth in my Complaint, the accompanying declaration of Aaron Rock-Singer in support of my opposition to Defendants' motions to dismiss this action, and the contents of my declaration herein, I contend that Defendants, and each one of them, are part of an enterprise which concocted and conspired to put in play a pattern of racketeering activity prohibited by the Racketeer Influenced and Corrupt Organizations Act – including wire fraud, mail fraud, and bank fraud – which they did execute, proximately causing harm to my business and property, inter alia. Moreover, I further contend that Defendants' actions arise to actionable fraudulent conduct, unfair or deceptive trade practices, tortious interference with existing and prospective business relationships, and tortious conduct in general.

54. In light of the above, I seek redress for the extensive professional, reputational, and financial damages, along with related emotional and psychological ailments, that I have suffered as a direct and proximate result of the Defendants' wrongful actions. My intent in pursuing this matter is to hold the Defendants accountable and to seek justice for myself and others similarly targeted.

---

[12] Parallel and related instances of censorship carried out by Defendants have been publicly shared and discussed, either on social media or other media platforms. An example involving Dr. Vidino, GWU, and the Program on Extremism is annexed hereto as **EXHIBIT I**.

I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct.

Executed on January 10, 2025.

_____
Farid Hafez